**INITIAL VERSION**

ORAL ARGUMENT NOT YET SCHEDULED

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

No. 15-1063 (and consolidated cases)

———————————

UNITED STATES TELECOM ASSOCIATION, *et al.*,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents.*

———————————

INDEPENDENT TELEPHONE & TELECOMMUNICATIONS ALLIANCE, *et al.*,

*Intervenors for Petitioners*,

AD HOC TELECOMMUNICATIONS USERS COMMITTEE, *et al.*,

*Intervenors for Respondents.*

———————————

On Petitions for Review of an Order
of the Federal Communications Commission

———————————

**JOINT BRIEF FOR PETITIONERS USTELECOM, NCTA, CTIA,
ACA, WISPA, AT&T, AND CENTURYLINK**

———————————

MIGUEL A. ESTRADA
THEODORE B. OLSON
JONATHAN C. BOND
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
*Counsel for NCTA*

MICHAEL K. KELLOGG
SCOTT H. ANGSTREICH
KELLOGG, HUBER, HANSEN, TODD,
   EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
*Counsel for USTelecom, CTIA, and
AT&T*

July 30, 2015

*(additional counsel listed on inside cover)*

MATTHEW A. BRILL
MATTHEW T. MURCHISON
JONATHAN Y. ELLIS
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 637-2200
*Counsel for NCTA*

HELGI C. WALKER
MICHAEL R. HUSTON
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 887-3599
*Counsel for CTIA*

KATHLEEN M. SULLIVAN
QUINN, EMANUEL, URQUHART &
    SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

JONATHAN BANKS
UNITED STATES TELECOM ASS'N
607 14th Street, N.W., Suite 400
Washington, D.C. 20005
(202) 326-7272
*Counsel for USTelecom*

PETER D. KEISLER
JAMES P. YOUNG
C. FREDERICK BECKNER III
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

WAYNE WATTS
DAVID L. LAWSON
GARY L. PHILLIPS
CHRISTOPHER M. HEIMANN
AT&T SERVICES, INC.
1120 20th Street, N.W., Suite 1000
Washington, D.C. 20036
(202) 457-3055
*Counsel for AT&T*

STEPHEN E. CORAN
LERMAN SENTER PLLC
2000 K Street, N.W., Suite 600
Washington, D.C. 20006
(202) 429-8970
*Counsel for WISPA*

JEFFREY A. LAMKEN
MOLOLAMKEN LLP
The Watergate, Suite 660
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000

BARBARA S. ESBIN
CINNAMON MUELLER
1875 Eye Street, N.W., Suite 700
Washington, D.C. 20006

ROSS J. LIEBERMAN
AMERICAN CABLE ASSOCIATION
2415 39th Place, N.W.
Washington, D.C. 20007
(202) 494-5661
*Counsel for ACA*

DAVID H. SOLOMON
RUSSELL P. HANSER
WILKINSON BARKER KNAUER, LLP
2300 N Street, N.W., Suite 700
Washington, D.C. 20037
(202) 783-4141

TIMOTHY M. BOUCHER
CENTURYLINK
1099 New York Avenue, N.W.
Suite 250
Washington, D.C. 20001
(303) 992-5751
*Counsel for CenturyLink*

RICK C. CHESSEN
NEAL M. GOLDBERG
MICHAEL S. SCHOOLER
NATIONAL CABLE & TELECOMMS.
    ASS'N
25 Massachusetts Avenue, N.W. Suite 100
Washington, D.C. 20001
(202) 222-2445
*Counsel for NCTA*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), petitioners United States Telecom Association ("USTelecom"), National Cable & Telecommunications Association ("NCTA"), CTIA – The Wireless Association® ("CTIA"), American Cable Association ("ACA"), Wireless Internet Service Providers Association ("WISPA"), AT&T Inc. ("AT&T"), and CenturyLink certify as follows:

**A.    Parties and Amici**

**1.**    Hundreds of thousands of companies, organizations, and individuals participated in some manner in the rulemaking proceeding (GN Docket No. 14-28) before the Federal Communications Commission ("FCC").  The FCC did not include in the order under review a listing of the participants before the agency.  Below is a reasonably complete, but not comprehensive, list of companies and organizations that filed comments or reply comments during the rulemaking, compiled using counsel's best efforts and the FCC's Electronic Comment Filing System:

> 4G Americas
> 18MillionRising.org
> 21st Century Fox, Inc.
> AARP
> Access
> Access Sonoma Broadband
> Ad Hoc Telecommunications Users Committee
> ADT Corporation
> ADTRAN, Inc.
> Advanced Communications Law & Policy Institute at New York Law School

AHCIET
Akamai Technologies, Inc.
Alamo Broadband
Alarm Industry Communications Committee
Alaska Rural Coalition
Alcatel–Lucent
American Association for Justice
American Association of Law Libraries et al.
American Association of People with Disabilities
American Association of State Colleges and Universities et al.
American Cable Association
American Civil Liberties Union
American Consumer Institute
American Library Association
American Public Media Group
American Society of Journalists and Authors
American Sustainable Business Council
Americans for Tax Reform and Digital Liberty
AOL Inc.
Arris Group, Inc.
Asian Americans Advancing Justice | AAJC
Association for Information Systems
Association of Free Community Papers
AT&T Services, Inc.
Automotive Parts & Services Association
Benton Foundation
Black Women's Roundtable
Blackfoot Telephone Cooperative
Boulder Regional Emergency Telephone Service Authority
Bright House Networks, LLC
Broadband Alliance of Mendocino
Broadband Institute of California
BT Americas
Cablevision
California Manufacturers & Technology Association
California Public Utilities Commission
California Telehealth Network
CALinnovates
CBS Corp.
CCIA

Center for Boundless Innovation in Technology
Center for Democracy & Technology
Center for Individual Freedom
Center for Media Justice et al.
CenturyLink
Cequel Communications, LLC d/b/a Suddenlink Communications
Charter Communications, Inc.
Chatham Business Association
Chicagoland Black Chamber of Commerce
Cisco Systems, Inc.
Citizens Against Government Waste
Citrus Council of the National Kidney Foundation of Florida
City of Boston, Massachusetts
City of New York, New York
City of Los Angeles, California
City of Philadelphia, Pennsylvania
City of Portland, Oregon
City of San Francisco, California
Coalition of Arts and Cultural Organizations
Codecademy
CodeCombat
Cogent Communications Group, Inc.
ColorOfChange.org
Comcast Corporation
Common Cause
Communications Workers of America
Competitive Carriers Association
Competitive Enterprise Institute
COMPTEL
Computer & Communications Industry Ass'n (CCIA)
Consumer Electronics Association
Consumer Federation of America
Consumer Watchdog
Consumers Union
Cox Communications, Inc.
Creative Commons – USA
Croatan Institute
CTIA – The Wireless Association®
Daily Kos
Data Foundry

Digital Policy Institute
Distributed Computing Industry Association (DCIA)
Dwolla Corp.
eBay Inc.
Elder Care Advocacy of Florida
Electronic Frontier Foundation
Embedly
Engine Advocacy
Entertainment Software Association
Ericsson
Etsy, Inc.
European Digital Rights
European Telecommunications Network Operators' Association
Fandor
Fiber to the Home Council Americas
Financial Services Roundtable
Floor64 / Techdirt
Florida State Hispanic Chamber of Commerce
Free Press
Free State Foundation
Free-Market Advocates Opposed to Internet Regulation
Frontier Communications
Future of Music Coalition
General Assembly
Global Healthy Living Foundation
Golden Frog
Google Inc.
Greenlining Institute
GSM Association
GVNW Consulting, Inc.
Hepatitis Education Awareness and Liver Support (H.E.A.L.S.) of the South
Heyzap
Hippo Smashblast
Home Telecom
i2Coalition
iClick2Media
Independent Colleges & Universities of Texas, Inc.
Independent Film & Television Alliance
Independent Filmmaker Organizations
Information Technology Industry Council

iv

Institute for Local Self-Reliance
Institute for Policy Integrity at New York University School of Law
Intel Corp.
Interisle Consulting Group LLC
International Center for Law & Economics
International Documentary Association et al.
Internet Association
Internet Business Council
Internet Business Council for Africa
Internet Innovation Alliance (IIA)
ITIF
ITTA – The Voice of Midsize Communications Companies
Kentucky Public Library Association Intellectual Freedom Committee
Kickstarter, Inc.
Level 3 Communications, LLC
Liberty Global
MadHat Media, Inc.
Massachusetts Department of Telecommunications and Cable
Media Action Grassroots Network
Media Alliance
MediaFreedom.org
Meetup, Inc.
Mercatus Center at George Mason University
Microsoft Corporation
Minority Media & Telecom Council
MIT Media Lab
MLB Advanced Media, L.P.
Mobile Future
Motion Picture Association of America
Mozilla
NAACP
National Arts and Cultural Organizations
National Association of Black Journalists
National Association of Consumer Advocates
National Association of Independent Colleges and Universities
National Association of Manufacturers (NAM)
National Association of Realtors
National Association of Regulatory Utility Commissioners
National Association of State Utility Consumer Advocates
National Black Chamber of Commerce et al.

National Black Church Initiative
National Cable & Telecommunications Association
National Congress of American Indians
National Grange
National Minority Organizations
National Public Radio, Inc.
National Religious Broadcasters
National Venture Capital Association
NetAccess Futures
Netflix, Inc.
New America Foundation
New Media Rights
New Networks
Newspaper Association of America
Nokia Solutions and Networks US LLC
Northeast Ohio Coalition for the Homeless
NTCA – The Rural Broadband Association
OCHIN
OneCommunity
Online News Association
Online Publishers Association
Open MIC et al.
OpenCurriculum
Opera Software ASA
Orange County Business Council
Orange County Taxpayers Association
Peer 2 Peer University & The School of Open
Pennsylvania Public Utility Commission
Phoenix Center
Popular Resistance
Presente.Org
Private Citizen
Public Citizen
Public Knowledge
QUALCOMM Incorporated
RCN Telecom
reddit, Inc.
Rewheel
Rivada Networks
Roku, Inc.

Rural Broadband Policy Group
Sandvine Incorporated
Scripps Networks Interactive, Inc.
Security Industry Association
Sickle Cell Disease Association
Small Business & Entrepreneurship Council
Smithwick & Belendiuk, P.C.
Southern Company Services, Inc.
Sprint Corporation
State Educational Technology Directors Association (SETDA)
State Library of Kansas
State of Illinois
State of New York
STEM4US!
Stop the Cap!
Syntonic Wireless, Inc.
Taxpayers Protection Alliance
TechAmerica
TechFreedom
Technology Policy Institute
Telecom Italia
Telecommunications for the Deaf and Hard of Hearing, Inc. (TDI), et al.
Telecommunications Industry Association
TELEFONICA
ThoughtWorks
TimeBank USA
Time Warner Cable Inc.
Time Warner Inc.
T-Mobile USA, Inc.
Tompkins County, New York
TouchCast
Tumblr, Inc.
U.S. Cellular Corp.
U.S. Chamber of Commerce
U.S. Public Interest Research Group
United Church of Christ et al.
United Spinal Association
United States Conference of Mayors
United States Distance Learning Association
United States Hispanic Chamber of Commerce

United States Telecom Association
Utilities Telecom Council
Verizon
Vermont Office of the Attorney General
Vermont Public Service Board
Viacom Inc.
Vimeo, LLC
Voices for Internet Freedom et al.
Vonage Holdings Corp.
Walt Disney Co.
WATCH
Williamson & Williams, PLLC
Wireless Internet Service Providers Association
Wisconsin Dept. of Public Instruction
Women, Action & the Media et al.
Women's Media Center
Writers Guild of America, East
Writers Guild of America, West, Inc.
WTA – Advocates for Rural Broadband
Y Combinator

   **2.**     Petitioners in these consolidated cases are USTelecom (Nos. 15-1063

& 15-1086); Alamo Broadband Inc. (Nos. 15-1078 & 15-1164); NCTA (No. 15-

1090); CTIA (No. 15-1091); AT&T (No. 15-1092); ACA (No. 15-1095);

CenturyLink (No. 15-1099); WISPA (No. 15-1117); Daniel Berninger (No. 15-

1128); and Full Service Network, TruConnect Mobile, Sage Telecommunications

LLC, and Telescape Communications, Inc. (No. 15-1151).

   Respondents in these consolidated cases are the FCC and the United States

of America.

   Intervenors in these consolidated cases are ACA (in No. 15-1151 only);

Ad Hoc Telecommunications Users Committee; Akamai Technologies, Inc.;

AT&T (in No. 15-1151 only); Scott Banister; Wendell Brown; CARI.net; Center for Democracy & Technology; CenturyLink (in No. 15-1151 only); Cogent Communications, Inc.; ColorOfChange.org; COMPTEL; Credo Mobile, Inc.; CTIA (in No. 15-1151 only); DISH Network Corporation; Demand Progress; Etsy, Inc.; Fight for the Future, Inc.; David Frankel; Free Press; Charles Giancarlo; Kickstarter, Inc.; Independent Telephone & Telecommunications Alliance; Level 3 Communications, LLC; Meetup, Inc.; National Association of Regulatory Utility Commissioners; National Association of State Utility Consumer Advocates; Netflix, Inc.; New America's Open Technology Institute; NCTA (in No. 15-1151 only); Public Knowledge; Jeff Pulver; TechFreedom; Tumblr, Inc.; Union Square Ventures, LLC; USTelecom (in No. 15-1151 only); Vimeo, Inc.; Vonage Holdings Corporation; and WISPA (in No. 15-1151 only).

## B.    Rulings Under Review

The ruling under review is the FCC's Report and Order on Remand, Declaratory Ruling, and Order, *Protecting and Promoting the Open Internet*, 30 FCC Rcd 5601 (2015) ("*Order*") (JA___-__).

## C.    Related Cases

The *Order* has not previously been the subject of a petition for review by this Court or any other court.  All petitions for review of the *Order* have been

consolidated in this Court, and petitioners are unaware of any other related cases

pending before this Court or any other court.

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, petitioners ACA, AT&T, CenturyLink, CTIA, NCTA, USTelecom, and WISPA submit the following corporate disclosure statements:

**ACA:** ACA has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock, pays 10 percent or more of its dues, or possesses or exercises 10 percent or more of the voting control of ACA.

As relevant to this litigation, ACA is a trade association of small and medium-sized cable companies, most of which provide broadband Internet access service. ACA is principally engaged in representing the interests of its members before Congress and regulatory agencies such as the Federal Communications Commission.

**AT&T:** AT&T is a publicly traded corporation that, through its wholly owned affiliates, is principally engaged in the business of providing communications services and products to the general public. AT&T has no parent company, and no publicly held company owns 10 percent or more of its stock.

**CenturyLink:** The CenturyLink companies participating in this petition for review are CenturyLink, Inc. (a publicly traded company) and its wholly owned subsidiaries. CenturyLink, Inc. owns subsidiaries that provide broadband Internet access and other communications services (*e.g.*, voice, broadband, and video) to

consumers and businesses.  Among the subsidiaries owned by CenturyLink, Inc. are regulated incumbent local exchange carriers.  CenturyLink's local exchange carriers provide local exchange telecommunications and other communications services in 37 states, including broadband Internet access.  Another subsidiary is CenturyLink Communications, LLC, which provides intrastate and interstate communications services, both domestically and internationally, including broadband Internet access.  CenturyLink, Inc. has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

**CTIA:**  CTIA (formerly known as the Cellular Telecommunications & Internet Association) is a Section 501(c)(6) not-for-profit corporation organized under the laws of the District of Columbia and represents the wireless communications industry.  Members of CTIA include service providers, manufacturers, wireless data and Internet companies, and other industry participants.  CTIA has not issued any shares or debt securities to the public, and CTIA has no parent companies, subsidiaries, or affiliates that have issued any shares or debt securities to the public.

**NCTA:**  NCTA is the principal trade association of the cable television industry in the United States.  Its members include owners and operators of cable television systems serving over 80 percent of the nation's cable television customers, as well as more than 200 cable program networks.  NCTA's members

also include equipment suppliers and others interested in or affiliated with the cable television industry.  NCTA has no parent companies, subsidiaries, or affiliates whose listing is required by Rule 26.1.

**USTelecom:**  USTelecom is a non-profit association of service providers and suppliers for the telecom industry.  Its members provide broadband services, including retail broadband Internet access and interconnection services, to millions of consumers and businesses across the country.  USTelecom has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

**WISPA:**  WISPA is a non-profit association that represents the interests of providers of fixed wireless broadband Internet access services.  WISPA has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock, pays 10 percent or more of its dues, or possesses or exercises 10 percent of the voting control of WISPA.  There is no publicly held member of WISPA whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims WISPA is pursuing in a representative capacity.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENTS .................................................... xi

TABLE OF AUTHORITIES ................................................................................. xvii

GLOSSARY ........................................................................................................... xxvii

STATEMENT OF JURISDICTION .................................................................... 1

STATEMENT OF THE ISSUES ......................................................................... 1

STATUTES AND REGULATIONS ..................................................................... 1

PRELIMINARY STATEMENT .......................................................................... 2

STATEMENT OF THE CASE ............................................................................. 6

      A.     Regulatory Background ........................................................... 6

            1.     Pre-1996 Act Regulation ..................................... 6

            2.     The 1996 Act ........................................................ 11

      B.     The FCC's Prior Attempts at Regulation ........................... 16

      C.     This Proceeding ...................................................................... 17

            1.     The *NPRM* .......................................................... 17

            2.     The *Order* ........................................................... 19

STANDARD OF REVIEW ................................................................................... 23

SUMMARY OF ARGUMENT ............................................................................ 24

STATEMENT OF STANDING ........................................................................... 29

ARGUMENT .......................................................................................................... 30

xiv

I.   THE FCC'S RECLASSIFICATION OF INTERNET ACCESS AS
     A TELECOMMUNICATIONS SERVICE IS UNLAWFUL .....................30

     A.   Reclassification Contravenes the Communications Act ....................30

     B.   Reclassification Is Arbitrary and Capricious ......................................46

          1.   The FCC Failed To Identify Any Change That Would
               Justify Rejecting Its Prior Factual Findings.............................47

          2.   The FCC Failed To Account for Serious Reliance
               Interests ....................................................................................50

II.  THE FCC'S RECLASSIFICATION OF MOBILE BROADBAND
     INTERNET ACCESS AS A COMMON-CARRIER SERVICE IS
     DOUBLY UNLAWFUL ..............................................................................56

     A.   Mobile Broadband Is a Private Mobile Service Within the
          Meaning of § 332..................................................................................57

     B.   The FCC's Effort To Evade § 332 by Changing Underlying
          Regulations Is Unlawful.......................................................................59

          1.   The FCC's Redefinition of the Public Switched
               Network Is Impermissible........................................................59

          2.   The FCC's Rejection of Its Prior Understanding of
               "Interconnected Service" Is Impermissible .............................64

          3.   The FCC's Refusal To Apply Its Existing Test for
               Functional Equivalence Is Impermissible................................66

          4.   The FCC Identifies No Changes That Render Mobile
               Broadband a Commercial Mobile Service................................68

III. EVEN ASIDE FROM THE UNLAWFUL
     RECLASSIFICATIONS, THE *ORDER* MUST BE VACATED................72

     A.   Even If Broadband Were Not an Information Service, It Is
          Not Common Carriage ..........................................................................73

B.     Regulation of Internet Interconnection Under Title II
       Without Reclassifying That Service Violates *Verizon* ........................75

C.     The FCC's Internet Conduct Standard Is Unlawfully Vague ............79

D.     In Extending Title II to Small Providers, the FCC Violated
       the Regulatory Flexibility Act ............................................................81

IV.    THE FCC FAILED TO PROVIDE NOTICE ...............................................83

A.     The FCC Failed To Provide Notice of the *Order*'s
       Fundamental Approach and of the Basis and Objectives of
       Reclassification ...................................................................................84

B.     The FCC's Reclassification of Mobile Broadband Was Not a
       Logical Outgrowth of the *NPRM* .......................................................88

C.     The FCC Failed To Provide Notice About Important Aspects
       of the *Order* .......................................................................................92

CONCLUSION .........................................................................................................94

CIRCUIT RULE 32(a)(2) ATTESTATION

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

Page

## CASES

*ABC, Inc. v. FCC*, 643 F.2d 818 (D.C. Cir. 1980)......................................................6

*Ad Hoc Telecomms. Users Comm. v. FCC*, 680 F.2d 790
(D.C. Cir. 1982) ...........................................................................61

*Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692 (D.C. Cir. 2014) ........................23

*Aeronautical Repair Station Ass'n, Inc. v. FAA*, 494 F.3d 161
(D.C. Cir. 2007) ...................................................................81, 82

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014) ........................84

*Association of Private Sector Colls. & Univs. v. Duncan*,
681 F.3d 427 (D.C. Cir. 2012).................................................90 91

*Business Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011) ...............................52

\*   *Cellco P'ship v. FCC*, 700 F.3d 534 (D.C. Cir. 2012) ....................3, 26, 57, 71, 73

*CFTC v. Schor*, 478 U.S. 833 (1986).....................................................................62

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984)...................................................................41

*City of Chicago v. Environmental Def. Fund*, 511 U.S. 328 (1994) ................44, 60

*Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010) ........................................16

*Council for Urological Interests v. Burwell*, – F.3d –,
2015 WL 3634632 (D.C. Cir. June 12, 2015) ...............................81

*Council Tree Communications, Inc. v. FCC*, 619 F.3d 235
(3d Cir. 2010)...........................................................................86

Authorities principally relied upon are designated by an asterisk (\*).

xvii

*Daimler Trucks North Am. LLC v. EPA*, 737 F.3d 95
    (D.C. Cir. 2013) ...................................................................90

*Environmental Integrity Project v. EPA*, 425 F.3d 992
    (D.C. Cir. 2005) ...............................................................84, 86

*FCC v. Fox Television Stations, Inc.*:

    556 U.S. 502 (2009)..........................................................50, 51

\*    132 S. Ct. 2307 (2012).....................................................79, 81

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000).......................35

*Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991)............................................79

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ................................................81

*HBO, Inc. v. FCC*, 567 F.2d 9 (D.C. Cir. 1977)....................................83, 84, 87, 89

*Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246
    (D.C. Cir. 1994) ...............................................................89, 94

*Independent Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248
    (D.C. Cir. 1996) ...................................................................67

*International Union, United Mine Workers of Am. v. Mine Safety
    & Health Admin.*, 407 F.3d 1250 (D.C. Cir. 2005) .......................................86

*King v. Burwell*, 135 S. Ct. 2480 (2015)................................................................23

*McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337 (1991) .........................................61

*Michigan v. EPA*, 135 S. Ct. 2699 (2015) .........................................................51, 57

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)...........................................................................47, 51

\* *NARUC v. FCC*:

      525 F.2d 630 (D.C. Cir. 1976).........................................................73, 74, 77

      533 F.2d 601 (D.C. Cir. 1976).................................................................73

*National Black Media Coal. v. FCC*, 775 F.2d 342
(D.C. Cir. 1985) ..............................................................................71

\* *NCTA v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ...............3, 4, 13, 14, 15, 25
                                                    34, 39, 41, 42, 43
                                                    44, 45, 46, 48, 49

*Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1 (D.C. Cir. 2011) ...........................62

*Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145 (D.C. Cir. 2005) .............................67

\* *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015) ..............................26, 47

*Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011) ..........................87

*Public Util. Comm'n v. FCC*, 886 F.2d 1325 (D.C. Cir. 1989)..............................61

*Sekhar v. United States*, 133 S. Ct. 2720 (2013) .......................................34

*Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506
(D.C. Cir. 1983) .................................................................83, 87, 91

*Southwestern Bell Tel. Co. v. FCC*, 19 F.3d 1475 (D.C. Cir. 1994) ................74, 75

*Timpinaro v. SEC*, 2 F.3d 453 (D.C. Cir. 1993) ...............................79, 80

*United States v. AT&T Co.*, 552 F. Supp. 131 (D.D.C. 1982)..................................8

*United States v. Western Elec. Co.*, 673 F. Supp. 525
(D.D.C. 1987) ....................................................................9, 34

*Utility Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427 (2014).....................23, 63, 64

\* *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014)..........................4, 12, 18, 28, 34, 54
72, 73, 75, 78, 84

*WorldCom, Inc. v. FCC*, 246 F.3d 690 (D.C. Cir. 2001)........................................61

