BRIEF FOR RESPONDENTS

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

NO. 15-1063 (AND CONSOLIDATED CASES)

———————

UNITED STATES TELECOM ASSOCIATION, ET AL.,

PETITIONERS,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

RESPONDENTS.

———————

ON PETITIONS FOR REVIEW OF AN ORDER OF THE
FEDERAL COMMUNICATIONS COMMISSION

———————

WILLIAM J. BAER
ASSISTANT ATTORNEY GENERAL

DAVID I. GELFAND
DEPUTY ASSISTANT ATTORNEY GENERAL

KRISTEN C. LIMARZI
ROBERT J. WIGGERS
NICKOLAI G. LEVIN
ATTORNEYS

UNITED STATES
  DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

JONATHAN B. SALLET
GENERAL COUNSEL

DAVID M. GOSSETT
DEPUTY GENERAL COUNSEL

JACOB M. LEWIS
STEPHANIE S. WEINER
ASSOCIATE GENERAL COUNSEL

JAMES M. CARR
MATTHEW J. DUNNE
SCOTT M. NOVECK
COUNSEL

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**1. Parties.**

All parties appearing in this Court are listed in the petitioners' briefs.

**2. Ruling under review.**

*Protecting and Promoting the Open Internet*, 30 FCC Rcd 5601 (2015)

(JA___) ("*Order*").

**3. Related cases.**

The *Order* was issued in response to a remand from this Court in

*Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014). We are aware of no pending

cases related to this one.

# TABLE OF CONTENTS

Table of Authorities........................................................................v

Glossary ................................................................................... xvi

Preliminary Statement .................................................................1

Jurisdiction .................................................................................7

Questions Presented ....................................................................7

Statutes and Regulations .............................................................8

Counterstatement.........................................................................8

    A.    The *Computer II* Framework And The
          Telecommunications Act Of 1996 ....................................10

    B.    The *Cable Modem Order*, *Brand X*, And Early
          Commission Actions To Promote The Open Internet.......................15

    C.    *Comcast v. FCC*, The *Broadband NOI*, And The 2010
          Open Internet Rules................................................20

    D.    The Order On Review ......................................................25

    E.    Challenges To The Order .................................................33

Summary of Argument.................................................................34

Standard of Review .....................................................................45

Argument...................................................................................49

I.    The Commission Reasonably Reclassified Broadband
    Internet Access Service As A Title II Telecommunications
    Service...............................................................................49

    A.    The Classification Of Broadband Internet Access Service
          Is A Reasonable Application Of Commission Discretion
          To Interpret Ambiguous Statutory Terms. .........................51

B.   The Commission Reasonably Determined That
     Broadband Internet Access Service Is A
     Telecommunications Service Subject To Title II
     Regulation. .................................................................63

1.   The Commission's determination is supported by the
     factual record and the Commission's policy goals. ........................64

2.   The Commission reasonably found that the
     telecommunications management exception
     encompasses DNS and caching.......................................................71

3.   The Commission was justified in finding that
     providers of Broadband Internet Access Service are
     common carriers............................................................................79

4.   The Commission reasonably accounted for the impact
     of Title II reclassification on investment. .......................................81

5.   The Commission reasonably accounted for the reliance
     interests of broadband providers. ...................................................85

II.  The Commission Reasonably Exercised Its Discretion To
     Determine That Mobile Broadband Internet Access Service
     Is Not A Private Mobile Service Exempt From Common-
     Carriage Regulation. .................................................................89

A.   The Commission Reasonably Classified Mobile
     Broadband As Commercial Mobile Service. .....................................90

1.   The Commission reasonably exercised its authority to
     modernize the definition of "public switched
     network." ........................................................................................90

2.   The term "public switched network" is broader than
     "public switched telephone network." ...........................................93

3.   Later statutes do not restrict the Commission's
     authority to redefine the meaning of "public switched
     network" in Section 332.................................................................96

ii

4.   The Commission's new interpretation of "public switched network" does not impermissibly encompass multiple networks or the "Internet of Things." ..............................98

5.   The Commission fully explained its reasons for revisiting the outdated definition of "public switched network." ...........................................................................100

B.   The Commission Reasonably Found In The Alternative That Mobile Broadband Is The Functional Equivalent Of Telephone-Network-Based Commercial Mobile Service.................101

III.  The Commission Satisfied APA Notice Requirements Regarding Reclassification. ...................................................105

A.   The Commission Provided Adequate Notice Of Title II Reclassification. ..........................................................106

B.   The Commission Provided Adequate Notice Of Its Reclassification Of Mobile Broadband Service..............112

IV.  Petitioners' Challenges To Specific Rules And Their Scope Lack Merit. ......................................................................119

A.   The Commission Properly Recognized Its Authority To Review Internet Interconnection Disputes. ......................119

B.   The Commission Adequately Explained The General Conduct Rule..................................................................123

C.   The Commission Had Authority To Prohibit Paid Prioritization. ...................................................................130

V.   The Commission Reasonably Forbore From Numerous Title II Requirements To Maintain Its Longstanding "Light-Touch" Approach To Broadband Regulation. ......................133

A.   The Commission Reasonably Found That The Forbearance Requirements Were Satisfied On A Nationwide Basis.................................................................135

B.   The Commission's Forbearance Decision Complied With All Applicable Procedural Requirements..........................140

VI.  The Open Internet Rules Are Consistent With The First
     Amendment. .......................................................................................143

     A.   The Rules Do Not Impair Petitioners' First Amendment
          Rights Because Broadband Providers Are Simply
          Conduits For The Speech Of Others. ................................................143

     B.   Even If The First Amendment Applied, The Open
          Internet Rules Easily Withstand First Amendment
          Scrutiny. ...........................................................................................149

VII. USTelecom's Regulatory Flexibility Act Arguments Are
     Procedurally Barred And Lack Merit. .................................................154

Conclusion ...................................................................................................157

## TABLE OF AUTHORITIES

### CASES

*Action for Children's Television v. FCC*, 564 F.2d
    458 (D.C. Cir. 1977)............................................................110

\*  *Ad Hoc Telecomms. Users Comm. v. FCC*, 572 F.3d
    903 (D.C. Cir. 2009)............................................ 45, 47, 134, 140

*Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692
    (D.C. Cir. 2014)................................................................93

\*  *Agape Church, Inc. v. FCC*, 738 F.3d 397 (D.C.
    Cir. 2013)........................................... 105, 106, 108, 129

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102
    (D.C. Cir. 2014)..............................................................118

*Ass'n of Battery Recyclers v. EPA*, 208 F.3d 1047
    (D.C. Cir. 2000)..............................................................106

*Ass'n of Private Sector Colleges & Universities v.
    Duncan*, 681 F.3d 427 (D.C. Cir. 2012)..................................117

*Ass'n of Public Safety Commc'ns Officials-Int'l, Inc.
    v. FCC*, 76 F.3d 395 (D.C. Cir. 1996)...................................69

*AT&T v. Iowa Utils. Bd.*, 525 U.S. 366 (1999)...............................57

*BDPCS, Inc. v. FCC*, 351 F.3d 1177 (D.C. Cir.
    2000)..............................................................................102

*Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044 (D.C. Cir.
    1997)..............................................................................53

*Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1 (D.C. Cir.
    2000)..............................................................................91

*Black Citizens for a Fair Media v. FCC*, 719 F.2d
    407 (D.C. Cir. 1983)........................................................86

*Boyce Motor Lines, Inc. v. United States*, 342 U.S.
    337 (1952) ......................................................................124

*British Caledonian Airways, Ltd. v. Civil
    Aeronautics Bd.*, 584 F.2d 982 (D.C. Cir. 1978) ...................156

*Cable & Wireless P.L.C. v. FCC*, 166 F.3d 1224
    (D.C. Cir. 1999)..............................................................121

*Cablevision Sys. Corp. v. FCC*, 649 F.3d 695 (D.C. Cir. 2011)................................................................48

*Cellco P'ship v. FCC*, 357 F.3d 88, 93 (D.C. Cir. 2004)................................................................45

*Cellco P'ship v. FCC*, 700 F.3d 534 (D.C. Cir. 2012)........................................................ 129, 133

\*   *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207 (D.C. Cir. 2007)................................. 112, 125, 126

*Cent. Vt. Ry. v. ICC*, 711 F.2d 331 (D.C. Cir. 1983) .................137

*CFTC v. Schor*, 478 U.S. 833 (1986) .............................................96

*Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ...... 16, 17, 23, 46, 48, 52, 69, 71, 88, 98

*Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010)................................................................ 5, 21, 87

*Common Cause v. FEC*, 842 F.2d 436 (D.C. Cir. 1988)................................................................60

*Covad Commc'ns Co. v. FCC*, 450 F.3d 528 (D.C. Cir. 2006)........................................................ 106, 114

*Creekstone Farms Premium Beef, L.L.C. v. Dep't of Agric.*, 539 F.3d 492 (D.C. Cir. 2008) ............................96

*Denver Area Educ. Telecomms. Consortium v. FCC*, 518 U.S. 727 (1996) ..................................146

*DiCola v. FDA*, 77 F.3d 504 (D.C. Cir. 1996)................... 124, 126

*DIRECTV, Inc. v. FCC*, 110 F.3d 816 (D.C. Cir. 1997)................................................................86

\*   *Earthlink, Inc. v FCC*, 462 F.3d 1 (D.C. Cir. 2006) ............... 39, 85, 138, 140

*FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307 (2012) ........................................ 126, 127

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ........................................................ 48, 85

*FCC v. League of Women Voters*, 468 U.S. 364 (1994) ................................................................147

*FCC v. Schreiber*, 381 U.S. 279 (1965)................................105

*FCC v. WNCN Listeners Guild*, 450 U.S. 582
(1981) .................................................................................140

*Fertilizer Inst. v. EPA*, 935 F.2d 1303 (D.C. Cir.
1991) ..................................................................................108

*First Am. Disc. Corp. v. CFTC*, 222 F.3d 1008
(D.C. Cir. 2000) .......................................................... 41, 108

*Freeman United Coal Mining Co. v. Fed. Mine
Safety & Health Review Comm'n*, 108 F.3d 358
(D.C. Cir. 1997) ....................................................... 124, 125

*Global Crossing Telecomms., Inc. v. Metrophones
Telecomms., Inc.*, 550 U.S. 45 (2007) .......................131

*Hermes Consol., LLC v. EPA*, 787 F.3d 568 (D.C.
Cir. 2015) .............................................................................48

\*    *Home Care Ass'n v. Weil*, 2015 WL 4978980 (D.C.
Cir. Aug. 21, 2015) .............................................................58

*In re Charter Commc'ns, Inc.*, 393 F.3d 771 (8th
Cir. 2005) ...........................................................................149

*In re Core Commc'ns, Inc.*, 455 F.3d 267 (D.C. Cir.
2006) ..................................................................................155

*In re Polar Bear Endangered Species Act Listing*,
720 F.3d 354 (D.C. Cir. 2013) .................................117

*Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615
(D.C. Cir. 1973) .................................................................108

*Int'l Internship Prog. v. Napolitano*, 718 F.3d 986
(D.C. Cir. 2013) .................................................................156

*King v. Burwell*, 135 S. Ct. 2480 (2015) ........................46

*Lansdowne of the Potomac Homeowners Ass'n v.
OpenBand at Lansdowne, LLC*, 713 F.3d 187
(4th Cir. 2013) ...................................................................133

*Long Island Care at Home, Ltd. v. Coke*, 551 U.S.
158 (2007) .......................................................... 106, 109, 127

*Manufactured Housing Inst. v. EPA*, 467 F.3d 391
(4th Cir. 2006) ...................................................................110

*Maryland v. United States*, 460 U.S. 1001 (1983) .........................12

*Melcher v. FCC*, 134 F.3d 1143 (D.C. Cir. 1998) .........................................85

*Miami-Dade Cnty. v. EPA*, 529 F.3d 1049 (11th Cir. 2008) ................................................................. 105, 106, 117

*Mobile Relay Assocs. v. FCC*, 457 F.3d 1 (D.C. Cir. 2006) ..............................................................................86

*NARUC v. FCC*, 525 F.2d 630 (D.C. Cir. 1976) ...................... 80, 81

*Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032 (D.C. Cir. 2012) ...............................................69

*Nat'l Ass'n of Mfrs. v. EPA*, 750 F.3d 921 (D.C. Cir. 2014) ................................................ 43, 110, 115

\* *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ............................ 4, 10, 12, 14, 16, 17, 18, 31, 35, 36, 37, 39, 46, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 61, 63, 65, 69, 71, 72, 73, 75, 78, 88, 108, 110, 111

*Nat'l Cable & Telecomms. Assn. v. Gulf Power Co.*, 534 U.S. 327 (2002) ...............................................................4

*Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702 (D.C. Cir. 2008) ...............................................................94

*Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 512 F.3d 696 (D.C. Cir. 2008) ...............................118

*Nat'l Oilseed Processors Ass'n v. OSHA*, 769 F.3d 1173 (D.C. Cir. 2014) ...............................................48

*NCTA v. FCC*, 567 F.3d 659 (D.C. Cir. 2009) ...........................133

*Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1 (D.C. Cir. 2011) ...............................................................................98

*Nuvio Corp. v. FCC*, 473 F.3d 302 (D.C. Cir. 2006) .......................... 110, 114

*Orloff v. FCC*, 352 F.3d 415 (D.C. Cir. 2003) ................................ 131, 132

*Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015) ...............................................................................85

*Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810 (D.C. Cir. 2008) ...............................................93

*Pub. Serv. Comm'n of D.C. v. FCC*, 906 F.2d 713
(D.C. Cir. 1990)................................................................. 117, 118

*Qwest Corp. v. FCC*, 482 F.3d 471 (D.C. Cir. 2007) ...................................155

*Qwest Servs. Corp. v. FCC*, 509 F.3d 531 (D.C. Cir.
2007)................................................................................156

*Recording Indus. Ass'n of Am. v. Verizon Internet
Servs., Inc.*, 351 F.3d 1229 (D.C. Cir. 2003) ...........................................149

*Reno v. ACLU*, 521 U.S. 844 (1997)............................................................59

*Rumsfeld v. Forum for Academic & Institutional
Rights, Inc.*, 547 U.S. 47 (2006)....................................... 145, 146

*Sierra Club v. Costle*, 657 F.2d 298 (D.C. Cir.
1981)................................................................................118

*Small Bus. in Telecomms. v. FCC*, 251 F.3d 1015
(D.C. Cir. 2001)................................................................156

*Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735 (1996) ....................................48

*Texas v. Johnson*, 491 U.S. 397 (1989)........................................................144

*Throckmorton v. Nat'l Transp. Safety Bd.*, 963 F.2d
441 (D.C. Cir. 1992)..................................................... 124, 127

*Time Warner Entm't Co. v. FCC*, 56 F.3d 151 (D.C.
Cir. 1995)........................................................................137

*Time Warner Telecom, Inc. v. FCC*, 507 F.3d 205
(3d Cir. 2007) ............................................................. 18, 138

*Timpinaro v. SEC*, 2 F.3d 453 (D.C. Cir. 1993) .........................................126

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S.
622 (1994) ..................................................... 147, 148, 150, 151

*Turner Broadcasting System, Inc. v. FCC*, 520 U.S.
180 (1997) ................................................................. 152, 153

*United Shoe Workers of Am. v. Bedell*, 506 F.2d 174
(D.C. Cir. 1974)................................................................60

*United States v. Am. Tel. & Tel. Co.*, 552 F. Supp.
131 (D.D.C. 1982), *aff'd, Maryland v. United
States*, 460 U.S. 1001 (1983)......................................... 12, 72, 75

*United States v. Monsanto*, 491 U.S. 600 (1989)............................................94

*United States v. Monzel*, 641 F.3d 528 (D.C. Cir. 2011) ................................................................98

*United States v. Thomas*, 864 F.2d 188 (D.C. Cir. 1988) ........................................................ 124, 127

*United States v. Western Electric Co.*, 907 F.2d 160 (D.C. Cir. 1990) ...............................................61

*Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427 (2014) .............................................. 46, 47

*Verizon & AT&T, Inc. v. FCC*, 770 F.3d 961 (D.C. Cir. 2014) .......................................... 134, 136

*Verizon California, Inc. v. FCC*, 555 F.3d 270 (D.C. Cir. 2009) ...............................................60

*Verizon v. FCC*, 2011 WL 1235523 (D.C. Cir. Apr. 4, 2011) .................................................7

\* *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014) ................... 2, 3, 8, 9, 10, 11, 21, 23, 24, 25, 34, 35, 44, 46, 47, 49, 68, 71, 82, 87, 122, 130, 131, 150, 151, 152, 153

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ..........................................125

*Virgin Islands Tel. Corp. v. FCC*, 198 F.3d 921 (D.C. Cir. 1999) ........................................ 80, 101

**STATUTES**

5 U.S.C. § 553(b) .................................................................118

5 U.S.C. § 553(b)(3) ............................................. 105, 110, 129

5 U.S.C. § 604 ................................................... 154, 156

5 U.S.C. § 604(a) .................................................................156

5 U.S.C. § 706 .................................................................118

5 U.S.C. § 706(2)(A) .................................................................45

18 U.S.C. § 1039(h)(4) .................................................................95

28 U.S.C. § 2342(1) ................................................................7

28 U.S.C. § 2344 .................................................................7

47 U.S.C. § 152(a) .................................................................9

47 U.S.C. § 153(24) ............................................ 12, 13, 14, 38, 50, 72, 74, 79

47 U.S.C. § 153(50) ....................................................................................13

47 U.S.C. § 153(51) ...................................................................... 13, 79, 153

47 U.S.C. § 153(53) ........................................................ 12, 13, 35, 56, 80

47 U.S.C. § 160 ........................................................... 21, 44, 133, 135

47 U.S.C. § 160(a) ...................................................... 21, 133, 134, 136, 139

47 U.S.C. § 160(b) .................................................................................137

47 U.S.C. § 160(c) ............................................................................ 44, 141

47 U.S.C. §§ 201-276 ...............................................................................13

47 U.S.C. § 201 ........................................................................ 29, 130

47 U.S.C. § 201(b) .......................................................... 43, 44, 120, 121, 131

47 U.S.C. § 202 ........................................................................ 29, 130

47 U.S.C. § 202(a) ..................................................................................131

47 U.S.C. § 230(c)(1) ............................................................... 59, 148

47 U.S.C. § 230(c)(2) ................................................................................59

47 U.S.C. § 230(c)(3) ................................................................................59

47 U.S.C. § 230(f) ...................................................................... 37, 60

47 U.S.C. § 230(f)(2) ................................................................... 37, 59

47 U.S.C. § 303(b) ....................................................................................28

47 U.S.C. § 332 .......................................................................................112

47 U.S.C. § 332(c)(1)(A) .........................................................................133

47 U.S.C. § 332(c)(2) ................................................................................89

47 U.S.C. § 332(d) ....................................................................................40

47 U.S.C. § 332(d)(1) ................................................................................90

47 U.S.C. § 332(d)(2) ....................................................................... 90, 94

47 U.S.C. § 332(d)(3) ..............................................................................101

47 U.S.C. § 402(a) ......................................................................................7

47 U.S.C. § 405(a) .......................................................................... 45, 155

47 U.S.C. § 1302 ........................................ 23, 25, 46, 49, 87, 107, 130, 134, 151

47 U.S.C. § 1302(a) .................................................................... 22, 140

47 U.S.C. § 1302(b) ........................................................................22

47 U.S.C. § 1422 .............................................................................97

Telecommunications Act of 1996, Pub. L. No. 104-
    104, 110 Stat. 56 (1996) ................................... 12, 13, 53, 58, 97

## REGULATIONS

20 C.F.R. § 20.3 ...........................................................................112

47 C.F.R. § 1.4(b)(1) .......................................................................7

47 C.F.R. § 1.4(b)(1) Note ...............................................................7

47 C.F.R. § 20.9(a)(14)(i) .............................................................104

47 C.F.R. § 20.9(a)(14)(ii) ............................................................104

47 C.F.R. § 20.9(a)(14)(ii)(B) .......................................................105

47 C.F.R. § 27.16(b)........................................................................20

47 C.F.R. § 64.702(a) ......................................................................62

## ADMINISTRATIVE DECISIONS

*Amendment of Section 64.702 of the Commission's
    Rules and Regulations*, 77 FCC 2d 384 (1980)..... 10, 11, 12, 13, 17, 53, 72,
    76, 86

*Applications of AT&T and DIRECTV*, MB Docket
    No. 14-90, FCC 15-94 (rel. July 28, 2015) ....................................3

*Applications of Comcast Corp., Gen. Elec. Co., and
    NBC Universal, Inc.*, 26 FCC Rcd 4238 (2011) ........................................19

*Appropriate Framework for Broadband Access to
    the Internet over Wireline Facilities*, 20 FCC Rcd
    14853 (2005), *pets. for review denied, Time
    Warner Telecom, Inc. v. FCC*, 507 F.3d 205 (3d
    Cir. 2007)............................................................ 18, 19, 67, 88, 138, 142

*Appropriate Framework for Broadband Access to
    the Internet over Wireline Facilities*, 20 FCC Rcd
    14986 (2005) ............................................................ 5, 18, 19

*Appropriate Regulatory Treatment for Broadband Access to the Internet over Wireless Networks*, 22 FCC Rcd 5901 (2007) ................................................ 18, 67, 100

*Bell Atl. Tel. Cos.*, 3 FCC Rcd 6045 (Comm. Carr. Bur. 1988) .................................................................... 62

*Commc'ns Assistance for Law Enforcement Act & Broadband Access & Servs.*, 20 FCC Rcd 14989 (2005) ................................................................................ 97

*Deployment of Wireline Services Offering Advanced Telecommunications Capability*, 13 FCC Rcd 24011 (1998) ...................................................................... 12

*Federal-State Joint Board on Universal Service*, 13 FCC Rcd 11501 (1998) ...................................... 14, 37, 62, 63, 78

*Formal Complaint of Free Press and Public Knowledge Against Comcast Corp. for Secretly Degrading Peer-to-Peer Applications*, 23 FCC Rcd 13028 (2008) ...................................................... 20

*Framework for Broadband Internet Service*, 25 FCC Rcd 7866 (2010) ...................... 21, 22, 33, 87, 112, 113, 114, 138, 142

*Implementation of Sections 3(n) & 332 of the Commc'ns Act*, 9 FCC Rcd 1411 (1994)......................... 32, 40, 90, 91, 92, 95, 96, 99, 104, 136

*Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 17 FCC Rcd 4798 (2002) .................... 15, 16, 36, 47, 51, 65, 66, 67, 68, 69, 70

*Lifeline and Link Up Reform and Modernization*, 30 FCC Rcd 7818 (2015) ............................................................. 141

*Madison River LLC and Affiliated Cos.*, 20 FCC Rcd 4295, 4297 (Enf. Bur. 2005) .............................................. 19

*Petition for Declaratory Ruling that pulver.com's Free World Dialup is Neither Telecommunications Nor a Telecommunications Service*, 19 FCC Rcd 3307 (2004) .......................................... 76

*Petition of USTelecom for Forbearance Under 47*
*U.S.C. § 160(c) from Enforcement of Certain*
*Legacy Telecommunications Regulations*, 28
FCC Rcd 7627 (2013), *pet. for review denied*,
*Verizon & AT&T*, 770 F.3d 961 (2014) ...................................................136

*Petition to Establish Procedural Requirements to*
*Govern Proceedings for Forbearance Under*
*Section 10 of the Communications Act of 1934, as*
*Amended*, 24 FCC Rcd 9543 (2009) ........................................................141

*Preserving the Open Internet*, 25 FCC Rcd 17905
(2010) ............................................................................................ 22, 23

*Rules and Policies Regarding Calling Number*
*Identification Service—Caller ID*, 10 FCC Rcd
11700 (1995) ........................................................................................77

*SBC Commc'ns Inc. and AT&T Corp. Applications*
*for Approval of Transfer of Control*, 20 FCC Rcd
18290 (2005) ........................................................................................19

*Service Rules for the 698-746, 747-762 and 777-*
*792 MHz Bands*, 22 FCC Rcd 15289 (2007) ............................................20

*Telecommunications Carriers Eligible For Support*,
28 FCC Rcd 4859 (2013) .......................................................................141

*Verizon Commc'ns Inc. and MCI, Inc. Applications*
*for Approval of Transfer of Control*, 20 FCC Rcd
18433 (2005) ........................................................................................19

## OTHER AUTHORITIES

Brief Amici Curiae of United States Telecom
Association and Network Engineers in Support of
Respondent, *Talk America Inc. v. Michigan Bell
Tel. Co.*, No. 10-313, 2011 WL 836421...................................................77

CHRISTOPHER BEAUCHAMP, INVENTED BY LAW:
ALEXANDER GRAHAM BELL AND THE PATENT
THAT CHANGED AMERICA (2015) ...........................................................50

*Clinton Steps Up Pressure On Hard-Liquor TV Ads*,
     WALL ST. J., Apr. 2, 1997, available at
     http://www.wsj.com/articles/SB85993807838594
     2000 .................................................................................................27

H.R. Rep. No. 103-827(I), *reprinted in* 1994
     U.S.C.C.A.N. 3489........................................................................97

John Lippman, *Sununu Defends White House Stand
     on TV Rerun Rules*, L.A. TIMES, Feb. 16, 1991,
     available at http://articles.latimes.com/1991-02-
     16/business/fi-984_1_white-house ............................................27

JONATHAN E. NUECHTERLEIN & PHILIP J. WEISER,
     DIGITAL CROSSROADS: AMERICAN
     TELECOMMUNICATIONS POLICY IN THE INTERNET
     AGE (2d ed. 2013)........................................................................10

PETER HUBER, MICHAEL KELLOGG, & JOHN
     THORNE, FEDERAL TELECOMMUNICATIONS LAW
     (2d ed. 1999)................................................................................55

Qwest Comments, GN Docket No. 00-185, Dec. 1,
     2000 ............................................................................................55

Robert Cannon, *The Legacy of the Federal
     Communications Commission's Computer
     Inquiries*, 55 FED. COMM. L.J. 167 (2003) ................................11

SBC and BellSouth Reply Comments, GN Docket
     No. 00-185, Jan. 10, 2001 ..........................................................55

Stuart Minor Benjamin, *Common Sense and Key
     Questions*, 127 HARV. L. REV. F. 346 (2007).................................. 144, 145

USTelecom Research Brief, *Latest Data Show
     Broadband Investment Surged in 2013*, Chart 2 .........................84

Verizon Comments, GN Docket No. 00-185, Dec.
     1, 2000 ........................................................................................55

*\* Cases and other authorities principally relied upon are marked with
asterisks.*

# GLOSSARY

| | |
|---|---|
| *1994 Section 332 Order* | *Implementation of Sections 3(n) & 332 of the Commc'ns Act*, 9 FCC Rcd 1411 (1994) |
| 1996 Act | Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 |
| *2010 Order* | *Preserving the Open Internet*, 25 FCC Rcd 17905 (2010), upheld in part and vacated in part by *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014) |
| Broadband Internet Access Service | "mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all Internet endpoints," *Order* ¶187 (JA___) |
| *Broadband NOI* | *Framework for Broadband Internet Service*, 25 FCC Rcd 7866 (2010) |
| *Cable Modem Order* | *Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 17 FCC Rcd 4798 (2002) |
| caching | "the storing of copies of content at locations in the network closer to subscribers than their original sources," *Order* ¶372 (JA___) |
| *Comcast Order* | *Formal Complaint of Free Press and Public Knowledge Against Comcast Corp. for Secretly Degrading Peer-to-Peer Applications*, 23 FCC Rcd 13028 (2008), vacated by *Comcast Corp. v. FCC*, 600 F.3d 642, 644 (D.C. Cir. 2010) |
| Communications Act (or "Act") | Communications Act of 1934, 48 Stat. 1064, encoded as amended at 47 U.S.C. § 151 et seq. |
| *Computer II Order* | *Amendment of Section 64.702 of the Commission's Rules and Regulations*, 77 FCC 2d 384 (1980) |

| | |
|---|---|
| DNS | domain name service, a function that "matches the Web site address the end user types into his browser …with the IP address of the Web page's host server," *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) |
| edge providers | providers of Internet content, applications, and services |
| FRFA | Final Regulatory Flexibility Analysis under the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.* |
| FSN | Full Service Network *et al.* |
| fixed broadband | broadband service to a user's fixed location, often via cable, fiber optic cable, coper wire, etc; contrast with mobile broadband |
| IP address | Internet Protocol address; a unique string of numbers used to identify each computer on a network |
| MFJ | The Modified Final Judgment governing the breakup of the AT&T monopoly; *see United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131 (D.D.C. 1982), *aff'd*, *Maryland v. United States*, 460 U.S. 1001 (1983) |
| mobile broadband | broadband service to a user's non-fixed location, often using radio waves; contrast with fixed broadband |
| mobile petitioners | petitioners CTIA and AT&T |
| NANP | North American Numbering Plan, the system of telephone numbers used in the U.S. |
| *NPRM* | *Protecting and Promoting the Open Internet*, 29 FCC Rcd 5561 (2014) (JA___) |
| *Order* | *Protecting and Promoting the Open Internet*, 30 FCC Rcd 5601 (2015) (JA___) |

| | |
|---|---|
| *Policy Statement* | *Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, 20 FCC Rcd 14986 (2005) |
| RFA | Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.* |
| Section 706 | Section 706 of the 1996 Act, Pub. L. 104-104, §706, 110 Stat. 153, codified at 47 U.S.C. § 1302. |
| SS7 | Signaling System 7, a system that transmits signaling information in digital format to local telephone network facilities to enable call routing and billing |
| *Stevens Report* | *Federal-State Joint Board on Universal Service*, 13 FCC Rcd 11501 (1998) |
| Title II | Title II of the Communications Act, codified as amended at 47 U.S.C. §§ 201–276 |
| VOIP | Voice Over Internet-Protocol; voice telephone service provided via the Internet |
| *Wireline Broadband Order* | *Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, 20 FCC Rcd 14853 (2005) *pets. for review denied*, *Time Warner Telecom, Inc. v. FCC*, 507 F.3d 205 (3d Cir. 2007) |
| *Wireless Broadband Order* | *Appropriate Regulatory Treatment for Broadband Access to the Internet over Wireless Networks*, 22 FCC Rcd 5901 (2007) |

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

NO. 15-1063 (AND CONSOLIDATED CASES)

———————

UNITED STATES TELECOM ASSOCIATION, ET AL.,

PETITIONERS,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

RESPONDENTS.

———————

ON PETITIONS FOR REVIEW OF AN ORDER OF
THE FEDERAL COMMUNICATIONS COMMISSION

———————

BRIEF FOR RESPONDENTS

———————

## PRELIMINARY STATEMENT

This case is about whether the Federal Communications Commission has the authority to ensure that the Internet, the central means of communication in the 21st Century, remains open to all Americans.

"The open Internet drives the American economy and serves, every day, as a critical tool for America's citizens to conduct commerce, communicate, educate, entertain, and engage in the world around them."

*Order* ¶1 (JA___)[1]. In 2014, this Court affirmed the "Commission's finding that Internet openness" fuels a virtuous cycle of online innovation, consumer demand, and broadband deployment. *Verizon v. FCC*, 740 F.3d 623, 643-49 (D.C. Cir. 2014). Innovation of the kind offered by companies as well-known as Apple and Google or as obscure as the newest start-up "leads to the expansion and improvement of broadband infrastructure." *Id*. at 644. "The [virtuous cycle] led to nearly $230 billion in capital expenditures by the leading network and edge providers over the three-year period" from 2011 to 2013, when the 2010 open Internet rules were in effect. *Order* n.114 (JA___) (quoting CWA & NAACP comments).