## STATUTES AND REGULATIONS

Communications Act of 1934, 47 U.S.C. § 151 *et seq.*:

\*        § 153(24)................................................................. 2, 11, 24, 30, 32, 37, 40

\*        § 153(50)................................................................................................11

\*        § 153(51)......................................................................................12, 24, 30

\*        § 153(53)..........................................................................................11, 40

         § 160.....................................................................................................20

         § 201................................................................................6, 21, 55, 72, 78

         § 201(b)..........................................................................................72, 77

         §§ 201-261...............................................................................................6

         § 202................................................................................6, 21, 55, 72, 78

         § 202(a).................................................................................................72

         § 206 ...............................................................................................6, 55

         § 207.................................................................................................6, 55

         § 208 ........................................................................................6, 55, 78, 82

         § 222.............................................................................................21, 55

         § 222(c)................................................................................................83

\*        § 230.............................................................................................24, 33

\*    § 230(a)(4) ......................................................................2

\*    § 230(b)(2) ..........................................................2, 12, 33

\*    § 230(f)(2) ....................................................2, 12, 24, 33

    § 259 ............................................................................62

\*    § 332................................ 9, 21, 56, 57, 60, 61, 62, 63, 68, 70, 91

\*    § 332(c) ......................................................................26

\*    § 332(c)(1)(A) ......................................................10, 58

\*    § 332(c)(2) ..................................................3, 10, 56, 58

\*    § 332(d) ................................................................60, 65

\*    § 332(d)(1) ............................................................10, 58

\*    § 332(d)(2) ............................................................10, 58

\*    § 332(d)(3) ......................................................10, 58, 66

    § 769(a)(11) ................................................................62

    § 1422(b)(1) ................................................................62

Telecommunications Act of 1996, Pub. L. No. 104-104,
    § 706, 110 Stat. 56, 153 (codified at 47 U.S.C.
    § 1302) ........................................ 16, 17, 54, 72, 73, 84

\*    5 U.S.C. § 604(a)(5) ......................................................82

\*    5 U.S.C. § 604(a)(6) ......................................................82

    5 U.S.C. § 706(2)(D) ......................................................84

    28 U.S.C. § 2342(1) ........................................................1

    28 U.S.C. § 2344 ............................................................1

47 U.S.C. § 402(a)................................................................................1

47 C.F.R. § 8.11 ................................................................................79

\* 47 C.F.R. § 20.3 (1994)................................................10, 58, 63, 65, 90

47 C.F.R. § 20.3 (2015)................................................................63

\* 47 C.F.R. § 20.9(a)(14)(i) ................................................................66

\* 47 C.F.R. § 20.9(a)(14)(ii)(B)................................................................67

\* 47 C.F.R. § 20.9(a)(14)(ii)(C)................................................................67

\* 47 C.F.R. § 64.702(a)................................................................7, 34, 35

## ADMINISTRATIVE MATERIALS

*2010 Notice*:
  Notice of Inquiry, *Framework for Broadband Internet
  Service*, 25 FCC Rcd 7866 (2010)................................17, 52, 53, 91

*2010 Order*:
  Report and Order, *Preserving the Open Internet*, 25 FCC
  Rcd 17905 (2010), *vacated in part*, *Verizon v. FCC*,
  740 F.3d 623 (D.C. Cir. 2014)................................17, 18, 56, 58, 92

*Broadband-Over-Powerline Order*:
  Memorandum Opinion and Order, *United Power Line
  Council's Petition for Declaratory Ruling Regarding the
  Classification of Broadband over Power Line Internet
  Access Service as an Information Service*,
  21 FCC Rcd 13281 (2006)................................................................15

\*  *Cable Broadband Order*:
 Declaratory Ruling and Notice of Proposed Rulemaking,
 *Inquiry Concerning High-Speed Access to the Internet*
 *Over Cable and Other Facilities*, 17 FCC Rcd 4798
 (2002), *aff'd sub nom. NCTA v. Brand X Internet*
 *Servs.*, 545 U.S. 967 (2005)........................................ 13, 14, 15, 36, 37, 41
 42, 44, 45, 49, 50, 52

\*  *Computer II*:
 Final Decision, *Amendment of Section 64.702 of the*
 *Commission's Rules and Regulations (Second Computer*
 *Inquiry)*, 77 F.C.C.2d 384 (1980)...............................................................6, 7

 *Data Roaming Order*:
 Second Report and Order, *Reexamination of Roaming*
 *Obligations of Commercial Mobile Radio Services*
 *Providers and Other Providers of Mobile Data Services*,
 26 FCC Rcd 5411 (2011)...............................................................................58

\*  *Gateway Service Order*:
 Memorandum Opinion and Order, *Bell Atlantic Tel. Cos.*,
 3 FCC Rcd 6045 (Com. Car. Bur. 1988)...................................................9, 35

 *IP-Enabled Services NPRM*:
 Notice of Proposed Rulemaking, *IP-Enabled Services*,
 19 FCC Rcd 4863 (2004)...............................................................................69

 Memorandum Opinion and Order, *Applications of Winter Park Tel.*
 *Co.*, 84 F.C.C.2d 689 (1981) ........................................................................60

 Memorandum Opinion and Order, *North American Telecomms.*
 *Ass'n*, 101 F.C.C.2d 349 (1985) ...................................................................38

 Memorandum Opinion and Order on Reconsideration, *Provision of*
 *Access for 800 Service*, 6 FCC Rcd 5421 (1991) .........................................60

 *Non-Accounting Safeguards Order*:
 First Report and Order and Further Notice of Proposed
 Rulemaking, *Non-Accounting Safeguards of Sections 271*
 *and 272*, 11 FCC Rcd 21905 (1996) ............................................7, 12, 34, 37

xxiii

\*  *NPRM*:
>  Notice of Proposed Rulemaking, *Protecting and*
>  *Promoting the Open Internet*, 29 FCC Rcd 5561
>  (2014)............................................................................ 4, 17, 18, 19, 21, 28,
>  29, 54, 84, 85, 86, 87
>  88, 89, 90, 91, 92, 93

>  *Second Broadband Deployment Report*:
>  Second Report, *Inquiry Concerning the Deployment of*
>  *Advanced Telecommunications Capability*,
>  15 FCC Rcd 20913 (2000)...........................................................................49

\*  *Second Report and Order*:
>  Second Report and Order, *Implementation of Sections*
>  *3(n) and 332 of the Communications Act; Regulatory*
>  *Treatment of Mobile Services*, 9 FCC Rcd 1411 (1994) .........9, 10, 60, 61, 68

>  *Seventeenth Mobile Competition Report*:
>  Seventeenth Report, *Implementation of Section 6002(b)*
>  *of the Omnibus Budget Reconciliation Act; Annual*
>  *Report and Analysis of Competitive Market Conditions*
>  *With Respect to Mobile Wireless, Including Commercial*
>  *Mobile Services*, 29 FCC Rcd 15311 (Wireless Telecom.
>  Bur. 2014) ...........................................................................................57

\*  *Stevens Report*:
>  Report to Congress, *Federal-State Joint Board on*
>  *Universal Service*, 13 FCC Rcd 11501 (1998).....................6, 8, 9, 11, 12, 13
>  14, 31, 32, 34, 35
>  36, 37, 46

>  *Time Warner Declaratory Ruling*:
>  Memorandum Opinion and Order, *Time Warner Request*
>  *for Declaratory Ruling*, 22 FCC Rcd 3513 (Wireline
>  Comp. Bur. 2007) .........................................................................65

>  *Verizon-MCI Merger Order*:
>  Memorandum Opinion and Order, *Verizon Communications*
>  *Inc. and MCI, Inc. Applications for Approval of Transfer of*
>  *Control*, 20 FCC Rcd 18433 (2005) .............................................................77

*Virgin Islands Order*:
> Memorandum Opinion and Order, *AT&T Submarine
> Systems, Inc.*, 13 FCC Rcd 21585 (1998)......................................74

*Vonage Order*:
> Memorandum Opinion and Order, *Vonage Holdings
> Corp. Petition for Declaratory Ruling*, 19 FCC Rcd
> 22404 (2004)....................................................................66

\*  *Wireless Broadband Ruling*:
> Declaratory Ruling, *Appropriate Regulatory Treatment
> for Broadband Access to the Internet Over Wireless
> Networks*, 22 FCC Rcd 5901 (2007) ...................... 15, 16, 58, 59, 62, 65, 70

*Wireline Broadband NPRM*:
> Notice of Proposed Rulemaking, Appropriate Framework
> for *Broadband Access to the Internet over Wireline
> Facilities*, 17 FCC Rcd 3019 (2002) ...................................15, 50

\*  *Wireline Broadband Order*:
> Report and Order and Notice of Proposed Rulemaking,
> *Appropriate Framework for Broadband Access to the
> Internet over Wireline Facilities*, 20 FCC Rcd 14853
> (2005).......................................................... 15, 31, 33, 40, 41, 51

## OTHER MATERIALS

February 26, 2015 Press Conference, *available at*
> http://goo.gl/oiPX2M....................................................................80

Fed. Pet'rs Br., No. 04-277 (2005), *available at*
> http://goo.gl/9qJZwA...................................................................44

Fed. Pet'rs Reply Br., No. 04-277, 2005 WL 640965 ...........................39

H.R. Rep. No. 103-213 (1993) (Conf. Rep.) ...........................................61

Holman W. Jenkins, Jr., *Washington Makes a Broadband Hash*,
> Wall St. J., May 27, 2015 ...........................................................53

Gautham Nagesh & Brody Mullins, *Net Neutrality: How White House Thwarted FCC Chief*, Wall St. J., Feb. 4, 2015 .................................19

Remarks of FCC Chairman Wheeler (June 12, 2014), *available at* http://goo.gl/DbND5B ....................................................................................64

USTelecom, *Historical Broadband Provider Capex*, http://goo.gl/Uzg2Is....................................................................................15

The White House, *Net Neutrality: President Obama's Plan for a Free and Open Internet* (Nov. 10, 2014), *available at* http://goo.gl/zn8w9z ....................................................................................19

# GLOSSARY

| | |
|---|---|
| 1996 Act or Act | Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 |
| *2010 Notice* | Notice of Inquiry, *Framework for Broadband Internet Service*, 25 FCC Rcd 7866 (2010) |
| *2010 Order* | Report and Order, *Preserving the Open Internet*, 25 FCC Rcd 17905 (2010), *vacated in part*, *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014) |
| APA | Administrative Procedure Act |
| *Broadband-Over-Powerline Order* | Memorandum Opinion and Order, *United Power Line Council's Petition for Declaratory Ruling Regarding the Classification of Broadband over Power Line Internet Access Service as an Information Service*, 21 FCC Rcd 13281 (2006) |
| *Cable Broadband Order* | Declaratory Ruling and Notice of Proposed Rulemaking, *Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 17 FCC Rcd 4798 (2002), *aff'd sub nom. NCTA v. Brand X Internet Servs.*, 545 U.S. 967 (2005) |
| *Computer II* | Final Decision, *Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry)*, 77 F.C.C.2d 384 (1980) |
| Clyburn Statement | Statement of Commissioner Clyburn re: *Order* (JA___-___) |
| *Data Roaming Order* | Second Report and Order, *Reexamination of Roaming Obligations of Commercial Mobile Radio Services Providers and Other Providers of Mobile Data Services*, 26 FCC Rcd 5411 (2011) |
| DNS | Domain Name Service |
| DSL | Digital Subscriber Line |

xxvii

| | |
|---|---|
| Fact Sheet | FCC, *Fact Sheet: Chairman Wheeler Proposes New Rules for Protecting the Open Internet* (Feb. 4, 2015) (JA___-__) |
| Final Analysis | Final Regulatory Flexibility Analysis (JA___-__) |
| FCC | Federal Communications Commission |
| FCC Stay Opp. | Opposition of Respondents to Motion for Stay and Response to Motion for Expedition, Nos. 15-1063 *et al.* (D.C. Cir. filed May 22, 2015) |
| *Gateway Service Order* | Memorandum Opinion and Order, *Bell Atlantic Tel. Cos.*, 3 FCC Rcd 6045 (Com. Car. Bur. 1988) |
| *IP-Enabled Services NPRM* | Notice of Proposed Rulemaking, *IP-Enabled Services*, 19 FCC Rcd 4863 (2004) |
| MFJ | Modification of Final Judgment |
| *Mobile Networks* | Dr. Jeffrey H. Reed & Dr. Nishith D. Tripathi, *Net Neutrality and Technical Challenges of Mobile Broadband Networks* (Sept. 4, 2014) (JA___-__) |
| *Non-Accounting Safeguards Order* | First Report and Order and Further Notice of Proposed Rulemaking, *Non-Accounting Safeguards of Sections 271 and 272*, 11 FCC Rcd 21905 (1996) |
| *NPRM* | Notice of Proposed Rulemaking, *Protecting and Promoting the Open Internet*, 29 FCC Rcd 5561 (2014) (JA___-__) |
| *Order* | Report and Order on Remand, Declaratory Ruling, and Order, *Protecting and Promoting the Open Internet*, 30 FCC Rcd 5601 (2015) (JA___-__) |
| O'Rielly Dissent | Dissenting Statement of Commissioner Michael O'Rielly to *Order* (JA___-__) |
| Pai Dissent | Dissenting Statement of Commissioner Ajit Pai to *Order* (JA___-__) |

| | |
|---|---|
| RFA | Regulatory Flexibility Act, as amended |
| *Second Broadband Deployment Report* | Second Report, *Inquiry Concerning the Deployment of Advanced Telecommunications Capability*, 15 FCC Rcd 20913 (2000) |
| *Second Report and Order* | Second Report and Order, *Implementation of Sections 3(n) and 332 of the Communications Act; Regulatory Treatment of Mobile Services*, 9 FCC Rcd 1411 (1994) |
| *Seventeenth Mobile Competition Report* | Seventeenth Report, *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act; Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services*, 29 FCC Rcd 15311 (Wireless Telecom. Bur. 2014) |
| *Stevens Report* | Report to Congress, *Federal-State Joint Board on Universal Service*, 13 FCC Rcd 11501 (1998) |
| *Time Warner Declaratory Ruling* | Memorandum Opinion and Order, *Time Warner Request for Declaratory Ruling*, 22 FCC Rcd 3513 (Wireline Comp. Bur. 2007) |
| *Verizon-MCI Merger Order* | Memorandum Opinion and Order, *Verizon Communications Inc. and MCI, Inc. Applications for Approval of Transfer of Control*, 20 FCC Rcd 18433 (2005) |
| *Virgin Islands Order* | Memorandum Opinion and Order, *AT&T Submarine Systems, Inc.*, 13 FCC Rcd 21585 (1998) |
| *Vonage Order* | Memorandum Opinion and Order, *Vonage Holdings Corp. Petition for Declaratory Ruling*, 19 FCC Rcd 22404 (2004) |
| Wheeler NPRM Statement | Statement of Chairman Wheeler re: *NPRM* (JA___-__) |
| Wheeler Statement | Statement of Chairman Wheeler re: *Order* (JA___-__) |

| | |
|---|---|
| *Wireless Broadband Ruling* | Declaratory Ruling, *Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, 22 FCC Rcd 5901 (2007) |
| *Wireline Broadband NPRM* | Notice of Proposed Rulemaking, Appropriate Framework for *Broadband Access to the Internet over Wireline Facilities*, 17 FCC Rcd 3019 (2002) |
| *Wireline Broadband Order* | Report and Order and Notice of Proposed Rulemaking, *Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, 20 FCC Rcd 14853 (2005), *petitions for review denied*, *Time Warner Telecom, Inc. v. FCC*, 507 F.3d 205 (3d Cir. 2007) |

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1).  The *Order*, released on March 12, 2015, was published in the Federal Register on April 13, 2015 (80 Fed. Reg. 19,738).  Petitions were timely filed.  *See* 28 U.S.C. § 2344.[1]

## STATEMENT OF THE ISSUES

1.      Whether the FCC lawfully reclassified fixed and mobile broadband Internet access as a telecommunications service.

2.      Whether the FCC lawfully reclassified mobile broadband Internet access as a commercial mobile service.

3.      Whether the FCC lawfully applied Title II regulation to Internet interconnection arrangements.

4.      Whether the FCC's Internet Conduct Standard is lawful.

5.      Whether the FCC provided sufficient notice.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the Addendum.

---

[1] Because USTelecom filed a timely petition for review (No. 15-1086) after Federal Register publication, the Court need not decide whether USTelecom's earlier-filed petition (No. 15-1063) was also timely.

## PRELIMINARY STATEMENT

In the *Order*, the FCC claims for itself unprecedented authority to regulate the Internet — authority that Congress expressly withheld and that the FCC for decades had rightly disclaimed. Under the guise of ensuring that the Internet remains "open," the *Order* upends the decades-old status quo by subjecting the service that offers consumers the capability to access and use the Internet — broadband Internet access service — to heavy-handed, public-utility-style regulation designed for 19th-century railroads and 1930s telephone monopolies.

Congress never envisioned entrusting the FCC with the extraordinary authority that the *Order* purports to exercise or subjecting the Internet to intrusive, central-planner-style oversight. Quite the contrary, Congress expressly found in 1996 that the Internet "ha[s] flourished . . . with a minimum of government regulation," and proclaimed a national "policy" "to preserve the vibrant and competitive free market that presently exists for the Internet . . . , unfettered by Federal or State regulation." 47 U.S.C. § 230(a)(4), (b)(2). To advance that policy, and building on decades of FCC and judicial pronouncements, Congress explicitly exempted all "information service[s]," *id.* § 153(24) — *i.e.*, services that provide "a capability for generating, acquiring, storing . . . or making available information," *id.*, which plainly include broadband Internet access, *see id.* § 230(f)(2) — from common-carrier regulation under Title II of the

2

Communications Act.  Congress also created an *additional* statutory ban on common-carriage treatment of mobile services not interconnected with the telephone network, *see id.* § 332(c)(2), thereby making mobile broadband statutorily immune "twice over" from common-carrier regulation, *Cellco P'ship v. FCC*, 700 F.3d 534, 538 (D.C. Cir. 2012).

In the last two decades, the FCC — seeking both to implement Congress's direction and to encourage capital-intensive investment in broadband deployment — consistently applied those statutes to classify broadband as an information service exempt from Title II.  The Supreme Court upheld the FCC's "light touch" non-Title II approach in *NCTA v. Brand X Internet Services*, 545 U.S. 967, 986-1000 (2005).  The FCC further concluded that mobile broadband is not interconnected with the telephone network and thus doubly exempt from Title II.  Those decisions achieved astonishing success.  Petitioners and their members invested *hundreds of billions* of dollars in reliance on that policy and brought broadband service to rural and other underserved areas.

The *Order* turns that settled understanding upside-down, reclassifying both fixed and mobile broadband as a telecommunications service.  The *Order* further concludes, in direct conflict with longstanding precedent and FCC regulations, that mobile broadband is interconnected with the telephone network.  On that basis, it subjects the entire broadband industry to a host of burdensome Title II provisions

3

that have nothing to do with Internet openness, as well as a series of new rules —

including a novel, catch-all "Internet Conduct Standard" that allows the FCC to

make up more rules as it goes.  And, for the first time, the *Order* subjects Internet

interconnection arrangements to common-carrier obligations.  Individually and

collectively, these rules will undermine future investment by large and small

broadband providers, to the detriment of consumers.

To reach these results, the FCC distorts the Communications Act's text and

disregards the regulatory regime the statute codified.  The FCC's strained reading

of the statute contradicts both *Brand X* and *Verizon v. FCC*, 740 F.3d 623 (D.C.

Cir. 2014).  Moreover, in flagrant contravention of the APA, the FCC jettisons its

prior factual findings and policy without any reasoned explanation and without

identifying any new facts that could support its about-face.  In the process, it

willfully ignores the hundreds of billions of dollars invested in reliance on the prior

policy — implausibly denying that such reliance even *exists*.

The FCC adopted this radical course without ever exposing it to public

comment.  The 2014 *NPRM* proposed a vastly different, much more modest

course.  It never hinted at the *Order*'s extraordinary assertion of regulatory

authority over the Internet in crafting what it calls a "Title II tailored for the 21st

Century," *Order* ¶ 38 (JA___), or suggested that this docket would be used to

regulate all rates and practices, much less privacy, pole attachments, and other

issues unrelated to Internet openness.  It was not until the notice-and-comment process was *over*, and the President weighed in urging a drastically different approach, that the FCC decided to overturn decades of settled law and policy.  Consequently, key aspects of the *Order*'s analysis and countless details regarding the scope and substance of the rules the *Order* imposed were never aired for public input.

The *Order* is not the culmination of a thoughtful and deliberate process.  It is the output of an agency determined (or pressured) to reach a particular result and visibly struggling to devise a post hoc justification for contradicting Congress's pronouncements, the agency's own longstanding policy, and real-world facts.  It is, in short, a sweeping bureaucratic power grab by a self-appointed "Department of the Internet."  Pai Dissent 324 (JA___).  The *Order* is unlawful, arbitrary, and the product of improper procedures.  It must be vacated.[2]

---

[2] CTIA and AT&T join the portions of this brief addressing mobile services. All petitioners join the remaining sections of the brief.

## STATEMENT OF THE CASE

**A.     Regulatory Background**

    *1. Pre-1996 Act Regulation*

  **a.** In enacting Title II of the Communications Act of 1934, Congress

"borrowed . . . language and purpose from the Interstate Commerce Act," which

regulated the "country's railroads" using "common-law doctrines respecting

common carriers." *ABC, Inc. v. FCC*, 643 F.2d 818, 820-21 (D.C. Cir. 1980).

That common-carrier regime was conceived as a system of filed tariffs and rate

regulation. Central components of that regime require a telephone carrier's rates

and practices to be "just and reasonable" (§ 201); prohibit a carrier from engaging

in "unjust or unreasonable discrimination" in its charges or practices (§ 202); and

permit "[a]ny person" to bring a complaint seeking damages against a carrier for

violations of its duties either in federal court or at the FCC (§§ 206-208). Over the

decades, Title II has been amended to impose a host of additional duties upon

common carriers. *See generally* 47 U.S.C. §§ 201-261.

  **b.** With the advent of data-processing services offered over the telephone

network, the FCC recognized that the "growing convergence and interdependence

of communication and data processing technologies threatened to strain its existing

interpretations of Title II." *Stevens Report* ¶ 23. Accordingly, in its landmark

1980 *Computer II* decision, the FCC established a distinction between "basic" and

6

"enhanced" services.  Basic services included "plain old telephone service," as well as other services that offered only "a pure transmission capability over a communications path."  *Computer II* ¶¶ 90, 96.  In contrast, enhanced services included everything else:  "*any* offering over the telecommunications network which is more than a basic transmission service."  *Id.* ¶ 97 (emphasis added).  Such services offered, for example, "computer processing applications" that "act on the . . . subscriber's transmitted information" or permit "subscriber interaction with stored information."  47 C.F.R. § 64.702(a).

While basic services were deemed common carriage, enhanced services "would not be subject to . . . Title II" at all.  *Computer II* ¶ 119.  The purpose of these regulatory distinctions was to ensure that competition, innovation, and investment in data-processing services could flourish unimpeded by regulation. *See id.* ¶ 123 ("subject[ing] enhanced services to a common carrier scheme of regulation . . . would negate the dynamics of computer technology in this area").[3]

The 1982 Modification of Final Judgment ("MFJ") that broke up the Bell System similarly protected computer-related services from regulation by drawing a substantively identical distinction between regulated "telecommunications

---

[3] The FCC also recognized a limited category of "adjunct-to-basic" services — capabilities used to facilitate transmission without processing or changing what was transmitted, such as call forwarding — that were effectively treated as "basic" services.  *Computer II* ¶ 98; *Non-Accounting Safeguards Order* ¶ 107.

7

services" and unregulated "information services."  The MFJ defined

"telecommunications service" as "the offering for hire of telecommunications

facilities, or of telecommunications by means of such facilities."[4]  "Information

service" under the MFJ included nearly everything else that might be done with

information through a communications network:  "the offering of a capability for

generating, acquiring, storing, transforming, processing, retrieving, utilizing, or

making available information which may be conveyed via telecommunications."[5]

When faced with classifying the antecedent to today's broadband Internet

access service, both the MFJ Court and the FCC concluded that "gateways" to

online services were unregulated information/enhanced services, not

telecommunications/basic services.[6]  When the regional Bell companies sought to

provide such gateway services that were "necessary for the transmission of

information services generated by others," the MFJ Court found that those services

offered a number of functions — including the capability for storing, processing,

acquiring, and making available information — that, under "*any fair reading*,"

---

[4] *United States v. AT&T Co.*, 552 F. Supp. 131, 229 (D.D.C. 1982); *see also id.* (defining "telecommunications" as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content").