"[A]bsent rules such as those set forth in the Open Internet Order, broadband providers represent a threat to Internet openness." *Verizon*, 740 F.3d at 645. The Commission, in the Court's words, "convincingly detailed how broadband providers' position in the market gives them the economic power to restrict edge-provider traffic," acting as "terminating monopolist[s]" holding "gatekeeper" power. *Id*. at 646 (internal quotation marks omitted). For example, broadband providers are incented to threaten Internet openness

---

[1] *Protecting and Promoting the Open Internet*, 30 FCC Rcd 5601 (2015) (JA___) ("*Order*").

when consumers patronize companies like Netflix and Hulu that "compete directly with their own 'core video subscription services'" *Id*. at 645.[2]

The *Order* safeguards that *status quo* of Internet openness with three bright-line rules that prohibit broadband providers from (1) blocking or (2) otherwise degrading consumers' access to the Internet, and (3) from engaging in "paid prioritization," *i.e.*, accepting payment to favor certain content, applications, devices, or services over others. These bright-line rules are supported by two important backstops: first, a general prohibition on actions by broadband providers that unreasonably interfere with or disadvantage the ability of consumers and edge providers to reach each other; and, second, statutory standards to prevent broadband providers from using interconnection agreements, which govern the exchange of Internet traffic, to achieve the same prohibited ends.

After an extensive factual review, the Commission reclassified Broadband Internet Access Service, which consumers use every day to transmit traffic to and from Internet endpoints, as a "telecommunications

---

[2] Using different legal authority, the Commission this year prohibited AT&T from discriminating in the application of so-called "data caps" on fixed broadband Internet access service in order to ensure that AT&T could not favor its own online video services by effectively raising the price of using rivals. *Applications of AT&T and DIRECTV*, MB Docket No. 14-90, FCC 15-94 (rel. July 28, 2015).

service"—the precise statutory term that the Supreme Court held to be ambiguous in *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 993-96 (2005) ("*Brand X*"). Thus, the Commission's interpretation deserves deference. "The Commission is in a far better position," the Supreme Court explained, to address this "'technical, complex, and dynamic'" subject. *Id*. at 1002-3 (quoting *Nat'l Cable & Telecomms. Assn. v. Gulf Power Co.*, 534 U.S. 327, 339 (2002)).

Congress expressly delegated this authority to the Commission. In 1996, Congress expanded the Commission's regulatory responsibilities, including by enacting the definition of "telecommunications service," which supports the *Order*'s use of Title II of the Communications Act ("Act"). In 1993, Congress had already expressly delegated to the Commission the task of creating rules to interpret the definition of common-carrier mobile services.

Focusing on the threats to Internet openness, the Order adopts necessary solutions, using a light-touch version of Title II. Its scope is limited to retail Broadband Internet Access Service. People know, and the Commission ruled, that ordering broadband service from their local cable company is not the same as buying an online subscription to *The Wall Street Journal*, ordering a new coffee maker from Amazon, or downloading music

from iTunes. The first involves signing up for a transmission service that supplies access to those online applications, services, and content; the others are themselves the providers of online content and services. That is why, for example, the *Order* does not even apply to non-telecommunications activities (including speech) of broadband providers themselves; Verizon's operation of *Huffington Post*, for example, is left untouched. It does not reach the conduct of edge providers or devices consumers attach to the network. It does not "regulate the Internet" (USTelecom Br. 2).

The *Order* does reaffirm the Commission's longstanding policy of restraining gatekeeper power and the decade-old policy preserving the open Internet.[3] With constrained legal authority after *Comcast*[4] and *Verizon*, but with a factual record fully supporting the classification of Broadband Internet Access Service as a telecommunications service, the Commission applied its version of Title II rather than dispensing with rules like the prohibitions on blocking and paid prioritization, which the *Verizon* Court held constitute common carriage. Given the history of pro-open Internet policies and actions,

---

[3] *Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, 20 FCC Rcd 14986 (2005) ("*Policy Statement*").

[4] *Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010).

5

the express desire of the Commission in the *NPRM*[5] to consider the use of Title II, and the record that was subsequently created, it cannot be said that the Order upends some "settled understanding" (USTelecom Br. 3) that Broadband Internet Access Service would be forever free from Title II regulation.

This is Title II tailored for the 21st century, *Order* ¶5 (JA___), without any requirement of prior approval of rates, need to file tariffs, mandated unbundling of networks, need to ask permission before introducing new products, or government-mandated rate of return. The *Order* expressly disavows a majority of Title II's statutory provisions (and hundreds of accompanying regulations). This is not "heavy-handed, utility-style regulation" (USTelecom Br. 2).

It is the *Order*—not USTelecom's rhetoric—that is before this Court. The *Order* concludes that the Internet "must remain open: open for commerce, innovation and speech; open for consumers and for the innovation created by applications developers and content companies; and open for expansion and investment by America's broadband providers." *Order* ¶1 (JA___). The *Order* is well within the statutory authority that Congress has

---

[5] *Protecting and Promoting the Open Internet*, 29 FCC Rcd 5561 (2014) (JA___) ("*NPRM*").

vested in the Commission and rests on a factual record reflecting an "overwhelming consensus" that "carefully tailored rules to protect Internet openness will allow investment and innovation to continue to flourish." *Order* ¶4 (JA___).

## JURISDICTION

The *Order* was published in the Federal Register on April 13, 2015. 80 Fed. Reg. 19738. Petitioners filed timely petitions for review within 60 days of that publication. *See* 28 U.S.C. § 2344, 47 C.F.R. § 1.4(b)(1).[6] This Court has jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1).

## QUESTIONS PRESENTED

(1)    Whether the Commission reasonably reclassified Broadband Internet Access Service as a Title II telecommunications service.

(2)    Whether the Commission reasonably determined that mobile Broadband Internet Access Service is not a private mobile service.

(3)    Whether the Commission provided adequate notice of reclassification.

(4)    Whether the Commission properly recognized its jurisdiction to resolve interconnection disputes.

---

[6] Although they filed timely petitions for review, USTelecom and Alamo also filed "protective" petitions (Nos. 15-1063, 15-1078) before Federal Register publication. The Court should dismiss those petitions as premature. *See Verizon v. FCC*, 2011 WL 1235523 (D.C. Cir. Apr. 4, 2011); 47 C.F.R. § 1.4(b)(1) and Note.

(5)     Whether the general conduct rule is lawful.

(6)     Whether the Commission has authority to ban paid prioritization.

(7)     Whether the Commission reasonably exercised its forbearance authority.

(8)     Whether the open Internet rules are consistent with the First Amendment.

(9)     Whether the Commission complied with the Regulatory Flexibility Act.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in an addendum to this brief.

## COUNTERSTATEMENT

The Internet—a network of networks empowering millions of computers to communicate seamlessly with one another—is the dominant means of communication by wire and radio in the 21st Century, occupying an increasingly central position in American social and economic life. The Internet is accessed by "end-users" (consumers) using broadband providers, like Comcast or Verizon, to reach content, services and applications furnished by "edge-providers," such as Amazon or Google. *Verizon*, 740 F.3d at 628-29.

8

In the Communications Act, Congress provided the Commission with broad authority over "all interstate and foreign communication by wire or radio." 47 U.S.C. § 152(a). As this Court has recognized, access to the "communications network" that is the Internet "falls comfortably within the Commission's jurisdiction." *Verizon*, 740 F.3d at 629.

The FCC has long sought to preserve an "open Internet"—one where residential consumers can reach Internet applications, content and services without the threat of gatekeeper power exercised by the providers of those residential telecommunications. The Commission's open Internet policies promote innovation and investment and protect against the incentive and ability of broadband providers to "act in ways that would ultimately inhibit the speed and extent of future broadband deployment." *Verizon*, 740 F.3d at 645.

As described in detail below, the Commission's work has proceeded in three phases. These phases culminate in the *Order* on review, which adopts open Internet protections grounded in multiple sources of Commission authority—applied with a light touch.

9

### A. The *Computer II* Framework And The Telecommunications Act Of 1996

**1.** "The roots of the [open Internet] debate can be traced back to" 1980 and *Computer II*,[7] *see* JONATHAN E. NUECHTERLEIN & PHILIP J. WEISER, DIGITAL CROSSROADS: AMERICAN TELECOMMUNICATIONS POLICY IN THE INTERNET AGE 188 (2d ed. 2013), in which the Commission separated data-processing activities from the telecommunications services regulated under Title II in order to enable new information services to flourish free from the "bottleneck" power of telephone companies, *see Brand X*, 545 U.S. at 996.

That 1980 proceeding distinguished between "basic" services—e.g, traditional telephone service—involving the transmission of information, and "enhanced" services—*e.g.,* voicemail—involving the processing of information. *Verizon*, 740 F.3d at 629-30. "[B]asic service[s]," the Commission explained, included "data processing" capabilities—like "compression techniques," "packet switching," and "storage within the network"—used "for the purpose of providing a communications service." *Computer II Order* ¶¶30, 95.

---

[7] *Amendment of Section 64.702 of the Commission's Rules and Regulations*, 77 FCC 2d 384 (1980) ("*Computer II Order*").

The Commission used these definitions to establish a regulatory framework supporting development of the nascent information economy free from interference by the traditional providers of telecommunications services. Basic services were subject to common-carrier regulation under Title II of the Communications Act; enhanced services were not. And *Computer II* imposed strong nondiscrimination rules to prevent owners of transmission facilities from exercising gatekeeper power over enhanced services transmitted over over those facilities. *Id.* ¶¶228-230. The *Computer II* rules prevented network owners from engaging in anticompetitive behavior and sparked the development and adoption of new technologies.[8] They ensured, for example, that consumers could connect a modem to their telephone line and dial up an independent online service provider (*e.g.*, AOL) of their choice.

For well over a decade, the FCC applied its *Computer II* restrictions to the provision of Internet access over the telephone network, "then the predominant way in which most end users connected to the Internet." *Verizon*, 740 F.3d at 629. Consistent with this regulatory framework, the

---

[8] *See* Robert Cannon, *The Legacy of the Federal Communications Commission's Computer Inquiries*, 55 FED. COMM. L.J. 167, 169, 204-05 (2003) (arguing that the rules established in *Computer II* "have been … wildly successful" and were "a necessary precondition for the success of the Internet").

Commission classified the broadband transmission of Internet traffic over telephone lines, *e.g.*, Digital Subscriber Line ("DSL") service, as a distinct offering of "telecommunications services" regulated under Title II. *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, 13 FCC Rcd 24011, 24029-30 ¶¶35-36 (1998).

    **2.**    In 1996, Congress vested the Commission with additional authority to determine the appropriate form of regulation and deregulation to be applied to communications services by wire or radio. *See* Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) ("1996 Act"). Congress expressly replaced the Modified Final Judgment ("MFJ"),[9] the antitrust decree governing the breakup of AT&T, with statutory definitions that substantially incorporated the *Computer II* definitions, *Brand X*, 545 U.S. at 992, and authorized the Commission, rather than the MFJ Court, to administer those provisions. *see* Pub. L. No. 104-104, § 601(a)(1), 110 Stat. at 143. As relevant here, the 1996 Act enacted the definitions of "telecommunications service," 47 U.S.C. § 153(53), and "information service," *id*. § 153(24), which, like the *Computer II* definitions, divide into three parts.

---

[9] *See United States v. Am. Tel. & Tel. Co*., 552 F. Supp. 131, 229 (D.D.C. 1982) ("*AT&T*"), *aff'd*, *Maryland v. United States*, 460 U.S. 1001 (1983).

12

First, the 1996 Act defined "telecommunications" as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(50), and "telecommunications service" as "the offering of telecommunications for a fee directly to the public … regardless of the facilities used," *id*. § 153(53).

Second, the Act defined "information services" as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." *Id.* § 153(24).

Under the Act, "telecommunications service" and "information service" are mutually exclusive categories. A "telecommunications carrier"— a provider of telecommunications service—is subject to common-carrier regulation under Title II of the Act, 47 U.S.C. §§ 201-276, but "only to the extent it is engaged in providing telecommunications services." *Id*. § 153(51).

Third, Congress recognized, as the Commission had in *Computer II*, that network owners need to use tools to manage their networks that would not otherwise qualify as telecommunications. In a provision often called the "network management exception," Congress provided that the term "information services" does not include "the management, control, or

13

operation of a telecommunications system or the management of a telecommunications service." *Id*. § 153(24). By amending the Communications Act to include these definitions, Congress vested in the Commission the authority to interpret their contours. *See Brand X*, 545 U.S. at 980-81.

In 1997, Congress ordered the Commission to report on, among other things, the impact of "the Commission's interpretation" of those definitions and its "application" of them to "mixed or hybrid services" on the universal service system. *See Federal-State Joint Board on Universal Servic*e, 13 FCC Rcd 11501, 11502 ¶1, n.1 (1998) ("*Stevens Report*"). As a part of that report, the Commission stated that Internet service from a non-facilities based provider, like AOL, which did not own the facilities used to transmit its end users' Internet traffic, was an information service. It also "clarif[ied] that the provision of transmission capacity" to such providers was not an "information service." *Id.* ¶15. The report expressly declined to reach the "more complicated" question of how to interpret the definitions with respect to facilities-based Internet service providers, like AT&T, Comcast, CenturyLink, and others. *Id.* ¶60.

14

### B.   The *Cable Modem Order*, *Brand X*, And Early Commission Actions To Promote The Open Internet

**1.**     The Commission reached that "more complicated" question—and changed course from its historical approach to DSL—when it examined cable modem service provided by cable companies. In a 2002 declaratory ruling, it concluded that cable modem service providers are "not offering telecommunications service to the end user," but instead are providing a "single, integrated information service" that is exempt from Title II regulation. *See Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 17 FCC Rcd 4798, 4824 ¶41 (2002) ("*Cable Modem Order*").

The FCC reasoned that although "by definition an information service includes a telecommunications component, the mere existence of such a component, without more, does not indicate that there is a separate offering of a telecommunications service to the subscriber." *Cable Modem Order* ¶58. The Commission concluded that cable modem service (as then offered) did "not include an offering of telecommunications" to subscribers because the service's "telecommunications component" was not "separable from" its "data-processing capabilities." *Id.* ¶39.

Although the Commission recognized that its classification exempted cable modem service from Title II regulation, the agency sought comment on

15

its exercise of Title I authority over cable modem service. *Id.* ¶77. The

Commission noted concerns about open access to the network. *Id.* ¶¶83-85.

    **2.**    In 2005, the Supreme Court upheld the FCC's classification of

cable modem service as an integrated information service that did not include

a separate offering of telecommunications service. *Brand X*, 545 U.S. at 986-

1000. Reviewing the agency's action under the analytical framework

prescribed by *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*,

467 U.S. 837 (1984), the Court held that the Act's "telecommunications

service" definition is ambiguous, 545 U.S. at 992, and that the Commission's

interpretation was "entitled to deference." *Id.* at 989.

    The Court found that the Act was "ambiguous about whether cable

companies 'offer' telecommunications" with cable modem service. *Id.* at 992.

The question was whether "the transmission component of cable modem

service" was "sufficiently integrated with the finished service to make it

reasonable to describe the two as a single, integrated offering." *Id.* at 990.

"That question," the Court said, "turns not on the language of the Act, but on

the factual particulars of how Internet technology works and how it is

provided, questions *Chevron* leaves to the Commission to resolve in the first

instance." *Id.* at 991.

16

Noting the "technical, complex, and dynamic" nature of the issues involved, the Court reasoned that the Commission—exercising its "expert policy judgment"—was "in a far better position … to resolve these difficult questions" than was the Court. *Id.* at 1002-03 (internal quotation marks omitted). Consequently, the Court deferred to the agency's determination that a cable modem subscriber "uses the high-speed wire *always* in connection with the information-processing capabilities provided by Internet access." *Id.* at 990 (emphasis added).

The Court recognized that without Title II in hand, the Commission would lose the statutory basis it had employed in *Computer II* to achieve the agency's open access policy goals. *Id.* at 996. But it explained that the Commission "remains free to impose special regulatory duties on facilities-based [Internet Service Providers] under its Title I ancillary jurisdiction." *Id.* at 996.

Three justices dissented. They read the statute to require the FCC to classify the transmission portion of cable modem service as a telecommunications service subject to Title II. 545 U.S. at 1005-14 (Scalia, J., dissenting). In a concurring opinion, Justice Breyer agreed only that the FCC's interpretation had "perhaps just barely" passed muster under *Chevron*. *Brand X*, 545 U.S. at 1003 (Breyer, J., concurring).

17

In the wake of *Brand X*, the FCC discontinued its treatment of DSL as a telecommunications service, opting instead to classify wireline broadband service as an integrated information service. *Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, 20 FCC Rcd 14853, 14862-65 ¶¶12-17 (2005) ("*Wireline Broadband Order*"), *pets. for review denied*, *Time Warner Telecom, Inc. v. FCC*, 507 F.3d 205 (3d Cir. 2007). Two years later, the Commission also classified wireless broadband as an integrated information service, finding that wireless broadband did not meet the definition of "commercial mobile service" under section 332 of the Act." *Appropriate Regulatory Treatment for Broadband Access to the Internet over Wireless Networks*, 22 FCC Rcd 5901, 5909-14 ¶¶19-34 (2007) ("*Wireless Broadband Order*").

**3.**     On the same day that the Commission classified DSL as an information service, it simultaneously adopted a unanimous 2005 policy statement designed to "encourage broadband deployment and preserve and promote the open and interconnected nature of the public Internet." *Policy Statement* ¶4. The *Policy Statement* declared that consumers are entitled to: (1) "access the lawful Internet content of their choice"; (2) "run applications and use services of their choice, subject to the needs of law enforcement"; (3) "connect their choice of legal devices that do not harm the network"; and (4)

18

"competition among network providers, application and service providers, and content providers." *Id*. The Commission also made clear that if it saw "evidence that providers of telecommunications for Internet access … are violating" the principles it adopted in the Internet policy statement, it would "not hesitate to take action to address that conduct." *Wireline Broadband Order* ¶96.

**4.**    The Commission did, entering into a consent decree to resolve an investigation into allegations that a broadband provider "was blocking ports" used for voice over Internet Protocol (VoIP) [voice telephone service provided via the Internet], "thereby affecting customers' ability to use VoIP through one or more VoIP service providers." *Madison River LLC and Affiliated Cos.*, 20 FCC Rcd 4295, 4297 (Enf. Bur. 2005).

Subsequently, the FCC conditioned its approval of broadband provider mergers on the merged entities' commitment to abide by the FCC's open Internet principles and rules. *See Applications of Comcast Corp., Gen. Elec. Co., and NBC Universal, Inc.*, 26 FCC Rcd 4238, 4275 ¶94 (2011); *SBC Commc'ns Inc. and AT&T Corp. Applications for Approval of Transfer of Control*, 20 FCC Rcd 18290, 18368 ¶144 (2005); *Verizon Commc'ns Inc. and MCI, Inc. Applications for Approval of Transfer of Control*, 20 FCC Rcd 18433, 18509 ¶143 (2005).

The Commission also exercised its power to set conditions on spectrum auctions to require that, with limited exceptions, licensees offering service on the 700 MHz C Block "not deny, limit, or restrict the ability of their customers to use the devices and applications of their choice on the licensee's C Block network." 47 C.F.R. § 27.16(b); *see also Service Rules for the 698-746, 747-762 and 777-792 MHz Bands*, 22 FCC Rcd 15289, 15364 ¶¶203-204 (2007). This "open access" rule "overlap[s] in significant parts with the open Internet rules" adopted here. *Order* ¶39 (JA___).

## C. *Comcast v. FCC*, The *Broadband NOI*, And The 2010 Open Internet Rules

**1.**    In 2008, the FCC discovered that Comcast was secretly interfering with its subscribers' use of peer-to-peer Internet applications (such as BitTorrent) to upload computer files. *Formal Complaint of Free Press and Public Knowledge Against Comcast Corp. for Secretly Degrading Peer-to-Peer Applications*, 23 FCC Rcd 13028, 13050-59 ¶¶41-53 (2008) ("*Comcast Order*"). Such applications had "become a competitive threat" to Comcast because consumers could use them "to view high-quality video" online "that they might otherwise watch (and pay for) on cable television." *Id.* ¶5. The Commission—invoking its ancillary authority under Title I—ordered Comcast to revise its network management practices. *Id.* ¶¶54-55. On review, this Court vacated the *Comcast Order*, holding that the FCC had "failed to tie

20

its assertion of ancillary authority" under Title I "to any statutorily mandated responsibility." *Comcast*, 600 F.3d at 661 (internal quotation marks omitted).

In the wake of *Comcast*, "the Commission sought comment on whether and to what extent it should reclassify broadband Internet services as telecommunications services." *Verizon*, 740 F.3d at 632; *see Framework for Broadband Internet Service*, 25 FCC Rcd 7866, 7867 ¶2 (2010) ("*Broadband NOI*"). The Commission requested comment on alternatives for classifying and regulating broadband Internet service, including classifying the transmission component as a telecommunications service and forbearing under Section 10 of the Act from applying most of Title II's provisions to the service. *Id*.[10] The *Broadband NOI* also sought comment on "factual and legal issues specific to … wireless services that bear on their appropriate classification." *Id*.

**2.** In 2010, the Commission adopted three rules designed to preserve the open Internet by limiting broadband providers' gatekeeper

---

[10] Section 10, 47 U.S.C. § 160, authorizes the Commission to "forbear from applying any regulation or any provision of this [Act] to a telecommunications carrier or telecommunications service," so long as the Commission finds that (1) enforcement of the provision is unnecessary to ensure that the carrier's charges or practices are "just and reasonable" and "not unjustly or unreasonably discriminatory," (2) enforcement of the provision "is not necessary for the protection of consumers," and (3) forbearance would be "consistent with the public interest." *Id.* § 160(a).

power: (1) requiring fixed broadband providers (which serve end users "primarily at fixed endpoints using stationary equipment," *Order* ¶337 (JA___)) and mobile broadband providers (which serve end users "primarily using mobile stations," *id.*) to disclose their network management practices; (2) barring those providers from blocking consumers' access to the Internet; and (3) prohibiting fixed broadband providers from unreasonably discriminating in the transmission of Internet traffic. *Preserving the Open Internet*, 25 FCC Rcd 17905, 17936-51 ¶¶53-79 (2010) ("*2010 Order*"). The agency left open the *Broadband NOI* docket, *see Order* ¶393 (JA___), but declined to reclassify broadband as a telecommunications service at that time.

Instead, the Commission relied upon its authority under Section 706 of the 1996 Act, *2010 Order* ¶¶117-123, which directs the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans," 47 U.S.C. § 1302(a), and to "take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment" if upon inquiry it finds that that such capability is not "being deployed to all Americans in a reasonable and timely fashion," 47 U.S.C. § 1302(b).

The Commission explained that its open Internet rules were necessary because broadband providers have the incentive and ability to block or

22

impede consumers' access to "edge" providers of Internet content, applications, and services. *2010 Order* ¶¶20-34. The agency found evidence that broadband providers had already engaged in such practices. *Id.* ¶¶35-37. It concluded that preserving open access between consumers and edge providers was essential to a "virtuous cycle," whereby innovations at the edges of the Internet increase consumer demand for broadband services, which, in turn, drive increased broadband investment and deployment in accordance with Section 706. *Id.* ¶¶13-19.

**3.**    In *Verizon*, 740 F.3d 623, this Court upheld the FCC's imposition of disclosure requirements on broadband providers, but vacated the rules prohibiting blocking and unreasonable discrimination.

The Court agreed with the Commission that Section 706 gave the agency "the requisite affirmative authority to adopt the regulations," *id.* at 635-42—recognizing, under *Chevron*, that the Commission could adopt this position despite its earlier view to the contrary. *Id.* at 636-37. The Court also affirmed the Commission's conclusion that the rules were reasonably designed to advance the broadband deployment goals of Section 706. *Id.* at 642-49. It found that the FCC "more than adequately explained its conclusion that edge-provider innovation leads to the expansion and improvement of broadband infrastructure." *Id.* at 644. "The Commission's finding that

Internet openness fosters the edge-provider innovation that drives this 'virtuous cycle' was likewise reasonable and grounded in substantial evidence." *Id.*

      In addition, the Court upheld the Commission's determination that, without open Internet rules, broadband providers would have "powerful incentives" and "the technical and economic ability" to disrupt the virtuous cycle of Internet innovation and investment by engaging in conduct that threatens Internet openness. 740 F.3d at 645-46. Indeed, the Court noted that at oral argument, Verizon's counsel stated that "but for" the open Internet rules, Verizon "would be exploring" arrangements whereby edge providers could pay Verizon to obtain "prioritized access to end users." *Id.* at 646 (internal quotation marks omitted). As the Court explained, "[b]ecause all end users generally access the Internet through a single broadband provider, that provider functions as a terminating monopolist with power to act as a gatekeeper with respect to edge providers that might seek to reach its end-user subscribers." *Id.* (internal quotation marks and citations omitted). "[T]his ability to act as a gatekeeper distinguishes broadband providers from other participants in the Internet marketplace—including prominent and potentially powerful edge providers such as Google and Apple—who have no similar

24

control [over] access to the Internet for their subscribers and for anyone wishing to reach those subscribers." *Id.* (internal quotation marks omitted).

Despite finding that the 2010 rules were authorized by Section 706 and supported by substantial evidence, the Court concluded that two of the three rules violated the Act's prohibition on common-carrier regulation of information services. *Id.* at 650-59. The Court held that because the FCC had "chosen" to classify broadband providers "not as providers of 'telecommunications services' but instead as providers of 'information services,'" *id.* at 650, the agency could not therefore impose the "*per se* common carriage obligations*" of the anti-blocking and anti-discrimination rules on "information service" providers. *Id.* at 655-59. The Court vacated those rules and "remand[ed] the case to the Commission for further proceedings." *Id.* at 659.[11]

### D.  The Order On Review

**1.**     In May 2014, the Commission commenced a new rulemaking to consider how best to respond to the *Verizon* remand. *See NPRM* (JA___-___). The Commission's intent was clear: "to find the best approach to protecting and promoting Internet openness." *NPRM* ¶4 (JA___). To do so, the

---

[11] The Court did not disturb the disclosure rule, which did not impose "*per se* common carrier obligations." *Id.*

Commission sought comment on the best way to protect the open Internet "[u]nder all available sources of legal authority." *Id.*

Although the Commission proposed "to rely on section 706" of the 1996 Act to adopt new rules, it made clear that it would "seriously consider" reclassifying broadband Internet access as a telecommunications service in order to use Title II of the Communications Act "as the basis for legal authority." *NPRM* ¶¶4, 149-150 (JA___, ___-___). The Commission asked questions about the use of Title II authority in nearly every substantive section of the NPRM, including whether mobile broadband "fit within the definition of 'commercial mobile service,'" *id.* ¶150 (JA___), so that mobile broadband providers could "be regulated as common carriers under Title II." *Id.* ¶149 (JA___-___).

The *NPRM* proposed to re-adopt the 2010 no-blocking rule (with a new rationale) and proposed a "commercially unreasonable" rule in place of the 2010 non-discrimination rule. *NPRM* ¶¶96, 116-118 (JA___. ___-___). The Commission also asked about banning particular broadband provider practices, such as pay-for-priority arrangements. *NPRM* ¶138 (JA___). In each case, the Commission asked about Title II-based alternatives to these proposals. *NPRM* ¶¶96, 116-118, 121, 138 (JA___. ___-___, ___. ___). While the Commission "tentatively conclude[d]" that it should not create

26

rules specifically to regulate arrangements for network interconnection (or

"Internet traffic exchange"), it requested comment on how it could "ensure

that a broadband provider would not be able to evade [the] open Internet rules

by engaging in traffic exchange practices that would be outside the scope of

the rules." *NPRM* ¶59 (JA___).

    After hearing from "nearly 4 million commenters,"[12] *Order* ¶6

(JA___), the FCC adopted new open Internet rules in March 2015. *Id.* ¶¶104-

224 (JA___-___). It grounded those rules in multiple sources of authority,

---

[12] USTelecom refers to the fact that President Obama was among the people who commented on the Commission's proposal. Br. 5, 19, 85, 92. The President's views were appropriately submitted through an *ex parte* publicly filed in the proceeding's docket, however, *see* NTIA Nov. 10, 2014 *ex parte* (JA___-___), and USTelecom does not identify any legal issue with respect to that participation, nor does it contest that Presidents have often publicly expressed views on issues before the Commission. *See, e.g.*, John Lippman, *Sununu Defends White House Stand on TV Rerun Rules*, L.A. TIMES, Feb. 16, 1991 (President Bush advocated FCC repeal of financial interest and syndication rules), available at http://articles.latimes.com/1991-02-16/business/fi-984_1_white-house; *Clinton Steps Up Pressure On Hard-Liquor TV Ads*, WALL ST. J., Apr. 2, 1997 (President Clinton urged FCC "to take all appropriate actions" to explore the effect of television liquor advertising on underage drinking), available at http://www.wsj.com/articles/SB859938078385942000.

including Section 706, Title II, and Title III[13] of the Communications Act (the "Act"). *Id.* ¶¶273-298 (JA___-___).

2.    The Commission adopted three bright-line rules that prohibit providers of fixed and mobile broadband from: (1) "block[ing] lawful content, applications, services, or non-harmful devices, subject to reasonable network management," *Order* ¶15 (JA___); (2) "impair[ing] or degrad[ing] lawful Internet traffic on the basis of Internet content, application, or service, or use of a non-harmful device, subject to reasonable network management," *id.* ¶16 (JA___); or (3) "engag[ing] in paid prioritization"—"the management of a broadband provider's network to directly or indirectly favor some traffic over other traffic," either "in exchange for consideration" or "to benefit an affiliated entity." *Id.* ¶18 (JA___).

The FCC also took two steps critical to guarding against circumvention of the bright-line rules. First, it adopted a general Internet conduct rule prohibiting conduct that unreasonably interferes with or unreasonably disadvantages consumers' ability to reach the Internet content, services, and applications of their choosing or edge providers's ability to access consumers

---

[13] Among other things, Title III affords the Commission the authority "to protect the public interest through spectrum licensing." *See, e.g.*, 47 U.S.C. § 303(b) (authorizing the FCC to "[p]rescribe the nature of the service to be rendered" by mobile spectrum users). *See Order* ¶¶285-87 (JA___-___).

using the Internet. *Order* ¶135 (JA___). Second, while the Commission

declined to apply any of its new rules to Internet interconnection practices, *id*

¶203 (JA___),[14] it recognized that reclassification vested it with the

jurisdiction to "hear disputes" involving broadband providers' Internet traffic

exchange arrangements "on a case-by-case basis" under the "just and

reasonable" standards of 47 U.S.C. §§ 201 and 202. *Order* ¶205 (JA___). In

the Commission's view, these measures were a necessary backstop to the

bright-line rules because broadband providers have the incentive and ability

to adopt practices that, although not prohibited by the bright-line rules, could

cause similar harms. *Id.* ¶¶137, 205 (JA___, ___).

The Commission also decided to apply the same set of Internet

openness protections to both fixed and mobile broadband services. *Order* ¶88

(JA___). Although the 2010 open Internet rules distinguished between the

two, the Commission concluded that distinction was no longer appropriate

because "the mobile broadband marketplace" was "no longer in a nascent

stage." *Id.* ¶88 (JA___). Mobile broadband networks are now "faster, more

---

[14] The *Order* defines interconnection as "the exchange of traffic between a broadband Internet access provider and connecting networks." *Order* ¶28 (JA___).

broadly deployed, more widely used, and more technologically advanced than they were in 2010." *Id.*

**3.**     The *Verizon* decision made clear that, absent classification of broadband service as a telecommunications service, the Commission could only adopt open Internet protections that did not amount to common carriage *per se*. *Order* ¶42 (JA___). But the Commission concluded that such regulation, including the "no-blocking standard," remained necessary. The Commission thus concluded that the best approach to protecting Internet openness was to rely on multiple sources of authority, *id.*, and to accept the Court's "implicit invitation" in the *Verizon* remand to "revisit" the question of how to classify "retail broadband Internet access service." *Id.* ¶308 (JA___).

The Commission defined "Broadband Internet Access Service" as a "mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all Internet endpoints." *Order* ¶187 (JA___). After reviewing the extensive factual record, the Commission determined that Broadband Internet Access Service (as currently offered) includes an "offering of telecommunications" that fits the statutory definition of "telecommunications service." *Id.* ¶¶306-387 (JA___-___).