[5] *Id.*

[6] *See Stevens Report* ¶ 75 ("gateways" provided the same "functions and services associated with Internet access").

were "information services."[7]  Similarly, the FCC found that a "gateway service"
that would "allow a customer with a personal computer . . . to reach an array" of
"databases providing business, . . . investment, . . . and entertainment information"
was an unregulated enhanced service.  *Gateway Service Order* ¶¶ 3 & n.8, 7.
Indeed, the FCC "consistently classed such services as 'enhanced services' under
*Computer II*."  *Stevens Report* ¶ 75.  Internet access services were thus deliberately
exempted from Title II from their inception, leaving providers free to innovate and
invest.[8]

       **c.**      Mobile radio communications services developed during this period
as well, but different mobile services — such as paging, radio dispatch, and
cellular voice services — were subject to varying regulatory treatment.  *See*
*Second Report and Order* ¶¶ 6-9.  In 1993, Congress amended 47 U.S.C. § 332 to
rationalize the regulatory regimes for mobile services.

---

[7] *United States v. Western Elec. Co.*, 673 F. Supp. 525, 587 & n.275 (D.D.C.
1987) (emphasis added).

[8] Under the *Computer* decisions, when a local telephone company (initially
through an affiliate) provided an enhanced service, such as Internet access, the
telephone company was required to tariff the connection between an end user and
an enhanced-service provider.  Although a telephone company affiliate obtained
"last-mile" connectivity from this tariff, no portion of the affiliate's retail enhanced
service was ever subject to Title II.  Thus, when the FCC claims that "facilities-
based telephone companies were obligated to offer the transmission component of
their enhanced service offerings" under Title II, *Order* ¶ 313 (JA___), the
"transmission component" was *only* the wholesale last-mile connection.  Cable and
wireless companies, moreover, were never subject to these requirements.

Congress provided that "commercial mobile services" — *i.e.*, mobile services "interconnected" with "the public switched network" — must be regulated as common carriage under Title II. 47 U.S.C. § 332(c)(1)(A), (d)(1)-(2). In contrast, "private mobile services" — services that are *neither* interconnected with the telephone network *nor* the functional equivalent of a commercial mobile service — cannot be regulated under Title II. *See id.* § 332(c)(2), (d)(3).

In 1994, the FCC implemented that new statutory provision. The FCC limited common-carrier treatment to services that are "interconnected with the traditional local exchange or [long-distance] switched network." *Second Report and Order* ¶ 59; *see* 47 C.F.R. § 20.3 (1994) (defining "public switched network" as a "common carrier switched network . . . that use[s] the North American Numbering Plan" (*i.e.*, ten-digit) telephone numbers, and defining "interconnected service" as one that "gives subscribers the capability to communicate . . . [with] all other users on the public switched network"). The FCC "anticipate[d] that very few mobile services" would qualify as functional equivalents of commercial mobile service and defined "functional equivalence" in terms of whether a service is a marketplace substitute for telephone service. *Second Report and Order* ¶¶ 79-80.

10

2.    *The 1996 Act*

**a.**    In the 1996 Act, Congress codified the existing distinction between telecommunications and information services.  *See Stevens Report* ¶ 21.

Under the statute, "telecommunications service" is "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used."  47 U.S.C. § 153(53).  "Telecommunications," in turn, means "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content."  *Id.* § 153(50).  In other words, *pure* transmission.

In contrast, "information service[s]" offer "a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications," except where — following the pre-existing "adjunct-to-basic" exception, *see supra* note 3; *Order* ¶ 312 (JA___) — that "capability" is used solely "for the management, control, or operation of a telecommunications system or the management of a telecommunications service."  47 U.S.C. § 153(24).

In enacting these statutory categories, Congress retained long-held regulatory understandings.  The category of information services includes "*all* of the services that the Commission ha[d] previously considered to be 'enhanced

11

services,'" as well as other services that meet the statutory definition. *Non-Accounting Safeguards Order* ¶¶ 102-103 (emphasis added). Common carriage applies only to telecommunications services, *not* information services. *See* 47 U.S.C. § 153(51); *Verizon*, 740 F.3d at 650. And the statute treats "telecommunications services and information services as mutually exclusive categories." *Stevens Report* ¶ 43; *see Order* ¶ 385 (JA___).

Elsewhere in the 1996 Act, Congress, emphasizing the extension of this deregulatory approach to the newly emerging commercial Internet, declared it "the policy of the United States" to "preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2). Section 230 defines the "interactive computer service[s]" subject to that deregulatory policy to include any "*information service*, . . . *including* specifically *a service . . . that provides access to the Internet*." *Id.* § 230(f)(2) (emphases added).

**b.** The FCC has consistently held that Internet access service is an information service under these statutory definitions. Broadband Internet access service offers consumers the capability of using the innumerable applications that rely on the Internet — including the "World Wide Web," email, and messaging — and offers the capability of using those applications to acquire, generate, store, transform, process, and retrieve information. Additionally, to offer a *mass-market*

12

Internet access service that allows ordinary consumers to use the Internet, an

Internet access provider must offer and integrate a range of information processing,

retrieval, storage, and other functions — such as Domain Name Service ("DNS")[9]

and caching[10] — with basic transmission.

Accordingly, the FCC concluded in 1998 that the most basic feature of an

Internet access service — the ability to access and interact with websites — is an

information service: "[s]ubscribers can retrieve files from the World Wide Web,

and browse their contents, because their service provider offers the 'capability for

. . . acquiring, . . . retrieving [and] utilizing . . . information.'" *Stevens Report* ¶ 76.

The FCC further explained that "Internet access services are appropriately classed"

as information services because Internet access providers "do not offer a pure

transmission path; they combine computer processing, information provision, and

other computer-mediated offerings with data transport." *Id.* ¶ 73.  Thus, the FCC

held that Internet access is an information service because it "alter[s] the format of

information through computer processing applications such as protocol conversion

---

[9] "DNS, among other things, matches the Web page addresses that end users type into their browsers (or 'click' on) with the Internet Protocol (IP) addresses of the servers containing the Web pages the users wish to access." *Brand X*, 545 U.S. at 987.

[10] "'Caching' is the storing of copies of content at locations in the network closer to subscribers than their original sources . . . that subscribers wish to see most often in order to provide more rapid retrieval of information." *Cable Broadband Order* ¶ 17 n.76.

and interaction with stored data." *Id.* ¶ 33. In addition, classifying Internet access as a telecommunications service could have "negative policy consequences," including impeding "the global development of the Internet." *Id.* ¶ 82.

Applying the same analysis, the FCC found that broadband Internet access offered over a cable provider's own facilities is a single, integrated information service because it "combines the transmission of data with computer processing, information provision, and computer interactivity, enabling end users to run a variety of applications." *Cable Broadband Order* ¶ 38. That was so "regardless of whether subscribers use all of the functions provided as part of the service, such as e-mail or web-hosting." *Id.* The FCC was also "mindful of the need to minimize both regulation of broadband services and regulatory uncertainty in order to promote investment" in broadband. *Id.* ¶ 73.

In *Brand X*, the Supreme Court upheld the FCC's conclusion that cable broadband service is a single, integrated information service because "it provides consumers with a comprehensive capability for manipulating information using the Internet." 545 U.S. at 987-89. It "enables users, for example, to browse the World Wide Web, to transfer files from file archives on the Internet via the 'File Transfer Protocol,' and to access e-mail and Usenet newsgroups." *Id.* at 987. Although the dissent argued that cable broadband *also* includes a *separate* telecommunications service solely over the so-called "last mile" between "the customer's computer and

14

the cable company's computer-processing facilities, *id*. at 1010 (Scalia, J., dissenting), *all nine* Justices agreed that, in offering Internet access, broadband providers offer an "information service," *id.* at 1009-11 (Scalia, J., dissenting) (agreeing that the provision of "computing functionality" to access the Internet is an "information service"); *see also infra* Part I.A.5.

Following *Brand X*, the FCC classified broadband offered over telephone wires (such as "DSL" service), via wireless technologies, and over power lines as information services not subject to common-carrier regulation.[11]  These classifications, the FCC explained, further congressional policy by inducing the "substantial investment" needed "to build out the networks that will support future broadband capabilities."[12]

The classification of broadband as an information service exempt from Title II worked as intended:  from 2002 to 2013, fixed and mobile providers invested more than $800 billion in broadband — more than $2,500 for every American.[13]

---

[11] *See Wireline Broadband Order* ¶ 12; *Wireless Broadband Ruling* ¶ 18; *Broadband-Over-Powerline Order* ¶ 18.

[12] *Wireline Broadband NPRM* ¶ 5; *see also*, *e.g.*, *Cable Broadband Order* ¶ 5; *Wireless Broadband Ruling* ¶ 27.

[13] *See* USTelecom, *Historical Broadband Provider Capex*, http://goo.gl/Uzg2Is.

15

     **c.**     In the same decision in which it found that mobile broadband Internet access is an information service, the FCC also confirmed that mobile broadband is *not* a "commercial mobile service" under § 332 because it is not interconnected to the public switched network, which FCC regulations had long defined as the telephone network. *See Wireless Broadband Ruling* ¶ 41.  Mobile broadband was thus also immune from common-carrier regulation for this independent reason. *See id.*  The FCC rejected claims that customers' ability to use third-party Voice-over-Internet-Protocol applications to make phone calls over their broadband Internet service transformed that service into one interconnected with the telephone network.  *See id.* ¶ 46.

     **B.**     **The FCC's Prior Attempts at Regulation**

     In recent years, the FCC twice attempted to impose "Open Internet" or "net neutrality" obligations on broadband Internet access providers.  This Court struck down both attempts.

     In *Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010), the Court held that the FCC — which had "[a]cknowledg[ed] that it has no express statutory authority" over broadband network management practices, *id.* at 644 — could not assert authority under § 706 of the 1996 Act, 47 U.S.C. § 1302, to regulate those practices given the agency's prior conclusion that "section 706 grants no regulatory authority."  *Id.* at 659.

After *Comcast*, the FCC sought comment on whether to reclassify broadband as a telecommunications service subject to Title II common-carrier regulation, *see 2010 Notice* ¶¶ 52-99, but it ultimately did not adopt that approach. Instead, the FCC rested its *2010 Order* on its reinterpretation of § 706 as a source of affirmative authority. *See 2010 Order* ¶¶ 117-123.

This Court agreed with the FCC that § 706 vests it with some authority. *See Verizon*, 740 F.3d at 629, 650-59. The Court held, however, that broadband providers offer a distinct service to end users and to "edge providers," *i.e.*, providers of Internet content such as Google or Amazon. *Id.* at 653. Because the FCC had not classified the service *offered to those edge providers* as a telecommunications service, broadband Internet access providers could not be "obligated to act as common carriers" in providing *that* service. *Id.* Because the no-blocking and no-unreasonable-discrimination rules required providers to deliver all edge-provider traffic indiscriminately, they impermissibly imposed common-carrier obligations. *See id.* The Court, however, set out a roadmap for adopting similar rules under § 706. *See id.* at 656-58.

## C.     This Proceeding

### 1.     *The* NPRM

In May 2014, the FCC issued a Notice of Proposed Rulemaking ("*NPRM*") that "respond[ed] directly to" *Verizon* by "propos[ing] to adopt" new rules

17

"consistent with the court's opinion." *NPRM* ¶ 24 (JA___).  The *NPRM* proposed

to follow "the blueprint offered by . . . *Verizon*," by "rely[ing] on section 706,"

while retaining the FCC's longstanding classification of broadband Internet access

as an information service. *Id.* ¶ 4 (JA___).  Taking *Verizon*'s cue, the *NPRM*'s

proposals were structured to avoid imposing common-carrier regulation. *See id.*

¶¶ 6, 89-90, 97, 122, 136 (JA___, ___-___, ___, ___, ___).

A few paragraphs of the *NPRM* sought comment on whether the FCC should

reclassify broadband under Title II, but *solely* to provide additional legal authority

for the new Open Internet rules, not to subject broadband Internet access service to

Title II requirements unrelated to the FCC's "goal" of "protecting and promoting

Internet openness." *Id.* ¶¶ 4, 142, 149-150 (JA___, ___, ___-___).  The FCC also

made clear that it was *not* proposing to address Internet interconnection — *i.e.*, the

linking of two networks for the mutual exchange of traffic. *See id.* ¶ 59 (JA___);

*see also Order* ¶ 194 n.482 (JA___).  Chairman Wheeler stated that the "question

of interconnection" is "a different matter that is better addressed separately" from

"[t]oday's proposal."  Wheeler NPRM Statement 87 (JA___).

With respect to mobile broadband, the FCC proposed the same approach it

had taken in the *2010 Order*:  recognizing the successful proliferation of mobile

broadband services, the FCC "tentatively conclude[d]" that it should "appl[y] a

different standard to mobile broadband" than to fixed broadband. *NPRM* ¶ 62

(JA\_\_\_).  The *NPRM* devoted only three sentences to the possible reclassification of mobile broadband, including the question:  "For mobile broadband Internet access service, does that service *fit within* the definition of 'commercial mobile service'?"  *Id.* ¶ 150 (JA\_\_\_) (emphasis added); *see id.* ¶¶ 149-150 (JA\_\_\_-\_\_).  It never suggested that the agency was considering *changing* that definition.

        2.    *The* Order

Later, after the White House held months of private meetings with interest groups pushing for Title II reclassification of broadband Internet access and the President publicly lobbied the FCC for that outcome,[14] the FCC abruptly changed course.  Without seeking further comment, the FCC issued a decision, by a 3-2 vote, that "differs dramatically from the proposal [it] put out for comment."  Pai Dissent 335 (JA\_\_\_); O'Rielly Dissent 385-87 (JA\_\_\_-\_\_).

        a.    The *Order* reclassifies both fixed and mobile broadband Internet access providers as common carriers subject to Title II.  *Order* ¶¶ 336-337 (JA\_\_\_-\_\_).  The *Order* does not merely reclassify a last-mile transmission service from an end user to the broadband provider's facilities.  It reclassifies the *entire* retail Internet access service as a telecommunications service.  *Id.* ¶ 25 (JA\_\_\_).  That

---

[14] *See* Gautham Nagesh & Brody Mullins, *Net Neutrality: How White House Thwarted FCC Chief*, Wall St. J., Feb. 4, 2015; The White House, *Net Neutrality: President Obama's Plan for a Free and Open Internet* (Nov. 10, 2014), *available at* http://goo.gl/zn8w9z.

reclassified service includes everything a broadband provider does when providing Internet access to its customers, until it hands off the Internet traffic to edge providers or other Internet networks.  *See id.* ¶¶ 28-29, 338-339 (JA___-__, ___-__).

To justify its reversal of its prior decisions, the FCC asserts that *Brand X* found the 1996 Act ambiguous on the issue presented here and allowed the FCC "to revisit [its] prior interpretation."  *Id.* ¶ 332 (JA___).  The FCC further claims that "[c]hanged factual circumstances" prompted it to exercise that asserted authority.  *Id.* ¶ 330 (JA___).  According to the *Order*, changes to consumer conduct and provider marketing establish that Internet access now consists of a "transmission link" that is separate from information-service functions such as email and cloud storage.  *Id.*  And information-processing functions that the FCC previously conceded are integral to broadband Internet access now allegedly fit within the "telecommunications-management" exception to the information-service definition — an exception nowhere mentioned in the *NPRM*.  *See id.* ¶¶ 366-375 (JA___-__).

Although the *Order* forbears under 47 U.S.C. § 160 from some Title II provisions, massive new regulation of broadband Internet access service remains. The FCC leaves in place the heart of Title II, including its most consequential provisions.  *See id.* ¶¶ 434-542 (JA___-__).  These provisions bear little, or no,

relationship to the FCC's purported goal of Internet openness. For example, §§ 201 and 202 govern *all* rates, terms, and practices of telecommunications service providers, and § 222 imposes restrictions on access to customer data. *See id.* ¶¶ 441-452, 462-468 (JA___-__, ___-__).

**b.** To escape the additional common-carrier prohibition in § 332, the *Order* also reclassifies mobile broadband as a "commercial mobile service" under § 332. The *Order* recognizes that mobile broadband itself neither interconnects with the telephone network, *see id.* ¶¶ 400-401 (JA___-__), nor is a commercial substitute for voice telephone service, *see id.* ¶¶ 407-408 (JA___-__). Instead, the *Order* changes the meaning of "commercial mobile service" by altering the underlying definition of "interconnected service" and transforming the definition of "the public switched network" to include *both* the telephone network and the Internet; it also creates a new "functional equivalence" test applicable only to mobile broadband. *Id.* ¶¶ 388-408 (JA___-__).

**c.** Despite the *NPRM*'s express indication that this proceeding would not address Internet interconnection, the *Order* holds that the FCC will apply §§ 201 and 202 — Title II's core common-carriage provisions — in reviewing such arrangements on a "case-by-case" basis. *Id.* ¶¶ 202-206 (JA___-__). However, the *Order* does not separately reclassify that service as a telecommunications service subject to Title II. *See id.* Instead, it asserts that, in offering their retail broadband

21

services to end users, providers "implied[ly] promise" to enter into Internet

interconnection with third-party networks and edge providers on a common-

carriage basis.  *Id.* ¶ 364 (JA___).

       **d.**     The *Order* adopts three "bright line" rules.  *First*, broadband Internet

access providers cannot block lawful content, applications, services, or non-

harmful devices.  *Second*, they may not impair or degrade lawful Internet traffic on

the basis of content, applications, or service.  *Third*, providers may not engage in

"paid prioritization," defined as "directly or indirectly favor[ing] some traffic over

other traffic" in exchange for consideration or to benefit an affiliate.  *See id.* ¶¶ 16-

18, 111-132 (JA___-__, ___-__).

       The *Order* also adopts a new "Internet Conduct Standard," under which the

FCC will decide, case-by-case, whether providers' practices "unreasonably

interfere with or unreasonably disadvantage the ability of consumers to reach the

Internet content, services, and applications of their choosing or of edge providers

to access consumers using the Internet."  *Order* ¶ 135 (JA___).  The *NPRM* did not

refer to any such standard.

       **e.**     Commissioners Pai and O'Rielly dissented on substantive and

procedural grounds.  They argued that the FCC's new classification of broadband

Internet access is unlawful and that the FCC failed to provide notice of the

radically new regulatory regime it adopted.  *See* Pai Dissent 334-70 (JA___-__);

22

O'Rielly Dissent 385-87, 390-94 (JA___-__, ___-__).  They further argued that the

*Order* did not substantiate any need for reclassifying broadband as a

telecommunications service.  *See* O'Rielly Dissent 387-90 (JA___-__); Pai Dissent

333-34 (JA___-__).  Finally, the dissenting Commissioners criticized the

majority's cursory dismissal of facts showing that subjecting broadband to Title II

would chill investment and undermine enormous reliance interests of broadband

providers that had invested billions of dollars in infrastructure.  *See* O'Rielly

Dissent 389-90 (JA___-__); Pai Dissent 327-28, 361 (JA___-__, ___).

## STANDARD OF REVIEW

Under *Chevron*, agencies are not entitled to deference where a court, after

"considering the text, structure, purpose, and history of an agency's authorizing

statute," can "determine [that] a provision reveals congressional intent about the

precise question at issue."  *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 696

(D.C. Cir. 2014).  Moreover, in extraordinary cases involving "question[s] of deep

'economic and political significance' that [are] central to [the] statutory scheme,"

*Chevron* deference is not appropriate at all.  *King v. Burwell*, 135 S. Ct. 2480, 2489

(2015).  Courts are also typically "skeptic[al]" where, as here, an agency claims to

have "discover[ed] in a long-extant statute an unheralded power to regulate" a

"significant portion of the American economy."  *Utility Air Regulatory Grp. v.*

*EPA*, 134 S. Ct. 2427, 2444 (2014).

23

## SUMMARY OF ARGUMENT

**I.**       Congress enacted the 1996 Act against the background of the long-settled regulatory understanding that both data-processing systems that preceded the Internet and broadband Internet access itself are "information services."  Thus, those services cannot be subject to common-carrier regulations developed for monopoly voice providers.  The 1996 Act codified that settled understanding by defining information services capaciously to include any service that "offer[s]" the "capability" to "stor[e]," "utiliz[e]," "acquir[e]," or otherwise manipulate information.  47 U.S.C. § 153(24).  These offered capabilities, of course, are precisely why consumers purchase Internet access.  In addition, retail Internet access necessarily involves not just pure transmission but also information-service capabilities — indeed, consumers can only click on a link and go to a Web page because Internet access involves such enhanced functionalities.  Congress's understanding that Internet access is an information service under § 153(24) is confirmed by § 230, which states that "information services" include "service[s] . . . that provide[] access to the Internet."  *Id.* § 230(f)(2).  And Congress then made clear that such information services shall *not* be subject to heavy-handed common-carrier treatment.  *Id.* § 153(51).

The *Order* seeks to evade this conclusion by wishing away the dispositive statutory language, inventing facts about consumer perceptions, twisting

24

dispositive case law, and plain *ipse dixit*, all to regulate the Internet under public-utility rules.  The *Order* does not even attempt to explain how Internet access could be anything other than an information service when it "offers" each of the eight "capabilities" listed in the statutory definition.  The *Order* also ignores the regulatory backdrop of the 1996 Act, even though the FCC has acknowledged that the 1996 Act codified pre-Act definitions and expressly determined that the predecessors to Internet access service could not be regulated under Title II because they provided consumers with access to "stored information."  Instead, the FCC claims that anything *other* than transmission is either irrelevant to classifying the offered broadband service or covered by a narrow statutory exception that the FCC and MFJ Court previously deemed inapt.

The FCC believes that *Brand X* allows it to surmount these obstacles, because the Court found the statute ambiguous in one respect.  But the *Order* falls far outside the ambiguity that divided the Court:  in *Brand X*, *all* the Justices agreed that broadband Internet access is an information service.  The only disagreement was whether the last-mile transmission component, downstream from all data processing, should be broken out and analyzed separately as "pure" transmission.  The dispute over that distinct issue does not support the FCC's radical reclassification of a consumer-to-edge-provider service.

25

Even if Title II reclassification were permissible, the *Order* must be set aside as arbitrary and capricious. The *Order* relies on alleged factual changes that are neither relevant nor real; indeed, many of these exact facts were discussed in *Brand X*. Moreover, when agencies reverse course, they must confront significant reliance interests engendered by their previous policies and provide "a more substantial justification" for adopting that new course. *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015). Instead of wrestling with previous orders that embraced the information-services classification *in order to* induce broadband investment, or the hundreds of billions of dollars invested as a result, the FCC baldly denies any relationship between classification and investment.

**II.**      Mobile broadband providers are doubly immune from common-carrier regulation. *See Cellco*, 700 F.3d at 538. That is so because, as the FCC has repeatedly held, mobile broadband service not only is an "information service," but also is *not* a "commercial mobile service" subject to common-carriage treatment. 47 U.S.C. § 332(c). Mobile broadband interconnects with the *Internet*, not "the public switched network" as required by the statutory definition of "commercial mobile service." To retrofit the FCC's desired outcome to the statute, the *Order* rewrites numerous regulations and principles that have long governed mobile broadband. Those changes cannot be justified by the FCC's political judgments that mobile broadband's very success necessitates its regulation as a public utility

26

or that reclassification of fixed broadband compels a parallel framework for mobile.

> **III.**    Because retail fixed and mobile broadband Internet access are information services immune from common-carriage regulation, the FCC's attempt to regulate Internet interconnection and its adoption of the Internet Conduct Standard — both of which are grounded on the unlawful reclassification decision — must fail.

However, even assuming *arguendo* that the FCC could treat broadband Internet access as something other than an information service, many of the *Order*'s key determinations would still fail.