30

Broadband Internet Access Service "is useful to consumers today primarily as a conduit for reaching modular content, applications, and services that are provided by unaffiliated third parties" such as Netflix, Google, and Amazon. *Order* ¶350 (JA___). And it is marketed as such. *Id.* ¶354 (JA___). In other words, "the ability to transmit data to and from Internet endpoints has become the 'one indispensable function' that broadband Internet access service uniquely provides." *Id.* ¶350 (JA___) (quoting CDT Comments at 11 (JA___)).

On the basis of this record, the Commission concluded that retail Broadband Internet Access Service—whether fixed or mobile—"is best seen, and is in fact most commonly seen, as an offering … 'consisting of two separate things': '*both* high-speed access to the Internet *and* other applications and functions.'" *Order* ¶356 (JA___) (quoting *Brand X*, 545 U.S. at 1008 (Scalia, J., dissenting)). The Commission reclassified "only the transmission component" of the service. *Order* ¶382 (JA___).

**4.**     The Commission also determined that mobile broadband should no longer be treated as a "private" mobile service exempt from common-carriage obligations because mobile broadband was "not akin to" the type of mobile service that, when section 332 was adopted, would have been categorized as "private"—*e.g.*, a "taxi dispatch service" that "offered users

31

access to a discrete and limited set of endpoints." *Id.* ¶404 (JA___-___).

Instead, the Commission found, based on the record, that mobile broadband is

a "commercial" mobile service, or its functional equivalent under section 332,

and thus subject to Title II. *Id.*[15]

    **5.**    At the same time that it reclassified broadband as a

telecommunications service, the FCC used its authority under 47 U.S.C.

§ 160 to forbear from applying to broadband providers the large majority of

Title II's provisions and hundreds of FCC rules implementing Title II. *Order*

¶¶493-542 (JA___-___). This "light-touch regulatory framework" was

"tailored to preserving those provisions that advance [the] goals of more,

better, and open broadband." *Id.* ¶51 (JA___). With these objectives in mind,

---

[15] Congress established the distinction between private and commercial mobile services in 1993, to bring regulatory parity to an environment in which similar services had been treated differently. Before the statute, one provider—the predecessor of Nextel, which has since been acquired by Sprint—was using spectrum and a regulatory classification originally intended for specialized services, such as police and taxi dispatch service, to offer mobile voice service that was essentially indistinguishable from cellular phone service, which was subject to common-carrier regulation. *See Implementation of Sections 3(n) & 332 of the Commc'ns Act*, 9 FCC Rcd 1411, 1414-15 ¶¶3-7 (1994) (*1994 Section 332 Order*). To "ensure that similar services would be subject to consistent regulatory classification," *id.* ¶13, Congress created the categories of "private mobile service" and "commercial mobile service." The Commission interpreted private mobile service to include, for example, "traditional … dispatch services," while it interpreted "commercial mobile service" to include carriers "providing interconnected service on a competitive basis with cellular carriers." *Id.* ¶91.

the Commission declined to forbear from a select group of Title II provisions,

including the consumer safeguards afforded by Sections 201 and 202, the

consumer privacy protections of Section 222, and several other provisions

that advance access for persons with disabilities and foster network

deployment. *Id.* ¶¶440-492 (JA___-___).

The Commission described its approach—a combination of targeted

regulation of broadband and "extensive forbearance" designed to "minimiz[e]

the burdens on broadband providers," *Order* ¶51 (JA___)—as "a Title II

tailored for the 21st century." *Id.* ¶5 (JA___). This approach—which the

Commission had originally suggested in its 2010 *Broadband NOI*—was

"based on the proven model Congress and the Commission have applied to

[commercial mobile voice services], under which investment has flourished."

*Id.* ¶409 (JA___). The Commission struck "an appropriate balance" by

producing "beneficial conditions for investment and innovation while also

ensuring" that the agency would be able "to protect consumers and foster

competition." *Id.*

### E.    Challenges To The Order

Three groups of petitioners challenge the *Order*. The first—led by

USTelecom—principally argues that the FCC lacked authority to reclassify

broadband as a telecommunications service. Two members of this group—

33

CTIA and AT&T—contest the FCC's authority to reclassify mobile broadband as a commercial mobile service or its functional equivalent. *See* USTelecom Br. 5 n.2. The second—led by Alamo—contends (among other things) that the FCC's open Internet rules violate the First Amendment. Finally, the third—led by Full Service Network (or "FSN")—maintains that the Commission did not go far enough in regulating broadband providers and improperly forbore from certain provisions of Title II.[16]

## SUMMARY OF ARGUMENT

The openness of the Internet—the ability of edge providers and consumers to reach each other as they choose—has sparked tremendous growth in broadband deployment. Edge provider innovation drives a "virtuous cycle" by which development of new and improved products and services triggers increased demand for those products and services—and for an expanded broadband infrastructure to support them. *Verizon*, 740 F.3d at 644. But broadband providers have "powerful incentives," as well as the "technical and economic ability," to impose restrictions that would undermine substantially the virtuous cycle of innovation and broadband

---

[16] We use the name of the lead petitioner in each group (USTelecom, Alamo, and Full Service Network) to refer to all petitioners in that group, and refer to the petitioners raising mobile broadband claims as the "mobile petitioners."

34

investment. *Id*. at 644-45. The *Order* adopts rules, grounded on "multiple, complementary sources of legal authority," *Order* ¶274 (JA___), reasonably designed to ensure that broadband providers deliver the Internet access they have promised.

> **I.**     The Commission reasonably interpreted the Communications Act's definition of "telecommunications service," 47 U.S.C. § 153(53), to include the separable telecommunications component of Broadband Internet Access Service.

> **A.**     USTelecom's argument that Broadband Internet Access Service can only be an information service is a direct attempt to relitigate *Brand X*. As the Supreme Court held, the term "telecommunications service" is ambiguous and the relevant analysis of whether a broadband service includes a separate offering that is a "telecommunications service" turns "on the factual particulars of how Internet technology works and how it is provided, questions *Chevron* leaves to the Commission to resolve in the first instance." *Brand X*, 545 U.S. at 991.

The Commission's decision to reclassify the transmission component of retail Broadband Internet Access Service as a telecommunications service is amply supported by the record. Today, "the ability to transmit data to and from Internet endpoints has become the 'one indispensable function' that

35

broadband Internet access uniquely provides." *Order* ¶350 (JA___) (citation

omitted). Consumers view Broadband Internet Access Service primarily as a

conduit for reaching third-party applications, content and services; a view

seconded by broadband providers' advertisements, which emphasize speed as

the predominant feature of the service. Dramatic changes have occurred since

the Commission issued the 2002 *Cable Modem Order*; an entire app- and

Web-based economy has exploded and the use of "walled garden" services

has effectively disappeared. And broadband providers have an increased

technical ability to engage in practices that harm an open Internet.

　　　Attempting to distinguish *Brand X*, USTelecom tries to re-read that

opinion narrowly, to mischaracterize the Order, and to show that *Brand X*

was wrong by invoking materials outside the express language of the relevant

statutory definitions. These efforts fail.

　　　**1.**　　　USTelecom claims that *Brand X* was only concerned with the

"last mile" of broadband provider service. But the statutory definitions focus

on "services," not network architecture, which was not before the *Brand X*

Court. Accordingly, the Court focused on "the nature of the functions the *end

user* is offered" and how consumers use the service. *Id.* at 988. The length of

the transmission path and the network's configuration had no bearing on the

Court's analysis.

36

2.      USTelecom contends that *Brand X* is "irrelevant" because the Commission found that "broadband Internet access is *only* a telecommunications service." Br. 43 (emphasis added).  But the Commission emphasized that its reclassification of broadband Internet access service involves only the transmission component of the service.

3.      Next, USTelecom contends that Section 230's definition of "interactive computer service" impliedly equates "information service" with "a service or system that provides access to the Internet." 47 U.S.C. § 230(f)(2). That reading is not compelled by the statute's language and structure. In any event, section 230 was enacted for a different purpose, and its definitions apply only "as used in this section." 47 U.S.C. § 230(f).

4.      USTelecom's reliance on the "information service" categorization of certain "gateway" services before the 1996 Act likewise cannot override the ambiguity identified in *Brand X*. There is no reason to believe that "the Communications Act unambiguously freezes in time" the decisions made by the FCC and the MFJ court under the pre-1996 Act regime. 545 U.S. at 996.  In any event, such gateway services included elements, like search functions, that are clearly information services under the *Order*. And the *Steven*s *Report*, on which USTelecom relies, expressly

37

declined to characterize the Internet access services of facilities-based broadband companies like AT&T, Comcast and Verizon.

5.    USTelecom argues that the use of DNS, a routing function, and caching, a storage mechanism, demonstrates that broadband is an information service. Not so. When used by broadband providers, DNS and caching are tools that are used "for the management, control or operation of a telecommunications system or the management of a telecommunications service"—and by the terms of the Communications Act, excluded from the definition of "information service," 47 U.S.C. § 153(24). USTelecom's view that Broadband Internet Access Service must be an "information service" because it involves things like "acquir[ing,]" "retriev[ing,]" and "stor[ing]" information would read this statutory exception out of the statute altogether.

6.    USTelecom argues that the Commission failed to consider the impact of the Order on future broadband network investment. On the contrary, the Commission expressly concluded that application of Title II, particularly as tailored by means of broad-ranging forbearance, would spur continued investment in both infrastructure and Internet content and applications— as the virtuous cycle forecasts. The Commission's predictive judgments about the incentives for investment and broadband deployment

38

"are entitled to particularly deferential review." *Earthlink, Inc. v FCC*, 462

F.3d 1, 12 (D.C. Cir. 2006) (internal quotation marks omitted).

**7.** Finally, USTelecom claims that the Commission faces a higher

explanatory burden because broadband providers made past investments in

"reliance" on the assumption that the Commission would not reclassify

Broadband Internet Access Service. But any such reliance interests could not,

of course, include future plans for investment (which could be changed),

much less foreclose the Commission's obligation to reconsider the wisdom of

agency policies. *See Brand X*, 545 U.S. at 981. The Commission has for a

decade made plain that it will find legal authority to protect the Open Internet

and, especially in light of multiple Commission decisions and judicial

opinions foreclosing other statutory options, broadband providers had every

reason to foresee that the Commission might use Title II to achieve its policy

goals. In any event, the *Order* expressly addresses and accounts for any such

reliance interests, fully satisfying its explanatory burden.

**II.** The mobile petitioners contend that their internet access service

is a "private mobile service" akin to taxi dispatch or an intra-enterprise

corporate network. But mobile broadband today is a "virtually universal"

service used by "hundreds of millions of consumers" "to send and receive

communications," *Order* ¶¶398-99 (JA___), not a "private" service to a

39

limited set of users. The Commission thus reasonably exercised its authority to determine that mobile broadband today is a "commercial mobile service" or the "functional equivalent" thereof. *See* 47 U.S.C. § 332(d).

A.    Mobile broadband is a "commercial mobile service" because it is interconnected with the Internet, which the agency found to constitute part of the "public switched network" under Section 332. When the FCC first interpreted the statutory term "public switched network" in 1994, only networks that used telephone numbers "allow[ed] the public to send or receive messages to or from anywhere in the nation." *1994 Section 332 Order* ¶59. In 2015, the Commission found that the Internet also serves this function.

Mobile petitioners argue that "public switched network" must be read to mean "public switched *telephone* network." USTelecom Br. 60-64. But the word "telephone" appears nowhere in the statute. Furthermore, the FCC has consistently refused to define "public switched network" as simply "public switched telephone network," rejecting this "static" definition in favor of a more flexible approach that would allow the agency to adapt to a "network [that] is continuously growing and changing." *1994 Section 332 Order* ¶59.

B.    The FCC reasonably determined that, in the alternative, mobile broadband is the "functional equivalent" of commercial mobile service, even

40

under the old, telephone-based definition of that term. The Commission

reasoned that, "from an end user's perspective," both mobile broadband and

mobile voice telephone service "are commercial services that allow users to

communicate with the vast majority of the public." *Order* ¶404 (JA___).

Mobile petitioners assert that functional equivalents must be connected to the

telephone network. But this also would require inserting the word

"telephone" into the statute and, in effect, rendering Congress' notion of a

"function equivalent" to be mere surplusage.

     **III.**    The *Order* also satisfied APA notice requirements.

     **A.**    In the *NPRM*, the Commission expressly sought comment on

whether it should revisit its classification of Broadband Internet Access

Service. *NPRM* ¶¶148-155 (JA__-__). While the *NPRM* tentatively proposed

relying only on Section 706 rather than Title II,, the agency clearly "advise[d]

interested parties that comments directed to the controverted aspect of the

final rule should have been made." *First Am. Disc. Corp. v. CFTC*, 222 F.3d

1008, 1015 (D.C. Cir. 2000). The *NPRM* noted that the Commission was

"seriously considering" reclassification, extensively discussed the subject, *see*

*NPRM* ¶¶4, 148-155 (JA__, __-__), explained that Title II obligations would

"flow" from reclassification as a telecommunications service, and asked to

what extent it should forbear from those obligations. *NPRM* ¶153 (JA___-

41

___). Ample comments—including from petitioners themselves—show that commenters fully comprehended the scope of proceedings.

      **B.**    Notice of possible mobile broadband reclassification was equally adequate. The *NPRM* asked whether the agency "should revisit its prior classification decisions," including with respect "to wireless broadband Internet access service." *NPRM* ¶149 (JA__). Mobile petitioners contend nonetheless that there was insufficient notice that the Commission would revisit the 1994 interpretation of "public switched network." But the agency specifically asked whether, if it reclassified broadband as a Title II service, "mobile broadband Internet access service … fit[s] within the definition of "commercial mobile service." In doing so, the Commission cited Section 332 of the Act and the relevant definitional rules. *Id.* ¶150 & n.307 (JA___). Finally, given that the agency had reached its prior classification precisely because it had defined "public switched network" to reach only telephone numbers, it was reasonably foreseeable that changing the categorization likely would entail revisiting that definition. Again, there were ample comments on precisely these issues—including both mobile petitioners—which shows that interested parties "had no problem understanding the scope of issues up for consideration." *Nat'l Ass'n of Mfrs. v. EPA*, 750 F.3d 921, 926 (D.C. Cir.

2014). They had actual notice or, at minimum, any failure of notice was harmless.

    **IV.**    Petitioners' challenges to specific rules and their scope lack merit.

    **A.**    The Commission reasonably recognized that, following reclassification, it is available to hear interconnection disputes. Interconnection is an essential part of the telecommunications service that broadband providers promise to their subscribers, and even were it not subsumed within that service, Section 201(b) gives the Commission authority over services provided "in connection with" telecommunications service, which interconnection surely is.

    **B.**    The general conduct rule is not impermissibly vague. It rests on simple, common-sense principles that channel agency discretion, giving fair notice of what is prohibited: Broadband providers may not unreasonably interfere with users' ability to access the content, applications, and services of their choice, or with edge providers' access to users. The *Order* also provides extensive guidance on the factors that inform the rule and allows broadband providers to request advisory opinions from the agency.

    **C.**    The Commission has ample authority to prohibit paid prioritization once the bar against common-carriage treatment is removed.

*See Verizon*, 740 F.3d at 645-46. The Commission also independently found (with ample support in the record) that paid prioritization is an unreasonable practice that, given its pernicious effects, violates Section 201(b).

    **V.**    Full Service Network's argument that the Commission's forbearance is unlawful lacks merit. The Commission reasonably determined that extensive forbearance satisfied Section 10. The Commission need not first find persuasive evidence of competition on a market-by-market basis—especially when, as here, the Commission reasonably determined that the forbearance criteria were satisfied by conditions other than competition. The special procedural rules to which Full Service Network adverts apply only to forbearance petitions under Section 10(c), not when the Commission forbears on its own. And the *NPRM* plainly provided adequate notice of the agency's eventual forbearance determination.

    **VI.**    The open Internet rules satisfy the First Amendment. When supplying Broadband Internet Access Service, broadband providers are not speaking but instead merely acting as conduits for the speech of others. And even if First Amendment scrutiny applied, the rules easily pass muster. They are classic content-neutral regulations that have nothing to do with the suppression of speech, and survive any level of First Amendment scrutiny

44

because they are carefully tailored to serve governmental interests of the highest order.

**VII.**   Finally, USTelecom's Regulatory Flexibility Act challenge is baseless. Because no party raised objections with the Commission about the Final Regulatory Flexibility Analysis, judicial review is precluded by 47 U.S.C. § 405(a). In any event, Section 604 requires a Final Regulatory Flexibility Analysis only for "rule[s]," but the reclassification of broadband service was a declaratory ruling, a form of informal adjudication.

## STANDARD OF REVIEW

**1.**   The Commission's *Order* must be affirmed unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Under this highly deferential standard of review," the Court "presumes the validity of agency action," and "must affirm unless the Commission failed to consider relevant factors or made a clear error in judgment." *Cellco P'ship v. FCC*, 357 F.3d 88, 93 (D.C. Cir. 2004) (internal quotation marks and citations omitted). This standard "is particularly deferential in matters … which implicate competing policy choices, technical expertise, and predictive market judgments." *Ad Hoc Telecomms. Users Comm. v. FCC*, 572 F.3d 903, 908 (D.C. Cir. 2009).

2.    Review of the FCC's interpretation of the statutes it administers is governed by *Chevron*. Where a "statute is silent or ambiguous with respect to the specific issue, the question for the [Court] is whether the agency's answer is based on a permissible construction of the statute." 467 U.S. at 843. If so, the Court must "accept the agency's construction of the statute, even if the agency's reading differs from what the [C]ourt believes is the best statutory interpretation." *Brand X*, 545 U.S. at 980.

Petitioners argue that *Chevron* should not apply to this case, citing *King v. Burwell*, 135 S. Ct. 2480 (2015), and *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427 (2014). *See* USTelecom Br. 23; Alamo Br. 4. Those cases are inapposite.

While the IRS in *Burwell* had "no expertise in crafting health insurance policy," 135 S. Ct. at 2489, the FCC is the congressionally delegated expert in communications policy. Indeed, in reviewing the agency's previous classification of broadband, the Supreme Court held that the Act "leaves federal telecommunications policy in this technical and complex area to be set by the Commission." *Brand X*, 545 U.S. at 992. This court similarly found that regulation of the Internet "generally speaking, falls comfortably within the Commission's jurisdiction over 'all interstate and foreign communications by wire or radio,'" *Verizon*, 740 F.3d at 629, and that Section 706 of the 1996

Act gives the FCC "significant, albeit not unfettered, authority and discretion to settle on the best regulatory or deregulatory approach to broadband," *Ad Hoc*, 572 F.3d at 906-07. To be sure, the "regulation of broadband Internet providers certainly involves decisions of great 'economic and political significance," but given the broad language of the Act, as well as "the Commission's long history" of regulation in this area, this Court found "little reason" to doubt that Congress delegated authority to reach these issues to the Commission. *Verizon*, 740 F.3d at 638.

Unlike the EPA in *Utility Air*, the FCC is not exercising a newly "discover[ed]" or "unheralded power" to regulate a new portion of the economy. 134 S. Ct. at 2444 (quoted in USTelecom Br. 23). To the contrary, the agency has "never disclaimed authority to regulate the Internet or Internet providers altogether." *Verizon*, 740 F.3d at 638. Before the *Cable Modem Order*, for example, Internet access providers were regulated under Title II. *See* pp. 11-12 *supra*. And for the past decade, the Commission has made clear that it intended to take measures to protect the open Internet from misconduct by broadband providers.

**3.**     The fact that the Commission changed its classification of broadband service does not affect the standard of review. An agency "must consider … the wisdom of its policy on a continuing basis." *Brand X*, 545

47

U.S. at 981 (quoting *Chevron*, 467 U.S. at 863-64). Indeed, "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.'" *Id.* (quoting *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996)). And under the APA, "[j]udicial review of a change in agency policy is no stricter than … review of an initial agency action." *Hermes Consol., LLC v. EPA*, 787 F.3d 568, 576 (D.C. Cir. 2015) (internal quotation marks omitted). An agency need only "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("*Fox I*").

    **4.**    The constitutional challenge to the *Order* "is subject to *de novo* review." *Nat'l Oilseed Processors Ass'n v. OSHA*, 769 F.3d 1173, 1179 (D.C. Cir. 2014). The presence of a constitutional claim, however, does not affect the standard of review for non-constitutional issues. *See Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 709 (D.C. Cir. 2011) (courts do not "abandon *Chevron* deference at the mere mention of a possible constitutional problem") (internal quotation marks omitted).

## ARGUMENT

## I.   THE COMMISSION REASONABLY RECLASSIFIED BROADBAND INTERNET ACCESS SERVICE AS A TITLE II TELECOMMUNICATIONS SERVICE.

USTelecom does not dispute the *Verizon* Court's recognition that broadband providers have both the incentive and ability to take actions that could threaten Internet openness, and USTelecom does not contest that the Commission's rules are tailored to protect against such actions. Nor does USTelecom challenge the Commission's authority under Section 706 of the 1996 Act "to promulgate rules governing broadband providers." *Verizon*, 740 F.3d at 642.[17]

Instead, US Telecom argues that the Commission lacks the authority to recognize Broadband Internet Access Service as a telecommunications service subject to regulation under Title II of the Act, arguing that "[t]he 1996 Act *makes clear* that broadband Internet access is an information service." Br. 30 (emphasis added). That argument is a frontal attack, plain and simple, on the Supreme Court's decision in *Brand X*, and is foreclosed by that decision.[18]

_____

[17] In contrast to USTelecom, Alamo and Full Service Network challenge the Commission's authority under Section 706 to promulgate open Internet rules, *see* Alamo Br. 9-17; FSN Br. 36-39; but their arguments are foreclosed by their rejection, after an extended discussion, by this Court in *Verizon*, 740 F.3d at 635-49.

[18] In contrast to USTelecom, Full Service Network argues that the Act's "plain language" requires the FCC to classify broadband as a

USTelecom contends that because broadband Internet access—including its telecommunications component—is used to *obtain* information, it becomes an "information service." Br. 30. That contention (1) flies in the face of Congress's recognition that an information service is provided "via telecommunications," 47 U.S.C. § 153(24), (2) ignores the central issue in *Brand X*, which was whether cable modem service involved the separate offering of a telecommunications service alongside an information service; and (3) reads the telecommunications management exception out of the statute. The error of USTelecom's contention is starkly illustrated by the fact that under its logic, telephony would have become an information service on March 10, 1876 when Mr. Watson answered Alexander Graham Bell's famous first phone call and received the following information: "Mr. Watson—come here—I want to see you." CHRISTOPHER BEAUCHAMP, INVENTED BY LAW: ALEXANDER GRAHAM BELL AND THE PATENT THAT CHANGED AMERICA 3 (2015).

---

telecommunications service. FSN Br. 28-30. That argument—like USTelecom's "plain meaning" argument—cannot survive the Supreme Court's finding of statutory ambiguity in *Brand X*.

**A.    The Classification Of Broadband Internet Access Service Is A Reasonable Application Of Commission Discretion To Interpret Ambiguous Statutory Terms.**

**1.**        The Commission found that Broadband Internet Access Service (as currently offered) is a "telecommunications service" because it offers consumers a transmission service of "telecommunications" that is functionally distinct from any "information service." *Order* ¶¶47, 356, 363-364 (JA___-___, ___-___). Revisiting its thirteen-year-old conclusion in the *Cable Modem Order*, the Commission in the *Order* here concluded that "broadband Internet access service, as offered by both fixed and mobile providers, is best seen, and is in fact most commonly seen, as" offering "*both* high-speed access to the Internet *and* other applications and functions." *Id.* ¶356 (JA___) (quoting *Brand X*, 545 U.S. at 1008 (Scalia, J., dissenting)). Acknowledging that "broadband providers in many cases provide broadband Internet access service along with information services, such as email and online storage," it found that "broadband Internet access service is today sufficiently independent of those information services that it is a separate 'offering.'" *Id.*

        That determination falls well within the agency's authority to interpret and apply the Communications Act's definition of "telecommunications service." In *Brand X*, the Supreme Court upheld, as based on a "permissible

reading of the Communications Act" under *Chevron*, the Commission's determination that cable modem service as a whole should be treated as an information service because its telecommunications element was offered in combination with its information-service features. *See* 545 U.S. at 986. But the presence of telecommunications was never in doubt. As the Court explained, "like all information-service providers, cable companies use 'telecommunications' to provide consumers with Internet service." *Id*. at 988. The question before the Court was "whether the transmission component of cable modem service is sufficiently integrated with the finished service to make it reasonable to describe the two as a single, integrated offering." *Id*. at 990. "That question" (whether the two are "functionally integrated" or "functionally separate"), the Court explained, "turns not on the language of the Act, but on the factual particulars of how Internet technology works and how it is provided, questions *Chevron* leaves to the Commission to resolve in the first instance." *Id*. at 991. In holding that "the statute fails unambiguously to classify the telecommunications component of cable modem service as a distinct offering," the Court thus left "federal telecommunications policy in this technical and complex area to be set by the Commission." *Id*. at 992. The agency, the Court concluded, employing its "expert policy judgment," was "in a far better position to address these questions than we are." *Id*. at 1003.

52

The *Brand X* Court's recognition of the primacy of Commission interpretation in this "technical, complex, and dynamic" arena, *id*. at 1002-03 (citation omitted), itself reflects Congress's decision, in adopting the definitions of telecommunications service and information service in the 1996 Act, to substantially incorporate "the parallel terms" of "basic" and "enhanced" service that the Commission had developed in its *Computer II* rules, *id.* at 992. The 1996 Act amendments to Title II also reflect Congress's express decision to vest the Commission with additional authority. *See* 1996 Act, § 601(a)(1), 110 Stat. at 143 (any conduct previously subject to the AT&T consent decree shall "be subject to the restrictions and obligations imposed by the Communications Act of 1934, as amended"); *see Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1045 (D.C. Cir. 1997) (1996 Act "superseded" the MFJ). Deference to the Commission in this area is thus not just a matter of basic administrative law principles, but of considered congressional choice.

USTelecom contends that the Commission "misreads" *Brand X*, and that "*[n]o* Justice in that case doubted that services offering consumers the ability to access the Internet are 'information services.'" Br. 41. But the question before the Court was not whether the "telecommunications component" of cable modem service existed at all or whether consumers

could use it to reach online "information services." The question was whether the telecommunications and information components were "sufficiently integrated," *Brand X*, 545 U.S. at 990, to justify the classification of the combination of components as *only* an "information service." That same question is at issue here.

In fact, no Justice held that telecommunications was not present in cable modem service or that the Act compelled classification of cable modem service as an integrated information service. Six held it was ambiguous (one of them viewed it as "just barely" so, 545 U.S. at 1003 (Breyer, J., concurring)). And three would have held that the statute compelled the

Commission to identify a separate telecommunications service offering. *Id.* at 1005-14 (Scalia, J., dissenting).[19]

USTelecom attempts to distinguish *Brand X*, arguing that the telecommunications service at issue in that case "spanned only the last mile, *i.e.*, the connection between 'the customer's computer and the cable company's computer processing facilities.'" Br. 43 (quoting 545 U.S. at 1010 (Scalia, J., dissenting)). But the *Brand X* Court never used the term "last-mile," nor did it describe network architecture anywhere in its analysis. "The

---

[19] Indeed, the Bell company predecessors to some of the petitioners in this case previously argued that the Commission not only may but *should* classify the transmission component of cable modem service as a telecommunications service. *See, e.g.*, Verizon Comments, GN Docket No. 00-185, Dec. 1, 2000, at 2 ("The Act defines residential broadband access—whether provided by a local telephone company or a cable operator—as a telecommunications service subject to 'common carrier' regulation."); Qwest Comments, GN Docket No. 00-185, Dec. 1, 2000, at 2-3 ("the transport portion of cable modem service is a telecommunications service under the 1996 Act"). Others took the position that, while not required to do so, the Commission could reasonably make a finding that cable modem service includes a telecommunications service. *See, e.g.*, SBC and BellSouth Reply Comments, GN Docket No. 00-185, Jan. 10, 2001, at 13 ("the Commission *may*" determine that cable Internet service providers "offer both an 'information service' subject to Title I and a 'telecommunications service' subject to Title II"); *id.* at 20 ("the plain fact is that cable broadband service *can be*—and often *is*—used as a pure transport service, whatever other incidents may be bundled with it"). *See also* PETER HUBER, MICHAEL KELLOGG, & JOHN THORNE, FEDERAL TELECOMMUNICATIONS LAW, § 11.8.1 (2d ed. 1999) (describing cable modem's "promise … to originate and deliver data traffic encoded and addressed [for] the Internet," as "the purest form of 'common carriage' ever devised").

entire question" in the case was whether the transmission component of a broadband service was "functionally separate" from any data-processing capability that fit the definition of information service. 545 U.S. at 991. In answering that question, the Court focused solely on "the nature of the functions the *end user* is offered" and how consumers use the service. *Id.* at 988 (internal quotation marks omitted). The length of the transmission path and the network's configuration had no bearing on the Court's analysis.[20]

That makes perfect sense. The question before the *Brand X* Court—and in this case—is the meaning of the phrase "telecommunications service," 47 U.S.C. § 153(53), which depends on the nature of the "service" provided to consumers by carriers—the central concern of Title II—not on specific network architecture. Consider the operation of a traditional telephone system. Local telephone service was not confined to a single wire running from a customer's home to the end office; it necessarily included as well the

_____

[20] To support its contention, USTelecom relies on a statement by Justice Scalia in dissent describing "the delivery service provided by cable" as the "connection between the customer's computer and the cable company's computer-processing facilities" located "downstream from the computer-processing facilities." 545 U.S. at 1010 (Scalia, J., dissenting). In making this statement, Justice Scalia was not purporting to canvass the architecture of cable modem service, but to illustrate his view that the cable company "merely serves as a conduit for the information services that have already been 'assembled' by the cable company in its capacity as [Internet Service Provider]." *Id.*

56

functionality (whether through a live operator, mechanical switch, or software program) that routed a telephone call from the caller to its intended destination. See *AT&T v. Iowa Utils. Bd*., 525 U.S. 366, 371 (1999) (a "local exchange network" consists of, "among other things, … local loops, … switches, and . . . transport trunks").[21]

Finally, US Telecom contends that *Brand X* is "irrelevant" because the Commission erroneously found that "broadband Internet access is *only* a telecommunications service." Br. 43 (emphasis added). The Commission did no such thing. The Commission made clear that the Broadband Internet Access Service subject to its rules "is best viewed as separately identifiable offers of (1) a broadband Internet access service that is a telecommunications service," *Order* ¶47, 341 (JA___, ___)—that is, "a mass market retail service by wire or radio that provides the capability to *transmit* data to and receive

---

[21] Even if the ambiguity identified in *Brand X* was limited to USTelecom's "last mile" construct, it is impossible to see what advantage USTelecom would obtain by it—regulation of "last mile" telecommunications would still support the Commission's open Internet rules. Such regulation would prohibit broadband providers from interfering with end users' access to edge providers' content and applications over the "last mile" of the transmission path. *See* pp. 120-21 *infra* (FCC has jurisdiction over interconnection disputes involving broadband providers because interconnection arrangements are made "in connection with" the provision of Broadband Internet Access Service to consumers).

data from all or substantially all Internet endpoints," *id.* ¶25 (JA ___)

(emphasis added)—"and (2) various 'add-on applications, content, and

services that generally are information services.'" *Id.* ¶47, 341 (JA___, ___).

*Accord id.* ¶¶356, 362 n.1005, 365 (JA___, ___,___). The Commission

emphasized that its "reclassification of broadband Internet access service

involves only the transmission component" of broadband. *Order* ¶382

(JA___).

  **2.** The Commission's interpretation of the statutory term at issue—

telecommunications service—fits well within the deference accorded to the

Commission under *Brand X*. There is no basis for USTelecom's assertion that

*Brand X*'s conclusions should be ignored by this Court. *Home Care Ass'n v.

Weil*, 2015 WL 4978980, at *1, *6 (D.C. Cir. Aug. 21, 2015) (where Supreme

Court has decided that statutory provisions "vest" an agency "with

discretion," a "Chevron step-one argument" is "preclude[d]").

  **a.** USTelecom first contends that Section 230 of the Act

unambiguously states that Internet access service is an "information service."

Br. 33. Section 230 does no such thing.