*First*, the *Order* does not justify imposing common-carrier duties on broadband Internet access services under the well-established *NARUC* test.  The *Order* does not (and could not) determine that thousands of separate providers across the nation all have market power and thus can be *compelled* to act as common carriers.  Absent a basis to compel common carriage, providers remain free to elect to operate on a private-carriage basis rather than submit to this new regulatory regime.

*Second*, with respect to Internet interconnection, the FCC has not reclassified as telecommunications services the separate interconnection arrangements between broadband providers and others, whether network providers

27

like Level 3 or edge providers like Google.  Indeed, after initially indicating that it would reclassify those services, at the very last minute, the FCC explicitly declined to do so.  The *Order*'s conclusion that the FCC may subject those arrangements to Title II without classifying this service as a telecommunications service directly contravenes *Verizon*.

*Third*, the FCC's Internet Conduct Standard is unlawfully vague.  It uses broad, undefined terms such as "interfere" and "disadvantage," and provides only a non-exclusive list of equally unclear and incommensurable "factors" that the agency will apply in some indeterminate way.  Those standards do not provide the clarity required to prevent arbitrary decisionmaking and to inform parties what conduct will subject them to enforcement.

*Fourth*, the FCC violated the Regulatory Flexibility Act by failing to consider the burdens reclassification imposes on small providers.  The FCC neither explained why it rejected alternatives to reclassification for small providers nor identified the compliance burdens it created.

**IV.**     The *Order* must be set aside because the FCC violated the APA's notice-and-comment requirements.  The FCC proposed to respond to *Verizon* with "net neutrality" rules based on the "blueprint" this Court provided, *NPRM* ¶ 4 (JA___), and it briefly mentioned the possibility of Title II reclassification only as a jurisdictional backstop for those rules.  Even then, the *NPRM* assured the public

28

that any reclassification would include forbearance from all but a handful of truly "core" provisions. None of this gave notice that the FCC would promulgate a comprehensive "Title II tailored for the 21st Century." *Order* ¶ 38 (JA___).

As to mobile broadband, the *NPRM* asked only whether that service fit the existing definition of commercial mobile service. The FCC never hinted that it intended to reverse multiple controlling regulations that define what *constitutes* that service to get out from under the separate statutory ban on common-carrier regulation of mobile broadband.

The *NPRM* likewise gave zero notice that interconnection was on the table — in fact, Chairman Wheeler asserted the opposite — or that the FCC would adopt the amorphous Internet Conduct Standard.

## STATEMENT OF STANDING

Petitioners each participated in the proceedings that led to the *Order* and have standing because the *Order* subjects them or their members to multiple, onerous requirements.

29

# ARGUMENT

## I.   THE FCC'S RECLASSIFICATION OF INTERNET ACCESS AS A TELECOMMUNICATIONS SERVICE IS UNLAWFUL

### A.   Reclassification Contravenes the Communications Act

Broadband Internet access service is an "information service." Thus, it cannot fall within the "mutually exclusive"[15] category of telecommunications service. And because it is not a telecommunications service, Title II common-carrier regulation is flatly prohibited. *See* 47 U.S.C. § 153(51).

**1.**   The 1996 Act makes clear that broadband Internet access is an information service. Internet access qualifies under *each* of the eight, independent parts of the definition. It "offer[s]" consumers the "capability" to "acquir[e]" and "retriev[e]" information from websites, to "stor[e]" information in the cloud, to "transform[ ]" and "process[ ]" information by translating plain English commands into computer protocols, to "utiliz[e]" information through computer interaction with stored data, and to "generat[e]" and "mak[e] available" information to other users by sharing files. *Id.* § 153(24). The whole point of Internet access is to offer the capability to obtain and manipulate the information stored on the millions of interconnected computers that comprise the Internet.

---

[15] *Order* ¶ 385 (JA___).

And it can do so only because, as the FCC previously found, Internet access providers "combine computer processing, information provision, and other computer-mediated offerings with data transport." *Stevens Report* ¶ 73.  The computer processing inherent in Internet access service "provide[s] . . . subscribers with the ability to run a variety of applications," such as the "World Wide Web," which allows "[s]ubscribers [to] retrieve files . . . and browse their contents." *Id.* ¶ 76.

If broadband providers provided only pure transmission and not information processing, as the FCC now claims, the primitive and limited form of "access" broadband customers would receive would be unrecognizable to consumers.  They would be required, for example, to know the IP address of every website they visit.  But, because Domain Name Service ("DNS") is part of Internet access, consumers can visit any website without knowing its IP address and thereafter "click through" links on that website to other websites. *See Wireline Broadband Order* ¶ 15 ("[A]n end user of wireline broadband Internet access service cannot reach a third party's web site without access to the Domain Nam[e] Service (DNS) capability . . . .  The end user therefore receives more than transparent transmission whenever he or she accesses the Internet."); USTelecom Comments 24-26 (JA___); NCTA Dec. 23, 2014 Ex Parte 10 (JA___).

31

Similarly, many broadband Internet access providers use caching to enhance their customers' ability to acquire information. *See Stevens Report* ¶ 76 (noting that, when "subscribers . . . retrieve files from the World Wide Web, they are . . . interacting with stored data, typically maintained on the facilities of either their own Internet service provider (via a Web page 'cache') or on those of another"). Broadband providers use powerful information-processing algorithms to determine what to cache, where to cache it, and how long the content should be cached. And Internet access also includes parental controls, security, and other functions that go well beyond pure transmission and provide further capabilities that can only be part of an "information service."[16]

All these arguments apply equally to mobile; indeed, mobile broadband involves additional features that further buttress the conclusion that it is an "information service." The mobile environment is in constant flux: users move around, buildings obstruct wireless signals, and multiple signals cause interference. To address these distinct operational challenges, mobile broadband must provide the capability for "generating, . . . transforming, processing, . . . utilizing, [and] making available information," 47 U.S.C. § 153(24), including *generating* and *making available* multiple IP addresses for devices (one for

---

[16] *See*, *e.g.*, AT&T Feb. 2, 2015(H) Ex Parte 6-8 (JA___); AT&T Feb. 18, 2015 Ex Parte 4 (JA___): Suddenlink Reply Comments 3, 11 (JA___, ___).

Internet access, the other for services such as text messaging) and *processing* data in encrypting IP packets for security. *See Mobile Networks* at 31-33 (JA___-__).

     **2.**     Section 230, enacted alongside the definitions of information and telecommunications service, confirms that Congress understood Internet access to be an information service immune from the kinds of regulation the *Order* would now impose. Section 230 establishes that it is "the policy of the United States" "to preserve the vibrant and competitive free market that presently exists for the *Internet and other interactive computer services, unfettered by Federal or State regulation*." 47 U.S.C. § 230(b)(2) (emphasis added). Section 230(f)(2) then defines those "interactive computer service[s]" to include any "information service, . . . *including specifically a service . . . that provides access to the Internet*." *Id.* § 230(f)(2) (emphasis added).

     Congress thus made clear that the defined term "information service . . . includ[es]" Internet access services. Accordingly, the FCC previously (and correctly) concluded that § 230 demonstrates that classifying Internet access as an information service is "consistent with Congress's understanding." *Wireline Broadband Order* ¶ 15 n.41.

     **3.**     The statutory context and history confirm the plain meaning of the statutory text. As described in detail above, *see supra* pp. 6-9, 11-12, the 1996 Act codified two pre-existing regulatory classifications: the distinction between

information and telecommunications services under the MFJ; and the distinction between "enhanced" and "basic" services under the FCC's *Computer* decisions. *See Brand X*, 545 U.S. at 976-77, 992-93; *Verizon*, 740 F.3d at 630; *Order* ¶ 312 (JA___).

Both the MFJ Court and the FCC squarely concluded, *before* Congress passed the 1996 Act, that gateway services allowing access to information stored by third parties are unregulated information/enhanced services, not Title II-regulated basic/telecommunications services. *See supra* pp. 8-9. As the FCC itself has explained, those "gateways" involved the same "functions and services associated with Internet access." *Stevens Report* ¶ 75; *see Western Elec.*, 673 F. Supp. at 587 (the gateway services that qualify as information services include those offering "mere database access"). Indeed, the FCC had expressly defined any service that provided "subscriber interaction with stored information," 47 C.F.R. § 64.702(a), as an enhanced service.

Where, as here, Congress uses terms "obviously transplanted from another legal source, . . . it brings the old soil with it." *Sekhar v. United States*, 133 S. Ct. 2720, 2724 (2013). And, as the FCC itself long ago concluded (and the *Order* does not dispute), the statutory definition of information services in the 1996 Act includes "all of the services that the [FCC] has previously considered to be 'enhanced services.'" *Non-Accounting Safeguards Order* ¶ 102. Accordingly,

34

when Congress codified the prior regulatory regimes, it adopted the pre-existing understanding that Internet access comes within the class of non-regulated enhanced/information services.  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 142, 157 (2000) ("consistency of the FDA's prior position" disclaiming authority to regulate tobacco products "bolster[ed] the conclusion" that Congress's subsequent enactments excluded them from the FDA's jurisdiction). Indeed, the FCC cited directly to this regulatory history soon after the 1996 Act's enactment in concluding that Internet access services are information services.  *See Stevens Report* ¶ 75.

The FCC has no real answer to these points.  It does not explain why broadband Internet access falls outside the statutory definition of information service, as that service assuredly "offers" the "capability" to obtain, store, and utilize information.  Nor does the FCC even address its most directly relevant precedents.  Nowhere does the *Order* confront how a gateway service that offered "subscriber interaction" with third parties' "stored information" could be enhanced, *Gateway Service Order* ¶ 7; 47 C.F.R. § 64.702(a), but the much more sophisticated capabilities available today through Internet access do not meet the statutory definition that codifies the enhanced-services category.

To be sure, the FCC tries to diminish (some of) its past holdings by contending that the *Stevens Report* was not a "binding Commission Order

35

classifying Internet access services." *Order* ¶ 315 (JA___). That is irrelevant. The *Stevens Report* recounts and relies on the same regulatory history that fatally undermines the *Order* — in particular, (1) the MFJ Court and FCC held that "the functions and services associated with Internet access were classed" as information/enhanced services, *Stevens Report* ¶ 75, and (2) Congress in the 1996 Act codified the regulatory distinctions made in those proceedings. In all events, the FCC adopted the analysis in the *Stevens Report* in its binding classification orders, *see*, *e.g.*, *Cable Broadband Order* ¶¶ 36-41, and the FCC identifies no reason why the *Stevens Report*'s discussion of the relevant historical facts is no longer accurate.

**4.** The *Order* sidesteps the plain statutory text and the regulatory distinctions Congress codified. The FCC does this through definitional sleight-of-hand. It declares that all the information-processing functions it previously viewed as critical to classifying broadband as an information service can now be excluded from consideration. It claims that some fit within the narrow "telecommunications-management" exception to the definition of "information services," while the remainder are not part of the "offering" at all. *Order* ¶¶ 366-375 (JA___-__). It is only by systematically excluding every feature of the service that is not pure transmission that the FCC can claim that what remains is pure transmission.

**a.**    As an initial matter, the FCC's assertion that a few specific features of broadband Internet access are "telecommunications management" and that others are not "inextricably" part of that service is beside the point.  No matter how many computer-mediated features the FCC may sweep under the rug, the inescapable core of Internet access is a service that uses computer processing to enable consumers to "retrieve files from the World Wide Web, and browse their contents" and, thus, "offers the 'capability for . . . acquiring, . . . retrieving [and] utilizing . . . information.' "  *Stevens Report* ¶ 76.  Under the straightforward statutory definition, an "offering" of that "capability" is an information service.

Even if that were not dispositive, the FCC's argument fails if either of its new exclusionary rules is incorrect.  In fact, the FCC is wrong as to both.

**b.**    Contrary to the FCC's assertions, the many core information-service functions associated with Internet access cannot be dismissed as the "management of a *telecommunications* service."  47 U.S.C. § 153(24) (emphasis added).  The FCC recognizes that this exception codifies the pre-1996 Act "adjunct-to-basic" exception to the category of enhanced services, *see Order* ¶ 312 (JA___),[17] but ignores that this was a "narrow" exception limited to services that "facilitate use of

---

[17] *See also Non-Accounting Safeguards Order* ¶ 107.

the basic network without changing the nature of basic *telephone* service."[18] Therefore, an "offering of access to a data base for the purpose of obtaining telephone numbers" was an "adjunct to basic telephone service," but "an offering of access to a data base for most other purposes" — such as the access that gateway services offered, *see supra* pp. 8-9, 34 — "is the offering of an enhanced service," now an information service.[19]

Contrary to the FCC's claims, DNS does not manage telecommunications, *see Order* ¶ 367 (JA___), but instead "constitutes a general purpose information *processing* and *retrieval* capability that facilitates the use of the Internet in many ways." *Cable Broadband Order* ¶ 37 (emphases added). Most notably, as explained above, *see supra* p. 31, DNS provides the processing capabilities that allow consumers to visit a website without knowing its IP address, and thereafter to "click through" a link on that website to other websites. It also enables other capabilities that allow subscribers to manipulate information or that provide information directly to subscribers. For example, DNS is used to offer parental controls that enable subscribers to direct what content can be viewed through their service and suggests websites customers may want to reach when they enter an

---

[18] Memorandum Opinion and Order, *North American Telecomms. Ass'n*, 101 F.C.C.2d 349, ¶ 28 (1985) (emphasis added).

[19] *Id.* ¶ 26.

incomplete or inaccurate web address.  *See* AT&T Comments 48-49 (JA___-__);
AT&T Feb. 18, 2015 Ex Parte 4 (JA___).

These capabilities permit or enhance the use of the Internet application
known as the World Wide Web; they do not manage a telecommunications system
or service.  So, too, when Internet access providers cache content from the World
Wide Web, they are not performing functions, like switching or compression, that
are instrumental to pure transmission, but storing third-party content they select in
servers in their own networks to enhance access to *information*.

The FCC asserts that it never previously considered whether DNS and
caching are within the telecommunications-management exception.  *Order* ¶¶ 366-
367, 372 (JA___-__, ___).  That is simply not true.  The FCC argued in *Brand X*
that DNS and caching "do[ ] not fall within the statutory exclusion" for
telecommunications management and are "*not* used 'for the management, control,
or operation' of a telecommunications network," but instead provide "information-
processing capabilities . . . used to facilitate the information retrieval capabilities
that are inherent in Internet access."  Fed. Pet'rs Reply Br. 6 n.2, No. 04-277, 2005
WL 640965.

The FCC's statements to the Supreme Court were correct.  That is confirmed
by the fact that the FCC agrees that third parties do *not* offer telecommunications
service when they provide many of these very same "information-processing

39

capabilities" to retail customers.  *Order* ¶ 370 (JA___).  Computer-processing service sold directly to consumers by third-parties cannot possibly be for the management of *the Internet access provider's network*, and thus cannot fall within the statutory exception the FCC cites.

Recognizing this, the FCC contends that the *same functions* — DNS and caching — are used for telecommunications management when offered as part of Internet access, but are an *information service* when third-party content providers similarly offer them.  *See id.* ¶¶ 370 n.1046, 372 (JA___-__).  The FCC's refusal to classify the same functions in the same manner when used by providers doing the same things demonstrates the arbitrary nature of the FCC's decision.

**c.**      The FCC does not and cannot claim that functions such as email and web hosting could be "telecommunications management," and does not dispute that they are typically offered as part of broadband Internet access service.  It asserts instead that they should be excluded because consumers frequently use third-party alternatives.  *See id.* ¶¶ 376-381 (JA___-__).  But that is irrelevant to the critical statutory issue:  the service that broadband providers "*offer[ ]*."  47 U.S.C. § 153(24), (53) (emphasis added).

As the FCC has explained, "what matters is the finished product made available through a service."  *Wireline Broadband Order* ¶ 16.  For example, the FCC recognized in 2002 that many consumers *used* third-party content and

40

services, but it concluded that broadband is an information service based on consumers' perception of what broadband providers *offered*. *See Cable Broadband Order* ¶ 38.  That perception remains the same whether or not consumers "use all of the functions and capabilities provided as part of the service (*e.g.*, e-mail or web-hosting)." *Wireline Broadband Order* ¶ 15.  As the *Order* admits, broadband providers "still provide various Internet applications, including e-mail, online storage, and customized homepages, in addition to newer services such as music streaming and instant messaging." *Order* ¶ 347 (JA___).  Even assuming, as the FCC alleges, that there has been a change in how consumers *use* those functions — though, as petitioners demonstrate below, *see infra* Part I.B.1, that conclusion is unsupportable — those facts prove nothing about how consumers view what providers "*offer*."

     **5.**     Unable to defend its result based on the 1996 Act's text or the regulatory regimes that statute codified, the FCC seeks refuge in *Brand X*. According to the FCC, *Brand X* holds that the 1996 Act is ambiguous on the very issue presented here and gives the agency *carte blanche* "to revisit [its] prior interpretation" under *Chevron* step 2.  *Order* ¶ 332 (JA___); *see id.* ¶¶ 333-334, 356-357 (JA___-__, ___-__).

     That misreads *Brand X*.  *No* Justice in that case doubted that services offering consumers the ability to access the Internet are "information services."

41

The majority agreed with the FCC's conclusion that the cable broadband Internet access service at issue was an "information service" because it offers "a comprehensive capability for manipulating information using the Internet via high-speed telecommunications," just as today's Internet access services do.  545 U.S. at 987, 998.  Likewise, Justice Scalia (joined by Justices Souter and Ginsburg), in dissent, quoted with approval an FCC staff paper stating that "Internet access . . . is an enhanced service."  *Id.* at 1008-09.

The only place the majority found ambiguity — and the only place where the *Brand X* majority and dissent parted company — was as to whether a provider, *in addition to and separate from* offering an Internet access information service, *also* "offered" a telecommunications service.  The majority upheld as reasonable the FCC's determination that, "from the consumer's point of view," the delivery of Internet traffic to the consumer's computer is not a separate offering of a telecommunications service, but rather is "'part and parcel of [the information service] and is integral to [the information service's] other capabilities.'"  *Id.* at 988, 997 (quoting *Cable Broadband Order* ¶ 39).  The dissenters, in contrast, contended that broadband providers do "offer" a separate "delivery service," just as pizzerias also "offer" delivery of pizzas they bake.  *Id.* at 1007, 1010 (Scalia, J. dissenting).

42

Importantly, the delivery component the dissenters would have recognized as a separate service spanned only the last mile, *i.e.*, the connection between "the customer's computer and the cable company's computer-processing facilities." *Id.* at 1010. That was critical to the dissent's reasoning: it was precisely because delivery occurred "downstream from the computer-processing facilities" that performed those information-service functions that the delivery service "merely serve[d] as a conduit for the information services that have already been 'assembled' by" the broadband provider. *Id.* at 1007, 1010.

That ambiguity is irrelevant here, however, because the *Order* embraces a position that all nine Justices rejected: that broadband Internet access is *only* a telecommunications service. Where the *Brand X* dissenters saw *two* services, akin to making pizza (information service) and delivering it (telecommunications service), the *Order* pretends that broadband providers offer *only* delivery and do not make pizza at all. It defines as a telecommunications service the same complete retail broadband Internet access service that the agency had previously concluded was an information service, not some allegedly severable telecommunications service offered *in addition to* that service. *See Order* ¶ 336 (JA___).

The FCC's reclassification, therefore, is not of the last-mile connection between a customer and the broadband provider's computer-processing facilities

43

(as the *Brand X* dissenters argued), but of the *entire* broadband service from the end user all the way to edge providers. *See*, *e.g.*, *id.* ¶ 195 (JA___) (explaining that the defined service extends to the broadband provider's "exchange of Internet traffic [with] an edge provider," such as Google or cnn.com). The ambiguity addressed in *Brand X* thus has no bearing here because the *Order* "goes beyond the scope of whatever ambiguity [the statute] contains." *City of Chicago v. Environmental Def. Fund*, 511 U.S. 328, 339 (1994).

The FCC claims that *Brand X* was not limited to last-mile transmission and involved the same service, including Internet access functionalities, at issue here. *See* FCC Stay Opp. 12-13. That is incorrect. In *Brand X*, the FCC argued that the supposedly separate telecommunications service at issue involved the transmission "between the user and the [Internet] service provider's computers."[20] *See also* Pai Dissent 359 (JA___) ("It was this potential last-mile transmission service that was at issue in the *Brand X* case."). Similarly, in the *Cable Broadband Order* reviewed in *Brand X*, the FCC itself identified the potential telecommunications service at issue as one involving the "high-speed wire" used to transmit "data over the cable system between the subscriber" and the "headend," *i.e.*, the cable equipment that

---

[20] Fed. Pet'rs Br. 25 n.8, No. 04-277 (2005), *available at* http://goo.gl/9qJZwA.

44

serves a "*local* service area."[21]  The *Brand X* majority cited that very FCC discussion in discussing the "telecommunications" (*i.e.*, transmission) over a "high-speed wire" included in Internet access.  545 U.S. at 988 (citing *Cable Broadband Order* ¶ 40); *see also* Pai Dissent 358-59 (JA ___-__).

One convenient byproduct of the FCC's new, end-to-end definition of a broadband telecommunications service — a definition that no Justice in *Brand X* embraced — is that it provides a fig leaf to evade this Court's precedent.  *Verizon* held that, because broadband providers "furnish a service" to edge providers distinct from the retail service they provide to end users, the FCC could not subject that edge service to Title II without classifying it as a telecommunications service.  740 F.3d at 653.  The *Order* attempts to circumvent that ruling by redefining retail service to *include* that edge service also.  As discussed below, that approach is meritless.  *See infra* Part III.B.  In all events, the reclassified service bears no resemblance to the last-mile transmission component disputed in *Brand X*.

**6.**     Even if the statute were ambiguous in any relevant respect, the FCC's decision is unreasoned and unreasonable.  There is no rational limiting principle to the FCC's theory that functions involving access, utilization, storage, and

---

[21] *Cable Broadband Order* ¶¶ 12 n.52, 39 n.154 (emphasis added); *see id.* ¶ 17 n.70 (explaining that the "demarcation point" separating the cable facilities and the Internet access provider's facilities was "within the headend").

manipulation of information sometimes create an information service and other times can be dismissed as either "telecommunications management" or somehow not part of what consumers are "offered." This failure is demonstrated most vividly by the FCC's conclusion that transmission plus caching sometimes creates a telecommunications service, and sometimes does not. *See Order* ¶ 372 (JA___).

It is in part because there is no coherent limiting principle to such an approach that courts and the FCC have rejected a reading of the 1996 Act under which adding information-processing to telecommunications sometimes creates an information service and sometimes does not. *See Brand X*, 545 U.S. at 994 (rejecting claim that use of transmission in broadband Internet access rendered it a telecommunications service, as that position would subject "all information-service providers that use telecommunications as an input" to common-carrier regulation); *Stevens Report* ¶ 57 ("[I]f . . . some information services were classed as telecommunications services, it would be difficult to devise a sustainable rationale under which all, or essentially all, information services did not fall into [that] category.").

### B.  Reclassification Is Arbitrary and Capricious

The reclassification ruling independently must be vacated because it is arbitrary and capricious. It is expressly predicated on factual findings that contradict the prior findings underlying the FCC's long-settled approach to

broadband.  The purportedly "[c]hanged factual circumstances," *Order* ¶ 330

(JA___), the FCC invokes are neither changed nor even relevant to the

classification of broadband.  Worse, the *Order* willfully disregards the destructive

effects of reclassification on hundreds of *billions* of dollars in investment-backed

reliance interests that the FCC's prior light-touch approach deliberately induced.

The *Order* thus flunks the APA standard because the FCC "offered . . .

explanation[s] for its decision that run[] counter to the evidence before the agency"

and because it "failed to consider" seriously "important aspect[s] of the problem."

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983).  As the Supreme Court "underscore[d]" just this past Term, the APA

requires an even "more substantial justification" here, both because the FCC's

"new policy rests upon factual findings that contradict those which underlay its

prior policy," and because the FCC's prior broadband classification "has

engendered serious reliance interests that must be taken into account."  *Perez*,

135 S. Ct. at 1209.  The *Order* fails to provide even a colorable justification for

abandoning its prior findings and upsetting reliance interests, much less the "more

substantial justification" the APA demands.