  Section 230 was enacted as part of a portion of the 1996 Act entitled

"Communications Decency Act." That legislation, which dealt with "online

family empowerment," *see* 1996 Act, § 509, 110 Stat. at 137, did not receive

the same extensive legislative consideration as the rest of the 1996 Act. *See*

*Reno v. ACLU*, 521 U.S. 844, 857-58 (1997). In accordance with its purpose,

the section provides certain protections to providers of "interactive computer

service" that block and screen offensive material. *See* 47 U.S.C. § 230(c)(1);

*id.* § 230(c)(2); *id.* § 230(c)(3).

For purposes of "this section," Congress defined "interactive computer

service" to mean "any information service, system, or access software

provider that provides or enables computer access by multiple users to a

computer service," including a "service or system" that provides access to the

Internet." 47 U.S.C. § 230(f)(2). From this definition, USTelecom contends

Congress "made clear" that "information service … include[s] Internet access

services." Br. 33 (ellipsis and alteration by USTelecom).

The text of Section 230 does not support USTelecom's position,[22] but,

in any event, there is no basis for reading Section 230 to modify or even

illuminate the Communications Act-wide definition of "information service"

in Section 3 of the Act. Section 230 makes plain that its definition of

_____

[22] USTelecom's contention does not follow from the language of the statute, which defines "interactive computer service" as "any information service, system, *or* access software provider that enables computer access." 47 U.S.C. § 230(f)(2) (emphasis added). Nothing in that provision says that Internet access is an information service as opposed to a "system." The provision defines "interactive computer service," not "information service."

"interactive computer service" (not "information service") controls only as it is "used in this section" (*i.e.*, Section 230), and has no relevance elsewhere. 47 U.S.C. § 230(f). Moreover, as the Commission rightly observed, it is "unlikely that Congress would attempt to settle the regulatory status of broadband … in such an oblique and indirect manner" by burying the issue in a definitional section of a provision focused on "the blocking and screening of offensive material." *Order* ¶386 (JA___). In any event, this Court has recognized that statutory provisions that serve different purposes should not be read *in pari materia*. *See Common Cause v. FEC*, 842 F.2d 436, 441-42 (D.C. Cir. 1988); *United Shoe Workers of Am. v. Bedell*, 506 F.2d 174, 188 (D.C. Cir. 1974). Thus, "it is not impermissible under *Chevron* for an agency to interpret an imprecise term differently in two separate sections of a statute which have different purposes." *Verizon California, Inc. v. FCC*, 555 F.3d 270, 276 (D.C. Cir. 2009) (internal quotation marks omitted).

    **b.**    USTelecom also attempts to construct an alternate "statutory history and context" that, in its view, "confirm[s] the plain meaning of the statutory text." Br. 33.

    USTelecom finds it significant that "[b]oth the MFJ Court and the FCC" concluded, before the 1996 Act, that "gateway services allowing access to the information stored by third parties are unregulated

information/enhanced services, not Title II-regulated

basic/telecommunications services." Br. 34. But as the Supreme Court noted

in *Brand X*, there is no reason to believe that "the Communications Act

unambiguously freezes in time" the decisions made by the FCC and the MFJ

court under the pre-1996 Act regime. 545 U.S. at 996.

     In addition, this Court held in *United States v. Western Electric Co.*,

907 F.2d 160 (D.C. Cir. 1990), that telecommunications offered as a means of

accessing "gateway" services must be separately regulated as a

telecommunications service. The Court recognized that the provision of

services that included a menu and the ability to search a database for "listings

of providers of specific services"—a kind of early online search—was an

information service "variant." *See id.* at 162-63. Nonetheless, the Court

affirmed the district court's determination that the provision of

telecommunications designed to bring a customer's traffic *to* that gateway

service constituted a "basic service" component that had to be offered

separately under the terms of the MFJ. *Id.* at 163. Both conclusions are

consistent with the *Order*: (1) that the search function and menu of third party

services is an information service; and (2) that that communications component is a separate offering.[23]

Likewise, the "gateway" service addressed in the Common Carrier Bureau order cited by USTelecom (Br. 9, 35) allowed customers "to conduct key word searches to identify… providers," and "to obtain the description and prices" of … provider services," *Bell Atl. Tel. Cos.*, 3 FCC Rcd 6045, 6045 ¶6 (Comm. Carr. Bur. 1988)—capabilities that the Commission recognizes to be information services.

USTelecom also misses the mark when it seeks to rely on the *Stevens Report* statement that "'the functions and services associated with Internet access were classed' as 'information/enhanced services'" under the MFJ. Br. 36 (quoting *Stevens Report* ¶75). That statement was made with respect to services furnished by "non-facilities-based providers." *Stevens Report* ¶60. But the *Stevens Report* declined to reach the classification of facilities-based providers, like petitioners here. It forthrightly recognized that "the question may not always be straightforward whether, on the one hand, an entity is

_____

[23] USTelecom also seeks to rely on 47 C.F.R. § 64.702(a), which defines services that provide "subscriber interaction with stored information" as enhanced services. Br. 34. But as we explain at pp. 71-79 *infra*, any such subscriber interaction with stored information does not qualify as an information service if its purpose is simply to facilitate the transmission of information.

providing a single information service with communications and computing

components, or, on the other hand, is providing two distinct services, one of

which is a telecommunications service." *Id*. Like this Court and the Common

Carrier Bureau, the *Stevens Report* recognized that such "gateways" involved

activities that are undoubtedly information services—"the provision of

introductory information content" alongside the provision of

telecommunications. *Stevens Report* ¶75. More to the point, if anything, the

*Stevens Report*—which was issued two years after the 1996 Act and thus

could not have influenced its passage—is clear evidence that Congress

delegated to the Commission the authority to "interpret[]" and "appl[y]" the

definitions at issue here. *See id.* ¶1 n.1.

　　　In the end, USTelecom points to nothing that can overcome *Brand X*'s

holding that the statute is ambiguous or otherwise place this case outside of

that ambiguity. *Brand X* remains standing, as it must, and controls here.

**B.　The Commission Reasonably Determined That
　　　Broadband Internet Access Service Is A
　　　Telecommunications Service Subject To Title II
　　　Regulation.**

USTelecom contends that "[e]ven if the statute were ambiguous in any

relevant respect," the Commission's determination was "arbitrary and

capricious." Br. 45-46. On the contrary, the Commission reasonably

determined that Broadband Internet Access Service (as currently offered)

includes an "offering of telecommunications" that falls within the Act's

definition of "telecommunications service." *Order* ¶¶331-387 (JA___-___).

### 1. The Commission's determination is supported by the factual record and the Commission's policy goals.

    **a.**    The Commission's determination that Broadband Internet

Access Service includes a separate offering of telecommunications is fully

supported by the record. Over the past decade, "the market for both fixed and

mobile broadband Internet access service has changed dramatically." *Order*

¶346 (JA___). Broadband Internet Access Service "is useful to consumers

today primarily as a conduit for reaching modular content, applications, and

services that are provided by unaffiliated third parties." *Id.* ¶350 (JA___).

Thus, for example, "companies such as Google and Yahoo! offer popular

alternatives to the email services provided to subscribers as part of broadband

Internet access service packages." *Id*. ¶348 (JA ___). Other third-party

providers furnish "'cloud-based' storage," "website hosting, "blog hosting,"

and "personalized homepages." *Id*. As a result of the burgeoning desire to

reach third-party applications and services, "the ability to transmit data to and

from Internet endpoints has become the 'one indispensable function' that

broadband Internet access uniquely provides." *Id*. ¶350 (JA___) (quoting

CDT Comments at 11 (JA___))

Broadband providers themselves describe the product in just this way. Advertisements "emphasize transmission speed as the predominant feature that characterizes broadband Internet access service offerings." *Order* ¶351 (JA___). And "[f]ixed and mobile broadband Internet access providers also price and differentiate their service offerings on the basis of the quality and quantity of data transmission the offering provides." *Id*. ¶353 (JA___). As the Commission explained, "[m]arketing broadband services in this way leaves a reasonable consumer with the impression that a certain level of transmission capability—measured in terms of 'speed' or 'reliability'—is being offered in exchange for the subscription fee, even if complementary services are also included as part of the offer." *Id*. ¶354 (JA___).

**b.**     Challenging the Commission's evaluation of the facts, USTelecom contends that, since the *Cable Modem Order* was decided, there is "nothing new" in how consumers use and broadband providers market their services that could support the *Order's* reclassification decision. Br. 49. But the world of Broadband Internet Access Service was very different a decade ago, when the Commission made its determination that cable modem service was an information service and *Brand X* was decided. "In 2000, only 5 percent of American households had a fixed Internet access connection with speeds of over 200 [kilobits per second] in at least one direction, as compared

to approximately 72 percent of American households with this same connection today." *Order* ¶346 (JA___). This shift "from dial-up to broadband" has "boost[ed]" consumer demand for "third party services," exemplified by "the explosive growth of online content and application providers." *Id.* ¶347 (JA___).

In 2002—the year of the *Cable Modem Order*—the earliest version of Facebook was not yet available even to Harvard students, Google had not yet gone public, Twitter had not yet been created, Apple had not yet opened its first "app store," Dropbox had not yet launched, Netflix was almost a decade away from acquiring its first original content, and Amazon was more than a decade away from displacing Walmart as America's largest retailer. In early 2003, "there were approximately 36 million websites." *Order* ¶347 (JA___). "Today there are an estimated 900 million"—a twenty-five-fold increase. *Id*.

The nature of the Internet economy has also changed substantially in the past thirteen years. The modern Internet marketplace is characterized by a vibrant range of apps and third-party edge-provider services. To take one simple example, in 2002 streaming video services were a negligible factor on the Internet; today, by one estimate, "Netflix and YouTube alone account for 50 percent for peak Internet download traffic in North America." *Order* ¶349 (JA___). "Overall," as the Commission explained, "broadband providers

66

themselves operate very few of the websites that broadband Internet access services are most commonly used to access." *Id.* (JA___). Similarly, the "digital app economy" was nonexistent in 2002; use of mobile apps has skyrocketed since then. *Order* ¶76 & n.116 (JA__); *NPRM* ¶31 (JA__).

By contrast, the *Cable Modem Order* was released in an era of "walled gardens" best exemplified by AOL's Internet service, in which, as the Commission described it, "subscribers usually [did] not need to contract separately with another Internet access provider to obtain discrete services or applications, such as an email account or connectivity to the Internet." *Cable Modem Order* ¶11. Today consumers mix and match their telecommunications services with the software, apps, and content of their choice. *See Order* ¶347 (JA___). And while cable modem services a decade ago allowed subscribers to "click-through" to other providers, and thereby "bypass" a cable modem service's "web browser, proprietary content, and e-mail," that option was sufficiently obscure at the time that the Commission felt obliged to explain it in detail. *Cable Modem Order* ¶25. In short, the record established at the time the Commission made its determination that cable modem service was an integrated information service (and relied upon in the follow-on *Wireline* and *Wireless Broadband Orders*) reflected a broadband marketplace—and consumer expectations—that were quite unlike

67

the modular, speed- and app-driven Internet access marketplace of today. *See* pp. 15-18 *supra*.

Finally, broadband providers now "have the technological ability to distinguish between and discriminate against certain types of Internet traffic," *Verizon*, 740 F.3d at 646. *See Order* ¶82 (JA___) (noting the ability of providers to "block content in real time"); *id*. ¶85 (JA___) (describing "a variety of tools at the[] disposal" of broadband providers—including "deep packet inspection"—"that can be used to monitor and regulate the flow of traffic over their networks"). *See also* Internet Ass'n Comments at 13 (JA___) ("[a]dvances in network technologies" have given broadband providers "an unprecedented ability to discriminate among sources and types of Internet traffic in real time and with little cost"). The heightened technical ability of broadband providers to act on their incentives to threaten Internet openness is another fact that was not present—and certainly not taken into account by the Commission—at the time of the *Cable Modem Order*.

**c.**    In any event, the Commission did not rely solely on changed circumstances to conclude that Broadband Internet Access Service is a Title II telecommunications service. It found that "even assuming, *arguendo*, that the facts regarding how [Broadband Internet Access Service] is offered had

not changed, … the provision of [Broadband Internet Access Service] is best understood as a telecommunications service." *Order* n.993 (JA___). It therefore "disavow[ed]" its "prior interpretations to the extent they held otherwise." *Id*.

That alternative finding was well within the Commission's authority. It is settled that the Commission has an obligation to "consider varying interpretations and the wisdom of its policy on a continuing basis." *Brand X*, 545 U.S. at 981 (quoting *Chevron*, 467 U.S. at 863-64). In so doing, it has the right to view the same facts differently in light of changed or more pressing policy goals. *See, e.g.*, *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012). For example, in *Association of Public Safety Communications Officials-International, Inc. v. FCC*, 76 F.3d 395, 398 (D.C. Cir. 1996), the Court held that the same record that formed the basis for a prior FCC policy could also support the Commission's later "about-face" on the issue.

When the *Cable Modem Order* was issued, the arrival of cable modem service was bringing a new competitive force and faster speeds to the American broadband network. At the time, the "vast majority" of U.S. households with Internet connections subscribed to "narrowband" Internet service. *Cable Modem Order* ¶9. The Commission's concern that "broadband

69

services should exist in a minimal regulatory environment" in order to "promote[] investment and innovation in a competitive market" was expressed against the backdrop of rapidly growing, but still nascent, broadband services. *Id.* ¶5. In the succeeding thirteen years, the market for residential broadband has matured, and the edge-provider economy has exploded in size and importance. *Order* ¶¶346-50 (JA___-___). The Commission therefore refined its perspective on investment and innovation, recognizing the importance of innovation and investment from *all* sources, including both broadband networks and, equally importantly, the fast-developing and rapidly growing edge-provider marketplace.

At the same time, the Commission came (with this Court's assistance) to a new understanding of the authorities upon which it could ground robust rules to promote Internet openness. In the wake of *Comcast* and *Verizon*, the Commission determined that its goal of preserving and protecting the openness of the Internet while promoting investment and innovation could best be achieved by revisiting its classification, and determining, in light of the record before it, that Broadband Internet Access Service "is best understood as a telecommunications service," standing separately from the provision of information services. *Order* n.993 (JA___).

70

An agency is free, within the "permissible" bounds of ambiguous language, *see Chevron*, 467 U.S. at 843, and so long as its choice is explained, *see Brand X*, 545 U.S. at 981, to revise its statutory interpretation to serve its policy goals. *See, e.g.*, *Verizon*, 740 F.3d at 636 (upholding Commission's revised interpretation of Section 706). To the extent necessary, the Commission has done so here.

> ### 2. The Commission reasonably found that the telecommunications management exception encompasses DNS and caching.

USTelecom contends that the use of domain name service ("DNS") and caching are "core information-service functions associated with Internet access" that preclude the Commission's determination that Broadband Internet Access Service involves a separate offering of telecommunications. Br. 31-32, 37-40. It also contends that the management of mobile networks mandates the treatment of mobile Broadband Internet Access Service as an information service. *Id.* at 32.

But Congress recognized that certain information processing functions provided in conjunction with a telecommunications service facilitate the provision of that service, and do not change its nature. The Communications Act thus expressly provides that an "information service" does not include information processing that is used "for the management, control, or

operation of a telecommunications system or the management of a telecommunications service." 47 U.S.C. § 153(24). This is in keeping with the *Computer II Order*, which made clear that functions "internal to the carrier's facility," such as "bandwidth compression techniques, circuit switching, message or packet switching, [and] error control techniques," that "facilitate economical, reliable, movement of information do[] not alter the nature of the basic service." *Computer II Order* ¶95. To the same end, the MFJ definition of telecommunications expressly included "*all* instrumentalities, facilities, apparatus, and services (including the collection, storage, forwarding, switching, and delivery of such information) essential to such transmission." *AT&T*, 552 F. Supp. at 229 (emphasis added).

   USTelecom claims that Broadband Internet Access Service must be an "information service" because it involves things like "acquiring," "retrieving," and "storing" information. But such a view would read the telecommunications management exception out of the statute altogether.

   Like other provisions of the Communications Act, the Commission's interpretation of the telecommunications management exception is entitled to deference. *See, e.g.*, *Brand X*, 545 U.S. at 980-81. Here, the Commission reasonably determined that DNS falls within the exception because it allows for more efficient routing, *Order* ¶368 (JA___), and caching falls within the

72

exception because it allows for the more efficient retrieval of information, *id.* ¶372 (JA___).

     **a.**     DNS "matches the Web site address the end user types into his browser (or 'clicks' on with his mouse) with the IP address of the Web page's host server." *Order* ¶366 (JA___) (quoting *Brand X*, 545 U.S. at 999). It therefore "allows more efficient use of the telecommunications network by facilitating accurate and efficient routing from the end user to the receiving party," *id.* ¶368 (JA___), thereby benefiting the broadband provider by reducing its costs. In this context, DNS performs the same general routing function as "speed dialing, call forwarding, and computer-provided directory assistance"—services that were previously found to qualify for the telecommunications systems management exception. *Id.*; *see also Brand X*, 545 U.S. at 1012-13 (Scalia, J., dissenting) (DNS "is scarcely more than routing information, which is expressly excluded from the definition of 'information service'").

     USTelecom contends that DNS is an information service because it "provides the processing capabilities that allow consumers to visit a website without knowing its IP address." Br. 38. But by aiding users of Broadband Internet Access Service to reach desired points on the Internet, DNS used by the broadband provider assists in "the management, control, or operation of a

telecommunications system or the management of a telecommunications

service." 47 U.S.C. § 153(24). It therefore falls outside the statute's definition

of "information service." *See Order* n.1037 (JA___).[24] DNS is appropriately

viewed as providing the same kind of routing of a transmission as that

provided in an earlier day when a person could (without knowing a

neighbor's phone number) use computerized directory assistance to place the

call.

> **b.**     The FCC also reasonably determined that the

telecommunications management exception covers broadband providers' use

of caching—"the storing of copies of content at locations in the network

closer to subscribers than their original sources." *Order* ¶372 (JA___)

(internal quotation marks omitted). USTelecom asserts that Internet access

providers "are not performing functions … that are instrumental to pure

transmission" when they use caching "to enhance access to *information*." Br.

39. The question, however, is whether in doing so, these providers are using

caching for the purpose of managing the operation of a telecommunications

―――――――――――――――

[24] USTelecom asserts (Br. 38) that DNS is also "used to offer parental
controls that enable subscribers to direct what content can be viewed through
their service." But the fact that DNS can be used to facilitate other (separable)
services does not obscure its use for telecommunications management. *See
Order* ¶373 (JA___).

service or system. On that score, the FCC reasonably found that when

broadband providers use caching, they are managing the telecommunications

service they provide "by facilitating efficient retrieval of requested

information, reducing [their] costs in [providing] the service." *Order* n.1037

(JA___).[25] Indeed, storage was expressly recognized by the MFJ to be within

the scope of the activities included within the definition of

telecommunications service, alongside collection, forwarding, switching, and

delivery. *See AT&T*, 552 F. Supp. at 229.[26] As the Commission explained,

"[c]aching, like DNS, is simply used to facilitate the transmission of

information so that users can access other services, in this case by enabling

the user to obtain more rapid retrieval of information through the network."

*Order* ¶372 (JA___) (internal quotation marks omitted). Speeding

───────────────────

[25] USTelecom points out (Br. 39) that in a footnote in the *Brand X* reply brief, counsel for the federal petitioners asserted that DNS and caching did not fall within the telecommunications management exception. But the Court in *Brand X* did not reach that issue because no telecommunications service was involved, *Brand X*, 545 U.S. at 999 n.3. The Court thus left open the possibility that the exception might apply if the agency later determined (as here) that a telecommunications service was at issue.

[26] The Commission also found that even if DNS and caching do not fall within the telecommunications management exception, those services are functionally separable from the transmission component of broadband. *See Order* ¶370 (JA___) (DNS "is not so inextricably intertwined with broadband Internet access service so as to convert the entire service offering into an information service"); *id*. ¶372 (JA___) (noting that caching is a "distinct" component of broadband that may be offered by third parties).

75

information retrieval reduces the burden on the network, thereby directly

benefiting the broadband provider, *id.* n.1037 (JA__), by "facilitat[ing]

economical, reliable, movement of information" as part of its network

management. *Computer II Order* ¶95.

    **c.**     The Commission's interpretation of the telecommunications

management exception also reflects a common-sense understanding of how

telecommunications service is—and has always been—provided. Even the

most basic voice telephone service requires more than an unadorned

transmission wire. When local phone service was first offered, switches—and

even live switchboard operators—were needed to provide the service. *See*

*Order* n.1033 (JA___). Over time, providers of basic phone service began to

use "computing capabilities" to "facilitate and modernize the provision and

use of basic telephone service."[27]

    For example, in the late 20th Century, telephone companies used

Signaling System 7 ("SS7")—a digital signaling system incorporating

computer processing—to convey call "signaling information that enabled call

---

[27] *Petition for Declaratory Ruling that pulver.com's Free World Dialup is Neither Telecommunications Nor a Telecommunications Service*, 19 FCC Rcd 3307, 3315 ¶13 (2004).

routing and billing."[28] As USTelecom noted in an amicus brief filed with the Supreme Court, the use of SS7 by telephone companies "increases performance, reduces costs, and facilitates various calling services."[29] The use of SS7's data processing capabilities to ensure the efficient connection of telephone calls did not transform basic telephone service into an information service. Similarly, when broadband providers use DNS and caching to facilitate the transmission of information over their networks to and from Internet endpoints, they do not alter the nature of the telecommunications service they offer to consumers.

**d.**    USTelecom claims (Br. 40), that the Commission's application of the telecommunications management exception is "arbitrary" because DNS and caching fall within the exception when they are supplied by broadband Internet access providers but not when they are furnished on a stand-alone basis by third parties. *See Order* ¶¶370 n.1046, 372 (JA___, ___). But there is nothing anomalous about treating the same tool as part of the management of

---

[28] *Rules and Policies Regarding Calling Number Identification Service—Caller ID*, 10 FCC Rcd 11700, 11704 ¶7 (1995). SS7 transmits signaling information "in digital format to switches and other network elements" via "circuits separate from the circuits used to connect the calling and called parties." *Id.*

[29] Brief Amici Curiae of United States Telecom Association and Network Engineers in Support of Respondent at 9, *Talk America Inc. v. Michigan Bell Tel. Co.*, No. 10-313, 2011 WL 836421.

a telecommunications service when it is used for that purpose, and treating it differently when it is used for other purposes. When DNS and caching are "provided on a stand-alone basis by entities other than the provider of Internet access service," there is "no telecommunications service to which DNS [or caching] is adjunct." *Id.* n.1046 (JA___).

Finally, USTelecom contends that the Commission's interpretation has "no rational limiting principle" because it allows the agency to conclude that some functions are not information services because they are "telecommunications management," while others are "not part of what consumers are 'offered.'" Br. 46. On the contrary, the limiting principles derive from the purpose for which the tools are used, and do not include functions that are separately offered. *See Brand X*, 545 U.S. at 997-98 (a local telephone company "cannot escape Title II regulation" of basic phone service "simply by packaging that service with voice mail") (quoting *Stevens Report* ¶60). The statute says plainly that information services do not include capabilities "for the management, control, or operation of a

telecommunications system or the management of a telecommunications service." 47 U.S.C. § 153(24).[30]

### 3. The Commission was justified in finding that providers of Broadband Internet Access Service are common carriers.

USTelecom argues that the Commission cannot regulate broadband under Title II because it had no basis for finding that all providers of Broadband Internet Access Service are common carriers. Br. 73-75. That is incorrect.

The Communications Act provides that "[a] telecommunications carrier shall be treated as a common carrier … to the extent that it is engaged in providing telecommunications services." 47 U.S.C. § 153(51). The Act thus authorizes—indeed, requires—broadband providers to be treated as common carriers once they are found to offer telecommunications service.

---

[30] USTelecom also argues (Br. 32) that "mobile broadband involves additional features that further buttress the conclusion that it is an 'information service.'" USTelecom explains that those features are designed to "address … distinct operational challenges." *Id.* Because these features, as described, are used for the purpose of operating mobile broadband networks, they are either part and parcel of the telecommunications service offered by mobile broadband providers or, at a minimum, fall comfortably within the "operation of a telecommunications system" under the telecommunications management exception. 47 U.S.C. § 153(24).

The Commission reasonably found that Broadband Internet Access Service (as defined in the *Order*) is an "offering of telecommunications for a fee directly to the public." *Order* ¶363 (JA___) (quoting 47 U.S.C. § 153(53)). This language is "essentially a way of restating the definition of common carrier." *Virgin Islands Tel. Corp. v. FCC*, 198 F.3d 921, 926 (D.C. Cir. 1999) (citing *NARUC v. FCC*, 525 F.2d 630, 641-42 (D.C. Cir. 1976)). A company that holds itself out as offering broadband service to the public indiscriminately (rather than under individually negotiated contracts) is therefore a common carrier under the Act.

Furthermore, the Broadband Internet Access Service governed by the *Order*—"a mass-market retail service" that is "marketed and sold on a standardized basis to residential customers, small businesses, and other end user[s]" and "that provides the capability to transmit data to and receive data from all or substantially all Internet endpoints," *Order* ¶336 & n.879 (JA___-___)—would also qualify under the common law test of common carriage. By definition, this service features the "essential element" of common carriage: "the characteristic of holding oneself out to serve indiscriminately."

*NARUC*, 525 F.2d at 642. It is "offered on a common carriage basis 'by virtue of its functions.'" *Order* ¶384 (JA___) (quoting *NARUC*, 525 F.2d at 644).[31]

USTelecom asserts that broadband providers "have the right to elect whether to operate as private carriers or common carriers." Br. 75. If a provider in the future decides not to make a standardized, mass market offering of broadband service to the public, but instead opts to offer service as private carriage on individualized terms, it would no longer be offering "Broadband Internet Access Service" as defined in the *Order* and would not be subject to the legal standards adopted here.

### 4. The Commission reasonably accounted for the impact of Title II reclassification on investment.

USTelecom also claims that Title II reclassification "will undermine" future investment. Br. 54. But the Commission reasonably determined that the *Order's* regulatory framework of open Internet protections and "light-touch" Title II regulation would "not have a negative impact on investment and innovation in the Internet marketplace as a whole." *Order* ¶410 (JA___).

---

[31] Because the Commission found that broadband was already being offered on a common carrier basis, it had no need to—and did not purport to—"compel" broadband providers "to operate as common carriers." *Order* ¶384 (JA___). *See* USTelecom Br. 74.

As the Commission explained, the goals of an open Internet and broadband investment are "mutually reinforcing, not mutually exclusive." *Order* ¶11 (JA___). *See generally Verizon*, 740 F.3d at 644-45. The record evidence before the Commission reaffirmed the agency's view that effective open Internet protections are not only necessary to ensure the Internet remains a vibrant platform for civic engagement and economic growth, *Order* ¶¶75-77 (JA___-___), but also fuel a virtuous cycle—unleashing innovation, stimulating consumer demand, and increasing broadband investment and deployment. *Id.* ¶¶76-77 (JA___-___). The Commission also explained that its open Internet protections and tailored approach to Title II would spur continued investment in both infrastructure and Internet content and applications. *Order* ¶¶410-411 & n.1197 (JA___-___) (citing submissions by Sprint, AOL, COMPTEL, and Vonage).

Taking all of this into account, the Commission reasonably concluded that "any [investment disincentive] effects are far outweighed by positive effects on innovation and investment" that the FCC's "broadband policies will promote" in other areas of the Internet marketplace. *Order* ¶410 (JA___). In so doing, the Commission did not "den[y]" broadband providers' concerns or the link between regulation and investment (USTelecom Br. 52, 26).

82

Rather, the Commission reasonably balanced providers' concerns against the benefits of its chosen regulatory framework.

USTelecom all but ignores the Commission's efforts to tailor its approach through wide-ranging forbearance. This "light-touch" approach was designed precisely to lessen any potential adverse impact on broadband investment. As the Commission emphasized, the forbearance it granted "is broad in scope and extends to obligations"—such as "last-mile unbundling requirements" and the mandatory filing of tariffs—"that might be viewed as characteristic of 'utility-style regulation.'" *Order* ¶417 (JA___). The Commission also pointed out that its forbearance was more extensive than the framework it adopted for commercial mobile service providers, who have thrived under "a market-based Title II regime." *Id.* ¶423 (JA___). In the Commission's judgment, "classifying broadband Internet access service as a telecommunications service—but forbearing from applying all but a few core provisions of Title II—strikes an appropriate balance by combining minimal regulation with meaningful Commission oversight." *Id.* ¶409 (JA___).

The record evidence strongly supports the Commission's conclusions. As the Commission observed, for example, Title II already applies to mobile voice services, enterprise broadband services, and the residential broadband services offered by more than 1000 small rural phone companies. Investment

83

in all of those services has flourished under Title II. *Order* ¶¶421-425

(JA___-___). The Commission also noted that "the highest levels of [DSL]

wireline broadband infrastructure investment to date" occurred between the

late 1990s and 2005—a period when DSL broadband service was regulated as

a telecommunications service under Title II. *Id.* ¶414 (JA___-___) (citing

USTelecom Research Brief, *Latest Data Show Broadband Investment Surged*

*in 2013* at 2, Chart 2).

Looking to more recent evidence, the Commission cited statements in

the record by mobile broadband providers Sprint and T-Mobile that Title II

reclassification would not impede their business plans. *Order* n.1221

(JA___). And the Commission noted that Verizon's chief financial officer

had recently assured investors that Title II reclassification would not

influence Verizon's investment decisions. *Id.* ¶416 (JA___-___). The agency

also pointed to the statements of "[a] number of market analysts," who had

concluded that the "dire predictions" that Title II reclassification would have

"disastrous effects on investment are overblown." *Id.* ¶415 & n.1216

(JA___).

The Commission's reasonable predictive judgment, based on its

analysis and the record evidence, "about the development of new broadband

technologies and about the incentives for increased deployment" under its

84

new regulatory framework "are well within the agency's area of expertise,"

and those judgments "are entitled to *particularly deferential* review."

*Earthlink, Inc.*, 462 F.3d at 12 (internal quotation marks omitted); *see also*

*Melcher v. FCC*, 134 F.3d 1143, 1155-57 (D.C. Cir. 1998) (deferring to the

FCC's "predictive judgment" about how "the market and regulated entities

will react" to new regulation).

### 5. The Commission reasonably accounted for the reliance interests of broadband providers.

USTelecom maintains that the FCC must "provide 'a more substantial

justification'" for Title II reclassification in light of the "significant reliance

interests engendered by" the previous classification of broadband as an

information service. Br. 26 (quoting *Perez v. Mortgage Bankers Ass'n*, 135 S.

Ct. 1199, 1209 (2015)). To satisfy its burden of justification—as USTelecom

acknowledges (Br. 51)—the Commission need only show that any "serious

reliance interests" engendered by its prior policy were "taken into account"

when adopting the new policy; the agency acts arbitrarily only when it

"ignores such matters." *Perez*, 135 S. Ct. at 1209 (quoting *Fox I*, 556 U.S. at

515).

USTelecom complains that fixed and mobile broadband providers

made substantial investments in reliance on the FCC's classification of

broadband as an information service. Br. 51. USTelecom is careful, however,

not to say that their past investment has been in any way stranded, or

otherwise rendered worthless, by the Commission's change in policy. And it

has no basis for complaining about "reliance interests" in plans when the

investment has yet to be made. A regulatory change "is not arbitrary or

capricious merely because it alters the current state of affairs" or "upsets

expectations." *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 826 (D.C. Cir. 1997).

"It is often the case that a business will undertake a certain course of conduct

based on the current law, and will then find its expectations frustrated when

the law changes. … [M]ost economic regulation would be unworkable if all

laws disrupting prior expectations were deemed suspect." *Mobile Relay*

*Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006) (internal quotation marks

omitted). Even if companies "have spent millions of dollars" in reliance on a

particular FCC policy, "[t]he Commission 'is entitled to reconsider and revise

its views as to the public interest and the means needed to protect that

interest' if it gives a reasoned explanation for the revision." *DIRECTV*, 110

F.3d at 826 (quoting *Black Citizens for a Fair Media v. FCC*, 719 F.2d 407,

411 (D.C. Cir. 1983)).