      1.     *The FCC Failed To Identify Any Change That Would Justify Rejecting Its Prior Factual Findings*

The reclassification ruling is predicated on the FCC's rejection of a central

factual premise of its prior classification decisions:  that consumers perceive

broadband as a "single, integrated service" in which transmission and enhanced, information-processing functions are inextricably intertwined. *Brand X*, 545 U.S. at 977-78; *see Order* ¶ 330 (JA___). The FCC claims in the *Order* that it is now "unable to maintain [that] prior finding" — not because consumers' perceptions are no longer paramount, but because those perceptions supposedly have undergone a dramatic and comprehensive change. *See Order* ¶¶ 330, 350 (JA___, __).

As discussed, the FCC stacks the deck by declaring that several components inherent to broadband (such as DNS and caching), which undeniably entail more than facilitating mere transmission, are irrelevant because they supposedly fall within the telecommunications-management exception to the definition of "information service." The FCC then asserts that consumers no longer view the information-service components of broadband that *remain — e.g.*, email and cloud storage — as part of the offered broadband Internet access service. *See id.* ¶ 350 (JA___). Both arguments fail for the reasons discussed above. *See supra* Part I.A.4. But, even accepting *arguendo* the FCC's statutory interpretations, its contention that consumers' view of the remaining functions has radically changed — conveniently, just when the agency seeks authority over the Internet — rests on quicksand.

48

The FCC relies on two purported developments supposedly showing that consumers no longer view functions such as email and online storage as part of the service that broadband providers offer. Neither is a "development" *at all*. The *Order* cites consumers' use of broadband "to access third party content, applications, and services." *Order* ¶¶ 330, 346-347 (JA___, ___-__). But that use has existed for well over a decade. In the 2002 order affirmed in *Brand X*, the FCC itself recognized that consumers "may obtain many functions from companies with whom the cable operator has not even a contractual relationship" and that consumers used those functions instead of those "provided with their cable modem service." *Cable Broadband Order* ¶¶ 25, 38 & n.153.

The *Order* also notes that providers "emphasize speed and reliability of transmission separately from and over" other features. *Order* ¶¶ 330, 351 (JA___, __). That, too, is nothing new. Broadband providers advertised their service based on speed before the turn of the millennium. *See* Pai Dissent 357-58 (JA___-__); O'Rielly Dissent 391 (JA___). The dissenters in *Brand X* underscored that broadband providers (like pizzerias) "advertise[ ] quick delivery" as an "advantage[ ] over competitors." 545 U.S. at 1007 n.1 (Scalia, J., dissenting). The *Order*'s purported evidence concerning providers' pricing strategies (*Order* ¶ 353 (JA___)) is old news, too, as an FCC report from 2000 demonstrates. *See Second Broadband Deployment Report* ¶¶ 36-37.

49

Indeed, the supposed changes are mere window-dressing for the FCC's desired result.  The agency "clarif[ies]" in a footnote that, even if "the facts regarding how [broadband] is offered had *not* changed," it would abandon its prior classification *anyway*.  *Order* ¶ 360 n.993 (JA___) (emphasis added).  That "clarification" starkly illustrates the *Order*'s arbitrariness.  If the facts remain the same, the FCC could rationally reach a different conclusion only if its view of the law now differed.  Yet the *Order* articulates no relevant new interpretation of the pertinent statutory provisions.  And the APA forbids the agency to "depart from a prior policy *sub silentio*."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("*Fox I*").

2.    *The FCC Failed To Account for Serious Reliance Interests*

The reclassification ruling is independently arbitrary because the FCC failed to address the massive reliance interests that the FCC deliberately induced.

Historically, the FCC recognized that classifying broadband as an information service furthered congressional intent by *encouraging* investment in broadband.  "[S]ubstantial investment is required to build out the networks that will support future broadband capabilities and applications."  *Wireline Broadband NPRM* ¶ 5.  "[B]roadband services," the FCC concluded, "should exist in a minimal regulatory environment that promotes investment and innovation in a competitive market."  *Cable Broadband Order* ¶ 5.  The 2002 *Cable Broadband*

50

*Order* accordingly classified cable broadband as an information service "to remove regulatory uncertainty that in itself may discourage investment and innovation." *Id*. Similarly, in 2005, the FCC concluded that classifying wireline broadband as an integrated information service would "promote infrastructure investment." *Wireline Broadband Order* ¶ 19.

The FCC's light-touch approach was phenomenally successful. Between 2002 and 2013, fixed and mobile providers, including smaller providers serving rural and underserved areas, invested more than $800 *billion* in broadband service. *See supra* note 13. As the record demonstrates, that investment was made "in reliance on" the FCC's classification of broadband as an information service. *E.g.*, Comcast Comments 54-55 (JA___-__); AT&T Reply Comments 27 (JA___); NCTA Comments 33 (JA___).

The harmful effects of reclassification on these reliance interests are unquestionably an "important aspect of the problem," *State Farm*, 463 U.S. at 43, that the APA required the FCC to consider. The FCC could not rationally abandon its prior policy without "account[ing]" for "reliance interests" that its prior policy "engendered." *Fox I*, 556 U.S. at 515. It had to confront those reliance interests and identify some countervailing benefit that justified those costs. "No regulation is 'appropriate' if it does significantly more harm than good." *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015). And it is inherently arbitrary to adopt a policy

without a "serious evaluation of the costs" it will foist upon regulated entities. *Business Roundtable v. SEC*, 647 F.3d 1144, 1151-52 (D.C. Cir. 2011).

Instead of confronting those reliance interests, the FCC denies that they even *exist*. The *Order* asserts that classification of broadband has "at most, an indirect effect" on investment. *Order* ¶ 360 (JA___). That assertion is belied by the record[22] and contradicts the FCC's *own* oft-repeated view that classification of broadband directly affects investment. *See*, *e.g.*, *Cable Broadband Order* ¶ 5. As much as the FCC would prefer to airbrush the historical record, it cannot erase its own prior pronouncements and make the link it repeatedly recognized between classification and investment disappear.

The *Order*'s only evidence for its contrary view is insubstantial. It notes that, after the *2010 Notice* raised the possibility of reclassification, broadband executives maintained that they would continue to invest in their networks. *See Order* ¶ 360 n.986 (JA___). But the *2010 Notice* stressed the FCC's desire to "maintain a deregulatory status quo," *2010 Notice* ¶ 73, and never hinted at the far-reaching regulation the *Order* adopts, such as rate regulation.

The *Order* also cites one commenter's analysis purportedly showing that broadband providers' stock "outperformed the broader market" in the months after

---

[22] *See*, *e.g.*, Comcast Comments 45-46 (JA___-__); AT&T Comments 51-55 (JA___-__); NCTA Comments 18-25 (JA___-__).

the *2010 Notice*.  *Order* ¶ 360 n.986 (JA___).  But the FCC offers no evidence that capital investment causes strong stock performance; indeed, one might expect just the opposite, as investors focused on shorter-term profits presumably favor *fewer* capital outlays.[23]  The FCC contends that mobile providers continued to invest in their networks after mobile voice service was subject to Title II.  *See Order* ¶ 423 (JA___).  But that investment was "driven . . . by Title I mobile *broadband* services" that were *not* subject to Title II, not by the mobile *voice* services that were.  Verizon Feb. 19, 2015 Ex Parte 2 (JA___) (emphasis added).

There is no more merit to the FCC's fallback claim that any reliance on the FCC's longstanding information-service classification of broadband was not "reasonable" because broadband's status was "unsettled" and "called into question too consistently" until now.  *Order* ¶ 360 (JA___).  The FCC's express purpose in classifying broadband as an information service was to "*remove* regulatory uncertainty that in itself may discourage investment."  *Cable Broadband Order* ¶ 5 (emphasis added).  The most that the FCC can claim is that the issue was "unsettled" for a few months between the *2010 Notice* and the *2010 Order*.  That brief period pales in comparison to the many years in which broadband providers

---

[23] *See* Holman W. Jenkins, Jr., *Washington Makes a Broadband Hash*, Wall St. J., May 27, 2015, at A11 ("Incumbent broadband CEOs had been saying for months they would invest less under Title II.  Guess what?  Shareholders like the sound of less investment.  Investment is a cost.").

reasonably relied on the classification of broadband Internet access as an information service.

Nor does the FCC show that these massive costs are offset by corresponding benefits.  It argues that reclassification provides authority for the Open Internet rules.  *See Order* ¶¶ 42, 49 (JA___, __).  But, as *Verizon* made clear, 740 F.3d at 655-59, and as the FCC originally recognized, *see NPRM* ¶ 4 (JA___), it could have adopted appropriate Open Internet rules based upon § 706 *without* reclassifying broadband.  *See*, *e.g.*, Comcast Comments 13-19 (JA___-__); NCTA Comments 2 (JA___).  That "openness" rationale, moreover, could not explain imposing myriad, unrelated Title II requirements on broadband, as the FCC has done.

In any event, apart from a handful of stale anecdotes, *see Order* ¶ 79 & n.123 (JA___), the *Order* relies entirely on hypothetical claims that broadband providers have "incentives" to engage, or "may" engage, in conduct that has the "potential" to, or "could," cause harm to "innovation."  *E.g.*, *id.* ¶¶ 20, 78-79, 82-83, 127, 200 (JA___, ___-__, ___-__, ___, ___).  Contrary to those suggestions, reclassification will undermine Internet openness because, under the FCC's own "virtuous cycle" theory, increased Internet openness depends on "expanded investments in broadband infrastructure," *id.* ¶ 7 (JA___), which reclassification will undermine.  The alleged benefits of reclassification are thus far too attenuated

to justify the immense cost of upsetting providers' reliance interests.  *See* Pai

Dissent 334 (JA___); O'Rielly Dissent 387 (JA___).

      The FCC halfheartedly asserts that the *Order*'s forbearance from various

Title II provisions neutralizes any threat to reliance interests.  *See Order* ¶ 360

(JA___).  But the *Order* refuses to forbear from the most significant requirements

in Title II.  Those provisions include §§ 201 and 202, which impose broad but

undefined mandates against unreasonable conduct and discrimination.  Indeed, the

agency has already threatened rate regulation by reserving the right to "employ

sections 201 and 202 in case-by-case adjudications."  *Id.* ¶¶ 441, 451 (JA___, ___).

These provisions also include § 222, which imposes complex duties regarding

customer information clearly intended for voice service and as to which the FCC

has not even provided any rules governing compliance.  *See id.* ¶ 466 (JA___).

Nor does the FCC forbear from §§ 206, 207, or 208, throwing open the door to

complaints and class-action damages suits.  *See id.* ¶ 453 (JA___); *see also* Pai

Dissent 328 (JA___).  And the agency asserts authority under §§ 201 and 202 to

address matters covered by certain provisions from which it nominally forbore,

thus applying "all of Title II . . . through the backdoor of sections 201 and 202."

O'Rielly Dissent 385 (JA___); *see Order* ¶¶ 481, 490, 497, 508-509, 512-513

(JA___, ___, ___, ___-__, ___-__).

## II.   THE FCC'S RECLASSIFICATION OF MOBILE BROADBAND INTERNET ACCESS AS A COMMON-CARRIER SERVICE IS DOUBLY UNLAWFUL

The *Order* concludes that mobile broadband service has suddenly and simultaneously changed its fundamental nature under *two* different provisions of the Act:  the definition of "information service" *and* the separate statutory ban on common-carriage treatment of certain mobile services, 47 U.S.C. § 332(c)(2). Common-carriage regulation of mobile broadband providers is permissible only if *both* of the FCC's statutory conclusions are correct.  Neither is.

As explained above, broadband Internet access is an "information service," and that conclusion applies with special force to mobile broadband due to its specific operational characteristics.  Mobile broadband is also not a "commercial mobile service" interconnected with the telephone network, and thus remains — as the FCC had previously found it to be — shielded from common-carrier treatment by § 332.

The FCC is determined to make mobile broadband a victim of its own success.  Since the Commission decided to retain light-touch regulation of mobile broadband in the *2010 Order*, the only thing that has changed is greater deployment, more innovation, and enhanced competition, with multiple providers offering fourth-generation services across the nation.  That heightened competition — 82 percent of Americans can choose among four or more mobile broadband

56

providers[24] — both undermines the FCC's justification for regulation and defeats its authority to compel common carriage.  Nevertheless, to achieve the FCC's predetermined goal of subjecting all broadband to common-carrier regulation, the *Order* rewrites multiple regulations and warps established principles that have governed mobile broadband for decades.  *See* Wheeler Statement 315 (JA___) ("We cannot have two sets of Internet protections — one fixed and one mobile."); *cf. Michigan*, 135 S. Ct. at 2710 (agency's "preference for symmetry cannot trump an asymmetrical statute").  This is not reasoned agency action.

### A.    Mobile Broadband Is a Private Mobile Service Within the Meaning of § 332

Section 332 independently prohibits treating mobile broadband as a common-carrier service.  *See Cellco*, 700 F.3d at 538.  This second layer of statutory immunity is founded in the distinct history of mobile services.  In 1993, Congress enacted § 332 to ensure that all mobile services interconnected with the telephone network were treated in the same manner as landline phone service.  Congress determined, however, that mobile services *not* interconnected with the telephone network should *not* be regulated as common carriage.

Section 332 thus lays out two, mutually exclusive categories of mobile service:  A "commercial mobile service" is "provided for profit and makes

---

[24] *Seventeenth Mobile Competition Report* ¶ 51 & Chart III.A.2.

interconnected service available [to the public]," 47 U.S.C. § 332(d)(1), where "interconnected service" means "service that is interconnected with the public switched network (as such terms are defined by regulation by the Commission)," *id.* § 332(d)(2).  A "private mobile service," in contrast, is any mobile service "that is not a commercial mobile service or the functional equivalent of a commercial mobile service, as specified by regulation by the Commission."  *Id.* § 332(d)(3).  *Only* a commercial mobile service (or its functional equivalent) can be regulated as common carriage.  *Id.* § 332(c)(1)(A), (c)(2).

Before the *Order*, the FCC had always defined "interconnected service" to mean a service that "gives subscribers the capability to communicate . . . [with] *all* other users on the public switched network."  47 C.F.R. § 20.3 (1994) (emphasis added).  And the FCC had always interpreted "the public switched network" to mean the telephone network, *i.e.*, the "common carrier switched network . . . that use[s] the North American Numbering Plan [*i.e.*, ten-digit phone numbers]."  *Id.*

The FCC has repeatedly held that mobile broadband is not a commercial mobile service or its functional equivalent "because it is not an 'interconnected service.'"  *Wireless Broadband Ruling* ¶ 41; *see also Data Roaming Order* ¶ 41; *2010 Order* ¶ 79 & n.247.  Mobile broadband uses Internet Protocol addresses, not the North American Numbering Plan, and does not connect *at all* with the telephone network.  *See Wireless Broadband Ruling* ¶ 45.  Although the FCC

58

concluded that certain third-party applications riding "over the top" of mobile broadband, such as Voice-over-Internet-Protocol service (*e.g.*, Skype), can interconnect customers with the telephone network, it held that mobile broadband is distinct from those over-the-top services and "in and of itself does not provide this capability." *Id.* Those conclusions remain true today: "mobile broadband . . . does not use the North American Numbering Plan," *Order* ¶ 391 (JA___), and does not provide the capability for users to communicate with the telephone network, *see id.* ¶¶ 400-401 (JA___-__).

## B. The FCC's Effort To Evade § 332 by Changing Underlying Regulations Is Unlawful

To evade these clear statutory and regulatory barriers, the *Order* abandons multiple existing rules and interpretations in favor of new ones, divorced from the statute's text and context, to achieve its goal of across-the-board Title II regulation. The Act precludes these result-driven regulatory gymnastics.

### 1. The FCC's Redefinition of the Public Switched Network Is Impermissible

The *Order* fundamentally changes the longstanding meaning of "the public switched network." According to the FCC, *the* public switched network now refers *both* to the network that uses the North American Numbering Plan (the telephone network) *and* the network that uses "public IP addresses" (the Internet). *Order* ¶ 391 (JA___).

59

In overturning this long-established definition, the FCC purports to rely on its authority in § 332(d) to define "the public switched network." But the fact that Congress delegated to an agency authority to define a term does *not* allow the agency to stretch that term "beyond the scope of whatever ambiguity [the statute] contains." *City of Chicago*, 511 U.S. at 339. The FCC could not reasonably interpret "the public switched network" to include "the telegraph network" or "the postal mail network"; interpreting that term to include the Internet is no less far-fetched. Congress gave the FCC authority to define "the public switched network" to reach, for example, a paging system that connects to the telephone network and uses the North American Numbering Plan but is not itself a telephone service. *See Second Report and Order* ¶¶ 56-60. Congress did *not* authorize the FCC to abandon altogether the statute's core focus on the telephone network.

a.     "The public switched network" is a term of art. Before Congress enacted § 332, both the FCC and the courts repeatedly used that term to refer exclusively to the public switched *telephone* network. The FCC stated, for example, that "the public switched network interconnects all telephones in the country." Memorandum Opinion and Order, *Applications of Winter Park Tel. Co.*, 84 F.C.C.2d 689, ¶ 2 n.3 (1981); *see* Memorandum Opinion and Order on Reconsideration, *Provision of Access for 800 Service*, 6 FCC Rcd 5421, ¶ 1 n.3 (1991) (describing how "800 calls [are] transmitted over the public switched

60

network"). And this Court defined the public switched network as "the same network over which regular long distance calls travel." *Ad Hoc Telecomms. Users Comm. v. FCC*, 680 F.2d 790, 793 (D.C. Cir. 1982); *see also Public Util. Comm'n v. FCC*, 886 F.2d 1325, 1327, 1330 (D.C. Cir. 1989) (using "public switched network" and "public switched telephone network" interchangeably); *WorldCom, Inc. v. FCC*, 246 F.3d 690, 692 (D.C. Cir. 2001) (distinguishing the "public, circuit-switched telephone network" from the "packet-switched data network" of the Internet).

Congress incorporated this term of art into § 332 and thus intended that the term "have its established meaning." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991). In fact, Congress itself used public switched network and public switched telephone network interchangeably. Although the House and the Senate versions of the bill that became § 332 both used the term "the public switched network," the Conference Report characterized the House bill as requiring interconnection "with the [p]ublic switched telephone network." H.R. Rep. No. 103-213, at 495 (1993) (Conf. Rep.).

**b.**     Congress has, moreover, ratified the agency's prior interpretation of "the public switched network." The FCC has consistently interpreted that term to refer to "the traditional local exchange or interexchange switched network," *i.e.*, the telephone network. *Second Report and Order* ¶¶ 59-60. The FCC also rejected

61

the view that the phrase included any future "network of networks." *Id.* ¶ 53. And the FCC subsequently explained that both "section 332 and [its] implementing rules" do not include the Internet. *Wireless Broadband Ruling* ¶ 45 n.119. Congress's choice to leave the agency's interpretation undisturbed through multiple amendments to the Communications Act (and § 332 in particular) "is persuasive evidence that the interpretation is the one intended by Congress." *CFTC v. Schor*, 478 U.S. 833, 846 (1986).

Congress has also affirmatively distinguished "the public switched network" from the Internet. In a provision enacted in 2012, Congress provided for the development of a "core network" for public safety that "provides the connectivity" to "the public Internet or the public switched network, or both." 47 U.S.C. § 1422(b)(1). Indeed, *every other use* of "the public switched network" in the U.S. Code refers exclusively to the telephone network. *See* 47 U.S.C. § 259 (requiring incumbent local telephone companies to share "public switched network infrastructure"); *id.* § 769(a)(11) (referring to "public-switched network voice telephony"). These "subsequently enacted provisions" only "confirm that [the statutory phrase] is a term of art" that the agency must respect. *Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 9 (D.C. Cir. 2011).

    **c.**    The *Order*'s new interpretation turns § 332 on its head. The statutory term "the public switched network" is singular and plainly refers to a single,

integrated network.  Yet the *Order* defines the term to encompass two distinct

networks — the telephone network (which uses North American Numbering Plan

addresses) and the Internet (which uses public IP addresses).  *See Order* ¶ 391

(JA___).  Even if the FCC could treat these two networks as a single, combined

whole, that would mean that mobile voice service — which Congress plainly

intended to be a common-carrier service under § 332 — would no longer be a

commercial mobile service because it does not connect to the Internet or devices

with IP addresses, let alone to "all other users" on the Internet.  47 C.F.R. § 20.3

(1994) (defining "interconnected service").  Recognizing this absurdity, the FCC

redefines "interconnected service" to include a service that connects to "some" end

points on the public switched network — rather than "all" endpoints, as it has

always required.  *Order* ¶ 402 (JA___); *compare* 47 C.F.R. § 20.3 (2015) *with id.*

(1994).  But that only reveals how unreasonable the FCC's revisionist scheme truly

is.  Because the FCC's interpretation is "inconsistent with — in fact, would

overthrow — the Act's structure and design," it must be rejected.  *Utility Air*

*Regulatory Grp.*, 134 S. Ct. at 2442-43.

      **d.**     The *Order* also represents an unprecedented transfer of regulatory

power to the FCC, without a clear warrant from Congress.  By defining "the public

switched network" to reach *every device that uses an IP address* — everything

from mobile phones to cars to refrigerators — the FCC asserts authority to regulate

63

a massive portion of the U.S. economy. *See* Remarks of FCC Chairman Wheeler at AEI (June 12, 2014), *available at* http://goo.gl/DbND5B (predicting that "over 50 billion inanimate devices will be interconnected" by 2020). The *Order* makes no effort to justify this vast expansion of authority over the "Internet of Things," which sweeps in not just communications among the public, but also machine-to-machine communications. This is an overreach, even on the FCC's rationale. *See Order* ¶ 399 (JA___) (reasoning that mobile broadband "provides its users with the ability to send and receive communications from all other users").

An agency's interpretation is unreasonable where, as here, it "would bring about an enormous and transformative expansion in [the agency's] regulatory authority without clear congressional authorization." *Utility Air Regulatory Grp.*, 134 S. Ct. at 2444. Redefining the public switched network in a manner that would regulate billions of new devices is not an exercise in reasoned statutory interpretation; it is an appropriation of inordinate power.

> ### 2.   The FCC's Rejection of Its Prior Understanding of "Interconnected Service" Is Impermissible

In case its attempt to sweep anything with an IP address into "the public switched network" proves untenable, the *Order* claims that mobile broadband service actually *is* interconnected to "the public switched network" even under the 1994 definition that correctly limited that term to the telephone network. The FCC's theory is that, because users may download third-party Voice-over-Internet-

64

Protocol applications that allow them to call telephone numbers, the underlying broadband service too is "interconnected" to the telephone network.  *See Order* ¶ 400 (JA___).  This "half-hearted" argument, Pai Dissent 363 (JA___), simply gives up one unreasonable statutory redefinition (of "the public switched network") for another (of "interconnected service").

As the FCC has recognized until now, the statutory definition of "interconnected service" asks whether the mobile service *itself* is interconnected to the telephone network.  *See* 47 U.S.C. § 332(d)(2) ("'interconnected service' means service that is interconnected with the public switched network").[25]  There is no dispute that mobile broadband service (without adding a Voice-over-Internet-Protocol service) does not itself allow users to communicate with *any* users on the telephone network, much less all other users, as required by the longstanding definition of interconnected service.  *See* 47 C.F.R. § 20.3.  Mobile broadband companies do not provide a telephone service merely because smartphone owners may download Voice-over-Internet-Protocol apps, any more than they provide a car-and-driver service because of the Uber app or a brokerage service because of the E*Trade app.

---

[25] *See Wireless Broadband Ruling* ¶ 45; *cf. Time Warner Declaratory Ruling* ¶¶ 15-16 (holding, in the context of interconnection under § 251, that the transmission of Voice-over-Internet-Protocol traffic "has no bearing" on the regulatory status of the entity "transmitting [the] traffic").

65

Moreover, even when smartphone owners use a Voice-over-Internet-Protocol app, the mobile broadband service *still* is not connected to the telephone network as a factual matter. When two people use the same Voice-over-Internet-Protocol app to talk to each other, the call may travel over the Internet and never touch the telephone network at all. When a Voice-over-Internet-Protocol user calls a voice telephone user, the third party that offers the Voice-over-Internet-Protocol app relies on a local telephone company, and it is *that* carrier — not the Voice-over-Internet-Protocol provider or the mobile broadband provider — that interconnects with the telephone network. *See Vonage Order* ¶ 8.