Moreover, the proper classification and regulatory framework for

broadband was far from settled law. *Order* ¶360 (JA__). Under the 1980s-era

*Computer II* framework, the Commission for years subjected DSL to Title II

86

regulation. When the Commission classified cable and later wireline and wireless broadband as information services in the 2000s, it did so with the express understanding that it retained sufficient authority to achieve its policy goals, including the preservation of Internet openness. After *Comcast* cast doubt on that conclusion, the Commission expressly sought comment on the proper regulatory framework for broadband, including reclassification under Title II. When the Commission adopted its 2010 Open Internet rules based on the FCC's new interpretation of Section 706, it left open the *Broadband NOI* and its questions about reclassification. And when broadband providers challenged the Commission's 706 authority, *Verizon* held that the agency could not use that authority to impose common-carrier obligations on broadband providers because the FCC had classified broadband as an information service. *Verizon*, 740 F.3d at 649-59.[32]

USTelecom's reliance argument thus rests on the flawed assumption that, despite the Commission's repeatedly expressed desire to ensure an open Internet, broadband providers could expect that the Commission would shrink

_____

[32] USTelecom asserts that the Commission could have adopted "appropriate" Open Internet rules using its Section 706 authority. Br. 54. But it is careful not to state that the Commission could have adopted the rules under review using that authority. And this Court in *Verizon* made clear that the Commission could not impose the core common-carriage protections of its rules by using its Section 706 authority alone. 740 F.3d at 655-58.

87

from using all of the tools at its disposal to reach that end. But for more than

a decade, the Commission has made clear its intention to take the necessary

steps to ensure that the Internet remains open and its belief that it possesses

sufficient regulatory authority to do so. *See, e.g.*, *Wireline Broadband Order*

¶96 (stating that the agency would not "hesitate to take action" if it found

"evidence that providers of telecommunications for Internet access" were

"violating [the FCC's open Internet] principles,"); *see generally* pp. 18-23

*supra*.

In sum, the fact that broadband providers have previously invested in

their broadband networks cannot prevent the Commission from fulfilling its

obligation to "consider varying interpretations and the wisdom of its policy

on a continuing basis," *Brand X*, 545 U.S. at 981 (quoting *Chevron*, 467 U.S.

at 863-64), in light of the facts in the record as a whole. Otherwise,

broadband providers' asserted reliance interests would freeze future

communications policy, effectively nullifying the continuing interpretive and

rulemaking authority that Congress has vested in the FCC. *Brand X*, 545 U.S.

at 992.

## II. THE COMMISSION REASONABLY EXERCISED ITS DISCRETION TO DETERMINE THAT MOBILE BROADBAND INTERNET ACCESS SERVICE IS NOT A PRIVATE MOBILE SERVICE EXEMPT FROM COMMON-CARRIAGE REGULATION.

In the *Order*, the FCC determined that mobile broadband—a "virtually universal" service used by "hundreds of millions of consumers" "to send and receive communications … every day," *Order* ¶¶398-99 (JA___)—should be regulated in the same fashion as fixed broadband, *id.* ¶88 (JA___)—that is, as common carriage under Title II. Only CTIA and AT&T challenge this portion of the *Order*. *See* USTelecom Br. 5 n.2. These two mobile petitioners assert their service must instead remain classified as an exempted "private mobile service" under Section 332 of the Act, 47 U.S.C. § 332(c)(2), as the agency had formerly done. Br. 56. But the agency reasonably determined that mobile broadband today is *not* a "private mobile service," a regulatory classification aimed at offerings of "access to a discrete and limited set of endpoints," such as a taxi company's internal dispatch service. *Order* ¶404 (JA__). Rather, mobile broadband is either "commercial mobile service" or its "functional equivalent." To prevail, mobile petitioners must show that the FCC exceeded its explicitly delegated discretion to define the terms of the statute, and that their service can only be classified as "private mobile service." They cannot.

89

### A. The Commission Reasonably Classified Mobile Broadband As Commercial Mobile Service.

Section 332 of the Act specifies that a *commercial mobile service* is one "provided for profit [that] makes interconnected service available … to the public … as specified by regulation by the Commission." 47 U.S.C. § 332(d)(1). An *interconnected service*, in turn, is one "that is interconnected with the public switched network (as such terms are defined by regulation by the Commission)." *Id.* § 332(d)(2). The agency's determination that mobile broadband is a "commercial mobile service," subject to regulation under Title II, was entirely reasonable.

### 1. The Commission reasonably exercised its authority to modernize the definition of "public switched network."

In the *Order*, the Commission concluded that mobile broadband is a commercial mobile service because it provides "interconnected service" "to the public" "for profit." *Order* ¶389 (JA___). The agency found that the offering is an "interconnected service" based on an "update [of] our definition of public switched network … [to] reflect[] the current network landscape rather than that existing more than 20 years ago," when the Commission first defined the terms in the *1994 Section 332 Order*. *Order* ¶391(JA___). While its previous definition hinged on use of telephone numbers, the new definition also encompasses networks that use public IP addresses, the form

90

of address used in Internet communication. *Id.* The agency found that "[r]evising the definition … to include" IP-address networks "recognizes that today's broadband Internet access networks use … IP addresses … to give users a universally recognized format for sending and receiving messages across the country and worldwide." *Id.*[33]

This quality of "ubiquitous access" has been the touchstone of the FCC's definition of "interconnected service" and "public switched network" since the agency first interpreted Section 332 in 1994, when telephone numbers served "as a proxy" for such access. *Id.*; *see 1994 Section 332 Order* ¶60 (telephone numbers provide "ubiquitous access"). That focus on ubiquity is consistent both with the statutory text—which differentiates between "commercial" access to the "public switched network" and "private service"—and with Congress's concomitant intent in the 1993 statute to "differentiat[e] the [then] emerging cellular-based technology … as a mass market service from the traditional 'private' … dispatch services employed by taxi services and other private fleets." *Order* ¶391 (JA___); *see* n.15 *supra*. In 1994, only networks that used telephone numbers "allow[ed] the

---

[33] There is no dispute that the Internet is a "switched" network. *See, e.g.*, *Bell Atlantic Tel. Cos. v. FCC*, 206 F.3d 1, 4 (D.C. Cir. 2000) ("[T]he internet is a 'distributed packet-switched network.'").

public to send or receive messages to or from anywhere in the nation." *1994 Section 332 Order* ¶59. In 2015, the Commission found, Internet networks also serve this function and so also are part of the "public switched network." Mobile petitioners do not—and cannot—demonstrate that today's mobile broadband service is the kind of intra-enterprise or other closed service that operates on a limited network of connections.

By the same logic, the *Order*'s interpretation of "interconnected" also fits comfortably within the statutory language. Again, Congress in Section 332 aimed to differentiate cellular voice service and other indistinguishable services—which are "interconnected services"—from private, closed taxi dispatch systems—which are not "interconnected." Today, the agency found—based on the record—that mobile broadband "fits the former classification as millions of subscribers use it to send and receive communications on their mobile devices every day." *Order* ¶398 (JA___). For example—in contrast to the still-developing market of 2007 when the agency last addressed the issue—record evidence showed that 73.6% of the U.S. population over age 13 today communicate using smart phones, and that "[m]obile broadband subscribers … can … send or receive communications to or from anywhere in the nation, whether connected with other mobile

broadband subscribers, fixed broadband subscribers, or the hundreds of millions of websites available to them over the Internet." *Id.*

Given this "ubiquity and wide scale use of mobile broadband Internet access service today," *id.*, the agency was well within the bounds of its explicitly delegated authority to find that mobile Broadband Internet Access Service is a "commercial mobile service" under the statute.

### 2. The term "public switched network" is broader than "public switched telephone network."

Mobile petitioners challenge the Commission's redefinition of "public switched network," and thus its determination that mobile broadband is a commercial mobile service. They concede that Congress has explicitly delegated to the FCC authority to define the term "public switched network" in Section 332(d)(2). USTelecom Br. 60. Nonetheless, they argue that the term must be read to mean "public switched *telephone* network," thus bringing their offering outside the scope of the statute. *Id.* at 60-64.

But the word "telephone" appears nowhere in Section 332(d). The fact that petitioners' preferred interpretation would "add[ ] words that are not in the statute … creates strong doubts about whether [petitioners'] interpretation is correct, let alone unambiguously clear." *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 700 (D.C. Cir. 2014) (citation omitted); *see Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 816 (D.C. Cir. 2008) ("The principal

93

problem with [the proffered] reading is that the italicized words do not appear in the statute."); *United States v. Monsanto*, 491 U.S. 600, 611 (1989). In an analogous situation, this Court refused a petitioner's attempts to read "the ambiguous [statutory phrase] 'valid existing rights'" to mean only "valid existing property rights," because "[n]othing in" the language of the statute "suggests Congress intended to enact [one] understanding over" another. *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 708-09 (D.C. Cir. 2008); *see id.* ("If [valid existing right] operates as a 'term of art,' as the [petitioner] suggests, it is as a tool by which Congress delegates policymaking authority through ambiguity.").

Mobile petitioners nevertheless insist on adding the word "telephone" because, they claim, "public switched network" had an "established meaning" that Congress incorporated. USTelecom Br. 61. But Congress explicitly directed the FCC to "define" the term "by regulation," 47 U.S.C. § 332(d)(2), which belies any argument that this "term of art" (Br. 61) could only have a single meaning. To be sure, the telephone network was a "public switched network" at the center of Congress's attention in 1993. It is therefore no surprise, for example, that a 978-page committee report on the omnibus spending bill with the amendment in question referred in one place to the "public switched telephone network." Br. 61. But had Congress intended to

94

freeze in place the form of network technology that existed at that time, it could have easily included a limitation to "telephone networks" in the statute itself, as it did, for example in a criminal statute regarding phone records. *See* 18 U.S.C. § 1039(h)(4) (applying to records of entities that exchange traffic with "the public switched telephone network, or a successor network"). It did not.

From the first time the FCC interpreted Section 332(d) in 1994, the agency has read Congress's "use of the term 'public switched network,' rather than the more technologically based term 'public switched telephone network," as deliberate. *1994 Section 332 Order* ¶59. The agency therefore explicitly refused to define "public switched network" as "publicly switched telephone network," rejecting this "static" definition in favor of a more flexible approach that would allow the agency to adapt to a "network [that] is continuously growing and changing because of new technology and increasing demand." *Id.* Thus, even in reaching the prior interpretation that mobile petitioners prefer, the FCC rejected their rationale that Congress used

"public switched network" as a term of art to refer only to the telephone

network.[34]

### 3. Later statutes do not restrict the Commission's authority to redefine the meaning of "public switched network" in Section 332.

Mobile petitioners assert that Congress "ratified" the prior

interpretation of public switched network by leaving it "undisturbed through

multiple amendments" of the Act. Br. 62 (citing *CFTC v. Schor*, 478 U.S.

833, 846 (1986)). But "application of the legislative reenactment doctrine

requires a showing of both congressional awareness and express

congressional approval of an administrative interpretation if it is to be viewed

as statutorily mandated." *Creekstone Farms Premium Beef, L.L.C. v. Dep't of

Agric.*, 539 F.3d 492, 500 (D.C. Cir. 2008) (citation omitted). There is no

such showing here. In fact, Congress has amended Section 332 only once

since the *1994 Section 332 Order* first interpreted "public switched

network"—in 1996, only two years after that Order and when the Internet

---

[34] Contrary to mobile petitioners' assertion (Br. 62), the Commission cited with approval commenters who "urge[d] the Commission to adopt a more forward looking definition" of public switched network in contemplation of a future "'network of networks.'" *1994 Section 332 Order* ¶53 & n.99 (attributing viewpoint to commenters including Nextel and Pacific Bell); *id.* ¶60 ("We agree with Nextel and Pacific….").

was still nascent—and those amendments did not make substantive changes relevant to these issues. *See* 1996 Act, Pub. L. No. 104-104, §§ 704 & 705.

Mobile petitioners point out (USTelecom Br. 62) that other uses of "'public switched network' in the U.S. Code" center on the telephone network, but that does not undermine the Commission's decision here.[35] In 47 U.S.C. § 1422, Congress mandated a safety network that would connect to "the public Internet or the public switched network, or both." This does not show that "public switched network" is a term of art that can only mean "telephone network." Br. 62. Rather, it shows that in 2012, against a background in which the FCC had defined "public switched network" based on telephone numbers, Congress used both terms in order to guarantee inclusion of the Internet.

_____

[35] Petitioners also omit that the FCC has previously read Congress's use of the term "public switched network" in *legislative history* to include the Internet. The House Report on the Communications Assistance for Law Enforcement Act states that that "a carrier [that provides] access to a publicly switched network is responsible for complying" with the statute. H.R. Rep. No. 103-827(I), at 23, *reprinted in* 1994 U.S.C.C.A.N. 3489, 3503. The FCC interpreted the statute to apply to Internet providers, quoting with approval commenters who "assert that 'the [public switched telephone network] is not the only publicly switched network: the Internet is another.'" *Commc'ns Assistance for Law Enforcement Act & Broadband Access & Servs.*, 20 FCC Rcd 14989, 15004 ¶30 (2005).

Sections 259 & 769(a)(11), which mobile petitioners also cite (Br. 62), similarly do not constrain the agency here. Again, there is no dispute that in 1996 and 2000 (the enactment dates of those provisions) the telephone companies' networks comprised by far the predominant "public switched network," and it is unsurprising Congress might use the term. However, such usage in later statutes does not somehow establish that "public switched network" in the 1993 statute is a "term of art" with only one meaning, especially given that the 1993 statute directs the agency to interpret the phrase through regulation. Indeed, as a case on which petitioners rely (Br. 62) makes clear, "'[l]ater laws that do not seek to clarify an earlier enacted general term and do not depend for their effectiveness [on] … a change in the meaning of the earlier statute' are normally 'beside the point.'" *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 9 (D.C. Cir. 2011) (quoting *United States v. Monzel*, 641 F.3d 528, 536 (D.C. Cir. 2011)). Certainly such inconclusive signs cannot show that the FCC's reading here is "manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44.

### 4. The Commission's new interpretation of "public switched network" does not impermissibly encompass multiple networks or the "Internet of Things."

Mobile petitioners also briefly argue that the *Order* defined "public switched network" to consist of two distinct networks, the telephone network

and the Internet. Br. 63. Not so. The *Order* "contemplates a single network comprised of all users of public IP addresses and [telephone] numbers, and not two separate networks." *Order* ¶396 (JA___). This is not unlike the prior definition, which defined "public switched network" as "any common carrier switched network" that used telephone numbers, *1994 Section 332 Order* ¶60—thus including, for example, cellular networks, local carriers' networks, and long distance networks. All of these could be described as separate networks, but the Commission's old definition grouped them as a single network. So too here, the Commission found—in light of increasing technological "convergence between mobile voice and data networks [since] 2007"—that the many sub-networks that use Internet addresses or telephone numbers can be viewed as a single network. *Order* ¶401 (JA___) (citing "the increasing number of ways in which users communicate indiscriminately between NANP and IP endpoints on the public switched network").

Mobile petitioners next argue that the *Order* will sweep the "Internet of Things"—*i.e.*, interconnected devices like smart watches and appliances— into the FCC's jurisdiction. USTelecom Br. 63. But the Commission specifically stated that "devices and services that consumers use with today's Internet are not inextricably intertwined with the underlying transmission component." *Order* ¶380 (JA___). That is, the mere fact that such devices

99

*connect* to the public switched network does not mean that the devices themselves fall within the scope of the *Order*.

### 5. The Commission fully explained its reasons for revisiting the outdated definition of "public switched network."

Finally, mobile petitioners argue that the FCC failed adequately to explain why it changed the definition of "public switched network." *See* USTelecom Br. 68-71. In fact, the FCC explained at length that telecommunications technology had changed drastically since the agency defined the term in 1994. Mobile Internet-based communication was then virtually unheard of; now mobile broadband has become "virtually universal." *Order* ¶399 (JA___).[36] In response, the agency exercised its discretion to "update the definition of public switched network to reflect current technology." *Order* ¶391 (JA___). Although mobile petitioners argue such ubiquity cannot justify a change (Br. 70), ubiquitous access has been the linchpin of the agency's definition since the beginning, *see* pp. 91-92 *supra*.

---

[36] Mobile petitioners err in focusing on changes since the 2007 *Wireless Broadband Order* (Br. 69), which simply applied, but did not revisit, the 1994 definitions. *See Wireless Broadband Order* ¶¶42-45. In any case, the *Order* found a "sharp contrast" between today's marketplace and that of 2007, when the agency characterized mobile broadband as still "nascent." *See Order* ¶398 (JA___) (citing *Wireless Broadband Order* ¶59).

The agency also explained that treating mobile broadband service as a commercial mobile service subject to common carriage was most consistent with the *Order*'s parallel reclassification of fixed Broadband Internet Access Service as a "telecommunications service" likewise subject to common carriage. *Order* ¶403 (JA___). Although mobile petitioners criticize this rationale (Br. 70), it is consistent with the statute, which uses a public/private distinction for wireless service that mirrors the similar public/private divide embodied in the regulation of telecommunications under Title II. *See generally Virgin Islands*, 198 F.3d at 926 (discussing "public-private dichotomy" that characterizes "the distinction between common carrier and non-common carrier operators" under Title II).

### B.  The Commission Reasonably Found In The Alternative That Mobile Broadband Is The Functional Equivalent Of Telephone-Network-Based Commercial Mobile Service.

Under Section 332, private mobile service is "any mobile service … that is not a commercial mobile service *or the functional equivalent* of a commercial mobile service, as specified by regulation by the Commission." 47 U.S.C. § 332(d)(3) (emphasis added). In the *Order*, the Commission found that, even if mobile broadband did not qualify as a commercial mobile service (because, for example, a court rejected the agency's revised definition of public switched network), mobile broadband nonetheless is not a private

mobile service because it is the "functional equivalent" of commercial mobile service. *Order* ¶404 (JA___).[37]

"[L]ike [telephone-based] commercial mobile service, [mobile broadband] is a widely available, for-profit mobile service that offers mobile subscribers the capability to send and receive communications on their mobile device to and from the public." *Id.* Although IP addresses differ from telephone numbers, "from an end user's perspective, both are commercial services that allow users to communicate with the vast majority of the public." *Id.* Many forms of communication—from sharing news with family to ordering takeout—may be accomplished equally well through the telephone network or mobile internet service. While mobile broadband may be used for other purposes that do not mirror voice telephony, that "does not make them less useful as substitutes" for purposes that do overlap. *Order* ¶407 (JA__). Because a consumer may view these services as serving the same function, the agency was reasonable in determining that they are functional equivalents.

---

[37] *See BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1183 (D.C. Cir. 2000) (where agency offers two independent grounds for a decision, a court "will affirm the agency so long as any one of the grounds is valid").

Mobile petitioners' attacks on this determination are unavailing. They assert that Congress created the functional equivalence prong "to capture services that, though not technically commercial mobile services, are nevertheless connected to the telephone network and can be substituted for voice service." Br. 67-68. Here too, petitioners attempt to restrict the scope of the statute to the telephone network, even though Congress placed no such limitation. In the process, they make the phrase "functional equivalent" meaningless. A service that is functionally a commercial mobile service and that is connected to the telephone network presumably would *be* a commercial mobile service, not a functional equivalent. *Order* ¶407 (JA___). Instead, the Commission found that "Congress included the functional equivalence provision in the statute precisely to address such new

developments for services that may not meet the literal definition of commercial mobile service." *Id.* [38]

Mobile petitioners also argue (Br. 66-67) that the FCC erred by not applying the test the agency has set out to guide its resolution of petitions filed by private parties seeking a particularized determination that a "mobile service that does not meet the definition of a commercial mobile … service" is the functional equivalent of such service. 47 C.F.R. § 20.9(a)(14)(i). This test looks under existing law at the specific facts to decide petitions in which an "interested party," 47 C.F.R. § 20.9(a)(14)(ii)—typically a common-carrier incumbent—alleges that a competitor private mobile service is essentially a substitute for its own service, and so should be classified as a functional equivalent, thus bringing that service within common-carriage regulation. *1994 Section 332 Order* ¶¶79-80. Such a test makes sense in that

---

[38] Mobile petitioners assert that the Commission has previously found that Congress intended "functional equivalence" to reach services interconnected with the telephone network, citing the *1994 Section 332 Order*, which in turn cited a House Report discussing examples connected to the telephone network that were "functionally … indistinguishable" from common carrier services. USTelecom Br. 68. However, the House Report was written before the "functional equivalence" language was added to the statute, *1994 Section 332 Order* ¶78. And the Commission classified the services in question as "commercial mobile services," not functional equivalents. *Id.* ¶90 (addressing "specialized mobile radio" and "private paging services"). Thus neither the *1994 Section 332 Order* nor the House Report addresses whether a "functional equivalent" must be interconnected with the phone network.

context, where a common carrier is arguing that a specific unregulated competitor has an unfair advantage because the competitor is offering essentially the same service with less regulation. But this procedure does not prohibit the agency from designating a category of service to be a functional equivalent in a general rulemaking; nor does it constrain the agency's discretion to consider other factors when evaluating functional equivalence in a rulemaking context. *See generally FCC v. Schreiber*, 381 U.S. 279, 289 (1965) (Communications Act delegates broad authority to "make ad hoc procedural rulings in specific instances"). Indeed, even in the petition context, the rules state that "[a] variety of factors will be" considered, "including" those enumerated. 47 C.F.R. § 20.9(a)(14)(ii)(B).

## III. THE COMMISSION SATISFIED APA NOTICE REQUIREMENTS REGARDING RECLASSIFICATION.

The APA provides that before an agency can adopt a legislative rule, it must issue an NPRM that includes "*either* the terms or substance of the proposed rule *or* a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3) (emphasis added). "[A]n agency is not restricted to adopting the position it proposed and on which it sought comment." *Miami-Dade Cnty. v. EPA*, 529 F.3d 1049, 1059 (11th Cir. 2008); *see also Agape Church, Inc. v. FCC*, 738 F.3d 397, 411 (D.C. Cir. 2013) (adopted rule "need not be the one proposed in the NPRM"). "Such a restriction would undermine the 'purpose

105

of notice and comment—to allow an agency to reconsider, and sometimes

change, its proposal based on the comments of affected persons.'" *Miami-*

*Dade Cnty.*, 529 F.3d at 1059 (quoting *Ass'n of Battery Recyclers v. EPA*,

208 F.3d 1047, 1058 (D.C. Cir. 2000)). Rather, "an agency's final rule need

only be a logical outgrowth of its notice." *Agape Church*, 738 F.3d at 411

(quoting *Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 548 (D.C. Cir. 2006)).

A final rule qualifies as a "logical outgrowth" of a notice "if interested parties

should have anticipated that the change was possible, and thus reasonably

should have filed their comments on the subject during the notice-and-

comment period." *Id.* (internal quotation marks omitted); *see also Long*

*Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174-75 (2007) (the "logical

outgrowth" test is satisfied if it was "reasonably foreseeable" that the agency

would take the action it did).

    USTelecom asserts that the FCC gave insufficient notice of its

decisions to reclassify broadband as a telecommunications service and mobile

broadband as commercial mobile service or its functional equivalent. Br. 83-

92. These claims are baseless.

### A.   The Commission Provided Adequate Notice Of Title II Reclassification.

In the NPRM, the Commission sought "comment on whether the

Commission should rely on its authority under Title II of the

Communications Act, including … whether [it] should revisit the Commission's classification of broadband Internet access service as an information service." *NPRM* ¶148 (JA__). It noted that it would "seriously consider" reclassification, *id.* ¶4 (JA___), emphasizing that "both section 706 and Title II are viable solutions" and requesting "comment on the benefits of both section 706 and Title II, including the benefits of one approach over the other." *Id.* The Commission set out eight paragraphs of proposals and questions specifically on that issue, *see NPRM* ¶¶148-155 (JA__-__), and more generally sought comment in reference to Title II "in almost every section of the *NPRM*," *Order* ¶387 (JA___).[39]

USTelecom's assertions of inadequate notice are makeweight. First, USTelecom notes that the *NPRM* tentatively proposed relying on Section 706, rather than Title II. Br. 84. But "[t]he law does not require that every alteration in a proposed rule be reissued for notice and comment. If that were

---

[39] *See NPRM* ¶10 (JA__) ("[W]e ask how either section 706 or Title II … could be applied to ensure that the Internet remains open"); *id.* ¶65 (JA__) (citing Title II as source of authority for transparency rule); *id.* ¶¶89, 96 (JA__, __) (seeking comment on no-blocking rule under Title II); *id.* ¶¶112, 121 (JA__, __) (seeking comment on how "commercially reasonable" rule would change if Commission relied on Title II); *id.* ¶138 (seeking comment on paid-priority ban under Title II); *id.* ¶142 (JA__) (seeking comment "on the nature and the extent of the Commission's authority to adopt open Internet rules relying on Title II").

the case, an agency could 'learn from the comments on its proposals only at the peril of' subjecting itself to rulemaking without end." *First Am. Disc. Corp.*, 222 F.3d at 1015 (quoting *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 632 (D.C. Cir. 1973)); *see Agape Church*, 738 F.3d at 412 (*NPRM* and final rule need not be "coterminous"). Instead, notice need only be "'sufficient to advise interested parties that comments directed to the' controverted aspect of the final rule should have been made." *First Am. Disc. Corp*, 222 F.3d at 1015 (quoting *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991)). Here, the agency easily passed that bar, noting that it was "seriously consider[ing]" reclassification. *NPRM* ¶4 (JA__).

USTelecom next argues that the *NPRM* misled commenters, casting Title II only as "a backup source of 'legal authority' to support the proposed Open Internet rules." Br. 85. But the *NPRM* explained that "[i]f the Commission were to reclassify broadband Internet access service [as a telecommunications service under Title II], such a service would then be subject to all of the requirements of the Act and Commission rules that would flow from the classification." *NPRM* ¶153 (JA__). *See Brand X*, 545 U.S. at 977 (telecommunications services are "subjected to mandatory Title II common-carrier regulation").

Nor could petitioners reasonably have felt assured that the Commission would classify their offering as a Title II service only to forbear from every single provision of Title II. The *NPRM* specifically sought comment on "the extent to which forbearance" from the provisions of Title II "would be justified in order to strike the right balance between minimizing the regulatory burden on providers and ensuring that the public interest is served." *NPRM* ¶153 (JA___-___). The agency even directed commenters to "list and explain which provisions [of the Act] should be exempt from forbearance and which should receive it in order to protect and promote Internet openness." *Id.* ¶154 (JA__). Ultimately, the agency forbore from the majority of Title II's provisions—including *ex ante* rate regulation, *Order* ¶441 (JA___), contrary to petitioner's claims (Br. 86). It declined to forbear from others, such as the consumer protections of Section 222 identified by petitioners (Br. 86)—as the *NPRM* indicated was possible, *NPRM* ¶154 (JA__). In light of the *NPRM*, such an outcome was "reasonably foreseeable." *Long Island Care*, 551 U.S. at 175.

Finally, USTelecom argues the agency failed to provide "notice of the *path* to reclassification the *Order* adopted," Br. 87, apparently referring to the specific legal analysis that underlay reclassification in the final rule. But a notice "need not specify every precise proposal which [the agency] may

ultimately adopt as a rule." *Nuvio Corp. v. FCC*, 473 F.3d 302, 310 (D.C. Cir.

2006) (quoting *Action for Children's Television v. FCC*, 564 F.2d 458, 470

(D.C. Cir. 1977)); *see Manufactured Housing Inst. v. EPA*, 467 F.3d 391, 400

(4th Cir. 2006) (an agency "should not [be] penalize[d] … simply because the

precise contours of its … approach did not develop until after the agency had

reviewed the comments it sought"). Rather, an agency need only provide "a

description of the subjects and issues involved," 5 U.S.C. § 553(b)(3), which

the Commission plainly did here.

   The *NPRM* specifically asked "whether [the Commission] should

revisit [its] classification of broadband Internet access service as an

information service." *NPRM* ¶148 (JA__). It also asked about "changes to the

broadband marketplace" and whether the telecommunications component of

broadband Internet access is "integrated with applications and other offerings,

such that they are 'inextricably intertwined' with the underlying connectivity

service." *Id.* ¶150 (JA___) (quoting *Brand X*, 545 U.S. at 978). Read against

the backdrop of *Brand X* and *Verizon*, the questions posed by the *NPRM*

made it more than reasonably foreseeable that the agency would adopt the

approach it did. Indeed, many commenters, including petitioners

"themselves[,] had no problem understanding" "the scope of the issues up for

consideration," *Nat'l Ass'n of Mfrs.*, 750 F.3d at 926, and submitted

110

numerous comments arguing that broadband providers do not offer a

separable telecommunications service. *See Order* nn.985, 1054, 1065, 1078,

1101 (JA___, ___, ___, ___, ___).

For example, USTelecom asserts that commenters were "blindsided"

by the *Order*'s treatment of DNS and caching as falling within the

telecommunications management exception. Br. 88. But the agency had

previously concluded that cable modem service was an "information service"

in part based on its analysis of the role of DNS and caching. *See Brand X*,

545 U.S. at 987, 999. It was at least reasonably foreseeable that the agency

would need to revisit that earlier analysis in deciding whether to reclassify

Broadband Internet Access Service as a "telecommunications service." It is

therefore no surprise that numerous parties—including petitioners—filed

extensive comments that, in opposing Title II reclassification, specifically

focused on DNS and caching.[40] The fact that petitioners were "able to

comment meaningfully—and critically"—on Title II reclassification and

---

[40] *See, e.g.*, AT&T Reply Comments at 39, 54 (JA__, __) (arguing "DNS
lookup functionality… cannot be characterized as …within the 'management'
exception of 47 U.S.C. § 153(24)" and emphasizing importance of caching);
*see also* Comcast Comments at 58 (JA__); AT&T Comments at 48 (JA__);
Bright House Networks Reply Comments at 6-7 (JA__-__); CTIA Comments
at 43-46 (JA__-__).

relevant sub-issues "belies [their] claim that the notice was insufficient."

*Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 225 (D.C. Cir. 2007).

> **B.    The Commission Provided Adequate Notice Of Its Reclassification Of Mobile Broadband Service.**

Notice that the agency might reclassify mobile broadband was also plainly adequate. In the *NPRM*, the FCC explicitly asked for comment on whether it "should revisit its prior classification decisions," including with respect "to wireless broadband Internet access service." *NPRM* ¶149 (JA__). And the agency made clear that this could well entail reclassifying mobile broadband as no longer a "private mobile service." For example, the agency asked whether, if it reclassified broadband service as a Title II service, "mobile broadband Internet access service … fit[s] within the definition of 'commercial mobile service,'" *id.* ¶150 & n.307 (JA___)—citing Section 332 and 20 C.F.R. § 20.3, the regulation defining "private mobile service," "commercial mobile service," "interconnected service," and "public switched network" that the Commission amended in the *Order*.

The *NPRM* also directed commenters to the 2010 *Broadband NOI*, where the agency had earlier solicited comment on broadband classification. *See* p. 21 *supra*. The *NPRM* explained that the earlier *NOI* had asked "whether [the agency] should … alter its approach to wireless broadband Internet access service, noting that section 332 requires that wireless services

that meet the definition of 'commercial mobile service' be regulated as common carriers under Title II." *NPRM* ¶149 (JA__). In light of "extensive comments" in response to that previous inquiry, the *NPRM* specifically sought "further and updated comment on whether the Commission should revisit its prior classification decisions," asking follow-up questions such as "What would be the legal bases and theories for particular open Internet rules adopted pursuant to such an approach?" *Id.* The *Broadband NOI* to which the Commission directed parties also provided further context, stating, for example, that "Sections 332(c)(1) and (c)(3) … require that [commercial mobile service] providers be regulated as common carriers under Title II of the Act," and asking "[t]o what extent should section 332 of the Act affect our classification of wireless broadband Internet services?" *Broadband NOI* ¶104.