### 3. *The FCC's Refusal To Apply Its Existing Test for Functional Equivalence Is Impermissible*

Falling back further still, the FCC contends that, even if mobile broadband cannot be redefined as a commercial mobile service, the agency can deem it the "functional equivalent," 47 U.S.C. § 332(d)(3), and thus subject it to Title II. This is so, the *Order* finds, because mobile broadband is "widely available" and allows communication with the vast majority of the public. *Order* ¶¶ 404-405 (JA___-__). This new test for functional equivalence, which yet again throws existing precedent overboard, is arbitrary.

**a.** The FCC has always held that a mobile service that does not meet the statutory definition of a commercial mobile service is "presumed to be a private mobile radio service." 47 C.F.R. § 20.9(a)(14)(i). That presumption could be

66

overcome by showing that the service was "closely substitutable for a commercial mobile radio service" — that is, by showing, based on "market research," that changes in price for this service or for commercial mobile service "would prompt customers to change from one service to the other." *Id.* § 20.9(a)(14)(ii)(B), (C).

The *Order* did not even attempt to apply that presumption, or that standard, here, because mobile broadband and voice service obviously are not close substitutes for each other. *See* Pai Dissent 369 (JA___).  There is no record evidence that an increase in the price of mobile broadband would drive customers away to voice service, or vice versa.  Instead, the *Order* adopts a new test solely for mobile broadband (even while keeping the other test in place):  whether the service is "widely available" and offers "the capability to send and receive communications . . . to and from the public."  *Order* ¶ 404 (JA___).  That abandonment of established legal standards to achieve a result in a particular case is the paradigm of arbitrary action.  *See Independent Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996).

**b.**    The *Order*'s new definition of functional equivalence is particularly unreasonable because it would abandon, rather than "serve[ ]," the "statute's objectives."  *Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 2005).  Congress created the functional equivalence prong of § 332(d)(3) to capture services that, though not technically commercial mobile service, are nevertheless

67

connected to the *telephone* network and can be substituted for voice service. *See Second Report and Order* ¶ 78 (Congress intended that category to reach services "interconnected with the public switched telephone network"). Yet the *Order* abandons the requirement of any connection to the telephone network in favor of asking whether the service allows access to the vast majority of the public — a question that has nothing to do with whether the service is functionally the same as another service.

The fact that Congress gave the FCC authority to determine which mobile services are sufficiently close to the telephone network to be functionally equivalent to a commercial mobile service, *see Order* ¶ 404 (JA___), does not allow the FCC unfettered discretion to regulate services that have *no connection* to the telephone network at the heart of § 332, thereby obviating the common-carriage prohibition. And insisting on at least *some* connection to the telephone network for functionally equivalent services would not, contrary to the *Order*, render the functional equivalence language superfluous. *See id.* ¶ 407 (JA___). It simply means that the category of functionally equivalent services will be small, as the FCC has always recognized. *See Second Report and Order* ¶ 79.

> ### 4.    *The FCC Identifies No Changes That Render Mobile Broadband a Commercial Mobile Service*

The *Order* does not — and cannot — point to any change in the technology or functionality of mobile broadband that could justify these radical alterations.

Accordingly, all of the *Order*'s purported justifications for its statutory tear-down-and-rebuild simply confirm that the FCC was determined to reach its desired outcome regardless of the facts or law.

      **a.**     The *Order* notes that mobile broadband users can communicate with voice customers over Voice-over-Internet-Protocol service. *See Order* ¶ 401 (JA___). Yet that was equally true in 2007, when the FCC refused to classify mobile broadband as a commercial mobile service on that basis. *See Wireless Broadband Ruling* ¶ 45; Pai Dissent 363 (JA___). The *Order* also says that the continued growth of mobile services has spawned a larger mobile application system. *See Order* ¶ 401 (JA___). Also true, but irrelevant. No matter how many third-party applications exist, *mobile broadband* remains connected exclusively to the Internet — not the telephone network.

      The *Order* then claims that changes in the marketplace have "increasingly blurred the distinction between" services using Voice-over-Internet-Protocol and those using the phone system. *Id.* Yet the FCC made the *same* observation in 2004,[26] and in 2007 properly rejected the argument that the availability of Voice-over-Internet-Protocol apps means that mobile broadband itself is a commercial mobile service. Whatever the extent of the blurring at the margins, consumers

---

[26] *See IP-Enabled Services NPRM* ¶¶ 10, 22.

readily understand the difference between the mobile broadband that connects their iPad to the Internet, and the Skype app that can connect them to the telephone network using Voice-over-Internet-Protocol.

     **b.**     The *Order* also points to "the ubiquity and wide scale use of mobile broadband Internet access service." *Order* ¶ 398 (JA___); *see id.* ¶ 408 (JA___). That is circular and results-driven: the FCC cannot reasonably use the *fact* that mobile broadband is ubiquitous to justify creating new tests predicated on whether the service is "ubiquit[ous]," *id.* ¶ 398 (JA___), or "widely available," *id.* ¶ 404 (JA___). In prior orders, the FCC identified the need for widespread deployment of mobile broadband (especially in rural and low-income areas) as a reason *not* to reclassify mobile broadband under Title II. *See Wireless Broadband Ruling* ¶ 27. To rely now on successful deployment *without* Title II regulation as the reason *for* reclassification is sheer caprice. Regardless, the popularity of mobile broadband has nothing to do with whether that service satisfies the statutory definitions in § 332.

     **c.**     The FCC finally contends that treating mobile broadband as a common-carriage service "is necessary to avoid a statutory contradiction" that would result if mobile broadband were a telecommunications service (that could be subject to Title II) but were not a commercial mobile service (and thus exempt from Title II). *Order* ¶ 403 (JA___). No such "contradiction" exists: the

70

definitions of commercial mobile service and telecommunications service are entirely distinct.  Section 332 establishes that mobile services may not be treated as common-carrier services unless they meet the definition of a commercial mobile service, regardless of how those services could be treated under any other part of the Act.  The definitions do not rise or fall together.

In any event, any disconnect is of the FCC's own making:  mobile broadband is *neither* a commercial mobile service *nor* a telecommunications service and is thus immune "twice over" from common-carriage treatment.  *Cellco*, 700 F.3d at 538.  The FCC's perceived contradiction derives from its effort "to twist the statutory language into a pretzel in order to advance a preferred policy outcome."  Pai Dissent 370 (JA___).  The *Order* is regulation by political agenda; but "an agency may not repudiate precedent simply to conform with a shifting political mood."  *National Black Media Coal. v. FCC*, 775 F.2d 342, 356 n.17 (D.C. Cir. 1985).

## III.  EVEN ASIDE FROM THE UNLAWFUL RECLASSIFICATIONS, THE *ORDER* MUST BE VACATED

Because the FCC cannot lawfully classify *retail* fixed and mobile broadband Internet access service as a telecommunications service, every determination that depends on that reclassification must be vacated, including the *Order*'s assertion of Title II authority over Internet interconnection and its Internet Conduct Standard.[27]

*First*, the FCC grounds its assertion of authority to regulate broadband providers' interconnection arrangements under Title II on its reclassification of retail broadband service.  *See Order* ¶ 204 (JA___) (asserting that the retail broadband service "necessarily includes . . . interconnection arrangements" and that "such arrangements are plainly 'for and in connection with' the [retail] service") (quoting 47 U.S.C. §§ 201(b), 202(a)).  Applying §§ 201 and 202 *is* common-carrier regulation.  Such regulation cannot be justified under § 706 and must fall with the unlawful reclassification of retail broadband service.  *See Verizon*, 740 F.3d at 656-57.

---

[27] The FCC has already *conceded* that its bright-line rules impose "precisely the kind of" *per se* common-carrier regulation that *Verizon* holds "could *not* be applied until and unless broadband was reclassified as a 'telecommunications service.'"  FCC Stay Opp. 1.  This does not mean that the FCC is without authority to adopt any rules.  A number of the petitioners explained how the FCC could adopt lawful rules that stopped short of common carriage pursuant to the § 706 blueprint set forth in *Verizon*.  *See, e.g.*, USTelecom Comments 44-54 (JA___-__); AT&T Comments 26-39 (JA___-__); NCTA Comments 45-68 (JA___-__).

*Second*, the Internet Conduct Standard reflects the FCC's "interpretation of sections 201 and 202 in the broadband Internet access context." *Order* ¶ 137 (JA___). The FCC also acknowledged that the Internet Conduct Standard goes beyond "prohibiting commercially unreasonable practices." *Id.* ¶ 150 (JA___). Thus, unlike the standard at issue in *Cellco*, *see* 700 F.3d at 548-49, the Internet Conduct Standard imposes *per se* common-carrier obligations that can apply only to telecommunications services, *see Verizon*, 740 F.3d at 656-57. The agency did not adopt the Internet Conduct Standard solely under § 706, and could not have done so.

Even if the Court were to uphold the reclassification decisions, the *Order* must still be vacated — in whole, or at least in part — for four additional, independent reasons.

## A.    Even If Broadband Were Not an Information Service, It Is Not Common Carriage

The *Order* mandates common-carrier treatment of all broadband providers' service without addressing this Court's two-part *NARUC* test for common-carrier status. *See NARUC v. FCC*, 525 F.2d 630 (D.C. Cir. 1976) ("*NARUC I*"); *NARUC v. FCC*, 533 F.2d 601 (D.C. Cir. 1976) ("*NARUC II*"). The *Order* addresses only the first "prerequisite to [such] status," *i.e.*, that the service provide pure transmission. *NARUC II*, 533 F.2d at 609. But the *Order* ignores that a provider of such a service is not a common carrier unless the provider (a) operates under a

73

"legal compulsion . . . to serve indifferently," *NARUC I*, 525 F.2d at 642, or

(b) voluntarily makes "a conscious decision to offer [that] service to all takers on a

common carrier basis," *Southwestern Bell Tel. Co. v. FCC*, 19 F.3d 1475, 1481

(D.C. Cir. 1994).[28]

The *Order* does not set forth the required basis to compel common-carrier

treatment. A provider that does "not have market power" "should not be regulated

as a common carrier."[29] Here, the FCC made no finding that *any* retail broadband

provider has market power. *See Order* ¶ 11 n.12 (JA___). Moreover, the FCC

could not find that *every* retail provider in *every* market nationwide has market

power. Competitive circumstances vary widely, from areas where there may be

only a single provider to the many areas with head-to-head competition among

multiple facilities-based providers. Given this variability, there is no basis for

compelling nationwide common carriage.[30]

Nor does the *Order* offer any basis to find that *every* provider would

*voluntarily* hold itself out indifferently, if the consequence of doing so were the

application of Title II. Instead, the FCC asserts in a footnote that "marketing

---

[28] *See* WISPA Feb. 3, 2015 Ex Parte 8-12 (JA___-__); AT&T Feb. 2, 2015(P) Ex Parte (JA___-__); Verizon Oct. 29, 2014 Ex Parte, Attach. 1-5 (JA___-__).

[29] *E.g.*, *Virgin Islands Order* ¶¶ 9, 11.

[30] *See* AT&T Feb. 2, 2015(P) Ex Parte 4-6 (JA___-__).

materials" from *some* providers mean that *every* provider "hold[s] [itself] out

indifferently to the public when offering broadband Internet access service."

*Order* ¶ 354 n.965 (JA___).  Even if that were true,[31] it would not satisfy *NARUC*.

An indifferent offering of a service that the FCC had repeatedly classified as an

information service *exempt* from common-carriage regulation cannot constitute a

"conscious decision" willingly to assume common-carrier duties as to that service

if the FCC reclassified it.  *Southwestern Bell*, 19 F.3d at 1481.  At a minimum,

following a lawful reclassification, and absent a finding of market power,

broadband providers would have the right to elect whether to operate as private

carriers or common carriers.

### B.      Regulation of Internet Interconnection Under Title II Without Reclassifying That Service Violates *Verizon*

*Verizon* held that broadband providers "furnish a service" to edge providers

separate from the service they provide to end-user customers.  740 F.3d at 653.

The *Order* expressly *declines* to reclassify "the service that the *Verizon* court

identified as being furnished to the edge [provider]."  *Order* ¶ 339 (JA___).  The

FCC's extension of Title II's common-carriage requirements to that service

without classifying it as a telecommunications service is thus an "obvious"

violation of the statute.  *Verizon*, 740 F.3d at 650.

---

[31] *But see* AT&T Feb. 2, 2015(P) Ex Parte 6-7 (JA___-__).

Indeed, just weeks before it adopted the *Order*, the FCC declared that it would reclassify "both the service to the end user *and* to the edge provider" as common-carrier services. Fact Sheet 1 (JA___). However, in response to a last-minute campaign by Google against edge-side reclassification (which would bring its Internet interconnection rates, terms, and conditions under §§ 201 and 202 as well),[32] the FCC ultimately reclassified only the service to end users. *See Order* ¶ 338; *see also* Clyburn Statement 318 (JA___). Yet Title II regulation of Internet interconnection remained, even though the asserted rationale behind it — the reclassification of edge-side arrangements — had vanished.

The FCC attempts to square its Title II treatment of broadband providers' Internet interconnection with *Verizon* by claiming that those arrangements are actually part of the *retail* broadband service that providers offer to consumers. But interconnection agreements are made with parties *other than* retail customers and are independent agreements that often go well beyond serving the broadband provider's own retail business.

The FCC nevertheless contends that broadband providers' *retail* service "implicitly includes the assertion that the broadband provider will make *just and reasonable* efforts to transmit and deliver its customers' traffic to and from 'all or

---

[32] *See* Google Feb. 20, 2015 Ex Parte 1-3 (JA___-__).

76

substantially all Internet endpoints' under sections 201 and 202 of the Act." *Order*

¶ 204 (JA___) (emphasis added). But edge-side interconnection has always been

private carriage. *See Verizon-MCI Merger Order* ¶ 133 ("interconnection between

Internet backbone providers has never been subject to direct government

regulation"). As the *Order* acknowledges, providers have never made a promise to

make such arrangements on a common-carriage basis: "Internet traffic exchange

agreements have historically been and will continue to be commercially

negotiated." *Id.* ¶ 202 (JA___). For instance, broadband providers' offer of

interconnection with other Internet networks and edge providers relies on

individually negotiated arrangements specifying such things as when upgrades of

capacity will be required and which party will pay for such upgrades. It is thus

quintessentially private carriage. *See NARUC I*, 525 F.2d at 642; AT&T Feb. 2,

2015(P) Ex Parte 7-8 (JA___-__); Comcast Jan. 23, 2015 Ex Parte 3 (JA___); *see*

*also* Google Feb. 20, 2015 Ex Parte 2 (JA___) (Google's interconnection

agreements with broadband providers are "individually negotiated" and therefore

"could not support classification of a common carriage service provided to Google

or any other edge provider").

    The FCC also seeks to defend its conclusion by deeming Internet

interconnection a practice "in connection with" retail broadband service under

§ 201(b). But the "in connection with" language cannot be read so broadly as to

contravene the statutory prohibitions on applying Title II to non-common-carrier services. *Verizon*, 740 F.3d at 649 (FCC cannot exercise authority "in a manner that contravenes any specific prohibition contained in the Communications Act").

Here, the FCC's attempt to tie interconnection to retail service is a make-weight to try to justify creating a new Title II regime governing Internet interconnection without reclassifying that service. The FCC's scheme has nothing to do with regulating the retail service. Rather, the FCC's one-sided application of Title II to Internet interconnection is a deliberate attempt to avoid regulating other entities — such as Internet backbone providers and large edge providers, including Google — that provide similar interconnection but do not offer retail broadband service. It invites those entities to initiate complaint proceedings under § 208, in which broadband providers' interconnection rates and practices will be judged under the "just and reasonable" and "unreasonable discrimination" standards of §§ 201 and 202. *See Order* ¶ 205 (JA___). Conversely, if an Internet network or edge provider refused to interconnect with a broadband provider on "just and reasonable" terms and conditions (and thus caused harm to retail broadband customers), the broadband provider would have no recourse because the Internet network and edge providers remain *private carriers* for these purposes.

### C.    The FCC's Internet Conduct Standard Is Unlawfully Vague

The Internet Conduct Standard must be invalidated because it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" and "is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *FCC v. Fox Television Stations, Inc*., 132 S. Ct. 2307, 2317 (2012) ("*Fox II*"); *see Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993).

The Internet Conduct Standard forbids broadband providers to "unreasonably interfere with or unreasonably disadvantage" consumer access to Internet content.  47 C.F.R. § 8.11.  All of these terms — "unreasonably," "interfere," and "disadvantage" — are "classic terms of degree" that give regulated parties "no principle for determining" when they pass "from the safe harbor" of the permitted "to the forbidden sea" of the prohibited.  *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048-49 (1991).

This is especially true because these terms have "no settled usage or tradition of interpretation in law" in the broadband context.  *Id.* at 1049.  Telephone-era precedent applying the term "reasonable" will be of little value in determining whether broadband network management practices "unreasonably interfere with or unreasonably disadvantage" consumer access to Internet content.

It is thus unsurprising that the FCC's Chairman admits he "do[esn't] really know" what conduct is proscribed.[33]

The *Order* acknowledges that vague rules threaten to "stymie" innovation, *Order* ¶ 138 (JA___), but provides no clarity.  Rather, it announces a "non-exhaustive list" of seven factors to be used in assessing providers' practices, including "end-user control," "consumer protection," "effect on innovation," and "free expression."  *Id.* ¶¶ 138-145 (JA___-__).  These factors obscure more than they illuminate.  For instance, the *Order* defines the "end-user" factor as a preference for practices that "empower meaningful consumer choice," while recognizing that "many practices will fall somewhere on a spectrum" of end-user control and that "there may be practices controlled entirely by broadband providers that nonetheless satisfy" the Internet Conduct Standard.  *Id.* ¶ 139 (JA___).

Factors like these are "subject to . . . open-ended interpretation" and leave regulated parties "hard pressed to know when [they are] in danger of triggering an adverse reaction from" regulators.  *Timpinaro*, 2 F.3d at 460.  Worse, the FCC makes clear that it may consider other, unnamed factors, *Order* ¶ 138 (JA___), and provides no hint as to how it will weigh the known and unknown factors against each other.  *See Timpinaro*, 2 F.3d at 460 ("The uncertainty facing a [regulated

---

[33] February 26, 2015 Press Conference, *available at* http://goo.gl/oiPX2M (165:30-166:54).

party] . . . is all the greater when [open-ended factors] are considered in combination, according to some undisclosed system of relative weights.").

The Internet Conduct Standard also fails to give the "precision and guidance . . . necessary" to avoid "arbitrary or discriminatory" enforcement. *Fox II*, 132 S. Ct. at 2317. The Internet Conduct Standard's vagueness means that "basic policy matters" will be decided in enforcement actions brought "on an ad hoc and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

That is exactly what broadband providers can expect. Are arrangements akin to toll-free calling — in which edge providers, such as music-streaming services, foot the bill for their customers' data usage — allowed? What about plans with set data-usage allowances? Maybe or maybe not. *See Order* ¶¶ 151-153 (JA___-__). Providers can only guess.

### D.    In Extending Title II to Small Providers, the FCC Violated the Regulatory Flexibility Act

The FCC disregarded the especially burdensome effect of the *Order* on small providers, many of which serve only a few hundred customers in rural and underserved areas. Congress enacted the Regulatory Flexibility Act ("RFA") to address just such "burdens of federal regulation, especially on small businesses." *Council for Urological Interests v. Burwell*, – F.3d –, 2015 WL 3634632, at *11 (D.C. Cir. June 12, 2015). The RFA "set[s] out precise, specific steps" agencies "must take" to assess impacts on small businesses. *Aeronautical Repair Station*

81

*Ass'n, Inc. v. FAA*, 494 F.3d 161, 178 (D.C. Cir. 2007). The RFA requires

agencies not merely to justify "the alternative adopted" but also to (1) explain

"why *each one* of the other significant alternatives to the rule . . . was rejected," 5

U.S.C. § 604(a)(6) (emphasis added), and (2) describe all the "projected reporting,

recordkeeping and other compliance requirements," along with the necessary

"professional skills" to meet those requirements, *id.* § 604(a)(5). The FCC did

none of those things.

    **1.**    For the most significant decision here — whether to reclassify all

providers as Title II common carriers — the Final Regulatory Flexibility Analysis

("Final Analysis") nowhere explains why the *Order* rejects alternatives, offered in

the record, that would have minimized the adverse impact on small providers,

including following the *Verizon* roadmap; exempting small providers from

reclassification; or streamlining enforcement procedures. *See* WISPA Comments

16-22 (JA___-__). The Final Analysis does not even address the extraordinary

difficulty that small providers — with no legal departments, tiny budgets, and only

a few employees — will encounter in deciphering and complying with Title II.

*See* ACA Comments 62-66 (JA___-__). It ignores the enormous legal fees, the

costs of class-action defense, and the potential Title II liability even for good-faith

violations, all of which small providers can ill afford. *See* 47 U.S.C. § 208.

**2.**    The Final Analysis also disregards the RFA's requirement that

agencies describe all new reporting and compliance requirements, and the

professional skills needed to comply.  Despite record evidence, *see* ACA-NCTA-

WISPA Jan. 9, 2015 Ex Parte (JA___-__), the Final Analysis fails to describe the

obligations entailed by the newly applicable requirements under § 222(c)'s

customer-information requirements or the duty of small providers to interconnect

with other Internet networks and edge providers under Title II.  Those

requirements, and their costs, are nowhere addressed in the meager five paragraphs

the FCC devotes to the topic.  *See* Final Analysis ¶¶ 55-59 (JA___-__).

## IV.    THE FCC FAILED TO PROVIDE NOTICE

The *Order* also must be vacated because the FCC radically departed from

the *NPRM* without affording notice and meaningful opportunity to comment.  "To

put it plainly, this is not the order that the NPRM envisioned."  O'Rielly Dissent

386 (JA___); *see also* Pai Dissent 338 (JA___).

The APA requires an agency to "make its views known to the public in a

concrete and focused form so as to make criticism or formulation of alternatives

possible," *HBO, Inc. v. FCC*, 567 F.2d 9, 36 (D.C. Cir. 1977) (per curiam), and to

"describe the range of alternatives being considered with reasonable specificity,"

*Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir.

1983).  The agency necessarily must provide that notice *before* adopting the final

rule so that the public can offer input and the agency can respond; otherwise, the "opportunity to comment is meaningless." *HBO*, 567 F.2d at 35. An agency may adjust its proposal in light of comments "only if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice and comment period." *Environmental Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005).

These principles doom the *Order* and require vacatur. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) ("deficient notice is a 'fundamental flaw' that almost always requires vacatur"); 5 U.S.C. § 706(2)(D).

### A.    The FCC Failed To Provide Notice of the *Order*'s Fundamental Approach and of the Basis and Objectives of Reclassification

The *Order* adopts a regime of Internet regulation on which public input was never invited. The *NPRM* stated that "[t]he goal of this proceeding is to find the best approach to protecting and promoting Internet openness." *NPRM* ¶ 4 (JA___). And the FCC made clear *how* it intended to pursue that objective: by following "the blueprint offered by the D.C. Circuit in its decision in *Verizon v. FCC*" — which the *NPRM* cited 52 times — "rely[ing] on section 706 of the Telecommunications Act of 1996." *Id.* Chairman Wheeler confirmed that, "[i]n response [to *Verizon*]," he had "promptly stated that [the FCC] would reinstate rules that achieve the goals of the 2010 *Order* using the § 706-based roadmap laid out by the court," and that "[t]hat is what [the FCC was] proposing" in the *NPRM*.

84

Wheeler NPRM Statement 87 (JA___).  The *NPRM*'s ordering clauses cited § 706, but made no reference to Title II.  *See NPRM* ¶¶ 183-184 (JA___).

Although the *NPRM* noted that the FCC would also "consider the use of Title II," it stated that it would do so *only* as a backup source of "legal authority" to support the proposed Open Internet rules.  *Id.* ¶¶ 4, 10 (JA___, __).  Title II was merely a fallback "solution[]" to the problem the FCC encountered in *Verizon*:  the absence of legal authority for the Open Internet rules.  *Id.*  Chairman Wheeler described reclassification as a potential "method[]" for "accomplish[ing] the goals of an Open Internet."  Wheeler NPRM Statement 87 (JA___).  And the eight paragraphs discussing Title II appear in a section titled "Legal Authority."  *NPRM* ¶¶ 148-155 (JA___-__).  The scattered references to Title II elsewhere confirm, at most, that the FCC understood Title II only as a potential source of legal authority for the proposed rules.  *Id.* ¶¶ 65, 89, 96, 121, 138 (JA___, ___, ___, ___, ___).