Mobile petitioners argue that the discussion in the *Broadband NOI* is irrelevant (Br. 90), but the *NPRM* specifically directed parties to refresh that record, and mobile petitioners themselves filed their comments for the 2014 Open Internet docket in the *Broadband NOI* docket as well, demonstrating that they understood the two to be intertwined. *See* AT&T Comments (JA__); CTIA Comments (JA__). Moreover, the *Broadband NOI* led to the rules remanded by this court in *Verizon*, which in turn lead to the issues raised by

the *NPRM*. *See Covad Commc'ns*, 450 F.3d at 548 (parties "should have anticipated" rulemaking would address questions from the court remanding a prior rule).

This discussion in the *NPRM*, bolstered by the *Broadband NOI*, flatly contradicts mobile petitioners' assertion that the *NPRM* "did not seriously discuss reclassifying mobile broadband." USTelecom Br. 89. Mobile petitioners nevertheless argue that the *NPRM* was too "open-ended" because it did not specifically "suggest that the FCC would change the underlying regulatory requirements for what *constitutes* commercial mobile service." Br. 89. Again, a notice "need not specify every precise proposal which [the agency] may ultimately adopt as a rule." *Nuvio Corp.*, 473 F.3d at 310. Here, given that the agency had reached its prior classification precisely because it had defined "public switched network" to reach only telephone numbers, *see Wireless Broadband Order* ¶¶42-45, it was reasonably foreseeable that changing the categorization likely would entail revisiting that definition. Moreover, the NPRM also asked whether "changes…in the mobile marketplace, including … the increased use … of mobile devices and applications … should lead [the agency] to revisit [its] treatment of mobile broadband service." *NPRM* ¶62; *see also Broadband NOI* ¶102 (asking how mobile broadband services are "purchased, provided, and perceived" in

114

today's marketplace). The Commission relied on record evidence offered in response when it "update[d] the definition of 'public switched network' to reflect current … network technologies … and the rapidly growing and virtually universal use of mobile broadband service." *Order* ¶399.[41]

Indeed, as with Title II reclassification, there were ample comments on precisely these issues, which shows that the parties to this proceeding— including both mobile petitioners—"had no problem understanding the scope of the issues up for consideration," including whether the Commission should update its definition of the public switched network. *Nat'l Ass'n of Mfrs.*, 750 F.3d at 926. For example, CTIA argued in reply comments that "Mobile broadband service does not fall under [commercial mobile service] because it is not interconnected with the public switched network" as then defined, and that the "Commission cannot upend the statutory scheme simply by 'updating' the definition of [commercial mobile service] to determine that the use of IP addresses renders an offering 'interconnected.'" CTIA Reply Comments 44-45 (JA__-___) ("The statutory definition…properly focuses on

_____

[41] Even if this argument had more force, it would not affect the FCC's alternate finding that mobile broadband is the "functional equivalent" of a telephone-based "commercial mobile service," because that analysis is not predicated on any changes in the agency's interpretation of the statute. As discussed at pp. 101-104 *supra*, that independent finding is itself adequate to support reclassification.

NANP numbering[,]"and "treat[ing] the Internet as part of the public switched network" would be "unlawful."). CTIA later submitted a 26-page "White Paper," titled "Section 332's Bar Against Common Carrier Treatment Of Mobile Broadband: A Legal Analysis," which argued against the redefinitions of "public switched network" and "commercial mobile service" that the *Order* later adopted and discussed at length the arguments raised now on appeal. CTIA White Paper (JA__). Verizon submitted a similar document, which likewise argued, for example, that "public switched network" in Section 332 is a term of art that can only mean "telephone network." Verizon White Paper at 13-15 (JA__-___). And contrary to its claims before this Court that these issues received too little attention below, AT&T argued in the proceeding that it "and others have demonstrated [that] the Commission could not—as either a procedural or substantive matter—reclassify wireless broadband Internet access as [a commercial mobile service] or its functional equivalent." AT&T Feb. 2 *Ex Parte* at 1 (JA__); *see id.* (arguing that "public switched network" in Section 332 is a term of art meaning only telephone network). Many other parties likewise addressed the issue. *See* Vonage Comments at 41-44 (JA___-___); New America Dec. 11, 2014 *Ex Parte* (JA___); Public Knowledge Jan 15, 2015 *Ex Parte* (JA___); Open Technology Institute Jan 27, 2015 *Ex Parte* (JA___).

116

USTelecom argues that such comment is irrelevant because the agency "must itself provide notice." Br. 91 (citing *Ass'n of Private Sector Colleges & Universities v. Duncan*, 681 F.3d 427, 462 (D.C. Cir. 2012)). To be sure, comments on an issue will not alone demonstrate notice where an agency has failed to provide notice altogether. *See Duncan*, 681 F.3d at 462 (no notice of distance learning rule where NPRM failed to mention distance learning). But comments on an issue can provide powerful support for the agency's contention that its notice was sufficient. *Id.* (acknowledging that comments are relevant to inquiry); *see, e.g.*, *Miami-Dade Cnty.*, 529 F.3d at 1059 (comments "may not provide the only basis" to satisfy notice requirement but "may be adduced as evidence of the adequacy of notice"); *In re Polar Bear Endangered Species Act Listing*, 720 F.3d 354, 363 (D.C. Cir. 2013); *Pub. Serv. Comm'n of D.C. v. FCC*, 906 F.2d 713, 718 (D.C. Cir. 1990).[42]

Finally, even if notice had been insufficient, the ample comments on precisely these issues, including comments by both mobile petitioners

_____

[42] Petitioners point out that some of these comments were submitted after the close of the official notice-and-comment period (USTelecom Br. 92), but cite no authority for the novel proposition that comments submitted later in a lengthy rulemaking are irrelevant to the inquiry. Moreover, two parties, including petitioner CTIA, addressed the issue in official comments or reply comments. And the *Order* expressly relied on comments submitted later. *See, e.g.*, *Order* ¶395 & nn.1136-1140 (discussing *ex parte* comments from CTIA, AT&T, and Verizon).

themselves, show that mobile petitioners had actual notice, thus satisfying the

APA. *See* 5 U.S.C. § 553(b); *Nat'l Mining Ass'n v. Mine Safety & Health*

*Admin.*, 512 F.3d 696, 700 (D.C. Cir. 2008) (comments show rule was logical

outgrowth, and in any case "actual notice" "cured any inadequacy"); *Pub.*

*Serv. Comm'n of D.C.*, 906 F.2d at 718 (comments show petitioner had

"actual notice of the scope of the proceedings"); *Sierra Club v. Costle*, 657

F.2d 298, 355 (D.C. Cir. 1981) (letter criticizing agency's "new rationale" for

rule showed actual notice).

Or put differently, any error would be harmless. *See* 5 U.S.C. § 706

(reviewing court to take "due account … of prejudicial error"); *Allina Health*

*Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (even "abrupt

departure from a proposed rule" may be "harmless error" in light of

comments on the issue; where "the petitioner itself made … comment [on an

issue], it would presumably be hoist on its own petard" and cannot complain

of lack of notice). Every argument raised on appeal was considered and

addressed in the *Order. See id.* ("[A]ll that is necessary … is that the agency

had an opportunity to consider the relevant views."); *Pub. Serv. Comm'n of*

*D.C.*, 906 F.2d at 718 (petitioner "has not shown what additional arguments

would have been made if the [agency] had initiated another round of public

comments"). In sum, the *NPRM* squarely raised the issue of reclassifying

118

mobile Broadband Internet Access Service under Section 332, and the

specific legal path that the agency took to reclassify was foreseeable and

thoroughly raised in comments and discussed by the Commission. No more is

required.

## IV.   PETITIONERS' CHALLENGES TO SPECIFIC RULES AND THEIR SCOPE LACK MERIT.

Petitioners also raise various specific challenges to the open Internet

rules and the *Order*, but none of their objections have merit.

### A.   The Commission Properly Recognized Its Authority To Review Internet Interconnection Disputes.

**1.**     USTelecom argues that the FCC lacks authority to intervene in

interconnection disputes because it did not classify the service provided by

broadband providers to edge providers. Br. 75-78. That claim is baseless.

In the *Order*, the Commission recognized that, having reclassified

Broadband Internet Access Service under Title II, the agency is now

"available to hear [interconnection] disputes raised under sections 201 and

202" of the Act "on a case-by-case basis." *Order* ¶205 (JA___). It reasoned

that broadband providers' "representation to retail customers that they will be

able to reach 'all or substantially all Internet endpoints' necessarily includes

the promise to make the interconnection arrangements necessary to allow that

access." *Id.* ¶204 (JA___). And the record in this proceeding "demonstrates

that broadband Internet access providers have the ability to use terms of interconnection to disadvantage edge providers" and to "prevent[] consumers from reaching the services and applications of their choosing" in the same ways that the bright-line rules seek to prevent—for example, by blocking or throttling traffic at the interconnection point. *Id.* ¶205 (JA__).

Even assuming that interconnection supplies a service to edge providers, the Commission reasonably determined that it "is subsumed within the promise made to … retail customer[s]" to carry users' traffic to and from all Internet endpoints. *Order* ¶338 (JA___). Any service to edge providers "is simply derivative of" the Broadband Internet Access Service promised to end users, because connecting users to edge providers requires an exchange of traffic between broadband providers and edge providers or intermediaries. *Id.* ¶¶195, 339 (JA___). The "same data is flowing" between end user and edge provider; consequently, any discriminatory treatment of the edge provider "would be experienced by the … subscriber," and "the impact" on that subscriber (if any) "would be assessed under Title II." *Id.* ¶339 (JA___-___).

Even if interconnection were not subsumed within the end-user service, any "practices provided 'in connection with' a Title II service … must themselves be just and reasonable." *Order* ¶339 (JA___) (quoting 47 U.S.C. § 201(b)). The Commission reasonably concluded that, at a minimum, the

interconnection practices at issue here are provided "in connection with" Broadband Internet Access Service. *Id.* As a result, interconnection disputes involving broadband providers are subject to the agency's Title II authority if they interfere with the delivery of traffic to or from broadband subscribers. *Id.* ¶204 (JA___).

USTelecom insists that "the 'in connection with' language" in Section 201(b) "cannot be read so broadly" as to apply Title II to non-common carrier services. Br. 77-78. To the contrary, Section 201(b) states that "*[a]ll …* practices … in connection with" a telecommunications service "shall be just and reasonable." 47 U.S.C. § 201(b) (emphasis added). The Act does not require that a service provided "in connection with" common-carrier service must *itself* be such a service to be subject to Section 201(b), which would render this language meaningless.[43]

*Verizon* does not require a contrary conclusion. The *Verizon* Court found that broadband providers could not be treated as common carriers when carrying edge providers' traffic to and from end users because the FCC had not classified broadband service to end users as a telecommunications

---

[43] *See, e.g.*, *Cable & Wireless P.L.C. v. FCC*, 166 F.3d 1224, 1231 (D.C. Cir. 1999) (negotiation and payment of international settlement rates might not themselves be "common carrier" services, but the FCC could read "in connection with" in Section 201(b) to cover such practices)

service. *Verizon*, 740 F.3d at 649-53. The Commission has now classified that consumer-facing service as a telecommunications service. There was no need for the Commission to classify a separate edge service because any transmission service to edge providers "is simply derivative of," and "subsumed within," the transmission service offered to end users. *Order* ¶¶338-339 (JA___-___).

>    **2.**     USTelecom also complains that the *NPRM* supposedly gave inadequate notice that the Commission was contemplating addressing attempts by providers to escape the strictures created by the proposed Open Internet rules through interconnection practices. Br. 92. Contrary to USTelecom's assertion, the *NPRM* did not "assur[e]" commenters "that the *Order* would *not* address" interconnection. Quoting from Chairman Wheeler's separate statement accompanying the *NPRM* (Br. 92-93), USTelecom largely ignores the actual contents of the *NPRM*, which gave adequate notice: The *NPRM* specifically asked, "[H]ow can we ensure that a broadband provider would not be able to evade our open Internet rules by engaging in traffic exchange [*i.e.*, interconnection] practices that would be outside the scope of the rules as proposed?" *NPRM* ¶59 (JA__). It also sought "comment on [the] suggestion" that the agency "should expand the scope of the open Internet rules to cover issues related to traffic exchange." *Id.*

In response to this inquiry, both broadband providers and edge providers submitted extensive comments discussing traffic exchange practices, debating whether recent disputes threatened users' ability to access the content of their choice and demonstrating that the parties understood from the *NPRM* that interconnection was being considered. *See Order* ¶¶196-201, 206 n.533 (JA__-__).[44]

### B. The Commission Adequately Explained The General Conduct Rule.

**1.** There is no merit to USTelecom's contention (Br. 79-81) that the general conduct rule is unconstitutionally vague. The general conduct rule provides that broadband providers may not "unreasonably interfere with or unreasonably disadvantage … users' ability to select, access, and use … the lawful Internet content, applications, services, or devices of their choice," or likewise to restrict "edge providers' ability to make lawful content, applications, services, or devices available to end users." *Order* ¶136 (JA__). This rule is closely aligned with the bright-line rules because it prevents broadband providers from circumventing or undermining those rules by engaging in practices that may fall outside the precise terms of the rules but

---

[44] *E.g.*, AT&T Reply Comments at 93-108 (JA__-__); CenturyLink Reply Comments at 10 (JA__); Comcast Reply Comments at 38 (JA__); NCTA Dec. 23 *Ex Parte* at 23-25 (JA__-__).

are used to effect similarly harmful outcomes. *Id.* ¶¶21, 35, 135 (JA__, __, __).

**a.**    This Court has explained that "it is often sufficient, so far as due process is concerned, 'that [a] proscription mark out the rough area of prohibited conduct, allowing law-abiding individuals to conform their conduct by steering clear of the prohibition.'" *DiCola v. FDA*, 77 F.3d 504, 509 (D.C. Cir. 1996) (quoting *United States v. Thomas*, 864 F.2d 188, 194 (D.C. Cir. 1988)). After all, "specific regulations cannot begin to cover all of the infinite variety of conditions which [regulated entities] must face." *Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Review Comm'n*, 108 F.3d 358, 362 (D.C. Cir. 1997) (internal quotation marks and alteration omitted). Ultimately, "'no more than a reasonable degree of certainty can be demanded' and it is not 'unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.'" *Throckmorton v. Nat'l Transp. Safety Bd.*, 963 F.2d 441, 444 (D.C. Cir. 1992) (quoting *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340 (1952)).

"Accordingly," this Court has explained, "regulations will be found to satisfy due process so long as they are sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to

address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require." *Freeman*, 108 F.3d at 362. And USTelecom faces a particularly high hurdle here because it asserts a facial challenge, which can prevail "only if the enactment is impermissibly vague in all of its applications." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982); *see also Cement Kiln*, 493 F.3d at 224.

**b.**     The general conduct rule rests on a simple, common-sense principle more than sufficient to channel agency discretion and to give reasonably prudent broadband providers fair notice of what is prohibited: Broadband providers may not interfere with "the ability of consumers to reach the Internet content, services, and applications of their choosing or [the ability] of edge providers to access consumers using the Internet." *Order* ¶135 (JA__). In other words, the rule is designed to ensure that broadband providers do not unreasonably impair end users' and edge providers' ability to reach one another over the broadband network.

Beyond the rule itself, the *Order* gives regulated parties detailed guidance on how the rule is to be administered, including an extensive discussion of the key factors—including end-user control, consumer protection, and effects on competition, innovation, investment, broadband deployment, and free expression—that the Commission will take into

125

account. *Order* ¶¶138-145 (JA__-__). These detailed factors all align with the general conduct rule's foundational goal of protecting consumers' ability to access the Internet content, services, and applications of their choosing. As a result, this case is a far cry from *Timpinaro v. SEC*, on which USTelecom seeks to rely (Br. 80-81), because the SEC rule in that case recited a list of "seemingly open-ended" factors with little explanation and no hint of how the different factors fit together. 2 F.3d 453, 460 (D.C. Cir. 1993). This case instead more closely resembles *Cement Kiln*, which held that an EPA rule adopting a case-by-case approach was not impermissibly vague in view of the agency's "further guidance by reference to a list of relatively detailed factors." 493 F.3d at 224.

Finally, the *Order* establishes formal procedures for requesting an advisory opinion from the Commission. *See Order* ¶¶229-239 (JA__-__). As this Court has recognized, that "opportunity to obtain a prospective ruling" can provide "relief from [any] real uncertainty" that remains. *DiCola*, 77 F.3d at 509.

    **c.**    Ignoring the wealth of on-point authority, USTelecom seeks instead to rely (Br. 79-81) on *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307 (2012) (*Fox II*). That case bears little resemblance to the situation here. *Fox II* turned on the complete lack of notice given to broadcasters when the

agency attempted retroactively to enforce a new broadcast-indecency policy against conduct that occurred *before* the new policy was adopted. *Id.* at 2317-18. Here, by contrast, the general conduct rule, adopted through notice-and-comment rulemaking, applies only *prospectively*. *Long Island Care*, 551 U.S. at 170-71 ("recourse to notice-and-comment rulemaking … makes … surprise unlikely"). Moreover, *Fox II* applied a more stringent standard because the indecency policy restricted broadcasters' speech, *see* 132 S. Ct. at 2317-18, whereas the general conduct rule regulates business conduct and does not directly regulate speech.[45] *See Throckmorton*, 963 F.2d at 445 (recognizing "'greater leeway' for regulations and statutes governing business activities than those implicating the first amendment"); *Thomas*, 864 F.2d at 194 (similar). Finally, *Fox II* involved an as-applied challenge to a specific application of the indecency policy, unlike USTelecom's facial challenge here.

**2.**     Nor is there any merit to USTelecom's argument (Br. 93-94) that the Commission gave insufficient notice of the general conduct rule, which is a direct and logical outgrowth of the *NPRM*. As the *Order* explains, the general conduct rule arose directly out of the *NPRM*'s request for comment

---

[45] *See* Part VI, *infra*.

on a proposed rule requiring broadband providers to adhere to a

"commercially reasonable" standard that would "prohibit … practices that,

based on the totality of the circumstances, threaten to harm Internet openness

and all that it protects." *Order* ¶133 (JA__); *NPRM* ¶¶116-123 (JA__-__).

The *NPRM* also asked for "alternative legal standards … that the Commission

should consider," directing commenters to explain why these alternatives are

"preferable[] … and how they would protect an open Internet." *NPRM* ¶¶119,

121 (JA__-__). In response, some commenters argued that the "commercially

reasonable" standard was flawed and proposed instead an "Internet

reasonable" standard to achieve the same ends of protecting Internet

openness. *See Order* ¶150 (JA__) (citing comments). The general conduct

rule that the agency adopted in the *Order* grew from the *NPRM* in light of

these proposals. *Order* ¶136 (JA__).

　　USTelecom briefly asserts that the *NPRM*'s proposal to adopt a

"commercially reasonable standard" or "an alternative" to serve the same

ends was nonetheless "too general" to provide adequate notice. Br. 93.

However, a comparison of the two rules reveals, for example, that the factors

articulated in the *Order* to guide application of the general conduct rule

resemble the factors identified in the *NPRM* as proposed guidance for the

commercially reasonable rule—factors such as end-user control, effects on

competition, effects on free expression, and industry standards. *Compare Order* ¶¶139-145 (JA__-__) *with NPRM* ¶¶122-135 (JA__-__). And USTelecom does not explain how the final standard is more "nebulous" (Br. 93) or different in kind from the standard tentatively proposed in the *NPRM*. In short, the *NPRM* served to alert commenters of the "subjects and issues involved," 5 U.S.C. § 553(b)(3), and "interested parties should have anticipated that the" final standard "was possible." *Agape Church*, 738 F.3d at 411.

  **3.** Even if the Court were to vacate the classification of broadband as a telecommunications service, the general conduct rule must still be upheld because it is severable from the rest of the *Order*, is affirmatively authorized under Section 706 and Title III, *Order* ¶294 (JA__), and—unlike the bright-line rules in *Verizon*—does not constitute "common carriage *per se*," *id.* ¶295 (JA__). Like the multi-factor data-roaming rule in *Cellco Partnership v. FCC*, 700 F.3d 534, 548 (D.C. Cir. 2012), the general conduct rule "imposes no presumption[s]," "leaves substantial room for individualized bargaining and discrimination in terms," and "ensures providers more freedom from agency intervention than the 'just and reasonable' standard applicable to common carriers."

### C.   The Commission Had Authority To Prohibit Paid Prioritization.

Alamo contends that the regulation of paid prioritization exceeds the Commission's authority under Sections 201 and 202. Alamo Br. 17-19. That argument fails for multiple reasons.

First, in challenging the Commission's authority under Sections 201 and 202, Alamo entirely ignores that the Commission exercised authority to impose the ban *under Section 706*. *Verizon* squarely held that—but for the lack of reclassification—Section 706 would affirmatively authorize the Commission to adopt rules to ensure that "pay-for-priority agreements" do not impede broadband deployment. 740 F.3d at 645-46. In this proceeding, the Commission did reclassify, and the record showed that paid prioritization would "introduce artificial barriers to entry, distort the market," "discourage innovation," and harm consumers. *Order* ¶126 (JA___). On the basis of this record, the FCC reasonably found that paid prioritization arrangements "threaten to create barriers to broadband deployment that should be removed under section 706." *Id.* ¶292 (JA___). This alone suffices to uphold the paid prioritization rule, irrespective of Sections 201 and 202.

In any event, the Commission reasonably determined that, in the particular context of broadband Internet access, paid prioritization is an inherently unreasonable practice in violation of Section 201(b). *Order* ¶¶110,

290 (JA__, __). This Court has explained that the terms "unjust" and

"unreasonable" in Section 201(b) "open[] a rather large area for the free play

of agency discretion." *Orloff v. FCC*, 352 F.3d 415, 420 (D.C. Cir. 2003)

(internal quotation marks omitted); *see also Global Crossing Telecomms.,*

*Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45 (2007) (recognizing the

Commission's broad authority to define "unreasonable practice[s]" under

Section 201(b)). "Based on the record here," the Commission found that paid

prioritization "threaten[s] harms to consumers, competition, innovation, and

deployment that outweigh any possible countervailing justification of public

interest benefit." *Order* ¶291 (JA___); *see id.* ¶¶19, 125-129 (JA__, ___-

___). The Commission thus had ample authority to find that paid

prioritization is an unreasonable practice under Section 201(b).

Conflating two separate and distinct sources of authority, Alamo

contends that the Commission cannot prohibit paid prioritization *under*

*Section 201(b)* because *Section 202(a)* bars only "unjust or unreasonable

discrimination, not all discrimination." Alamo Br. 18 (quoting *Verizon*, 740

F.3d at 657) (emphasis omitted). But Section 202(a) addresses only "unjust or

unreasonable discrimination," 47 U.S.C. § 202(a), whereas Section 201(b)

confers separate, broad authority to prohibit "any … charge, practice,

classification, or regulation that is unjust or unreasonable," *id.* § 201(b).

Recognizing this distinction, the Commission reasonably concluded that paid prioritization is an unreasonable *practice* in violation of Section 201(b) because of its pernicious effects on the Internet as a whole. *See Order* ¶¶290-292 (JA___-___).[46]

Finally, Alamo is incorrect (Br. 17-19) that the paid prioritization rule is inconsistent with Commission precedent interpreting Sections 201 and 202 to allow differential pricing. The *Order* does not regulate rates—for example, broadband providers can (and some do) reasonably charge consumers more for faster service or more data. *See, e.g.*, *Order* ¶¶122, 351, 353 & n.964

_____

[46] Alamo's attempt to draw support from *Orloff* (Br. 18) is misplaced. *Orloff* upheld the Commission's finding that Verizon Wireless did not engage in unjust or unreasonable *discrimination* under *Section 202(a)* when it offered concessions to prospective customers who negotiated for a better deal. 352 F.3d at 417-21. The petitioner there did not challenge—and the Court did not address—whether granting concessions was an unreasonable *practice* under *Section 201(b)*. Harmful paid-prioritization agreements are very different, moreover, from pro-consumer concessions. Finally, insofar as Alamo contends that the Commission has previously interpreted Section 201(b) *in pari materia* with Section 202(a), Br. 18 (citing *Orloff*, 352 F.3d at 418), the Commission has disavowed that position, *see Order* ¶292 & n.753 (JA__).

(JA__, __, __). But this does not mean it must also allow paid prioritization,

which causes pernicious and unreasonable harms. *See id.* ¶292 (JA__).[47]

## V.    THE COMMISSION REASONABLY FORBORE FROM NUMEROUS TITLE II REQUIREMENTS TO MAINTAIN ITS LONGSTANDING "LIGHT-TOUCH" APPROACH TO BROADBAND REGULATION.

Section 10 of the Communications Act, 47 U.S.C. § 160, provides that

the Commission "shall forbear" from "any regulation" or "any provision of"

the Communications Act if the Commission determines that (1) the provision

is not necessary to ensure that rates and practices are just and reasonable,

(2) the provision is not necessary to protect consumers, and (3) forbearance is

in the public interest. 47 U.S.C. § 160(a); *accord id.* § 332(c)(1)(A) (identical

forbearance test for commercial mobile services). This Court has

"consistently deferred to the Commission's forbearance decisions, except in

cases where the Commission deviated without explanation from its past

_____

[47] Alamo also contends that the paid prioritization rule "exceeds the FCC's authority by 'invalidat[ing] licensees' contracts with third parties' for prioritization." Alamo Br. 19 (quoting *Cellco P'ship*, 700 F.3d at 543). Alamo has not identified any such contracts, and an industry commenter asserts that "no broadband providers have entered into such arrangements." *Order* n.748 (JA__) (quoting NCTA Comments at 29 (JA__)). Regardless, the fact that FCC action may have the secondary effect of superseding some contracts does not bar the FCC from exercising any authority granted to it under the Communications Act or Section 706. *See, e.g.*, *Lansdowne of the Potomac Homeowners Ass'n v. OpenBand at Lansdowne, LLC*, 713 F.3d 187 (4th Cir. 2013); *NCTA v. FCC*, 567 F.3d 659, 670-71 (D.C. Cir. 2009).

decisions or did not discuss section 10's criteria at all." *Verizon & AT&T, Inc. v. FCC*, 770 F.3d 961, 969 (D.C. Cir. 2014) (citations omitted). Judicial review of forbearance decisions "is particularly deferential in matters [that] implicate competing policy choices, technical expertise, and predictive market judgments." *Ad Hoc*, 572 F.3d at 908.

In the *Order*, the Commission exercised its authority to forbear on its own motion from a broad swath of Title II requirements. *See Order* ¶¶434-542 (JA__-__). Applying Section 10(a)'s three-factor test, the Commission determined—based on its experience applying a light-touch approach to broadband regulation; on Congress's instructions in Section 706; on the extensive public comments submitted in response to the *NPRM*; and on the protections afforded by other provisions of the Act from which the Commission did not forbear—that the forborne provisions are not necessary to ensure just and reasonable rates and practices or to protect consumers, and that forbearance is in the public interest. *Id.*

Full Service Network argues—over the opposition of the USTelecom petitioners, who have intervened in support of the Commission on this issue—that the Commission's forbearance is unlawful, particularly as to Sections 251 and 252, because the agency (1) did not first find persuasive evidence of competition in each local market, and (2) did not employ the

special procedures that govern forbearance petitions and violated the notice

requirements of the APA. FSN Br. 9-20. Both arguments are mistaken.

> **A. The Commission Reasonably Found That The Forbearance Requirements Were Satisfied On A Nationwide Basis.**

**1.** Full Service Network contends that forbearance is not authorized

unless the Commission finds persuasive evidence of competition in each

individual local market in which the Commission forbears. Br. 13-20. But

none of the three statutory criteria set forth in Section 10(a) requires such a

finding, nor does anything else in the Act restrict the Commission's

forbearance authority to circumstances where a competitive market has been

demonstrated, let alone on a market-by-market basis.

As the *Order* explains, when evaluating forbearance petitions

"premised on the state of competition"—that is, petitions arguing that a given

regulation or provision is no longer necessary because its aims will instead be

achieved through robust competition—the Commission has required the

petitioner to present persuasive evidence of competition. *See Order* ¶439 &

n.1307 (JA__).

But the Commission has never held, as Full Service Network would

have it, that forbearance can be granted *only* on the basis of competition. The

Commission may also decide to forbear from a regulation or provision

135

because, for example, other applicable requirements are already sufficient to satisfy the Section 10(a) criteria. Indeed, the Commission has often forborne from provisions of the Act upon finding that other factors, apart from competition, satisfied the statutory forbearance criteria. *See Order* ¶439 & n.1305 (JA__).[48] Here, the Commission relied on its "predictive judgment that," even without the forborne provisions, "other protections—notably the core broadband Internet access service requirements—will be adequate to ensure just, reasonable, and nondiscriminatory conduct by providers of broadband Internet access service and to protect consumers for purposes of sections 10(a)(1) and 10(a)(2)." *Order* ¶519 (JA__).

Full Service Network observes (Br. 15) that Section 10(b) directs the Commission to "consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions." 47 U.S.C.

---

[48] For example, the Commission has granted all price-cap carriers nationwide forbearance from cost-assignment rules because the Commission's other rules and the ability to obtain data on a case-by-case basis adequately meet the Commission's needs and satisfy the Section 10(a) criteria. *Petition of USTelecom for Forbearance Under 47 U.S.C. § 160(c) from Enforcement of Certain Legacy Telecommunications Regulations*, 28 FCC Rcd 7627, 7648-56, ¶¶36-55 (2013), *pet. for review denied*, *Verizon & AT&T*, 770 F.3d 961. Similarly, the Commission has granted mobile services providers nationwide forbearance from Section 205's prescription authority after finding that Sections 201, 202, and associated enforcement provisions are sufficient to address any harm. *1994 Section 332 Order* ¶176.

§ 160(b). But a requirement that the Commission must "consider" competition does not mean that competition is the *only* factor that can justify forbearance or that the Commission is forbidden from forbearing on other grounds. A statute that "by its terms merely requires the Commission to consider" some factor does not mean that the Commission must "'give any specific weight'" to the factor, and the Commission may "ultimately conclude[] that it should not be given any weight." *Time Warner Entm't Co. v. FCC*, 56 F.3d 151, 175 (D.C. Cir. 1995) (quoting *Cent. Vt. Ry. v. ICC*, 711 F.2d 331, 336 (D.C. Cir. 1983)).

The Commission complied with Section 10(b) by "consider[ing]" how forbearance would affect competition in this marketplace. *Id.* The record, the Commission found, "does not provide a strong basis for concluding that the forbearance granted in this Order is likely to directly impact the competitiveness of the marketplace for broadband Internet access services." *Order* ¶501 (JA__). At the same time, the Commission noted that "even if the grant of forbearance does not directly promote competitive market conditions,

it does so indirectly by enabling [the Commission] to strike the right balance at this time in our overall regulatory approach." *Id.*[49]

Finally, there is no requirement that the Commission conduct a separate forbearance analysis in each local market. This Court has held that Section 10 does not require "a painstaking analysis of market conditions in particular geographic markets." *Earthlink*, 462 F.3d at 8 (internal quotation marks omitted). The Commission has thus regularly forborne from numerous provisions of the Communications Act on a nationwide basis, as it did here, without conducting a separate analysis for each local market. *See Order* ¶439 n.1305 (JA__); *see also, e.g.*, *Broadband NOI* ¶73 (noting that the *Wireline Broadband Order* "granted forbearance on a nationwide basis" for DSL providers that elected to continue operating under Title II); *Time Warner Telecom.*, 507 F.3d at 221 (upholding the *Wireline Broadband Order*'s "decision to refrain from a traditional market analysis").

**2.**    Full Service Network likewise has not shown any flaw in the Commission's decision to forbear from the specific interconnection, resale, and unbundling requirements of Sections 251 and 252. *See* FSN Br. 13-17.

---

[49] The Commission also observed that competition will continue to be protected under the antitrust laws, and that nothing in the *Order* limits the ability of the Department of Justice to bring an enforcement action to address anticompetitive conduct by broadband providers. *Order* n.12 (JA__).

138

As required by Sections 10(a)(1) and (2), the Commission first found

that application of these provisions is not necessary to ensure just and

reasonable rates and practices or to protect consumers, because "other

protections render application of these provisions unnecessary." *Order* ¶513

(JA__). On interconnection, for example, the Commission noted that it

"retains authority under sections 201, 202, and the open Internet rules to

address interconnection issues should they arise, including through evaluating

whether broadband providers' conduct is just and reasonable on a case by

case basis." *Id.* As to resale and unbundling, the *Order* concludes that those

requirements are unnecessary given the other protections of Title II and the

open Internet rules. *Id.* ¶514 (JA__).