The *Order* turns that approach upside-down.  Prompted by the President's urging to pursue extensive regulation beyond "Open Internet" rules, the FCC abruptly changed course without seeking further public input.  *See* Pai Dissent 342, 350 (JA___, ___).  The *Order* transmogrifies Title II from alternative, "break-glass-in-case-of-emergency" authority for Open Internet rules into the rulemaking's central focus.  It fashions what it calls a "Modern Title II" "tailored for the 21st Century" — a new code of the agency's invention designed to allow

the FCC to regulate virtually every aspect of broadband Internet access.  *Order*

¶ 38 (JA___); *id.* ¶¶ 306-433 (JA___-__).  The *NPRM* "had not so much as hinted"

that an overhaul of Internet regulation touching on many matters wholly unrelated

to net neutrality "was the objective of the rulemaking."  *Council Tree*

*Communications, Inc. v. FCC*, 619 F.3d 235, 253-54 (3d Cir. 2010).  The Open

Internet rules, conversely, were transformed from the rulemaking's main objective

into an excuse for all-encompassing regulation over such things as rates,

management of customer information, and whatever conduct the FCC determines

case-by-case will "unreasonably interfere" with consumer Internet access under the

new Internet Conduct Standard.  As Commissioner O'Rielly explained, the original

"means became the end," and the Open Internet rules became a "pretext for

deploying Title II to a far greater extent than anyone could have imagined just

months" earlier.  O'Rielly Dissent 385 (JA___); *see* Pai Dissent 337 (JA___).

The FCC refused, however, to subject its new plan to notice and comment.

That failure alone renders the *Order* a blatant violation of the APA, which forbids

"agencies to use the rulemaking process to pull a surprise switcheroo on regulated

entities."  *Environmental Integrity Project*, 425 F.3d at 996; *see*, *e.g.*, *International*

*Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d

1250, 1260 (D.C. Cir. 2005) (vacating rule because notice that agency was

considering a "*minimum* air velocity" cap would not have caused "interested

parties to realize that [it] would consider" imposing a "*maximum*-velocity cap")
(second emphasis added).

The FCC independently violated the APA by never providing notice of the
*path* to reclassification the *Order* adopted.  The *NPRM*'s two-paragraph discussion
of reclassification was merely a series of open-ended questions that amount to
"Should we reclassify?  Why or why not?"  *See NPRM* ¶¶ 149-150 (JA___-___).
The *NPRM* offered no answers as to *what* or *how* or *on what basis* the FCC might
reclassify, and did not even hint at the rationale and analysis that ultimately
consumes *128 paragraphs* (including nearly 500 footnotes) in the *Order.  See
Order* ¶¶ 306-433 (JA___-__).  "In essence," the FCC "ask[ed] the public to
shadowbox with itself."  Pai Dissent 347 (JA___).

That falls far short of what the APA requires.  A notice must describe "in a
concrete and focused form" what the agency plans to do, *HBO*, 567 F.2d at 36, and
the "range of alternatives being considered with reasonable specificity," *Small
Refiner*, 705 F.2d at 549.  Simply asking open-ended questions is patently
inadequate.  *See Prometheus Radio Project v. FCC*, 652 F.3d 431, 450-51 (3d Cir.
2011).

The *NPRM* thus failed to provide notice of the FCC's basis for
reclassification.  The *NPRM* said nothing concerning the *Order*'s conclusion that
consumers' perceptions of what broadband providers offer have "changed

dramatically." *Order* ¶ 346 (JA___); *see id.* ¶¶ 341-354 (JA___-__).  Commenters

likewise were blindsided by the *Order*'s pronouncement that features such as

"domain name service (DNS) and caching, when provided with broadband Internet

access services" now supposedly fall "within the telecommunications systems

management exception" to the information-service definition.  *Id.* ¶ 356 (JA___).

The *NPRM* never *mentioned* that exception.

Nor did the *NPRM* apprise commenters of the scope of the service the FCC

reclassified.  The *NPRM* nowhere suggested that the FCC would reclassify *not*

merely a last-mile transmission component, but the *entire* service.  And it offered

no clue about the *Order*'s rationale for defining the reclassified service to

encompass the "service" broadband operators provide "to edge providers":  that

this service "is subsumed within" broadband by dint of a supposed "promise made

to the retail customer."  *Id.* ¶ 338 (JA___); *see supra* Part III.B.

### B.    The FCC's Reclassification of Mobile Broadband Was Not a Logical Outgrowth of the *NPRM*

The *NPRM* likewise provided no notice as to the radical reversal of course

the FCC ultimately undertook as to mobile broadband.  Just three sentences in the

*NPRM* referenced the possibility the FCC might reclassify mobile broadband

service as commercial mobile service.  *See NPRM* ¶¶ 149, 150, 153 (JA___-__,

___).  But only one of those sentences explained *how* the FCC might do so, and it

*presumed* the applicability of the FCC's existing regulations defining the relevant

statutory terms.  *See id.* ¶ 150 (JA___) ("For mobile broadband Internet access service, does that service fit within the definition of 'commercial mobile service'?").  That falls woefully short of "mak[ing] [the FCC's] views known to the public in a concrete and focused form."  *HBO*, 567 F.2d at 36.

  **a.** The *NPRM* did not seriously discuss reclassifying mobile broadband and indeed anticipated that a "different standard" would apply to that service than to fixed broadband (and that neither would be subject to Title II regulation). *NPRM* ¶ 62 (JA___).  The *NPRM*'s "general and open-ended" sentence about reclassification asked only whether mobile broadband fits the definition of commercial mobile service.  It did not suggest that the FCC would change the underlying regulatory requirements for what *constitutes* commercial mobile service.  Indeed, the *NPRM* never mentioned Voice-over-Internet-Protocol applications, the existing rules defining interconnected and the public switched network, or the possibility of a new test for functional equivalence, the factors that it ultimately relied on in reclassifying mobile broadband under § 332.  *See supra* Part II.B.

  Accordingly, the *NPRM*'s passing reference to mobile broadband did not describe the "range of alternatives being considered with reasonable specificity." *Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246, 1268 (D.C. Cir. 1994).  The FCC's failure to invite comment on the various decisions made in the *Order* is

dispositive.  *See*, *e.g.*, *Association of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 461 (D.C. Cir. 2012).

**b.**    The *Order* claims to have provided adequate notice by first asserting that the *NPRM*'s mere *citation* of 47 C.F.R. § 20.3 — which defines the statutory terms "the public switched network" and "interconnected service" — provided notice that the FCC might change those definitions.  *See Order* ¶¶ 393, 406 (JA___, ___).  That argument is foreclosed by *Daimler Trucks North America LLC v. EPA*, 737 F.3d 95 (D.C. Cir. 2013), which held that the EPA's redefinition of the phrase "substantial work" was not a logical outgrowth of previous documents that had "neither stated nor suggested that EPA was contemplating amending the [definition of 'substantial work']," *id.* at 102.[34]

The *Order* next asserts that the *NPRM*'s reference to the *2010 Notice* satisfied its notice obligations.  *See Order* ¶ 393 (JA___).  The FCC cites no authority for its view that citing a notice in a different and prior docket provides adequate notice in the present docket.  Regardless, the *NPRM* indicated only that the FCC would "refresh the record in [the *2010 Notice*]" to include inquiries from the 2014 proceedings.  *NPRM* ¶ 149 n.302 (JA___).  The FCC never said the reverse, *i.e.*, that the 2014 proceedings would include the 2010 inquiries.  In all

---

[34] This argument also does not support the new test for "functional equivalence," a term not defined in 47 C.F.R. § 20.3.

events, the *2010 Notice* merely posed an open-ended question: "To what extent should section 332 of the Act affect our classification of wireless broadband Internet services?" *2010 Notice* ¶ 104. Like the *NPRM* here, it did not cite the relevant regulatory definitions, much less suggest they might change.

Finally, the *Order* observes that a few parties made filings on the issue. *See Order* ¶ 394 (JA___). But the "fact that some commenters actually submitted comments" addressing the final rule "is of little significance" because the agency "must *itself* provide notice of [its] proposal." *Duncan*, 681 F.3d at 462; *see also Small Refiner*, 705 F.2d at 549 (agency "cannot bootstrap notice from a comment").

Indeed, the record shows that, precisely because of the *NPRM*'s open-ended questions, commenters had to divine the FCC's thoughts. Of the millions of comments submitted during the comment period, the FCC found *none* suggesting a new test for functional equivalence,[35] and only *two* addressing the possibility of revising the agency's definitions of "interconnected service" or "the public switched network." *Order* ¶ 394 nn.1134-35 (JA___) (citing CTIA Reply Comments 44 (JA___) and Vonage Comments 41-44 (JA___-__)). All other

_____

[35] CTIA's reply comments, *see Order* ¶ 406 n.1188 (JA___), nowhere mentioned the possibility that the FCC might *revise* its test for functional equivalence.

filings the *Order* cites regarding mobile broadband were filed long after the

comment period had ended — *after* the President called for the reclassification of

both fixed and mobile broadband.  Parties could not reasonably have anticipated

reclassification in this manner; indeed, FCC Commissioners were themselves

surprised.  *See* Pai Dissent 336-37 (JA___-__); O'Rielly Dissent 386 (JA___).

### C.    The FCC Failed To Provide Notice About Important Aspects of the *Order*

The *NPRM* affirmatively misled commenters about some requirements the

*Order* imposed.  And other important aspects of the *Order* were manufactured out

of whole cloth, insulating those aspects from public scrutiny until they were

adopted.  *See* Pai Dissent 334-50 (JA___-__); O'Rielly Dissent 385-87 (JA___-

__).

***Internet Interconnection.***  The *NPRM* assured the public that the *Order*

would *not* address Internet interconnection.  The *NPRM*'s single paragraph on

interconnection explained that the rules adopted in the *2010 Order* "were not

intended to affect existing arrangements for network interconnection, including

paid peering arrangements."  *NPRM* ¶ 59 (JA___).  The *NPRM* "tentatively

conclude[d] that [the FCC] should maintain this approach."  *Id.*  Chairman

Wheeler confirmed that this proceeding did not involve interconnection:

> Separate and apart from this connectivity is the question of
> interconnection ("peering") between the consumer's network provider

and the various networks that deliver to that ISP. That is a different
matter that is better addressed separately.

Wheeler NPRM Statement 87 (JA___).

The *Order*, however, not only addresses interconnection, but also subjects it

to the heavy-handed common-carrier framework of Title II. That determination is

unlawful, as explained above, but the point here is that it was not foreshadowed in

the *NPRM*. To be sure, the *NPRM* invited comment on the "suggestion" that the

agency "should expand the scope of the open Internet rules to cover issues related

to traffic exchange" (*NPRM* ¶ 59 (JA___)), but the *NPRM* nowhere contemplated

full Title II oversight of interconnection agreements. Even if omniscient parties

could have anticipated the FCC's decision to subject interconnection to Title II,

they could not plausibly have predicted "that the primary mechanism for doing so

would be to reinterpret broadband Internet service to include interconnection."

O'Rielly Dissent 393-94 (JA___-__).

**Internet Conduct Standard.** Commenters similarly could not have learned

from the *NPRM* that the FCC was considering the nebulous Internet Conduct

Standard adopted in the *Order*. No such "we-know-it-when-we-see-it standard"

was mentioned.

The *NPRM* did propose a "commercially reasonable" standard, which the

*Order* rejects. *See Order* ¶ 150 (JA___). It also contemplated, "[a]s an

alternative," "adopt[ing] a different rule." *NPRM* ¶ 121 (JA___). Such a "general

93

notice that a new standard will be adopted," let alone that it *might* be adopted,

without any clue as to that rule's content is legally insufficient. *Horsehead*, 16

F.3d at 1268.

## CONCLUSION

The Court should vacate the *Order*.

Dated: July 30, 2015                              Respectfully submitted,

                                                   /s/ *Michael K. Kellogg*
MIGUEL A. ESTRADA                                  MICHAEL K. KELLOGG
THEODORE B. OLSON                                  SCOTT H. ANGSTREICH
JONATHAN C. BOND                                   KELLOGG, HUBER, HANSEN, TODD,
GIBSON, DUNN & CRUTCHER LLP                          EVANS & FIGEL, P.L.L.C.
1050 Connecticut Avenue, N.W.                      1615 M Street, N.W., Suite 400
Washington, D.C. 20036                             Washington, D.C. 20036
(202) 955-8500                                     (202) 326-7900

MATTHEW A. BRILL                                   *Counsel for USTelecom, CTIA, and*
MATTHEW T. MURCHISON                               *AT&T*
JONATHAN Y. ELLIS
LATHAM & WATKINS LLP                               STEPHEN E. CORAN
555 Eleventh Street, N.W.                          LERMAN SENTER PLLC
Suite 1000                                         2000 K Street, N.W., Suite 600
Washington, D.C. 20004                             Washington, D.C. 20006
(202) 637-2200                                     (202) 429-8970

*Counsel for NCTA*                                 *Counsel for WISPA*

HELGI C. WALKER                                    JEFFREY A. LAMKEN
MICHAEL R. HUSTON                                  MOLOLAMKEN LLP
GIBSON, DUNN & CRUTCHER LLP                         The Watergate, Suite 660
1050 Connecticut Avenue, N.W.                      600 New Hampshire Avenue, N.W.
Washington, D.C. 20036-5306                        Washington, D.C. 20037
(202) 887-3599                                     (202) 556-2000

*Counsel for CTIA*                                 *Counsel for ACA*

94

KATHLEEN M. SULLIVAN
QUINN, EMANUEL, URQUHART &
    SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

JONATHAN BANKS
UNITED STATES TELECOM ASS'N
607 14th Street, N.W., Suite 400
Washington, D.C. 20005
(202) 326-7272

*Counsel for USTelecom*

PETER D. KEISLER
JAMES P. YOUNG
C. FREDERICK BECKNER III
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

WAYNE WATTS
DAVID L. LAWSON
GARY L. PHILLIPS
CHRISTOPHER M. HEIMANN
AT&T SERVICES, INC.
1120 20th Street, N.W., Suite 1000
Washington, D.C. 20036
(202) 457-3055

*Counsel for AT&T*

DAVID H. SOLOMON
RUSSELL P. HANSER
WILKINSON BARKER KNAUER, LLP
2300 N Street, N.W., Suite 700
Washington, D.C. 20037
(202) 783-4141

TIMOTHY M. BOUCHER
CENTURYLINK
1099 New York Avenue, N.W.
Suite 250
Washington, D.C. 20001
(303) 992-5751

*Counsel for CenturyLink*

RICK C. CHESSEN
NEAL M. GOLDBERG
MICHAEL S. SCHOOLER
NATIONAL CABLE & TELECOMMS.
    ASS'N
25 Massachusetts Avenue, N.W.
Suite 100
Washington, D.C. 20001
(202) 222-2445

*Counsel for NCTA*

BARBARA S. ESBIN
CINNAMON MUELLER
1875 Eye Street, N.W., Suite 700
Washington, D.C. 20006

ROSS J. LIEBERMAN
AMERICAN CABLE ASSOCIATION
2415 39th Place, N.W.
Washington, D.C. 20007
(202) 494-5661

*Counsel for ACA*

## CIRCUIT RULE 32(a)(2) ATTESTATION

In accordance with D.C. Circuit Rule 32(a)(2), I hereby attest that, as described in footnote 2, all other parties on whose behalf this joint brief is submitted concur in the brief's content.


 /s/ *Michael K. Kellogg*
Michael K. Kellogg

July 30, 2015

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and D.C. Circuit Rule 32(e), as modified by the Court's June 29, 2015 briefing order granting petitioners 20,000 words, the undersigned certifies that this brief complies with the applicable type-volume limitations. This brief was prepared using a proportionally spaced type (Times New Roman, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(e)(1), this brief contains 19,979 words. This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word 2013) used to prepare this brief.

/s/ *Michael K. Kellogg*
Michael K. Kellogg

July 30, 2015

# ADDENDUM

# TABLE OF CONTENTS

Page

<u>United States Code</u>

5 U.S.C. § 604 ...................................................................................Add. 1

47 U.S.C. § 153 (excerpt) ................................................................Add. 2

47 U.S.C. § 160 ...............................................................................Add. 3

47 U.S.C. § 201 ...............................................................................Add. 4

47 U.S.C. § 202 ...............................................................................Add. 5

47 U.S.C. § 206 ...............................................................................Add. 5

47 U.S.C. § 207 ...............................................................................Add. 6

47 U.S.C. § 208 ...............................................................................Add. 6

47 U.S.C. § 222 (excerpt) ................................................................Add. 7

47 U.S.C. § 230 ...............................................................................Add. 8

47 U.S.C. § 259 (excerpt) ................................................................Add. 11

47 U.S.C. § 332 ...............................................................................Add. 12

47 U.S.C. § 769 (excerpt) ................................................................Add. 18

47 U.S.C. § 1302 (1996 Act § 706) ................................................Add. 19

47 U.S.C. § 1422 .............................................................................Add. 20

<u>Code of Federal Regulations</u>

47 C.F.R. § 8.1 (2015) .....................................................................Add. 21

47 C.F.R. § 8.2 (2015) .....................................................................Add. 21

47 C.F.R. § 8.5 (2015) .....................................................................Add. 22

47 C.F.R. § 8.7 (2015) ..................................................................Add. 22

47 C.F.R. § 8.9 (2015) ..................................................................Add. 22

47 C.F.R. § 8.11 (2015) ................................................................Add. 23

47 C.F.R. § 20.3 (1994) (excerpt)................................................Add. 23

47 C.F.R. § 20.3 (2015) (excerpt)................................................Add. 24

47 C.F.R. § 20.9 (1994) (excerpt)................................................Add. 24

47 C.F.R. § 20.9 (2014) (excerpt)................................................Add. 25

47 C.F.R. § 64.702 (excerpt) ........................................................Add. 26

<u>**5 U.S.C. § 604**</u>

**§ 604. Final regulatory flexibility analysis**

**(a)** When an agency promulgates a final rule under section 553 of this title, after being required by that section or any other law to publish a general notice of proposed rulemaking, or promulgates a final interpretative rule involving the internal revenue laws of the United States as described in section 603(a), the agency shall prepare a final regulatory flexibility analysis. Each final regulatory flexibility analysis shall contain—

    **(1)** a statement of the need for, and objectives of, the rule;

    **(2)** a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;

    **(3)** the response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;

    **(4)** a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

    **(5)** a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;

    **(6)** a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected; and

    **(6)**[1] for a covered agency, as defined in section 609(d)(2), a description of the steps the agency has taken to minimize any additional cost of credit for small entities.

**(b)** The agency shall make copies of the final regulatory flexibility analysis available to members of the public and shall publish in the Federal Register such analysis or a summary thereof.

---

[1] So in original.  Two paragraphs (6) were enacted.

**47 U.S.C. § 153**

**§ 153. Definitions**

For the purposes of this chapter, unless the context otherwise requires—

\* \* \* \* \*

**(24) Information service**

The term "information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

\* \* \* \* \*

**(50) Telecommunications**

The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

**(51) Telecommunications carrier**

The term "telecommunications carrier" means any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 226 of this title). A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services, except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage.

\* \* \* \* \*

**(53) Telecommunications service**

The term "telecommunications service" means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.

Add. 2

**47 U.S.C. § 160**

**§ 160. Competition in provision of telecommunications service**

**(a) Regulatory flexibility**

Notwithstanding section 332(c)(1)(A) of this title, the Commission shall forbear from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of its or their geographic markets, if the Commission determines that—

    **(1)** enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

    **(2)** enforcement of such regulation or provision is not necessary for the protection of consumers; and

    **(3)** forbearance from applying such provision or regulation is consistent with the public interest.

**(b) Competitive effect to be weighed**

In making the determination under subsection (a)(3) of this section, the Commission shall consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services. If the Commission determines that such forbearance will promote competition among providers of telecommunications services, that determination may be the basis for a Commission finding that forbearance is in the public interest.

**(c) Petition for forbearance**

Any telecommunications carrier, or class of telecommunications carriers, may submit a petition to the Commission requesting that the Commission exercise the authority granted under this section with respect to that carrier or those carriers, or any service offered by that carrier or carriers. Any such petition shall be deemed granted if the Commission does not deny the petition for failure to meet the requirements for forbearance under subsection (a) of this section within one year after the Commission receives it, unless the one-year period is extended by the Commission. The Commission may extend the initial one-year period by an additional 90 days if the Commission finds that an extension is necessary to meet the requirements of subsection (a) of this section. The Commission may grant or deny a petition in whole or in part and shall explain its decision in writing.

Add. 3

**(d) Limitation**

Except as provided in section 251(f) of this title, the Commission may not forbear from applying the requirements of section 251(c) or 271 of this title under subsection (a) of this section until it determines that those requirements have been fully implemented.

**(e) State enforcement after commission forbearance**

A State commission may not continue to apply or enforce any provision of this chapter that the Commission has determined to forbear from applying under subsection (a) of this section.

## 47 U.S.C. § 201

**§ 201. Service and charges**

**(a)** It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

**(b)** All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: *Provided*, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: *Provided further*, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: *Provided further*, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

**47 U.S.C. § 202**

**§ 202. Discriminations and preferences**

**(a) Charges, services, etc.**

It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

**(b) Charges or services included**

Charges or services, whenever referred to in this chapter, include charges for, or services in connection with, the use of common carrier lines of communication, whether derived from wire or radio facilities, in chain broadcasting or incidental to radio communication of any kind.

**(c) Penalty**

Any carrier who knowingly violates the provisions of this section shall forfeit to the United States the sum of $6,000 for each such offense and $300 for each and every day of the continuance of such offense.

**47 U.S.C. § 206**

**§ 206. Carriers' liability for damages**

In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

<u>**47 U.S.C. § 207**</u>

**§ 207. Recovery of damages**

    Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

<u>**47 U.S.C. § 208**</u>

**§ 208. Complaints to Commission; investigations; duration of investigation; appeal of order concluding investigation**

    **(a)** Any person, any body politic, or municipal organization, or State commission, complaining of anything done or omitted to be done by any common carrier subject to this chapter, in contravention of the provisions thereof, may apply to said Commission by petition which shall briefly state the facts, whereupon a statement of the complaint thus made shall be forwarded by the Commission to such common carrier, who shall be called upon to satisfy the complaint or to answer the same in writing within a reasonable time to be specified by the Commission. If such common carrier within the time specified shall make reparation for the injury alleged to have been caused, the common carrier shall be relieved of liability to the complainant only for the particular violation of law thus complained of. If such carrier or carriers shall not satisfy the complaint within the time specified or there shall appear to be any reasonable ground for investigating said complaint, it shall be the duty of the Commission to investigate the matters complained of in such manner and by such means as it shall deem proper. No complaint shall at any time be dismissed because of the absence of direct damage to the complainant.

    **(b)(1)** Except as provided in paragraph (2), the Commission shall, with respect to any investigation under this section of the lawfulness of a charge, classification, regulation, or practice, issue an order concluding such investigation within 5 months after the date on which the complaint was filed.

    **(2)** The Commission shall, with respect to any such investigation initiated prior to November 3, 1988, issue an order concluding the investigation not later than 12 months after November 3, 1988.

    **(3)** Any order concluding an investigation under paragraph (1) or (2) shall be a final order and may be appealed under section 402(a) of this title.

## 47 U.S.C. § 222

**§ 222. Privacy of customer information**

**(a) In general**

Every telecommunications carrier has a duty to protect the confidentiality of proprietary information of, and relating to, other telecommunication carriers, equipment manufacturers, and customers, including telecommunication carriers reselling telecommunications services provided by a telecommunications carrier.

\* \* \* \* \*

**(c) Confidentiality of customer proprietary network information**

**(1) Privacy requirements for telecommunications carriers**

Except as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories.

**(2) Disclosure on request by customers**

A telecommunications carrier shall disclose customer proprietary network information, upon affirmative written request by the customer, to any person designated by the customer.

**(3) Aggregate customer information**

A telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service may use, disclose, or permit access to aggregate customer information other than for the purposes described in paragraph (1). A local exchange carrier may use, disclose, or permit access to aggregate customer information other than for purposes described in paragraph (1) only if it provides such aggregate information to other carriers or persons on reasonable and nondiscriminatory terms and conditions upon reasonable request therefor.