Then, as required by Section 10(a)(3), the Commission found that

forbearance from these requirements is in the public interest. The

Commission chose to forbear because it reasonably concluded that these

provisions create "disincentives for broadband deployment," so forbearance

is in "the interests of customers … and the public interest more generally."

*Order* ¶¶495-496, 514 (JA__-__, __-__). The Commission's reasonable

determination that the public interest would best be served by continuing to

forbear from these sections "is entitled to substantial judicial deference."

139

*FCC v. WNCN Listeners Guild*, 450 U.S. 582, 596 (1981); *see also Ad Hoc*, 572 F.3d at 908.

This approach is supported by Section 706, in which Congress directed the FCC to "utiliz[e] … regulatory forbearance" to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans." 47 U.S.C. § 1302(a). Congress's instruction to use forbearance to promote broadband deployment supports the balance the Commission struck here. And it comports with this Court's holding that Section 706's "forward-looking approach" supports the Commission's decision to forbear from other unbundling requirements resembling those found in Section 251. *See Earthlink*, 462 F.3d at 7-9.

**B.   The Commission's Forbearance Decision Complied With All Applicable Procedural Requirements.**

Full Service Network raises two procedural challenges to the Commission's forbearance determination. Neither has merit.

**1.**   Full Service Network contends that the *Order* is procedurally deficient because the Commission did not employ the special procedures that would govern a forbearance petition filed by a telecommunications carrier under Section 10(c). FSN Br. 9-12. But those procedures did not apply here because this proceeding was not initiated by a forbearance petition; the

Commission instead decided to forbear on its own motion as part of a rulemaking that complied with all APA requirements.

By its terms, the *Forbearance Procedures Order* "adopt[ed] procedural rules governing *petitions for forbearance*" under Section 10(c) only, while noting that the Commission also "has the authority to forbear from applying regulation *on its own motion*." *See Petition to Establish Procedural Requirements to Govern Proceedings for Forbearance Under Section 10 of the Communications Act of 1934, as Amended*, 24 FCC Rcd 9543, 9543 ¶1, 9546 ¶5 (2009) ("*Forbearance Procedures Order*") (emphasis added). Nothing in that order purports to apply when the Commission forbears on its own motion,[50] and the Commission has regularly exercised its authority to forbear on its own motion without applying those procedures.[51]

_____

[50] There is good reason for this. Under Section 10(c), the Commission *must* rule on each forbearance petition "within one year after the Commission receives it," and must "explain its decision in writing," or else the petition "shall be deemed granted." 47 U.S.C. § 160(c). Those special requirements do not apply when the Commission forbears on its own motion, so the special rules adopted to facilitate the processing of forbearance petitions would make little sense.

[51] *See, e.g.*, *Lifeline and Link Up Reform and Modernization*, 30 FCC Rcd 7818, 7899-7902 ¶¶244-46 (2015); *Telecommunications Carriers Eligible For Support*, 28 FCC Rcd 4859 (2013).

**2.** Full Service Network also contends that the *NPRM* failed to provide APA notice of the scope of possible forbearance because the relevant section of the *NPRM* was only "three paragraphs" and entailed limited discussion. FSN Br. 13. This characterization of the *NPRM* is incomplete and inaccurate; adequate notice was plainly given.

The *NPRM* "s[ought] comment on the extent to which forbearance from certain provisions of the Act or our rules would be justified in order to strike the right balance between minimizing the regulatory burden on providers and ensuring that the public interest is served." *NPRM* ¶153 (JA__). It then specifically directed parties to the *Broadband NOI*, in which—as the *NPRM* explained—"the Commission contemplated that, if it were to classify the Internet connectivity component of broadband Internet access service, it would forbear from applying all but a handful of core statutory provisions— sections 201, 202, 208, and 254—to the service." *Id.* ¶154 (JA__) (citing *Broadband NOI* ¶68). The *Broadband NOI*, in turn, contained 27 paragraphs discussing forbearance issues at length. *Broadband NOI* ¶¶67-93.[52] And the

_____

[52] Among other things, the *Broadband NOI* pointed out that companies choosing to provide DSL service on a common-carrier basis under the *Wireline Broadband Order* were "granted forbearance on a nationwide basis," much like the *Order* here. *Broadband NOI* ¶73 (citing *Wireline Broadband Order* ¶¶91-93).

142

*NPRM* further noted that the Commission "received considerable comment in [the prior] proceeding" and sought "further and updated comment" here, *NPRM* ¶154 (JA__)—which it received.

Thus, because the parties had proper notice of the forbearance being contemplated by the Commission and had multiple opportunities to comment on the issue, Full Service Network's cursory argument that the Commission failed to comply with APA notice requirements is unfounded.

## VI.    THE OPEN INTERNET RULES ARE CONSISTENT WITH THE FIRST AMENDMENT.

Alamo argues that the open Internet rules violate the First Amendment. Alamo Br. 4-9. On the contrary, the rules do not impair broadband providers' First Amendment rights at all, because broadband providers are not acting as speakers but instead as conduits for the speech of others. And even if the First Amendment were implicated, the open Internet rules would easily pass muster.

### A.    The Rules Do Not Impair Petitioners' First Amendment Rights Because Broadband Providers Are Simply Conduits For The Speech Of Others.

The *Order* does not curtail broadband providers' free speech rights because providers of Broadband Internet Access Service are not acting as speakers delivering their own messages, but instead serve as conduits for the speech of others. *Order* ¶¶143 n.343, 544, 546 (JA__, __, __).

143

Telecommunications service under the Communications Act amounts to simple transmission of users' speech without change in form or content, which does not entail any editorial judgment or discretion. *See id.* ¶¶544, 551 (JA__, __). And as one First Amendment scholar has put it, "there is no real basis for contending that mere transmission of bits is 'speech.'" Stuart Minor Benjamin, *Common Sense and Key Questions*, 127 Harv. L. Rev. F. 346, 346 (2007).

    **1.**    For conduct to possess "sufficient communicative elements to bring the First Amendment into play," it must manifest "an intent to convey a particularized message" and "be understood [as a message] by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (internal quotation marks omitted). The provision of broadband service lacks these essential characteristics.

    Nobody understands broadband providers to be sending a message or endorsing speech when transmitting the Internet content that a user has requested. When a user directs her browser to the *New York Times* or *Wall Street Journal* editorial page, she has no reason to think that the views expressed there are those of her broadband provider. Nor is there anything in the record to suggest that companies providing mass-market retail broadband

service as defined in the *Order* are seeking to convey any particularized message to their users.[53]

Instead, when providing Broadband Internet Access Service, broadband providers function (and are understood by their users to function) simply "as conduits for the speech of others, not as speakers themselves." *Order* ¶546 (JA__). This comports with the record evidence demonstrating that Broadband Internet Access Service "is marketed today primarily as a conduit for the transmission of data across the Internet," *id.* ¶354 (JA__), and "is useful to consumers today primarily as a conduit for reaching modular content, applications, and services that are provided by unaffiliated third parties," *id.* ¶350 (JA__). By simply delivering content as requested by their customers, broadband providers are no different from telephone companies or FedEx. *See* Benjamin, 127 HARV. L. REV. F. at 348-49.

Alamo's First Amendment challenge thus fails here for the same reason as the challenge in *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) ("*FAIR*"). In *FAIR*, universities argued that a

---

[53] The *Order* applies only to companies offering "mass-market" broadband access to "all or substantially all Internet endpoints," *Order* ¶¶25, 187, 204, 336, 549 (JA__, __, __, __, __). It would not apply to a hypothetical company that advertised "filtered" Internet access catering to a particular audience or that offered access only to curated content.

145

law requiring them to allow military recruiters to use their job-recruiting facilities violated the First Amendment by requiring the universities to carry the military's speech. The Supreme Court unanimously rejected that claim, explaining that the access requirement "regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.* at 60. Thus, "the schools are not speaking when they host interviews and recruiting receptions." *Id.* at 64. Here, as in *FAIR*, the Open Internet rules "regulate[] conduct, not speech," because they address only what broadband providers "must *do* … not what they may or may not *say*." *Id.* at 60. The rules therefore fall outside the ambit of the First Amendment.

**2.**    More broadly, the traditional duties of common carriage—a concept that dates back to "English common law traditions that imposed certain duties on individuals engaged in 'common callings,' such as innkeepers, ferrymen, and carriage drivers," *Cellco P'ship*, 700 F.3d at 545—have never been thought to implicate the First Amendment. The Supreme Court has repeatedly cautioned that common carriers do not share the free speech rights of broadcasters, newspapers, or others engaged in First Amendment activity. *See, e.g.*, *Denver Area Educ. Telecomms. Consortium v. FCC*, 518 U.S. 727, 739 (1996) (plurality opinion) (distinguishing rights of

146

"newspapers or television broadcasters" from those of "common carriers, such as telephone companies"); *FCC v. League of Women Voters*, 468 U.S. 364, 378 (1994) ("Unlike common carriers, broadcasters are 'entitled under the First Amendment to exercise … journalistic freedom'"). Like telephone companies, transportation companies, and other traditional common carriers, broadband providers do not have a First Amendment right to restrict or refuse carriage for speech or speakers they dislike.

**3.**     Alamo attempts to equate broadband providers with the cable system at issue in *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) (*Turner I*), as well as with newspapers. *See* Alamo Br. 6-7. As the *Order* explains, however, broadband service is fundamentally different.

*Turner* rests on the fact that cable operators, unlike Broadband Internet Access Service providers, occupy an editorial role in which they both "engage in … speech" as well as transmit it. 512 U.S. at 636. Cable systems have limited carriage capacity and, as a result, necessarily must exercise editorial judgment in selecting which channels to carry. *Id.* at 636-37. In making these decisions, *Turner* recognized, cable systems have long sought "to communicate messages on a wide variety of topics" through "original programming or by exercising editorial discretion over which stations or programs to include in [their] repertoire." *Id.* at 636. Cable carriage

147

constraints meant that the must-carry rules in *Turner* "render[ed] it more difficult for cable programmers to compete for carriage on the limited channels remaining" and "reduce[d] the number of channels over which cable operators exercise unfettered control." *Id.* at 637.

Here, unlike in *Turner*, no technological obstacles prevent broadband providers from allowing customers to access all lawful Internet content at all times (subject to reasonable network management practices, *see Order* ¶¶214-224 (JA__-__)). The Commission's no-blocking and no-throttling rules will not reduce access to competing content or to any content offered by the broadband company itself. *See id.* ¶550 (JA__). Nor, in contrast to cable systems and newspapers, is there any established tradition of broadband providers exercising editorial control over Internet content. *See id.* ¶¶347, 352, 549 & n.1696 (JA__, __, __, __)

In fact, broadband providers' lack of editorial control over Internet content has been recognized and relied upon by both Congress and this Court as the basis for granting providers immunity from copyright violations and other liability for material distributed on their networks. *See, e.g.*, 47 U.S.C. § 230(c)(1) ("[N]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."); *Recording Indus. Ass'n of Am. v. Verizon*

148

*Internet Servs., Inc.*, 351 F.3d 1229, 1237 (D.C. Cir. 2003) (broadband

provider not subject to subpoena in a copyright case because it "act[s] as a

mere conduit for the transmission of information sent by others"); *see also In*

*re Charter Commc'ns, Inc.*, 393 F.3d 771, 773 (8th Cir. 2005) (broadband

provider "is confined to acting as a conduit in the transfer of files through its

network").

To be sure, broadband companies may sometimes engage in First

Amendment activity when providing services *other* than broadband Internet

access (like operating their own websites). *See* Alamo Br. 5. But these

activities are separate from Broadband Internet Access Service and are

unaffected by the open Internet rules.[54]

### B. Even If The First Amendment Applied, The Open Internet Rules Easily Withstand First Amendment Scrutiny.

Even if First Amendment scrutiny applied, the Commission's rules

would easily pass muster. The open Internet rules make no distinctions based

on content or viewpoint, and a content-neutral regulation will be upheld if "it

---

[54] Alamo also says that the *Order* "restricts [a VOIP provider's] speech by preventing [it] from purchasing prioritization services" to make its services faster or more reliable than its competitors. Alamo Br. 5-6. As with the broadband providers' objections, the fact that the *Order* might govern certain business conduct has nothing to do with *speech*.

furthers an important or substantial governmental interest … unrelated to the suppression of free expression" and "the means chosen" to achieve that interest "do not burden substantially more speech than is necessary." *Turner I*, 512 U.S. at 662 (internal quotation marks omitted). That test is easily satisfied here.[55]

The open Internet rules serve three important governmental interests.

*First*, the rules "[a]ssur[e] that the public has access to a multiplicity of information sources" by promoting "the widest possible dissemination of information from diverse and antagonistic sources." *Turner I*, 512 U.S. at 663; *see Order* ¶555 (JA__). The Supreme Court has declared that this constitutes "a governmental purpose of the highest order," as it "promotes values central to the First Amendment." *Turner I*, 512 U.S. at 663.

---

[55] Alamo makes half-hearted arguments for strict scrutiny, Br. 7-8, but offers no persuasive reason why the open Internet rules should be subject to greater First Amendment scrutiny than the similarly content-neutral rules in *Turner*, where the Court considered and dismissed the same arguments. *See* 512 U.S. at 641-62. Even if strict scrutiny applied, the rules would still survive because they serve governmental interests "of the highest order," *id.* at 663, and are narrowly tailored to serve those interests through the least restrictive means—that is, by targeting only a narrow set of pernicious practices that threaten "widespread interference with the Internet's openness in the absence of Commission action," *Verizon*, 740 F.3d at 649, while forbearing from more intrusive regulation.

*Second*, the rules "ensur[e] a level playing field" by limiting the power of broadband providers to prefer or disadvantage particular edge providers, *Order* ¶¶554-555 (JA__), and "the Government's interest in eliminating restraints on fair competition is always substantial," *Turner I*, 512 U.S. at 664.

*Third*, the rules advance timely and widespread broadband deployment. *Order* ¶554 (JA__); *see Verizon*, 740 F.3d at 642-49. Congress emphasized this national policy interest in Section 706, specifically directing the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans." 47 U.S.C. § 1302.

None of these important governmental interests involves the suppression of free expression or targets any speakers' messages based on their content. And Alamo does not dispute the Commission's determination

that the open Internet rules serve these interests, a conclusion that is

supported by the record, *Order* ¶¶76-103 (JA__-__).[56]

The open Internet rules likewise "are sufficiently tailored to

accomplish these government[al] interests" without burdening substantially

more speech than necessary. *Order* ¶556 (JA__). Indeed, the rules "do not

burden *any* identifiable speech," because broadband providers "remain free to

engage in the full panoply of speech afforded to any other speaker." *Id.*

(emphasis added).

Alamo briefly contends that the Open Internet rules are underinclusive

because they do not apply to "other Internet companies with similar

---

[56] One *amicus* argues that the open Internet rules violate the First Amendment because the Commission did not make detailed factual findings of scarcity and market power demonstrating that they advance these interests. *See* CBIT Br. 19-22. That argument is foreclosed by *Verizon*, which held that the Commission has amply demonstrated broadband providers' "incentive[] and ability to restrict Internet traffic" in ways that "could produce widespread interference with the Internet's openness in the absence of Commission action," 740 F.3d at 649, and that the Commission is not required to make a market-power finding, *id.* at 648. It also ignores the holding in *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997) (*Turner II*) that fostering a diversity of viewpoints is an important governmental interest "regardless of whether the conduct that threatens it … rises to the level of an antitrust violation." *Id.* at 194. In any event, the Commission's conclusion that the open Internet rules serve important governmental interests is amply supported by the record, *Order* ¶¶76-103 (JA__-__), and the Commission's predictive judgments on this issue are entitled to substantial deference, *see Turner II*, 520 U.S. at 195-96.

152

incentives and abilities," Br. 9, apparently referring to Google, Apple, and Facebook, Br. 7-8. But companies providing Internet content, services, and applications are not similarly situated to broadband providers, who exercise gateway control over Internet *access* and are subject to different statutory requirements. *See Verizon*, 740 F.3d at 648-49. The rules are therefore narrowly tailored to apply only to mass-market retail broadband providers, who "shall be treated as … common carrier[s]" under the Act, 47 U.S.C. § 153(51), and have been proven to have the "incentive[] and ability to restrict Internet traffic," *Verizon*, 740 F.3d at 649.

In the alternative, Alamo contends that the rules are overbroad because, it speculates, the FCC could somehow protect Internet openness while still allowing broadband providers to block "traffic with which they disagree." Br. 9. But "[e]ven on the doubtful assumption that a narrower but still practicable [no-blocking] rule could be drafted[,] … content-neutral regulations are not invalid simply because there is some imaginable alternative that might be less burdensome on speech." *Turner II*, 520 U.S. at 217 (internal quotation marks omitted). In any event, content-blocking by broadband providers is by its nature anathema to Internet openness, and Alamo fails to explain how any narrower rule could serve the important governmental interests here.

If a provider of Broadband Internet Access Service wishes to distance itself from speech with which it disagrees, the open Internet rules permit it to do so through its own speech—for example, by publicizing its views on its own website, or by delivering a message on bill inserts accompanying customers' monthly bills. Absent any indication that Internet users mistake the content they choose to view online as representing the views of their broadband provider, and given the ability of broadband providers to make their views known through their own speech, Alamo has no substantial interest in blocking or throttling Internet content—much less any interest that outweighs the paramount governmental interests in ensuring that Internet users have access to a multiplicity of viewpoints and the ability to freely disseminate their own views, ensuring a level playing field for edge providers (and among broadband providers), and promoting timely and widespread broadband deployment.

## VII.  USTELECOM'S REGULATORY FLEXIBILITY ACT ARGUMENTS ARE PROCEDURALLY BARRED AND LACK MERIT.

The Regulatory Flexibility Act ("RFA") calls on an agency to "prepare a final regulatory flexibility analysis" addressing any "impact on small entities" when the agency "promulgates a final rule under [5 U.S.C. §] 553." 5 U.S.C. § 604. There is no dispute that the FCC paid attention the interests

of small businesses in the *Order*, *see*, *e.g.*, *Order* ¶¶172-175 (JA___-___)

(different treatment under enhanced transparency rule), and issued a detailed

Final Regulatory Flexibility Analysis addressing the impact of the open

Internet rules on small businesses, *see id.* app. B (JA__-__).

USTelecom does not challenge the discussion of the open Internet rules

in the Final Regulatory Flexibility Analysis. It insists, however, that the

analysis should also have discussed the "difficulty that small providers …

encounter when deciphering and complying with Title II." Br. 82. That

argument is procedurally barred and legally unsupported.

**1.** Judicial review is barred because this argument was not first

presented to the Commission. Section 405(a) precludes judicial review

"where the party seeking such review … relies on questions of fact or law

upon which the Commission … has been afforded no opportunity to pass." 47

U.S.C. § 405(a). This exhaustion requirement applies "even when a petitioner

has no reason to raise an argument until the FCC issues an order that makes

the issue relevant," in which case "the petitioner must file a petition for

reconsideration with the Commission before it may seek judicial review."

*Qwest Corp. v. FCC*, 482 F.3d 471, 474 (D.C. Cir. 2007) (quoting *In re Core

Commc'ns, Inc.*, 455 F.3d 267, 274-75 (D.C. Cir. 2006)).

Here, USTelecom has not afforded the Commission an "opportunity to

pass" on this argument. USTelecom nowhere contends that any party presented these arguments to the Commission, and no party filed a petition for reconsideration on the issue. *See Small Bus. in Telecomms. v. FCC*, 251 F.3d 1015, 1026 (D.C. Cir. 2001) (rejecting RFA challenge because petitioner "failed to raise the FRFA analysis issue during the rulemaking," as required by section 405(a)). Accordingly, judicial review is barred.

**2.** In any event, USTelecom's argument lacks merit. The RFA is designed to ensure that agencies consider small-business interests when "promulgat[ing] a final rule." 5 U.S.C. § 604. But the portion of the *Order* addressing reclassification was a *declaratory ruling*—a form of informal adjudication[57]—not a rulemaking. *See Order* ¶¶306-433 (JA__-__); *see also id.* ¶283 (JA__). This Court has squarely held that "informal adjudications" "d[o] not trigger the Regulatory Flexibility Act." *Int'l Internship Prog. v. Napolitano*, 718 F.3d 986, 988 (D.C. Cir. 2013).[58]

---

[57] *British Caledonian Airways, Ltd. v. Civil Aeronautics Bd.*, 584 F.2d 982, 993 n.23 (D.C. Cir. 1978). *Cf. Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 536 (D.C. Cir. 2007) (upholding the Commission's authority to "split [a] proceeding into a dual one, half rulemaking and half adjudication").

[58] Even if the RFA did apply, the burdens of which USTelecom complains arise from *statutory* requirements of *Title II itself*, not from any Commission rule implementing the statute. *See* Br. 81-83. These statutory burdens fall outside the RFA because they are imposed by Congress rather than by agency "rule[s]," 5 U.S.C. § 604(a).

156

## CONCLUSION

The petitions for review should be denied.

Respectfully submitted,

WILLIAM J. BAER
ASSISTANT ATTORNEY GENERAL

JONATHAN B. SALLET
GENERAL COUNSEL

DAVID I. GELFAND
DEPUTY ASSISTANT ATTORNEY
   GENERAL

DAVID M. GOSSETT
DEPUTY GENERAL COUNSEL

JACOB M. LEWIS
KRISTEN C. LIMARZI
ROBERT J. WIGGERS
NICKOLAI G. LEVIN
ATTORNEYS

STEPHANIE S. WEINER
ASSOCIATE GENERAL COUNSEL

/s/ James M. Carr

UNITED STATES
   DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

JAMES M. CARR
MATTHEW J. DUNNE
SCOTT M. NOVECK
COUNSEL

FEDERAL COMMUNICATIONS
   COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

September 14, 2015

157

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES TELECOM ASSOCIATION, ET AL.,

PETITIONERS,

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,

RESPONDENTS.

NO. 15-1063 (AND CONSOLIDATED CASES)

CERTIFICATE OF COMPLIANCE

Pursuant to the requirements of Fed. R. App. P. 32(a)(7), and the

Court's order dated June 29, 2015, I hereby certify that the accompanying

Brief for Respondents in the captioned case contains 32,680 words.

/s/ *James M. Carr*
James M. Carr
Counsel
Federal Communications Commission
Washington, D.C. 20554
(202) 418-1740 (Telephone)
(202) 418-2819 (Fax)

September 14, 2015

# STATUTORY ADDENDUM

TELECOMMUNICATIONS ACT OF 1996, Pub. L. No 104-104, § 601 ...............1

5 U.S.C. § 604 ...........................................................................................2

47 U.S.C. § 153 (excerpts) ...........................................................................3

47 U.S.C. § 160 ..........................................................................................4

47 U.S.C. § 201 ..........................................................................................6

47 U.S.C. § 202 ..........................................................................................7

47 U.S.C. § 230 ..........................................................................................8

47 U.S.C. § 251 ........................................................................................11

47 U.S.C. § 252 ........................................................................................18

47 U.S.C. § 332 ........................................................................................25

47 U.S.C. § 1302 ......................................................................................32

47 C.F.R. § 1.54 .......................................................................................34

47 C.F.R. § 20.9 .......................................................................................36

# TELECOMMUNICATIONS ACT OF 1996, Pub. L. No 104-104, § 601

## SEC. 601. APPLICABILITY OF CONSENT DECREES AND OTHER LAW.

(a) APPLICABILITY OF AMENDMENTS TO FUTURE CONDUCT.—

    (1) AT & T CONSENT DECREE.—Any conduct or activity that was, before the date of enactment of this Act, subject to any restriction or obligation imposed by the AT & T Consent Decree shall, on and after such date, be subject to the restrictions and obligations imposed by the Communications Act of 1934 as amended by this Act and shall not be subject to the restrictions and the obligations imposed by such Consent Decree.

    (2) GTE CONSENT DECREE.—Any conduct or activity that was, before the date of enactment of this Act, subject to any restriction or obligation imposed by the GTE Consent Decree shall, on and after such date, be subject to the restrictions and obligations imposed by the Communications Act of 1934 as amended by this Act and shall not be subject to the restrictions and the obligations imposed by such Consent Decree.

    (3) McCAW CONSENT DECREE.—Any conduct or activity that was, before the date of enactment of this Act, subject to any restriction or obligation imposed by the McCaw Consent Decree shall, on and after such date, be subject to the restrictions and obligations imposed by the Communications Act of 1934 as amended by this Act and subsection (d) of this section and shall not be subject to the restrictions and the obligations imposed by such Consent Decree.

(b) ANTITRUST LAWS.—

    (1) SAVINGS CLAUSE.—Except as provided in paragraphs (2) and (3), nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws.

## 5 U.S.C. § 604

**§ 604 Final regulatory flexibility analysis**

(a) When an agency promulgates a final rule under section 553 of this title, after being required by that section or any other law to publish a general notice of proposed rulemaking, or promulgates a final interpretative rule involving the internal revenue laws of the United States as described in section 603(a), the agency shall prepare a final regulatory flexibility analysis. Each final regulatory flexibility analysis shall contain--

(1) a statement of the need for, and objectives of, the rule;

(2) a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;

(3) the response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;

(4) a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

(5) a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;

(6) a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected; and

(6)[1] for a covered agency, as defined in section 609(d)(2), a description of the steps the agency has taken to minimize any additional cost of credit for small entities.

(b) The agency shall make copies of the final regulatory flexibility analysis available to members of the public and shall publish in the Federal Register such analysis or a summary thereof.

---

[1] So in original. Two paragraphs (6) were enacted.

## 47 U.S.C. § 153 (excerpts)

### § 153. Definitions

For the purposes of this chapter, unless the context otherwise requires—

\* \* \* \* \* \*

(24) Information service

   The term "information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

\* \* \* \* \* \*

(50) Telecommunications

   The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

(51) Telecommunications carrier

   The term "telecommunications carrier" means any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 226 of this title). A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services, except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage.

\* \* \* \* \* \*

(53) Telecommunications service

   The term "telecommunications service" means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.

## 47 U.S.C. § 160

**§ 160. Competition in provision of telecommunications service**

(a) Regulatory flexibility

Notwithstanding section 332(c)(1)(A) of this title, the Commission shall forbear from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of its or their geographic markets, if the Commission determines that--

(1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

(2) enforcement of such regulation or provision is not necessary for the protection of consumers; and

(3) forbearance from applying such provision or regulation is consistent with the public interest.

(b) Competitive effect to be weighed

In making the determination under subsection (a)(3) of this section, the Commission shall consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services. If the Commission determines that such forbearance will promote competition among providers of telecommunications services, that determination may be the basis for a Commission finding that forbearance is in the public interest.

(c) Petition for forbearance

Any telecommunications carrier, or class of telecommunications carriers, may submit a petition to the Commission requesting that the Commission exercise the authority granted under this section with respect to that carrier or those carriers, or any service offered by that carrier or carriers. Any such petition shall be deemed granted if the Commission does not deny the petition for failure to meet the requirements for forbearance under subsection (a) of this section within one year after the Commission receives it, unless the one-year period is extended by the Commission. The Commission may extend the initial one-year period by an additional 90 days if the Commission finds that an extension is necessary to meet the

requirements of subsection (a) of this section. The Commission may grant or deny a petition in whole or in part and shall explain its decision in writing.

(d) Limitation

Except as provided in section 251(f) of this title, the Commission may not forbear from applying the requirements of section 251(c) or 271 of this title under subsection (a) of this section until it determines that those requirements have been fully implemented.

(e) State enforcement after commission forbearance

A State commission may not continue to apply or enforce any provision of this chapter that the Commission has determined to forbear from applying under subsection (a) of this section.

# 47 U.S.C. § 201

### § 201. Service and charges

(a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: Provided further, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: Provided further, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

## 47 U.S.C. § 202

**§ 202. Discriminations and preferences**

(a) Charges, services, etc.

It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

(b) Charges or services included

Charges or services, whenever referred to in this chapter, include charges for, or services in connection with, the use of common carrier lines of communication, whether derived from wire or radio facilities, in chain broadcasting or incidental to radio communication of any kind.

(c) Penalty

Any carrier who knowingly violates the provisions of this section shall forfeit to the United States the sum of $6,000 for each such offense and $300 for each and every day of the continuance of such offense.

## 47 U.S.C. § 230

**§ 230. Protection for private blocking and screening of offensive material**

(a) Findings

The Congress finds the following:

(1) The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

(2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

(3) The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

(4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

(5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

(b) Policy

It is the policy of the United States--

(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

(c) Protection for "Good Samaritan" blocking and screening of offensive material

Add. 8

(1) Treatment of publisher or speaker

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2) Civil liability

No provider or user of an interactive computer service shall be held liable on account of--

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[2]

(d) Obligations of interactive computer service

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

(e) Effect on other laws

(1) No effect on criminal law

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

(2) No effect on intellectual property law

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

(3) State law

---

[2] So in original. Probably should be "subparagraph (A)".

Add. 9

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

(4) No effect on communications privacy law

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

(f) Definitions

As used in this section:

(1) Internet

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

(2) Interactive computer service

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

(3) Information content provider

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

(4) Access software provider

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

(A) filter, screen, allow, or disallow content;

(B) pick, choose, analyze, or digest content; or

(C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

Add. 10

# 47 U.S.C. § 251

**§ 251. Interconnection**

(a) General duty of telecommunications carriers

Each telecommunications carrier has the duty--

(1) to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers; and

(2) not to install network features, functions, or capabilities that do not comply with the guidelines and standards established pursuant to section 255 or 256 of this title.

(b) Obligations of all local exchange carriers

Each local exchange carrier has the following duties:

(1) Resale

The duty not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of its telecommunications services.

(2) Number portability

The duty to provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission.

(3) Dialing parity

The duty to provide dialing parity to competing providers of telephone exchange service and telephone toll service, and the duty to permit all such providers to have nondiscriminatory access to telephone numbers, operator services, directory assistance, and directory listing, with no unreasonable dialing delays.

(4) Access to rights-of-way

The duty to afford access to the poles, ducts, conduits, and rights-of-way of such carrier to competing providers of telecommunications services on rates, terms, and conditions that are consistent with section 224 of this title.

(5) Reciprocal compensation

The duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications.

(c) Additional obligations of incumbent local exchange carriers

Add. 11

In addition to the duties contained in subsection (b) of this section, each incumbent local exchange carrier has the following duties:

(1) Duty to negotiate

The duty to negotiate in good faith in accordance with section 252 of this title the particular terms and conditions of agreements to fulfill the duties described in paragraphs (1) through (5) of subsection (b) of this section and this subsection. The requesting telecommunications carrier also has the duty to negotiate in good faith the terms and conditions of such agreements.

(2) Interconnection

The duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network--

(A) for the transmission and routing of telephone exchange service and exchange access;

(B) at any technically feasible point within the carrier's network;

(C) that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection; and

(D) on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title.

(3) Unbundled access

The duty to provide, to any requesting telecommunications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title. An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service.

(4) Resale

The duty--

(A) to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers; and

(B) not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of such telecommunications service, except that a State commission may, consistent with regulations prescribed by the Commission under this section, prohibit a reseller that obtains at wholesale rates a telecommunications service that is available at retail only to a category of subscribers from offering such service to a different category of subscribers.

(5) Notice of changes

The duty to provide reasonable public notice of changes in the information necessary for the transmission and routing of services using that local exchange carrier's facilities or networks, as well as of any other changes that would affect the interoperability of those facilities and networks.

(6) Collocation

The duty to provide, on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, for physical collocation of equipment necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier, except that the carrier may provide for virtual collocation if the local exchange carrier demonstrates to the State commission that physical collocation is not practical for technical reasons or because of space limitations.

(d) Implementation

(1) In general

Within 6 months after February 8, 1996, the Commission shall complete all actions necessary to establish regulations to implement the requirements of this section.