\* \* \* \* \*

**(h) Definitions**

As used in this section:

Add. 7

**(1) Customer proprietary network information**

The term "customer proprietary network information" means—

    **(A)** information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and

    **(B)** information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier;

except that such term does not include subscriber list information.

* * * * *

<h2 align="center"><u>47 U.S.C. § 230</u></h2>

**§ 230. Protection for private blocking and screening of offensive material**

**(a) Findings**

The Congress finds the following:

    **(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

    **(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

    **(3)** The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

    **(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

    **(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

Add. 8

**(b) Policy**

It is the policy of the United States—

   **(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;

   **(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

   **(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

   **(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

   **(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c) Protection for "Good Samaritan" blocking and screening of offensive material**

   **(1) Treatment of publisher or speaker**

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

   **(2) Civil liability**

No provider or user of an interactive computer service shall be held liable on account of—

   **(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

   **(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

**(d) Obligations of interactive computer service**

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer

Add. 9

in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e) Effect on other laws**

**(1) No effect on criminal law**

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

**(2) No effect on intellectual property law**

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

**(3) State law**

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

**(4) No effect on communications privacy law**

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

**(f) Definitions**

As used in this section:

**(1) Internet**

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

**(2) Interactive computer service**

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

Add. 10

**(3) Information content provider**

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

**(4) Access software provider**

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

**(A)** filter, screen, allow, or disallow content;

**(B)** pick, choose, analyze, or digest content; or

**(C)** transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

<u>**47 U.S.C. § 259**</u>

**§ 259. Infrastructure sharing**

**(a) Regulations required**

The Commission shall prescribe, within one year after February 8, 1996, regulations that require incumbent local exchange carriers (as defined in section 251(h) of this title) to make available to any qualifying carrier such public switched network infrastructure, technology, information, and telecommunications facilities and functions as may be requested by such qualifying carrier for the purpose of enabling such qualifying carrier to provide telecommunications services, or to provide access to information services, in the service area in which such qualifying carrier has requested and obtained designation as an eligible telecommunications carrier under section 214(e) of this title.

**(b) Terms and conditions of regulations**

The regulations prescribed by the Commission pursuant to this section shall—

**(1)** not require a local exchange carrier to which this section applies to take any action that is economically unreasonable or that is contrary to the public interest;

**(2)** permit, but shall not require, the joint ownership or operation of public switched network infrastructure and services by or among such local exchange carrier and a qualifying carrier;

(3) ensure that such local exchange carrier will not be treated by the Commission or any State as a common carrier for hire or as offering common carrier services with respect to any infrastructure, technology, information, facilities, or functions made available to a qualifying carrier in accordance with regulations issued pursuant to this section;

(4) ensure that such local exchange carrier makes such infrastructure, technology, information, facilities, or functions available to a qualifying carrier on just and reasonable terms and conditions that permit such qualifying carrier to fully benefit from the economies of scale and scope of such local exchange carrier, as determined in accordance with guidelines prescribed by the Commission in regulations issued pursuant to this section;

(5) establish conditions that promote cooperation between local exchange carriers to which this section applies and qualifying carriers;

(6) not require a local exchange carrier to which this section applies to engage in any infrastructure sharing agreement for any services or access which are to be provided or offered to consumers by the qualifying carrier in such local exchange carrier's telephone exchange area; and

(7) require that such local exchange carrier file with the Commission or State for public inspection, any tariffs, contracts, or other arrangements showing the rates, terms, and conditions under which such carrier is making available public switched network infrastructure and functions under this section.

* * * * *

## 47 U.S.C. § 332

**§ 332. Mobile services**

**(a) Factors which Commission must consider**

In taking actions to manage the spectrum to be made available for use by the private mobile services, the Commission shall consider, consistent with section 151 of this title, whether such actions will—

(1) promote the safety of life and property;

(2) improve the efficiency of spectrum use and reduce the regulatory burden upon spectrum users, based upon sound engineering principles, user operational requirements, and marketplace demands;

(3) encourage competition and provide services to the largest feasible number of users; or

**(4)** increase interservice sharing opportunities between private mobile services and other services.

**(b) Advisory coordinating committees**

**(1)** The Commission, in coordinating the assignment of frequencies to stations in the private mobile services and in the fixed services (as defined by the Commission by rule), shall have authority to utilize assistance furnished by advisory coordinating committees consisting of individuals who are not officers or employees of the Federal Government.

**(2)** The authority of the Commission established in this subsection shall not be subject to or affected by the provisions of part III of Title 5 or section 1342 of Title 31.

**(3)** Any person who provides assistance to the Commission under this subsection shall not be considered, by reason of having provided such assistance, a Federal employee.

**(4)** Any advisory coordinating committee which furnishes assistance to the Commission under this subsection shall not be subject to the provisions of the Federal Advisory Committee Act.

**(c) Regulatory treatment of mobile services**

**(1) Common carrier treatment of commercial mobile services**

**(A)** A person engaged in the provision of a service that is a commercial mobile service shall, insofar as such person is so engaged, be treated as a common carrier for purposes of this chapter, except for such provisions of subchapter II of this chapter as the Commission may specify by regulation as inapplicable to that service or person. In prescribing or amending any such regulation, the Commission may not specify any provision of section 201, 202, or 208 of this title, and may specify any other provision only if the Commission determines that—

**(i)** enforcement of such provision is not necessary in order to ensure that the charges, practices, classifications, or regulations for or in connection with that service are just and reasonable and are not unjustly or unreasonably discriminatory;

**(ii)** enforcement of such provision is not necessary for the protection of consumers; and
**(iii)** specifying such provision is consistent with the public interest.

**(B)** Upon reasonable request of any person providing commercial mobile service, the Commission shall order a common carrier to establish physical connections with such service pursuant to the provisions of section 201 of this title. Except to the extent that the Commission is required to respond to such a request, this subparagraph shall not be construed as a limitation or expansion of the Commission's authority to order interconnection pursuant to this chapter.

    **(C)** The Commission shall review competitive market conditions with respect to commercial mobile services and shall include in its annual report an analysis of those conditions. Such analysis shall include an identification of the number of competitors in various commercial mobile services, an analysis of whether or not there is effective competition, an analysis of whether any of such competitors have a dominant share of the market for such services, and a statement of whether additional providers or classes of providers in those services would be likely to enhance competition. As a part of making a determination with respect to the public interest under subparagraph (A)(iii), the Commission shall consider whether the proposed regulation (or amendment thereof) will promote competitive market conditions, including the extent to which such regulation (or amendment) will enhance competition among providers of commercial mobile services. If the Commission determines that such regulation (or amendment) will promote competition among providers of commercial mobile services, such determination may be the basis for a Commission finding that such regulation (or amendment) is in the public interest.

    **(D)** The Commission shall, not later than 180 days after August 10, 1993, complete a rulemaking required to implement this paragraph with respect to the licensing of personal communications services, including making any determinations required by subparagraph (C).

### (2) Non-common carrier treatment of private mobile services

    A person engaged in the provision of a service that is a private mobile service shall not, insofar as such person is so engaged, be treated as a common carrier for any purpose under this chapter. A common carrier (other than a person that was treated as a provider of a private land mobile service prior to August 10, 1993) shall not provide any dispatch service on any frequency allocated for common carrier service, except to the extent such dispatch service is provided on stations licensed in the domestic public land mobile radio service before January 1, 1982. The Commission may by regulation terminate, in whole or in part, the prohibition contained in the preceding sentence if the Commission determines that such termination will serve the public interest.

### (3) State preemption

    **(A)** Notwithstanding sections 152(b) and 221(b) of this title, no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services. Nothing in this subparagraph shall exempt providers of commercial mobile services (where such services are a substitute for land line telephone exchange service for a substantial portion of the communications within such State) from requirements imposed by a State commission on all providers of telecommunications services necessary to ensure the universal availability of telecommunications service at affordable rates. Notwithstanding the first sentence of this subparagraph, a State may petition the Commission for authority to regulate the rates for any commercial mobile service and the Commission shall grant such petition if such State demonstrates that—

  **(i)** market conditions with respect to such services fail to protect subscribers adequately from unjust and unreasonable rates or rates that are unjustly or unreasonably discriminatory; or

  **(ii)** such market conditions exist and such service is a replacement for land line telephone exchange service for a substantial portion of the telephone land line exchange service within such State.

The Commission shall provide reasonable opportunity for public comment in response to such petition, and shall, within 9 months after the date of its submission, grant or deny such petition. If the Commission grants such petition, the Commission shall authorize the State to exercise under State law such authority over rates, for such periods of time, as the Commission deems necessary to ensure that such rates are just and reasonable and not unjustly or unreasonably discriminatory.

  **(B)** If a State has in effect on June 1, 1993, any regulation concerning the rates for any commercial mobile service offered in such State on such date, such State may, no later than 1 year after August 10, 1993, petition the Commission requesting that the State be authorized to continue exercising authority over such rates. If a State files such a petition, the State's existing regulation shall, notwithstanding subparagraph (A), remain in effect until the Commission completes all action (including any reconsideration) on such petition. The Commission shall review such petition in accordance with the procedures established in such subparagraph, shall complete all action (including any reconsideration) within 12 months after such petition is filed, and shall grant such petition if the State satisfies the showing required under subparagraph (A)(i) or (A)(ii). If the Commission grants such petition, the Commission shall authorize the State to exercise under State law such authority over rates, for such period of time, as the Commission deems necessary to ensure that such rates are just and reasonable and not unjustly or unreasonably discriminatory. After a reasonable period of time, as determined by the Commission, has elapsed from the issuance of an order under subparagraph (A) or this subparagraph, any interested party may petition the Commission for an order that the exercise of authority by a State pursuant to such subparagraph is no longer necessary to ensure that the rates for commercial mobile services are just and reasonable and not unjustly or unreasonably discriminatory. The Commission shall provide reasonable opportunity for public comment in response to such petition, and shall, within 9 months after the date of its submission, grant or deny such petition in whole or in part.

### (4) Regulatory treatment of communications satellite corporation

Nothing in this subsection shall be construed to alter or affect the regulatory treatment required by title IV of the Communications Satellite Act of 1962 [47 U.S.C.A. § 741 et seq.] of the corporation authorized by title III of such Act [47 U.S.C.A. § 731 et seq.].

**(5) Space segment capacity**

Nothing in this section shall prohibit the Commission from continuing to determine whether the provision of space segment capacity by satellite systems to providers of commercial mobile services shall be treated as common carriage.

**(6) Foreign ownership**

The Commission, upon a petition for waiver filed within 6 months after August 10, 1993, may waive the application of section 310(b) of this title to any foreign ownership that lawfully existed before May 24, 1993, of any provider of a private land mobile service that will be treated as a common carrier as a result of the enactment of the Omnibus Budget Reconciliation Act of 1993, but only upon the following conditions:

**(A)** The extent of foreign ownership interest shall not be increased above the extent which existed on May 24, 1993.

**(B)** Such waiver shall not permit the subsequent transfer of ownership to any other person in violation of section 310(b) of this title.

**(7) Preservation of local zoning authority**

**(A) General authority**

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

**(B) Limitations**

**(i)** The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

**(I)** shall not unreasonably discriminate among providers of functionally equivalent services; and

**(II)** shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

**(ii)** A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

**(iii)** Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

**(iv)** No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

**(v)** Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

### (C) Definitions

For purposes of this paragraph—

**(i)** the term "personal wireless services" means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;

**(ii)** the term "personal wireless service facilities" means facilities for the provision of personal wireless services; and

**(iii)** the term "unlicensed wireless service" means the offering of telecommunications services using duly authorized devices which do not require individual licenses, but does not mean the provision of direct-to-home satellite services (as defined in section 303(v) of this title).

### (8) Mobile services access

A person engaged in the provision of commercial mobile services, insofar as such person is so engaged, shall not be required to provide equal access to common carriers for the provision of telephone toll services. If the Commission determines that subscribers to such services are denied access to the provider of telephone toll services of the subscribers' choice, and that such denial is contrary to the public interest, convenience, and necessity, then the Commission shall prescribe regulations to afford subscribers unblocked access to the provider of telephone toll services of the subscribers' choice through the use of a carrier identification code assigned to such provider or other mechanism. The requirements for unblocking shall not apply to mobile satellite services unless the Commission finds it to be in the public interest to apply such requirements to such services.

Add. 17

**(d) Definitions**

For purposes of this section—

**(1)** the term "commercial mobile service" means any mobile service (as defined in section 153 of this title) that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public, as specified by regulation by the Commission;

**(2)** the term "interconnected service" means service that is interconnected with the public switched network (as such terms are defined by regulation by the Commission) or service for which a request for interconnection is pending pursuant to subsection (c)(1)(B) of this section; and

**(3)** the term "private mobile service" means any mobile service (as defined in section 153 of this title) that is not a commercial mobile service or the functional equivalent of a commercial mobile service, as specified by regulation by the Commission.

<u>**47 U.S.C. § 769**</u>

**§ 769. Definitions**

**(a) In general**

As used in this subchapter:

\* \* \* \* \*

**(11) Non-core services**

The term "non-core services" means, with respect to INTELSAT provision, services other than public-switched network voice telephony and occasional-use television, and with respect to Inmarsat provision, services other than global maritime distress and safety services or other existing maritime or aeronautical services for which there are not alternative providers.

\* \* \* \* \*

Add. 18

**47 U.S.C. § 1302 (1996 Act § 706)**

**§ 1302. Advanced telecommunications incentives**

**(a) In general**

The Commission and each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.

**(b) Inquiry**

The Commission shall, within 30 months after February 8, 1996, and annually thereafter, initiate a notice of inquiry concerning the availability of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) and shall complete the inquiry within 180 days after its initiation. In the inquiry, the Commission shall determine whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion. If the Commission's determination is negative, it shall take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market.

**(c) Demographic information for unserved areas**

As part of the inquiry required by subsection (b), the Commission shall compile a list of geographical areas that are not served by any provider of advanced telecommunications capability (as defined by subsection (d)(1)) and to the extent that data from the Census Bureau is available, determine, for each such unserved area—

    (1) the population;
    (2) the population density; and
    (3) the average per capita income.

**(d) Definitions**

For purposes of this subsection:

**(1) Advanced telecommunications capability**

The term "advanced telecommunications capability" is defined, without regard to any transmission media or technology, as high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology.

**(2) Elementary and secondary schools**

The term "elementary and secondary schools" means elementary and secondary schools, as defined in section 7801 of title 20.

## 47 U.S.C. § 1422

**§ 1422. Public safety broadband network**

**(a) Establishment**

The First Responder Network Authority shall ensure the establishment of a nationwide, interoperable public safety broadband network.

**(b) Network components**

The nationwide public safety broadband network shall be based on a single, national network architecture that evolves with technological advancements and initially consists of—

**(1)** a core network that—

**(A)** consists of national and regional data centers, and other elements and functions that may be distributed geographically, all of which shall be based on commercial standards; and

**(B)** provides the connectivity between—

**(i)** the radio access network; and

**(ii)** the public Internet or the public switched network, or both; and

**(2)** a radio access network that—

**(A)** consists of all cell site equipment, antennas, and backhaul equipment, based on commercial standards, that are required to enable wireless communications with devices using the public safety broadband spectrum; and

**(B)** shall be developed, constructed, managed, maintained, and operated taking into account the plans developed in the State, local, and tribal planning and implementation grant program under section 1442(a) of this title.

Add. 20

**47 C.F.R. § 8.1 (2015)**

**§ 8.1. Purpose**

The purpose of this part is to protect and promote the Internet as an open platform enabling consumer choice, freedom of expression, end-user control, competition, and the freedom to innovate without permission, and thereby to encourage the deployment of advanced telecommunications capability and remove barriers to infrastructure investment.

**47 C.F.R. § 8.2 (2015)**

**§ 8.2. Definitions**

(a) *Broadband Internet access service.* A mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all Internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up Internet access service. This term also encompasses any service that the Commission finds to be providing a functional equivalent of the service described in the previous sentence, or that is used to evade the protections set forth in this part.

(b) *Edge provider.* Any individual or entity that provides any content, application, or service over the Internet, and any individual or entity that provides a device used for accessing any content, application, or service over the Internet.

(c) *End user.* Any individual or entity that uses a broadband Internet access service.

(d) *Fixed broadband Internet access service.* A broadband Internet access service that serves end users primarily at fixed endpoints using stationary equipment. Fixed broadband Internet access service includes fixed wireless services (including fixed unlicensed wireless services), and fixed satellite services.

(e) *Mobile broadband Internet access service.* A broadband Internet access service that serves end users primarily using mobile stations.

(f) *Reasonable network management.* A network management practice is a practice that has a primarily technical network management justification, but does not include other business practices. A network management practice is reasonable if it is primarily used for and tailored to achieving a legitimate network management purpose, taking into account the particular network architecture and technology of the broadband Internet access service.

**47 C.F.R. § 8.5 (2015)**

**§ 8.5. No blocking**

A person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not block lawful content, applications, services, or non-harmful devices, subject to reasonable network management.

**47 C.F.R. § 8.7 (2015)**

**§ 8.7. No throttling**

A person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not impair or degrade lawful Internet traffic on the basis of Internet content, application, or service, or use of a non-harmful device, subject to reasonable network management.

**47 C.F.R. § 8.9 (2015)**

**§ 8.9. No paid prioritization**

(a) A person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not engage in paid prioritization.

(b) "Paid prioritization" refers to the management of a broadband provider's network to directly or indirectly favor some traffic over other traffic, including through use of techniques such as traffic shaping, prioritization, resource reservation, or other forms of preferential traffic management, either;

(1) In exchange for consideration (monetary or otherwise) from a third party, or

(2) To benefit an affiliated entity.

(c) The Commission may waive the ban on paid prioritization only if the petitioner demonstrates that the practice would provide some significant public interest benefit and would not harm the open nature of the Internet.

Add. 22

## 47 C.F.R. § 8.11 (2015)

### § 8.11. No unreasonable interference or unreasonable disadvantage standard for Internet conduct

Any person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not unreasonably interfere with or unreasonably disadvantage end users' ability to select, access, and use broadband Internet access service or the lawful Internet content, applications, services, or devices of their choice, or edge providers' ability to make lawful content, applications, services, or devices available to end users. Reasonable network management shall not be considered a violation of this rule.

## 47 C.F.R. § 20.3 (1994)

### § 20.3. Definitions

\* \* \* \* \*

*Interconnected Service*. A service:

(a) That is interconnected with the public switched network, or interconnected with the public switched network through an interconnected service provider, that gives subscribers the capability to communicate to or receive communication from all other users on the public switched network; or

(b) For which a request for such interconnection is pending pursuant to section 332(c)(1)(B) of the Communications Act, 47 U.S.C. 332(c)(1)(B). A mobile service offers interconnected service even if the service allows subscribers to access the public switched network only during specified hours of the day, or if the service provides general access to points on the public switched network but also restricts access in certain limited ways. Interconnected service does not include any interface between a licensee's facilities and the public switched network exclusively for a licensee's internal control purposes.

\* \* \* \* \*

*Public Switched Network*. Any common carrier switched network, whether by wire or radio, including local exchange carriers, interexchange carriers, and mobile service providers, that use the North American Numbering Plan in connection with the provision of switched services.

Add. 23

### 47 C.F.R. § 20.3 (2015)

**§ 20.3. Definitions**

* * * * *

*Interconnected Service*. A service:

(a) That is interconnected with the public switched network, or interconnected with the public switched network through an interconnected service provider, that gives subscribers the capability to communicate to or receive communication from other users on the public switched network; or

(b) For which a request for such interconnection is pending pursuant to section 332(c)(1)(B) of the Communications Act, 47 U.S.C. 332(c)(1)(B). A mobile service offers interconnected service even if the service allows subscribers to access the public switched network only during specified hours of the day, or if the service provides general access to points on the public switched network but also restricts access in certain limited ways. Interconnected service does not include any interface between a licensee's facilities and the public switched network exclusively for a licensee's internal control purposes.

* * * * *

*Public Switched Network*. The network that includes any common carrier switched network, whether by wire or radio, including local exchange carriers, interexchange carriers, and mobile service providers, that uses the North American Numbering Plan, or public IP addresses, in connection with the provision of switched services.

* * * * *

### 47 C.F.R. § 20.9 (1994)

**§ 20.9. Commercial mobile radio service**

(a) The following mobile services shall be treated as common carriage services and regulated as commercial mobile radio services (including any such service offered as a hybrid service or offered on an excess capacity basis to the extent it meets the definition of commercial mobile radio service, or offered as an auxiliary or ancillary service), pursuant to Section 332 of the Communications Act, 47 U.S.C. 332:

* * * * *

Add. 24

(13) A mobile service that is the functional equivalent of a commercial mobile radio service.

(i) A mobile service that does not meet the definition of commercial mobile radio service is presumed to be a private mobile radio service.

(ii) Any interested party may seek to overcome the presumption that a particular mobile radio service is a private mobile radio service by filing a petition for declaratory ruling challenging a mobile service provider's regulatory treatment as a private mobile radio service.

(A) The petition must show that: (*1*) The mobile service in question meets the definition of commercial mobile radio service; or

(*2*) The mobile service in question is the functional equivalent of a service that meets the definition of a commercial mobile radio service.

(B) A variety of factors will be evaluated to make a determination whether the mobile service in question is the functional equivalent of a commercial mobile radio service, including: consumer demand for the service to determine whether the service is closely substitutable for a commercial mobile radio service; whether changes in price for the service under examination, or for the comparable commercial mobile radio service would prompt customers to change from one service to the other; and market research information identifying the targeted market for the service under review.

(C) The petition must contain specific allegations of fact supported by affidavit(s) of person(s) with personal knowledge. The petition must be served on the mobile service provider against whom it is filed and contain a certificate of service to this effect. The mobile service provider may file an opposition to the petition and the petitioner may file a reply. The general rules of practice and procedure contained in §§ 1.1 through 1.52 of this chapter shall apply.

## 47 C.F.R. § 20.9 (2014)

### § 20.9. Commercial mobile radio service

(a) The following mobile services shall be treated as common carriage services and regulated as commercial mobile radio services (including any such service offered as a hybrid service or offered on an excess capacity basis to the extent it meets the definition of commercial mobile radio service, or offered as an auxiliary or ancillary service), pursuant to Section 332 of the Communications Act, 47 U.S.C. 332:

* * * * *

(14) A mobile service that is the functional equivalent of a commercial mobile radio service.

(i) A mobile service that does not meet the definition of commercial mobile radio service is presumed to be a private mobile radio service.

(ii) Any interested party may seek to overcome the presumption that a particular mobile radio service is a private mobile radio service by filing a petition for declaratory ruling challenging a mobile service provider's regulatory treatment as a private mobile radio service.

(A) The petition must show that: (*1*) The mobile service in question meets the definition of commercial mobile radio service; or

(*2*) The mobile service in question is the functional equivalent of a service that meets the definition of a commercial mobile radio service.

(B) A variety of factors will be evaluated to make a determination whether the mobile service in question is the functional equivalent of a commercial mobile radio service, including: consumer demand for the service to determine whether the service is closely substitutable for a commercial mobile radio service; whether changes in price for the service under examination, or for the comparable commercial mobile radio service would prompt customers to change from one service to the other; and market research information identifying the targeted market for the service under review.

(C) The petition must contain specific allegations of fact supported by affidavit(s) of person(s) with personal knowledge. The petition must be served on the mobile service provider against whom it is filed and contain a certificate of service to this effect. The mobile service provider may file an opposition to the petition and the petitioner may file a reply. The general rules of practice and procedure contained in §§ 1.1 through 1.52 of this chapter shall apply.

* * * * *

## 47 C.F.R. § 64.702

### § 64.702. Commercial mobile radio service

(a) For the purpose of this subpart, the term *enhanced service* shall refer to services, offered over common carrier transmission facilities used in interstate communications, which employ computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information; provide the subscriber additional, different, or restructured information; or involve subscriber interaction with stored information. Enhanced services are not regulated under title II of the Act.

* * * * *

Add. 26

## CERTIFICATE OF SERVICE

I hereby certify that, on July 30, 2015, I electronically filed the foregoing joint brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Michael K. Kellogg*
Michael K. Kellogg