(2) Access standards

In determining what network elements should be made available for purposes of subsection (c)(3) of this section, the Commission shall consider, at a minimum, whether--

(A) access to such network elements as are proprietary in nature is necessary; and

(B) the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer.

(3) Preservation of State access regulations

Add. 13

In prescribing and enforcing regulations to implement the requirements of this section, the Commission shall not preclude the enforcement of any regulation, order, or policy of a State commission that--

(A) establishes access and interconnection obligations of local exchange carriers;

(B) is consistent with the requirements of this section; and

(C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.

(e) Numbering administration

(1) Commission authority and jurisdiction

The Commission shall create or designate one or more impartial entities to administer telecommunications numbering and to make such numbers available on an equitable basis. The Commission shall have exclusive jurisdiction over those portions of the North American Numbering Plan that pertain to the United States. Nothing in this paragraph shall preclude the Commission from delegating to State commissions or other entities all or any portion of such jurisdiction.

(2) Costs

The cost of establishing telecommunications numbering administration arrangements and number portability shall be borne by all telecommunications carriers on a competitively neutral basis as determined by the Commission.

(3) Universal emergency telephone number

The Commission and any agency or entity to which the Commission has delegated authority under this subsection shall designate 9-1-1 as the universal emergency telephone number within the United States for reporting an emergency to appropriate authorities and requesting assistance. The designation shall apply to both wireline and wireless telephone service. In making the designation, the Commission (and any such agency or entity) shall provide appropriate transition periods for areas in which 9-1-1 is not in use as an emergency telephone number on October 26, 1999.

(f) Exemptions, suspensions, and modifications

(1) Exemption for certain rural telephone companies

(A) Exemption

Subsection (c) of this section shall not apply to a rural telephone company until (i) such company has received a bona fide request for interconnection, services, or

Add. 14

network elements, and (ii) the State commission determines (under subparagraph (B)) that such request is not unduly economically burdensome, is technically feasible, and is consistent with section 254 of this title (other than subsections (b)(7) and (c)(1)(D) thereof).

(B) State termination of exemption and implementation schedule

The party making a bona fide request of a rural telephone company for interconnection, services, or network elements shall submit a notice of its request to the State commission. The State commission shall conduct an inquiry for the purpose of determining whether to terminate the exemption under subparagraph (A). Within 120 days after the State commission receives notice of the request, the State commission shall terminate the exemption if the request is not unduly economically burdensome, is technically feasible, and is consistent with section 254 of this title (other than subsections (b)(7) and (c)(1)(D) thereof). Upon termination of the exemption, a State commission shall establish an implementation schedule for compliance with the request that is consistent in time and manner with Commission regulations.

(C) Limitation on exemption

The exemption provided by this paragraph shall not apply with respect to a request under subsection (c) of this section from a cable operator providing video programming, and seeking to provide any telecommunications service, in the area in which the rural telephone company provides video programming. The limitation contained in this subparagraph shall not apply to a rural telephone company that is providing video programming on February 8, 1996.

(2) Suspensions and modifications for rural carriers

A local exchange carrier with fewer than 2 percent of the Nation's subscriber lines installed in the aggregate nationwide may petition a State commission for a suspension or modification of the application of a requirement or requirements of subsection (b) or (c) of this section to telephone exchange service facilities specified in such petition. The State commission shall grant such petition to the extent that, and for such duration as, the State commission determines that such suspension or modification--

(A) is necessary--

(i) to avoid a significant adverse economic impact on users of telecommunications services generally;

(ii) to avoid imposing a requirement that is unduly economically burdensome; or

(iii) to avoid imposing a requirement that is technically infeasible; and

(B) is consistent with the public interest, convenience, and necessity.

The State commission shall act upon any petition filed under this paragraph within 180 days after receiving such petition. Pending such action, the State commission may suspend enforcement of the requirement or requirements to which the petition applies with respect to the petitioning carrier or carriers.

(g) Continued enforcement of exchange access and interconnection requirements

On and after February 8, 1996, each local exchange carrier, to the extent that it provides wireline services, shall provide exchange access, information access, and exchange services for such access to interexchange carriers and information service providers in accordance with the same equal access and nondiscriminatory interconnection restrictions and obligations (including receipt of compensation) that apply to such carrier on the date immediately preceding February 8, 1996 under any court order, consent decree, or regulation, order, or policy of the Commission, until such restrictions and obligations are explicitly superseded by regulations prescribed by the Commission after February 8, 1996. During the period beginning on February 8, 1996 and until such restrictions and obligations are so superseded, such restrictions and obligations shall be enforceable in the same manner as regulations of the Commission.

(h) "Incumbent local exchange carrier" defined

(1) Definition

For purposes of this section, the term "incumbent local exchange carrier" means, with respect to an area, the local exchange carrier that--

(A) on February 8, 1996, provided telephone exchange service in such area; and

(B)(i) on February 8, 1996, was deemed to be a member of the exchange carrier association pursuant to section 69.601(b) of the Commission's regulations (47 C.F.R. 69.601(b)); or

(ii) is a person or entity that, on or after February 8, 1996, became a successor or assign of a member described in clause (i).

(2) Treatment of comparable carriers as incumbents

The Commission may, by rule, provide for the treatment of a local exchange carrier (or class or category thereof) as an incumbent local exchange carrier for purposes of this section if--

(A) such carrier occupies a position in the market for telephone exchange service within an area that is comparable to the position occupied by a carrier described in paragraph (1);

(B) such carrier has substantially replaced an incumbent local exchange carrier described in paragraph (1); and

(C) such treatment is consistent with the public interest, convenience, and necessity and the purposes of this section.

(i) Savings provision

Nothing in this section shall be construed to limit or otherwise affect the Commission's authority under section 201 of this title.

## <u>47 U.S.C. § 252</u>

**§ 252. Procedures for negotiation, arbitration, and approval of agreements**

(a) Agreements arrived at through negotiation

    (1) Voluntary negotiations

        Upon receiving a request for interconnection, services, or network elements pursuant to section 251 of this title, an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251 of this title. The agreement shall include a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement. The agreement, including any interconnection agreement negotiated before February 8, 1996, shall be submitted to the State commission under subsection (e) of this section.

    (2) Mediation

        Any party negotiating an agreement under this section may, at any point in the negotiation, ask a State commission to participate in the negotiation and to mediate any differences arising in the course of the negotiation.

(b) Agreements arrived at through compulsory arbitration

    (1) Arbitration

        During the period from the 135th to the 160th day (inclusive) after the date on which an incumbent local exchange carrier receives a request for negotiation under this section, the carrier or any other party to the negotiation may petition a State commission to arbitrate any open issues.

    (2) Duty of petitioner

        (A) A party that petitions a State commission under paragraph (1) shall, at the same time as it submits the petition, provide the State commission all relevant documentation concerning--

            (i) the unresolved issues;

            (ii) the position of each of the parties with respect to those issues; and

            (iii) any other issue discussed and resolved by the parties.

(B) A party petitioning a State commission under paragraph (1) shall provide a copy of the petition and any documentation to the other party or parties not later than the day on which the State commission receives the petition.

(3) Opportunity to respond

A non-petitioning party to a negotiation under this section may respond to the other party's petition and provide such additional information as it wishes within 25 days after the State commission receives the petition.

(4) Action by State commission

(A) The State commission shall limit its consideration of any petition under paragraph (1) (and any response thereto) to the issues set forth in the petition and in the response, if any, filed under paragraph (3).

(B) The State commission may require the petitioning party and the responding party to provide such information as may be necessary for the State commission to reach a decision on the unresolved issues. If any party refuses or fails unreasonably to respond on a timely basis to any reasonable request from the State commission, then the State commission may proceed on the basis of the best information available to it from whatever source derived.

(C) The State commission shall resolve each issue set forth in the petition and the response, if any, by imposing appropriate conditions as required to implement subsection (c) of this section upon the parties to the agreement, and shall conclude the resolution of any unresolved issues not later than 9 months after the date on which the local exchange carrier received the request under this section.

(5) Refusal to negotiate

The refusal of any other party to the negotiation to participate further in the negotiations, to cooperate with the State commission in carrying out its function as an arbitrator, or to continue to negotiate in good faith in the presence, or with the assistance, of the State commission shall be considered a failure to negotiate in good faith.

(c) Standards for arbitration

In resolving by arbitration under subsection (b) of this section any open issues and imposing conditions upon the parties to the agreement, a State commission shall--

(1) ensure that such resolution and conditions meet the requirements of section 251 of this title, including the regulations prescribed by the Commission pursuant to section 251 of this title;

(2) establish any rates for interconnection, services, or network elements according to subsection (d) of this section; and

(3) provide a schedule for implementation of the terms and conditions by the parties to the agreement.

(d) Pricing standards

(1) Interconnection and network element charges

Determinations by a State commission of the just and reasonable rate for the interconnection of facilities and equipment for purposes of subsection (c)(2) of section 251 of this title, and the just and reasonable rate for network elements for purposes of subsection (c)(3) of such section--

(A) shall be--

(i) based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable), and

(ii) nondiscriminatory, and

(B) may include a reasonable profit.

(2) Charges for transport and termination of traffic

(A) In general

For the purposes of compliance by an incumbent local exchange carrier with section 251(b)(5) of this title, a State commission shall not consider the terms and conditions for reciprocal compensation to be just and reasonable unless--

(i) such terms and conditions provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier; and

(ii) such terms and conditions determine such costs on the basis of a reasonable approximation of the additional costs of terminating such calls.

(B) Rules of construction

This paragraph shall not be construed--

(i) to preclude arrangements that afford the mutual recovery of costs through the offsetting of reciprocal obligations, including arrangements that waive mutual recovery (such as bill-and-keep arrangements); or

(ii) to authorize the Commission or any State commission to engage in any rate regulation proceeding to establish with particularity the additional costs of transporting or terminating calls, or to require carriers to maintain records with respect to the additional costs of such calls.

(3) Wholesale prices for telecommunications services

For the purposes of section 251(c)(4) of this title, a State commission shall determine wholesale rates on the basis of retail rates charged to subscribers for the telecommunications service requested, excluding the portion thereof attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier.

(e) Approval by State commission

(1) Approval required

Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies.

(2) Grounds for rejection

The State commission may only reject

(A) an agreement (or any portion thereof) adopted by negotiation under subsection (a) of this section if it finds that--

(i) the agreement (or portion thereof) discriminates against a telecommunications carrier not a party to the agreement; or

(ii) the implementation of such agreement or portion is not consistent with the public interest, convenience, and necessity; or

(B) an agreement (or any portion thereof) adopted by arbitration under subsection (b) of this section if it finds that the agreement does not meet the requirements of section 251 of this title, including the regulations prescribed by the Commission pursuant to section 251 of this title, or the standards set forth in subsection (d) of this section.

(3) Preservation of authority

Notwithstanding paragraph (2), but subject to section 253 of this title, nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements.

(4) Schedule for decision

If the State commission does not act to approve or reject the agreement within 90 days after submission by the parties of an agreement adopted by negotiation under subsection (a) of this section, or within 30 days after submission by the parties of an agreement adopted by arbitration under subsection (b) of this section, the agreement shall be deemed approved. No State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section.

(5) Commission to act if State will not act

If a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the Commission shall issue an order preempting the State commission's jurisdiction of that proceeding or matter within 90 days after being notified (or taking notice) of such failure, and shall assume the responsibility of the State commission under this section with respect to the proceeding or matter and act for the State commission.

(6) Review of State commission actions

In a case in which a State fails to act as described in paragraph (5), the proceeding by the Commission under such paragraph and any judicial review of the Commission's actions shall be the exclusive remedies for a State commission's failure to act. In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.

(f) Statements of generally available terms

(1) In general

A Bell operating company may prepare and file with a State commission a statement of the terms and conditions that such company generally offers within that State to comply with the requirements of section 251 of this title and the regulations thereunder and the standards applicable under this section.

(2) State commission review

A State commission may not approve such statement unless such statement complies with subsection (d) of this section and section 251 of this title and the regulations thereunder. Except as provided in section 253 of this title, nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of such statement, including requiring compliance with intrastate telecommunications service quality standards or requirements.

(3) Schedule for review

The State commission to which a statement is submitted shall, not later than 60 days after the date of such submission--

(A) complete the review of such statement under paragraph (2) (including any reconsideration thereof), unless the submitting carrier agrees to an extension of the period for such review; or

(B) permit such statement to take effect.

(4) Authority to continue review

Paragraph (3) shall not preclude the State commission from continuing to review a statement that has been permitted to take effect under subparagraph (B) of such paragraph or from approving or disapproving such statement under paragraph (2).

(5) Duty to negotiate not affected

The submission or approval of a statement under this subsection shall not relieve a Bell operating company of its duty to negotiate the terms and conditions of an agreement under section 251 of this title.

(g) Consolidation of State proceedings

Where not inconsistent with the requirements of this chapter, a State commission may, to the extent practical, consolidate proceedings under sections 214(e), 251(f), 253 of this title, and this section in order to reduce administrative burdens on telecommunications carriers, other parties to the proceedings, and the State commission in carrying out its responsibilities under this chapter.

(h) Filing required

A State commission shall make a copy of each agreement approved under subsection (e) of this section and each statement approved under subsection (f) of this section available for public inspection and copying within 10 days after the agreement or statement is approved. The State commission may charge a reasonable and nondiscriminatory fee to the parties to the agreement or to the party filing the statement to cover the costs of approving and filing such agreement or statement.

(i) Availability to other telecommunications carriers

A local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement.

(j) "Incumbent local exchange carrier" defined

For purposes of this section, the term "incumbent local exchange carrier" has the meaning provided in section 251(h) of this title.

<u>**47 U.S.C. § 332**</u>

**§ 332. Mobile services**

(a) Factors which Commission must consider

In taking actions to manage the spectrum to be made available for use by the private mobile services, the Commission shall consider, consistent with section 151 of this title, whether such actions will--

(1) promote the safety of life and property;

(2) improve the efficiency of spectrum use and reduce the regulatory burden upon spectrum users, based upon sound engineering principles, user operational requirements, and marketplace demands;

(3) encourage competition and provide services to the largest feasible number of users; or

(4) increase interservice sharing opportunities between private mobile services and other services.

(b) Advisory coordinating committees

(1) The Commission, in coordinating the assignment of frequencies to stations in the private mobile services and in the fixed services (as defined by the Commission by rule), shall have authority to utilize assistance furnished by advisory coordinating committees consisting of individuals who are not officers or employees of the Federal Government.

(2) The authority of the Commission established in this subsection shall not be subject to or affected by the provisions of part III of Title 5 or section 1342 of Title 31.

(3) Any person who provides assistance to the Commission under this subsection shall not be considered, by reason of having provided such assistance, a Federal employee.

(4) Any advisory coordinating committee which furnishes assistance to the Commission under this subsection shall not be subject to the provisions of the Federal Advisory Committee Act.

(c) Regulatory treatment of mobile services

(1) Common carrier treatment of commercial mobile services

(A) A person engaged in the provision of a service that is a commercial mobile service shall, insofar as such person is so engaged, be treated as a common carrier for purposes of this chapter, except for such provisions of subchapter II of this chapter as the Commission may specify by regulation as inapplicable to that service or person. In prescribing or amending any such regulation, the Commission may not specify any

Add. 25

provision of section 201, 202, or 208 of this title, and may specify any other provision only if the Commission determines that--

(i) enforcement of such provision is not necessary in order to ensure that the charges, practices, classifications, or regulations for or in connection with that service are just and reasonable and are not unjustly or unreasonably discriminatory;

(ii) enforcement of such provision is not necessary for the protection of consumers; and

(iii) specifying such provision is consistent with the public interest.

(B) Upon reasonable request of any person providing commercial mobile service, the Commission shall order a common carrier to establish physical connections with such service pursuant to the provisions of section 201 of this title. Except to the extent that the Commission is required to respond to such a request, this subparagraph shall not be construed as a limitation or expansion of the Commission's authority to order interconnection pursuant to this chapter.

(C) The Commission shall review competitive market conditions with respect to commercial mobile services and shall include in its annual report an analysis of those conditions. Such analysis shall include an identification of the number of competitors in various commercial mobile services, an analysis of whether or not there is effective competition, an analysis of whether any of such competitors have a dominant share of the market for such services, and a statement of whether additional providers or classes of providers in those services would be likely to enhance competition. As a part of making a determination with respect to the public interest under subparagraph (A)(iii), the Commission shall consider whether the proposed regulation (or amendment thereof) will promote competitive market conditions, including the extent to which such regulation (or amendment) will enhance competition among providers of commercial mobile services. If the Commission determines that such regulation (or amendment) will promote competition among providers of commercial mobile services, such determination may be the basis for a Commission finding that such regulation (or amendment) is in the public interest.

(D) The Commission shall, not later than 180 days after August 10, 1993, complete a rulemaking required to implement this paragraph with respect to the licensing of personal communications services, including making any determinations required by subparagraph (C).

(2) Non-common carrier treatment of private mobile services

Add. 26

A person engaged in the provision of a service that is a private mobile service shall not, insofar as such person is so engaged, be treated as a common carrier for any purpose under this chapter. A common carrier (other than a person that was treated as a provider of a private land mobile service prior to August 10, 1993) shall not provide any dispatch service on any frequency allocated for common carrier service, except to the extent such dispatch service is provided on stations licensed in the domestic public land mobile radio service before January 1, 1982. The Commission may by regulation terminate, in whole or in part, the prohibition contained in the preceding sentence if the Commission determines that such termination will serve the public interest.

(3) State preemption

(A) Notwithstanding sections 152(b) and 221(b) of this title, no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services. Nothing in this subparagraph shall exempt providers of commercial mobile services (where such services are a substitute for land line telephone exchange service for a substantial portion of the communications within such State) from requirements imposed by a State commission on all providers of telecommunications services necessary to ensure the universal availability of telecommunications service at affordable rates. Notwithstanding the first sentence of this subparagraph, a State may petition the Commission for authority to regulate the rates for any commercial mobile service and the Commission shall grant such petition if such State demonstrates that--

(i) market conditions with respect to such services fail to protect subscribers adequately from unjust and unreasonable rates or rates that are unjustly or unreasonably discriminatory; or

(ii) such market conditions exist and such service is a replacement for land line telephone exchange service for a substantial portion of the telephone land line exchange service within such State.


The Commission shall provide reasonable opportunity for public comment in response to such petition, and shall, within 9 months after the date of its submission, grant or deny such petition. If the Commission grants such petition, the Commission shall authorize the State to exercise under State law such authority over rates, for such periods of time, as the Commission deems necessary to ensure that such rates are just and reasonable and not unjustly or unreasonably discriminatory.

(B) If a State has in effect on June 1, 1993, any regulation concerning the rates for any commercial mobile service offered in such State on such date, such State may, no later than 1 year after August 10, 1993, petition the Commission requesting that the State be authorized to continue exercising authority over such rates. If a State files such a petition, the State's existing regulation shall, notwithstanding subparagraph (A), remain in effect until the Commission completes all action (including any reconsideration) on such petition. The Commission shall review such petition in accordance with the procedures established in such subparagraph, shall complete all action (including any reconsideration) within 12 months after such petition is filed, and shall grant such petition if the State satisfies the showing required under subparagraph (A)(i) or (A)(ii). If the Commission grants such petition, the Commission shall authorize the State to exercise under State law such authority over rates, for such period of time, as the Commission deems necessary to ensure that such rates are just and reasonable and not unjustly or unreasonably discriminatory. After a reasonable period of time, as determined by the Commission, has elapsed from the issuance of an order under subparagraph (A) or this subparagraph, any interested party may petition the Commission for an order that the exercise of authority by a State pursuant to such subparagraph is no longer necessary to ensure that the rates for commercial mobile services are just and reasonable and not unjustly or unreasonably discriminatory. The Commission shall provide reasonable opportunity for public comment in response to such petition, and shall, within 9 months after the date of its submission, grant or deny such petition in whole or in part.

(4) Regulatory treatment of communications satellite corporation

Nothing in this subsection shall be construed to alter or affect the regulatory treatment required by title IV of the Communications Satellite Act of 1962 [47 U.S.C.A. § 741 et seq.] of the corporation authorized by title III of such Act [47 U.S.C.A. § 731 et seq.].

(5) Space segment capacity

Nothing in this section shall prohibit the Commission from continuing to determine whether the provision of space segment capacity by satellite systems to providers of commercial mobile services shall be treated as common carriage.

(6) Foreign ownership

The Commission, upon a petition for waiver filed within 6 months after August 10, 1993, may waive the application of section 310(b) of this title to any foreign ownership that lawfully existed before May 24, 1993, of any provider of a private land mobile service that will be treated as a common carrier as a result of the enactment of the Omnibus Budget Reconciliation Act of 1993, but only upon the following conditions:

Add. 28

(A) The extent of foreign ownership interest shall not be increased above the extent which existed on May 24, 1993.

(B) Such waiver shall not permit the subsequent transfer of ownership to any other person in violation of section 310(b) of this title.

(7) Preservation of local zoning authority

(A) General authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this

Add. 29

subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

(C) Definitions

For purposes of this paragraph--

(i) the term "personal wireless services" means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;

(ii) the term "personal wireless service facilities" means facilities for the provision of personal wireless services; and

(iii) the term "unlicensed wireless service" means the offering of telecommunications services using duly authorized devices which do not require individual licenses, but does not mean the provision of direct-to-home satellite services (as defined in section 303(v) of this title).

(8) Mobile services access

A person engaged in the provision of commercial mobile services, insofar as such person is so engaged, shall not be required to provide equal access to common carriers for the provision of telephone toll services. If the Commission determines that subscribers to such services are denied access to the provider of telephone toll services of the subscribers' choice, and that such denial is contrary to the public interest, convenience, and necessity, then the Commission shall prescribe regulations to afford subscribers unblocked access to the provider of telephone toll services of the subscribers' choice through the use of a carrier identification code assigned to such provider or other mechanism. The requirements for unblocking shall not apply to mobile satellite services unless the Commission finds it to be in the public interest to apply such requirements to such services.

(d) Definitions

For purposes of this section--

(1) the term "commercial mobile service" means any mobile service (as defined in section 153 of this title) that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public, as specified by regulation by the Commission;

Add. 30

(2) the term "interconnected service" means service that is interconnected with the public switched network (as such terms are defined by regulation by the Commission) or service for which a request for interconnection is pending pursuant to subsection (c)(1)(B) of this section; and

(3) the term "private mobile service" means any mobile service (as defined in section 153 of this title) that is not a commercial mobile service or the functional equivalent of a commercial mobile service, as specified by regulation by the Commission.

## <u>47 U.S.C. § 1302</u>

**§ 1302. Advanced telecommunications incentives**

(a) In general

The Commission and each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.

(b) Inquiry

The Commission shall, within 30 months after February 8, 1996, and annually thereafter, initiate a notice of inquiry concerning the availability of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) and shall complete the inquiry within 180 days after its initiation. In the inquiry, the Commission shall determine whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion. If the Commission's determination is negative, it shall take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market.

(c) Demographic information for unserved areas

As part of the inquiry required by subsection (b), the Commission shall compile a list of geographical areas that are not served by any provider of advanced telecommunications capability (as defined by subsection (d)(1)) and to the extent that data from the Census Bureau is available, determine, for each such unserved area--

(1) the population;

(2) the population density; and

(3) the average per capita income.

(d) Definitions

For purposes of this subsection:1

(1) Advanced telecommunications capability

The term "advanced telecommunications capability" is defined, without regard to any transmission media or technology, as high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology.

(2) Elementary and secondary schools

The term "elementary and secondary schools" means elementary and secondary schools, as defined in section 7801 of Title 20.

# 47 C.F.R. § 1.54

Code of Federal Regulations
Title 47. Telecommunication
Chapter I. Federal Communications Commission
Subchapter A. General
Part 1. Practice and Procedure
Subpart A. General Rules of Practice and Procedure
Forbearance Proceedings

## § 1.54 Petitions for forbearance must be complete as filed.

(a) Description of relief sought. Petitions for forbearance must identify the requested relief, including:

    (1) Each statutory provision, rule, or requirement from which forbearance is sought.

    (2) Each carrier, or group of carriers, for which forbearance is sought.

    (3) Each service for which forbearance is sought.

    (4) Each geographic location, zone, or area for which forbearance is sought.

    (5) Any other factor, condition, or limitation relevant to determining the scope of the requested relief.

(b) Prima facie case. Petitions for forbearance must contain facts and arguments which, if true and persuasive, are sufficient to meet each of the statutory criteria for forbearance.

    (1) A petition for forbearance must specify how each of the statutory criteria is met with regard to each statutory provision or rule, or requirement from which forbearance is sought.

    (2) If the petitioner intends to rely on data or information in the possession of third parties, the petition must identify:

        (i) The nature of the data or information.

        (ii) The parties believed to have or control the data or information.

        (iii) The relationship of the data or information to facts and arguments presented in the petition.

    (3) The petitioner shall, at the time of filing, provide a copy of the petition to each third party identified as possessing data or information on which the petitioner intends to rely.

(c) Identification of related matters. A petition for forbearance must identify any proceeding pending before the Commission in which the petitioner has requested, or otherwise taken a

Add. 34

position regarding, relief that is identical to, or comparable to, the relief sought in the forbearance petition. Alternatively, the petition must declare that the petitioner has not, in a pending proceeding, requested or otherwise taken a position on the relief sought.

(d) Filing requirements. Petitions for forbearance shall comply with the filing requirements in § 1.49.

    (1) Petitions for forbearance shall be e-mailed to forbearance@fcc.gov at the time for filing.

    (2) All filings related to a forbearance petition, including all data, shall be provided in a searchable format. To be searchable, a spreadsheet containing a significant amount of data must be capable of being manipulated to allow meaningful analysis.

(e) Contents. Petitions for forbearance shall include:

    (1) A plain, concise, written summary statement of the relief sought.

    (2) A full statement of the petitioner's prima facie case for relief.

    (3) Appendices that list:

        (i) The scope of relief sought as required in § 1.54(a);

        (ii) All supporting data upon which the petition intends to rely, including a market analysis; and

        (iii) Any supporting statements or affidavits.

(f) Supplemental information. The Commission will consider further facts and arguments entered into the record by a petitioner only:

    (1) In response to facts and arguments introduced by commenters or opponents.

    (2) By permission of the Commission.

# 47 C.F.R. § 20.9

Code of Federal Regulations
Title 47. Telecommunication
Chapter I. Federal Communications Commission
Subchapter B. Common Carrier Services
Part 20. Commercial Mobile Services

## § 20.9 Commercial mobile radio service.

(a) The following mobile services shall be treated as common carriage services and regulated as commercial mobile radio services (including any such service offered as a hybrid service or offered on an excess capacity basis to the extent it meets the definition of commercial mobile radio service, or offered as an auxiliary or ancillary service), pursuant to Section 332 of the Communications Act, 47 U.S.C. 332:

   (1) Private Paging (part 90 of this chapter), excluding not-for-profit paging systems that serve only the licensee's own internal communications needs;

   (2) Stations that offer Industrial/Business Pool (§ 90.35 of this chapter) eligibles for-profit, interconnected service;

   (3) Land Mobile Systems on 220–222 MHz (part 90 of this chapter), except services that are not-for-profit or do not offer interconnected service;

   (4) Specialized Mobile Radio services that provide interconnected service (part 90 of this chapter);

   (5) Public Coast Stations (part 80, subpart J of this chapter);

   (6) Paging and Radiotelephone Service (part 22, subpart E of this chapter).

   (7) Cellular Radiotelephone Service (part 22, subpart H of this chapter).

   (8) Air–Ground Radiotelephone Service (part 22, subpart G of this chapter).

   (9) Offshore Radiotelephone Service (part 22, subpart I of this chapter).

   (10) Any mobile satellite service involving the provision of commercial mobile radio service (by licensees or resellers) directly to end users, except that mobile satellite licensees and other entities that sell or lease space segment capacity, to the extent that it does not provide commercial mobile radio service directly to end users, may provide space segment capacity to commercial mobile radio service providers on a non-common carrier basis, if so authorized by the Commission;

   (11) Personal Communications Services (part 24 of this chapter), except as provided in paragraph (b) of this section;

Add. 36

(12) Mobile operations in the 218–219 MHz Service (part 95, subpart F of this chapter) that provide for-profit interconnected service to the public;

(13) For-profit subsidiary communications services transmitted on subcarriers within the FM baseband signal, that provide interconnected service (47 CFR 73.295 of this chapter); and

(14) A mobile service that is the functional equivalent of a commercial mobile radio service.

(i) A mobile service that does not meet the definition of commercial mobile radio service is presumed to be a private mobile radio service.

(ii) Any interested party may seek to overcome the presumption that a particular mobile radio service is a private mobile radio service by filing a petition for declaratory ruling challenging a mobile service provider's regulatory treatment as a private mobile radio service.

(A) The petition must show that:

(1) The mobile service in question meets the definition of commercial mobile radio service; or

(2) The mobile service in question is the functional equivalent of a service that meets the definition of a commercial mobile radio service.

(B) A variety of factors will be evaluated to make a determination whether the mobile service in question is the functional equivalent of a commercial mobile radio service, including: consumer demand for the service to determine whether the service is closely substitutable for a commercial mobile radio service; whether changes in price for the service under examination, or for the comparable commercial mobile radio service would prompt customers to change from one service to the other; and market research information identifying the targeted market for the service under review.

(C) The petition must contain specific allegations of fact supported by affidavit(s) of person(s) with personal knowledge. The petition must be served on the mobile service provider against whom it is filed and contain a certificate of service to this effect. The mobile service provider may file an opposition to the petition and the petitioner may file a reply. The general rules of practice and procedure contained in §§ 1.1 through 1.52 of this chapter shall apply.

(b) Licensees of a Personal Communications Service or applicants for a Personal Communications Service license, and VHF Public Coast Station geographic area licensees or applicants, and Automated Maritime Telecommunications System (AMTS) licensees or applicants, proposing to use any Personal Communications Service, VHF Public Coast Station, or AMTS spectrum to offer service on a private mobile radio service basis must

Add. 37

overcome the presumption that Personal Communications Service, VHF Public Coast, and AMTS Stations are commercial mobile radio services.

(1) The applicant or licensee (who must file an application to modify its authorization) seeking authority to dedicate a portion of the spectrum for private mobile radio service, must include a certification that it will offer Personal Communications Service, VHF Public Coast Station, or AMTS service on a private mobile radio service basis. The certification must include a description of the proposed service sufficient to demonstrate that it is not within the definition of commercial mobile radio service in § 20.3. Any application requesting to use any Personal Communications Service, VHF Public Coast Station, or AMTS spectrum to offer service on a private mobile radio service basis will be placed on public notice by the Commission.

(2) Any interested party may file a petition to deny the application within 30 days after the date of public notice announcing the acceptance for filing of the application. The petition shall contain specific allegations of fact supported by affidavit(s) of person(s) with personal knowledge to show that the applicant's request does not rebut the commercial mobile radio service presumption. The petition must be served on the applicant and contain a certificate of service to this effect. The applicant may file an opposition with allegations of fact supported by affidavit. The petitioner may file a reply. No additional pleadings will be allowed. The general rules of practice and procedure contained in §§ 1.1 through 1.52 of this chapter and § 22.30 of this chapter shall apply.

(c) Any provider of private land mobile service before August 10, 1993 (including any system expansions, modifications, or acquisitions of additional licenses in the same service, even if authorized after this date), and any private paging service utilizing frequencies allocated as of January 1, 1993, that meet the definition of commercial mobile radio service, shall, except for purposes of § 20.5 (applicable August 10, 1993 for the providers listed in this paragraph), be treated as private mobile radio service until August 10, 1996. After this date, these entities will be treated as commercial mobile radio service providers regulated under this part.

**UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| UNITED STATES TELECOM ASSOCIATION,<br>　　　　　　　Petitioner,<br><br>　　　v.<br><br>FEDERAL COMMUNICATIONS COMMISSION,<br>AND UNITED STATES OF AMERICA,<br>　　　　　　　Respondents. | No. 15-1063 *et al.* |

## CERTIFICATE OF SERVICE

I, James M. Carr, hereby certify that on September 14, 2015, I electronically filed the foregoing Brief for Respondents with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ James M. Carr*