**INITIAL VERSION**

ORAL ARGUMENT SCHEDULED FOR DECEMBER 4, 2015

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

No. 15-1063 (and consolidated cases)

————————

UNITED STATES TELECOM ASSOCIATION, *et al.*,
*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,
*Respondents.*

————————

INDEPENDENT TELEPHONE & TELECOMMUNICATIONS ALLIANCE, *et al.*,
*Intervenors for Petitioners*,

————————

AD HOC TELECOMMUNICATIONS USERS COMMITTEE, *et al.*,
*Intervenors for Respondents.*

————————

On Petitions for Review of an Order
of the Federal Communications Commission

————————

## JOINT REPLY BRIEF FOR PETITIONERS USTELECOM, NCTA, CTIA, ACA, WISPA, AT&T, AND CENTURYLINK

————————

| | |
|---|---|
| MIGUEL A. ESTRADA | MICHAEL K. KELLOGG |
| THEODORE B. OLSON | SCOTT H. ANGSTREICH |
| JONATHAN C. BOND | KELLOGG, HUBER, HANSEN, TODD, |
| GIBSON, DUNN & CRUTCHER LLP | EVANS & FIGEL, P.L.L.C. |
| 1050 Connecticut Avenue, N.W. | 1615 M Street, N.W., Suite 400 |
| Washington, D.C. 20036 | Washington, D.C. 20036 |
| (202) 955-8500 | (202) 326-7900 |
| *Counsel for NCTA* | *Counsel for USTelecom, CTIA, and* |
| | *AT&T* |
| October 5, 2015 | |

*(additional counsel listed on inside cover)*

MATTHEW A. BRILL
MATTHEW T. MURCHISON
JONATHAN Y. ELLIS
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 637-2200
*Counsel for NCTA*

HELGI C. WALKER
MICHAEL R. HUSTON
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 887-3599
*Counsel for CTIA*

KATHLEEN M. SULLIVAN
QUINN, EMANUEL, URQUHART &
   SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

JONATHAN BANKS
UNITED STATES TELECOM ASS'N
607 14th Street, N.W., Suite 400
Washington, D.C. 20005
(202) 326-7272
*Counsel for USTelecom*

PETER D. KEISLER
JAMES P. YOUNG
C. FREDERICK BECKNER III
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

DAVID R. MCATEE II
DAVID L. LAWSON
GARY L. PHILLIPS
CHRISTOPHER M. HEIMANN
AT&T SERVICES, INC.
1120 20th Street, N.W., Suite 1000
Washington, D.C. 20036
(202) 457-3055
*Counsel for AT&T*

STEPHEN E. CORAN
S. JENELL TRIGG
LERMAN SENTER PLLC
2000 K Street, N.W., Suite 600
Washington, D.C. 20006
(202) 429-8970
*Counsel for WISPA*

JEFFREY A. LAMKEN
MOLOLAMKEN LLP
The Watergate, Suite 660
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000

BARBARA S. ESBIN
CINNAMON MUELLER
1875 Eye Street, N.W., Suite 700
Washington, D.C. 20006

ROSS J. LIEBERMAN
AMERICAN CABLE ASSOCIATION
2415 39th Place, N.W.
Washington, D.C. 20007
(202) 494-5661
*Counsel for ACA*

DAVID H. SOLOMON
RUSSELL P. HANSER
WILKINSON BARKER KNAUER, LLP
2300 N Street, N.W., Suite 700
Washington, D.C. 20037
(202) 783-4141

TIMOTHY M. BOUCHER
CENTURYLINK
1099 New York Avenue, N.W.
Suite 250
Washington, D.C. 20001
(303) 992-5751
*Counsel for CenturyLink*

RICK C. CHESSEN
NEAL M. GOLDBERG
MICHAEL S. SCHOOLER
NATIONAL CABLE & TELECOMMS. ASS'N
25 Massachusetts Avenue, N.W. Suite 100
Washington, D.C. 20001
(202) 222-2445
*Counsel for NCTA*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ iii

GLOSSARY ........................................................................................ ix

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

ARGUMENT ...................................................................................... 3

I.    THE FCC'S RECLASSIFICATION OF INTERNET ACCESS AS
      A TELECOMMUNICATIONS SERVICE IS UNLAWFUL ........................ 3

      A.    Reclassification Contravenes the Communications Act ....................... 3

      B.    Reclassification Is Arbitrary and Capricious ..................... 15

II.   MOBILE BROADBAND IS TWICE IMMUNE FROM
      COMMON-CARRIAGE REGULATION ................................... 23

      A.    The FCC Unlawfully Changed the Definition of
            "Commercial Mobile Service" ........................................ 24

      B.    The FCC Unlawfully Crafted a New Test for Functional
            Equivalence for this Proceeding Only .................................. 30

III.  EVEN ASIDE FROM THE UNLAWFUL RECLASSIFICATIONS,
      THE *ORDER* MUST BE VACATED ........................................... 32

      A.    Broadband Providers Are Not Common Carriers .............................. 33

      B.    The FCC's Regulation of Internet Interconnection Under
            Title II Violates *Verizon* ....................................... 35

      C.    The Internet Conduct Standard Is Unlawfully Vague ...................... 37

      D.    The FCC Violated the Regulatory Flexibility Act .............................. 39

IV.    THE FCC FAILED TO PROVIDE NOTICE ...............................................40

    A.    The FCC Failed To Provide Sufficient Notice of
        Reclassification ....................................................................................40

    B.    The FCC Provided No Notice That It Would Amend
        Multiple Regulations in Order To Reclassify Mobile
        Broadband ............................................................................................43

    C.    The FCC Failed To Provide Notice About Important Aspects
        of the *Order* ........................................................................................45

CONCLUSION ......................................................................................................46

CIRCUIT RULE 32(a)(2) ATTESTATION

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page

## CASES

*Association of Private Sector Colls. & Univs. v. Duncan*,
   681 F.3d 427 (D.C. Cir. 2012)......................................................45

*Cable & Wireless v. FCC*, 166 F.3d 1224 (D.C. Cir. 1999)....................................37

\* *Cellco P'ship v. FCC*, 700 F.3d 534 (D.C. Cir. 2012) ......................................32, 33

*Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207 (D.C. Cir. 2007)..............38, 39

*Council Tree Communications, Inc. v. FCC*, 619 F.3d 235
   (3d Cir. 2010).......................................................................................41

*Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95 (D.C. Cir. 2013) .......................43

*Environmental Integrity Project v. EPA*, 425 F.3d 992
   (D.C. Cir. 2005) ...............................................................................40, 42

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ...............................................38

*HBO, Inc. v. FCC*, 567 F.2d 9 (D.C. Cir. 1977)......................................................41

*Johnson v. United States*, 135 S. Ct. 2551 (2015) ...................................................38

*Loveday v. FCC*, 707 F.2d 1443 (D.C. Cir. 1983)...................................................40

*Maracich v. Spears*, 133 S. Ct. 2191 (2013).........................................................36

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983).........................................................................................17

\* *NARUC v. FCC*, 525 F.2d 630 (D.C. Cir. 1976) .............................................33, 34

Authorities principally relied upon are designated by an asterisk (\*).

\* *NCTA v. Brand X Internet Servs.*, 545 U.S. 967 (2005) .......... 1, 2, 3, 4, 7, 9, 11, 12, 13, 14, 15, 16, 18

*Orloff v. FCC*, 352 F.3d 415 (D.C. Cir. 2003) .......................................................34

\* *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015) .............................15, 19

*Pharmaceutical Research & Mfrs. v. Thompson*, 251 F.3d 219 (D.C. Cir. 2001) ..................................................................................27

*Semon v. Royal Indem. Co.*, 279 F.2d 737 (5th Cir. 1960)......................................34

*Shell Oil Co. v. EPA*, 950 F.2d 741 (D.C. Cir. 1991)..............................................42

*Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506 (D.C. Cir. 1983) ..................................................................................41

*Southwestern Bell Tel. Co. v. FCC*, 19 F.3d 1475 (D.C. Cir. 1994) ......................33

*Timpinaro v. SEC*, 2 F.3d 453 (D.C. Cir. 1993) ...............................................37, 38

*United States v. Home Concrete & Supply, LLC*, 132 S. Ct. 1836 (2012).........................................................................................3

*United States v. Western Elec. Co.*:

    673 F. Supp. 525 (D.D.C. 1987)....................................................................6

    907 F.2d 160 (D.C. Cir. 1990)........................................................................6

*Utility Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427 (2014) ...........................28, 29

\* *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014)...................................2, 20, 21, 33, 35, 36, 45

*Verizon California, Inc. v. FCC*, 555 F.3d 270 (D.C. Cir. 2009)............................34

## STATUTES AND REGULATIONS

Communications Act of 1934, 47 U.S.C. § 151 *et seq.*:

\* § 153(24) ...................................................................................3, 24

\* § 153(50) ........................................................................................24

\* § 153(51) ..........................................................................................3

§ 201 ................................................................................................32

§ 201(b) ...........................................................................................36

§ 202 ................................................................................................32

\* § 230 ..................................................................................................5

\* § 230(b) .............................................................................................5

\* § 230(b)(2) ........................................................................................5

§ 230(f) ..............................................................................................5

\* § 230(f)(2) .........................................................................................5

\* § 332 .........................................................................................25, 26

\* § 332(c) .....................................................................................24, 25

\* § 332(d) .....................................................................................24, 25

\* § 332(d)(1) ......................................................................................26

\* § 332(d)(3) ..................................................................................24-25

§ 1422(b)(1)(B)(ii) ..........................................................................25

Telecommunications Act of 1996, Pub. L. No. 104-104,
§ 706, 110 Stat. 56, 153 (codified at 47 U.S.C.
§ 1302) .................................................................................2, 21, 46

18 U.S.C. § 1039(h)(2)...................................................................25

18 U.S.C. § 1039(h)(4)...................................................................25

\* 47 C.F.R. § 20.3 (1994)............................................................26, 43

47 C.F.R. § 20.3 (2015)...............................................................26

\* 47 C.F.R. § 64.702(a)..................................................................6


## ADMINISTRATIVE MATERIALS

*2010 Notice*:
　　Notice of Inquiry, *Framework for Broadband Internet
　　Service*, 25 FCC Rcd 7866 (2010)...............................................43

*2010 Order*:
　　Report and Order, *Preserving the Open Internet*, 25 FCC
　　Rcd 17905 (2010), *vacated in part*, *Verizon v. FCC*,
　　740 F.3d 623 (D.C. Cir. 2014)........................................14, 20, 34

\* *Cable Broadband Order*:
　　Declaratory Ruling and Notice of Proposed Rulemaking,
　　*Inquiry Concerning High-Speed Access to the Internet
　　Over Cable and Other Facilities*, 17 FCC Rcd 4798
　　(2002), *aff'd sub nom. NCTA v. Brand X Internet
　　Servs.*, 545 U.S. 967 (2005)..............................4, 8, 11, 12, 14, 16,
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　17, 18, 20, 23

*COMSAT Order*:
　　Order, *Application of COMSAT Corp. for Authority To
　　Interconnect Its INMARSAT Satellite Communications
　　Facilities with the Facilities of Commercial Internet Service
　　Provider(s)*, 11 FCC Rcd 22468 (Int'l Bur. 1996).........................6

\* *Gateway Service Order*:
　　Memorandum Opinion and Order, *Bell Atlantic Tel. Cos.*,
　　3 FCC Rcd 6045 (Com. Car. Bur. 1988).....................................7

\*  *NPRM*:
    Notice of Proposed Rulemaking, *Protecting and Promoting the Open Internet*, 29 FCC Rcd 5561 (2014)....................................................................... 2, 21, 40, 41, 42, 43, 45

\*  *Second Report and Order*:
    Second Report and Order, *Implementation of Sections 3(n) and 332 of the Communications Act; Regulatory Treatment of Mobile Services*, 9 FCC Rcd 1411 (1994) ...................30, 31, 32

\*  *Stevens Report*:
    Report to Congress, *Federal-State Joint Board on Universal Service*, 13 FCC Rcd 11501 (1998)................................4, 6, 11, 12

\*  *Wireline Broadband Order*:
    Report and Order and Notice of Proposed Rulemaking, *Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, 20 FCC Rcd 14853 (2005)..............................................................................................5

## OTHER MATERIALS

Richard Bennett, *FCC Brief Painfully Wrong About DNS*, HighTech Forum (Sept. 17, 2015), http://goo.gl/vk8BjT.............................10

Brief for the Federal Petitioners, *NCTA v. Brand X Internet Servs.*, Nos. 04-277, 04-281, 2005 WL 122088 (U.S. filed Jan. 19, 2005) ...........................................................................................13

Brief for Respondents, *Brand X Internet Servs. v. FCC*, No. 02-70518, 2002 WL 32816337 (9th Cir. filed Dec. 19, 2002)...............11, 13

Brief for Respondents EarthLink, Inc., Brand X Internet Services, and Center for Digital Democracy, *NCTA v. Brand X Internet Servs.*, Nos. 04-277, 04-281, 2005 WL 435900 (U.S. filed Feb. 22, 2005) ...........................................................13

Reply Brief for the Federal Petitioners, *NCTA v. Brand X Internet Servs.*, Nos. 04-277, 04-281, 2005 WL 640965 (U.S. filed Mar. 18, 2005) ..............................................................................4, 9, 12, 18

Hal Singer, *Does the Tumble in Broadband Investment Spell Doom for the FCC's Open Internet Order?*, Forbes.com (Aug. 25, 2015), http://goo.gl/Dx3bAj ..........................................................................21

## GLOSSARY

| | |
|---|---|
| 1996 Act or Act | Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 |
| *2010 Notice* | Notice of Inquiry, *Framework for Broadband Internet Service*, 25 FCC Rcd 7866 (2010) |
| *2010 Order* | Report and Order, *Preserving the Open Internet*, 25 FCC Rcd 17905 (2010), *vacated in part*, *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014) |
| AdLaw Amicus | Brief of Amici Professors of Administrative Law in Support of Respondents |
| APA | Administrative Procedure Act |
| Bennett Amicus | Brief of Amicus Richard Bennett in Support of Petitioners |
| *Cable Broadband Order* | Declaratory Ruling and Notice of Proposed Rulemaking, *Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 17 FCC Rcd 4798 (2002), *aff'd sub nom. NCTA v. Brand X Internet Servs.*, 545 U.S. 967 (2005) |
| CCIA-Mozilla Amicus | Brief of Amici Computer & Communications Industry Association and Mozilla in Support of Respondents |
| Cogent et al. Br. | Joint Brief of Intervenors Cogent Communications, Inc. et al. in Support of the FCC |
| *COMSAT Order* | Order, *Application of COMSAT Corp. for Authority To Interconnect Its INMARSAT Satellite Communications Facilities with the Facilities of Commercial Internet Service Provider(s)*, 11 FCC Rcd 22468 (Int'l Bur. 1996) |
| DNS | Domain Name Service |
| DSL | Digital Subscriber Line |

| | |
|---|---|
| EarthLink *Brand X* Br. | Brief for Respondents EarthLink, Inc., Brand X Internet Services, and Center for Digital Democracy, *NCTA v. Brand X Internet Servs.*, Nos. 04-277, 04-281, 2005 WL 435900 (U.S. filed Feb. 22, 2005) |
| EFF-ACLU Amicus | Brief of Amici Electronic Freedom Foundation, American Civil Liberties Union, and the American Civil Liberties Union of the Nation's Capital in Support of Respondents |
| FCC | Federal Communications Commission |
| FCC 9th Cir. *Brand X* Br. | Brief for Respondents, *Brand X Internet Servs. v. FCC*, No. 02-70518, 2002 WL 32816337 (9th Cir. filed Dec. 19, 2002) |
| FCC *Brand X* Br. | Brief for the Federal Petitioners, *NCTA v. Brand X Internet Servs.*, Nos. 04-277, 04-281, 2005 WL 122088 (U.S. filed Jan. 19, 2005) |
| FCC *Brand X* Reply Br. | Reply Brief for the Federal Petitioners, *NCTA v. Brand X Internet Servs.*, Nos. 04-277, 04-281, 2005 WL 640965 (U.S. filed Mar. 18, 2005) |
| *Gateway Service Order* | Memorandum Opinion and Order, *Bell Atlantic Tel. Cos.*, 3 FCC Rcd 6045 (Com. Car. Bur. 1988) |
| Georgetown Center Amicus | Brief of Amici Georgetown Center for Business and Public Policy and Thirteen Economists and Scholars in Support of Petitioners |
| Lerner/Ordover Decl. | Andres V. Lerner & Janusz A. Ordover, *The "Terminating Access Monopoly" Theory and the Provision of Broadband Internet Access* (Jan. 15, 2015) (attached to Verizon Jan. 15, 2015 Ex Parte Letter) (JA___-__) |
| MFJ | Modification of Final Judgment |

| | |
|---|---|
| NAM Amicus | Brief of Amici National Association of Manufacturers, the Business Roundtable, and the Chamber of Commerce of the United States of America in Support of Petitioners |
| *NPRM* | Notice of Proposed Rulemaking, *Protecting and Promoting the Open Internet*, 29 FCC Rcd 5561 (2014) (JA___-__) |
| *Order* | Report and Order on Remand, Declaratory Ruling, and Order, *Protecting and Promoting the Open Internet*, 30 FCC Rcd 5601 (2015) (JA___-__) |
| O'Rielly Dissent | Dissenting Statement of Commissioner Michael O'Rielly to *Order* (JA___-__) |
| Pai Dissent | Dissenting Statement of Commissioner Ajit Pai to *Order* (JA___-__) |
| RFA | Regulatory Flexibility Act, as amended |
| *Second Report and Order* | Second Report and Order, *Implementation of Sections 3(n) and 332 of the Communications Act; Regulatory Treatment of Mobile Services*, 9 FCC Rcd 1411 (1994) |
| *Stevens Report* | Report to Congress, *Federal-State Joint Board on Universal Service*, 13 FCC Rcd 11501 (1998) |
| USTelecom Br. | Joint Brief of Petitioners USTelecom, NCTA, CTIA, ACA, WISPA, AT&T, and CenturyLink |
| Wheeler NPRM Statement | Statement of Chairman Wheeler re: *NPRM* (JA___-__) |
| *Wireline Broadband Order* | Report and Order and Notice of Proposed Rulemaking, *Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, 20 FCC Rcd 14853 (2005), *petitions for review denied*, *Time Warner Telecom, Inc. v. FCC*, 507 F.3d 205 (3d Cir. 2007) |

## INTRODUCTION AND SUMMARY OF ARGUMENT

At its core, the *Order* rests on the claim that Internet access is no different from voice telephone service and that the FCC therefore has authority to subject them both to Title II's common-carriage requirements. But Internet access, unlike voice telephony, *necessarily* "offers" a "comprehensive capability for manipulating information"[1] — namely, data stored on distant computers — which is a classic information service exempt from common carriage under a long-settled regulatory regime. In 1996, Congress codified that regulatory regime and thereby *precluded* the FCC from regulating such services under Title II.

The FCC defends its upheaval of this regime with little more than a plea for deference, based on an aggressive misreading of *Brand X*. But *Brand X* involved classification of a transmission link *to* Internet access functions, whereas the *Order* reclassifies *Internet access service itself*, which everyone in *Brand X* agreed is an information service. And, to avoid reclassifying many other Internet players as common carriers, the FCC has done something else the statute forbids: it classifies the *same* computer-processing and storage functions in opposite ways — as "telecommunications services" or "information services" — depending solely on whether they are provided by petitioners or third parties.

---

[1] *NCTA v. Brand X Internet Servs.*, 545 U.S. 967, 987 (2005).

The FCC rewrites far more than the statutory definitions and *Brand X*. It has unlawfully: (1) overturned years of consistent decisions classifying Internet access service as an information service, upsetting the FCC-induced reliance interests of companies large and small that invested billions in deploying broadband networks; (2) abandoned 20-year-old interpretations of multiple Title III provisions that provide additional immunity from common-carrier regulation for highly competitive mobile broadband services; (3) ignored *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014), in extending Title II to Internet interconnection; and (4) done all of this without proper notice.

This is not the exercise of "expertise." To the contrary, the fact that the FCC has suddenly discovered that so many longstanding statutory interpretations and prior orders, adopted on independent rationales over several decades, are now simultaneously "incorrect" precludes any deference and exposes the FCC's about-face for what it is: an effort to enact by regulatory fiat a Title II "for the 21st Century" that Congress expressly foreclosed.

In *Verizon*, this Court gave the FCC a "blueprint" to adopt rules addressing Internet "openness" under § 706, *not* Title II. *NPRM* ¶ 4 (JA___). The FCC's rejection of that path demonstrates that this case is not about "openness" but rather the FCC's unlawful attempt to assert broad public-utility regulatory authority over

2

the Internet, from the end user all the way to a broadband provider's connection to

an edge provider.[2]

## ARGUMENT

## I.     THE FCC'S RECLASSIFICATION OF INTERNET ACCESS AS A TELECOMMUNICATIONS SERVICE IS UNLAWFUL

### A.     Reclassification Contravenes the Communications Act

Broadband Internet access offers consumers, first and foremost, access to

data stored on computers.  The FCC's brief never grapples with the simple — and

dispositive — fact that such a service meets the statutory definition of an

"information service," 47 U.S.C. § 153(24), and thus is immune from common-

carrier regulation, *see id.* § 153(51).  The FCC asserts that the statutory definitions

are "ambiguous" and that, under *Brand X*, its reclassification is entitled to

deference.  But *Brand X* involved a fundamentally different issue and does not

stand for the proposition that the statutory definitions are ambiguous as to *every*

possible classification question.  *See United States v. Home Concrete & Supply,*

*LLC*, 132 S. Ct. 1836, 1846 n.1 (2012) (Scalia, J., concurring in part) ("It does not

matter whether the word 'yellow' is ambiguous when the agency has interpreted it

to mean 'purple.'").  The statutory text and codified understandings foreclose the

FCC's attempt to redefine Internet access capabilities themselves as mere

---

[2] CTIA and AT&T join the portions of this brief addressing mobile services. All petitioners join the remaining sections.

transmission and thus a telecommunications service — an assertion no one in *Brand X* supported.

**1.a.**   From the customer's standpoint, broadband Internet access is plainly an "information service."  When subscribers use Internet access service "to retrieve files from the World Wide Web, they are . . . interacting with stored data," and the service provider is offering the "'capability for . . . acquiring, . . . retrieving [and] utilizing . . . information.'"  *Stevens Report* ¶ 76; *see* USTelecom Br. 30.

Contrary to the FCC's facile analogy (at 50), the capability to store, find, retrieve, and manipulate information through Internet access is nothing like Dr. Bell's phone call to Mr. Watson.  Even apart from DNS, caching, and functions such as email that differentiate Internet access from voice telephony, *see infra* pp. 7-12, the heart of Internet access is the capability to *interact with* and *manipulate* data stored on remote computers by the provider or a third party.  The FCC thus argued in *Brand X* that, when a cable operator provides customers with the capability to "click through" to third-party websites and obtain the "contents of the requested web page[ ]," the subscriber is "interact[ing] with stored data" and the cable operator is therefore providing an "information service."  FCC *Brand X* Reply Br. 5; *see Brand X*, 545 U.S. at 998-99; *Cable Broadband Order* ¶ 62 (cable modem is an information service even though providers "do not control the

4

majority of information accessible" to subscribers).  The same is true today.  That alone resolves this case.

**b.**     Section 230 confirms that Congress understood that "information service" includes a "service . . . that provides access to the Internet."  47 U.S.C. § 230(f)(2).  After oddly claiming (at 58-59) that Congress gave little "consideration" to § 230, the FCC asserts (at 59) that § 230 is concerned only with "block[ing] . . . offensive material."  In fact, § 230(b) establishes Congress's policy that "interactive computer service[s]" — defined to include, *inter alia*, "information service[s]," a category that expressly encompasses "service[s] . . . that provide[] access to the Internet" — must remain "unfettered by Federal or State regulation."  *Id.* § 230(b)(2), (f)(2).

The FCC is likewise wrong (at 59-60) that § 230's text is irrelevant because the definition of "interactive computer service" is only as "used in this section." *Id.* § 230(f).  It makes no sense to conclude that the general, defined term "information service" means something different in § 230 than elsewhere in the Act, or that Congress intended that Internet access service be an information service only under § 230.  *See also Wireline Broadband Order* ¶ 15 n.41 (§ 230 supports classifying broadband Internet access as information service).

**c.**     The FCC's and MFJ Court's pre-1996 holdings that the enhanced/information service category included "the functions and services

5

associated with Internet access" compel the same conclusion. *Stevens Report* ¶ 75. By 1996, it was well established that the enhanced/information service categories — which the FCC has repeatedly held are codified in the statutory definition of "information service," *see* USTelecom Br. 34 — included any service that provided "interaction with stored information," 47 C.F.R. § 64.702(a), including gateway services that offered "mere database access," *United States v. Western Elec. Co.*, 673 F. Supp. 525, 587 (D.D.C. 1987).

The FCC argues that the "*means of accessing* 'gateway' services" were telecommunications services. FCC Br. 61 (emphasis added). But those "means" were limited to the telephone lines *connecting* the customer *to* the network's "central processor" that provided the gateway service and, through that gateway, access to other information service providers. *United States v. Western Elec. Co.*, 907 F.2d 160, 162 (D.C. Cir. 1990).[3] The *Order*, by contrast, does not classify "the means of accessing" Internet access service as a telecommunications service; it classifies *the broadband Internet access service itself* as a telecommunications service. And, notwithstanding its argument here (at 62), the FCC has always

---

[3] The FCC staff decision stressed in Professor Wu's *amicus* brief (at 3-4, 8-11) was also about "access to commercial Internet carriers," not Internet access service itself. *COMSAT Order* ¶ 3. By contrast, Professor Wu's chart (at 19) shows that functions allowing a user to interact with stored content were classified as enhanced.

6

classified gateway services that "involve subscriber interaction with stored information" as enhanced services.  *Gateway Service Order* ¶ 7.

The FCC claims (at 53) that Congress's codification of the pre-1996 Act understandings reflects a "congressional choice" to endorse broad FCC discretion over how to classify these services.  To the contrary, by codifying then-existing interpretations, the 1996 Act *limited* the FCC's future discretion.  Moreover, as *Brand X* held, those pre-1996 understandings are now central to understanding the 1996 Act's definitions.  *See* 545 U.S. at 994-95.  By codifying those understandings, under which services offering the capability to retrieve and manipulate stored data are information services, Congress eliminated the FCC's discretion on the precise question raised here.

**2.**     Internet access service meets the statutory definition of "information service" not only because it enables use of the World Wide Web and other applications, but also because Internet access providers offer information storage, retrieval, and processing capabilities.  *See* USTelecom Br. 37-40.  In straining to conclude otherwise, the FCC recharacterizes selected information-service capabilities of Internet access as falling either (a) within the statute's telecommunications-management exception or (b) outside the offering of Internet access to consumers.  Both attempts fail.

7

a.      The FCC's contention (at 71-79) that DNS and caching fall within the telecommunications-management exception fundamentally misunderstands these two functionalities.

DNS is "a general purpose information processing and retrieval capability" that enables consumers to interact with and manage information from the Internet. *Cable Broadband Order* ¶ 37.  DNS allows "click-through" access from one web page to another.  It utilizes computer-processing functions to analyze user queries to determine which website (and server) would respond best to the user's request, including offering consumers alternative websites to select when, for example, they mistype an address.  If broadband providers did not offer DNS as part of their Internet access service, mass-market consumers would find that service useless for accessing the Internet's various applications.  *See* Bennett Amicus 10-11; USTelecom Br. 13, 31, 38-39.

The FCC held in 2002 that DNS "do[es] not" fit within the management exception, *Cable Broadband Order* ¶¶ 37-38 & n.150, and DNS has only gained functionality since then.  For instance, DNS now actively protects users from

8

Internet attacks and scams.[4]  The intelligence in DNS also enables parental controls.  *See* USTelecom Br. 38-39.

Similarly, "caching" is not management of a telecommunications service; it is a means of improving the user experience.  Through sophisticated analytics, broadband providers dynamically determine where and when to store certain Internet content on their own networks to enhance consumers' access to stored information.  In the Supreme Court's words, caching is a "capability for . . . acquiring, [storing] . . . retrieving [and] utilizing . . . information" that "facilitates access" to information by "obviat[ing] the need for the end user to download anew information from third-party Web sites each time the consumer attempts to access them."  *Brand X*, 545 U.S. at 999-1000.  The *Order* asserts, remarkably, that the Court's determination was "inaccurate."  *Order* ¶ 372 n.1051 (JA___).  But the Court's analysis was based on the FCC's own argument that caching is "an information access and retrieval capability" and (like DNS) is "*not* used for" network management.  FCC *Brand X* Reply Br. 5 & n.2.

The FCC does not identify (at 71-79) any relevant facts about DNS and caching that have changed since it expressly told the Supreme Court they are

---

[4] *See* Bennett Amicus 11; Bennett Dec. 30, 2014 Ex Parte 8 (JA___).  Unlike SS7 signaling (FCC Br. 76), DNS does not merely route calls to a specific destination.

information services that do not fall within the telecommunications-management exception. Nor does the FCC provide any justification for the *Order*'s simultaneous finding that DNS and caching *are* information services when offered by third parties, such as Google or Akamai. *See Order* ¶¶ 370 n.1046, 372 (JA___, ___).[5]

The FCC seeks to square this circle by asserting (at 77-78) that broadband providers offer DNS and caching for different "purposes" than third parties. That is not only wrong (both use them to improve users' experience), but also irrelevant. The statutory definitions turn on the functions and capabilities the customer is offered. Regardless of who offers them, DNS and caching provide end users with the same functionality in conjunction with the end user's broadband service.

Indeed, the fact that these services are offered by third parties demonstrates that they do not "manage[ ] a telecommunications network." Internet access providers would not (indeed, could not) allow end users to give third parties authority or responsibility for "managing" their networks.[6] Third-party alternatives

---

[5] Like petitioners, third parties offer DNS and caching along with transmission over their own facilities. *See* AT&T Comments 58-61 (JA___-__).

[6] *See* Richard Bennett, *FCC Brief Painfully Wrong About DNS*, HighTech Forum (Sept. 17, 2015), http://goo.gl/vk8BjT.

exist precisely because DNS and caching are designed to benefit end users, not to manage broadband networks.[7]

The FCC's brief confirms that its new "purpose" test is based on the agency's desire to impose common-carrier obligations on any entity it believes (wrongly, and contrary to the economic evidence) to be a "gatekeeper" — that is, entities that provide last-mile facilities — while sparing others.  FCC Br. 2, 5, 9, 11.  The statute forecloses that approach.  As the FCC itself explained in *Brand X*, the claim of some parties that the case involved "bottleneck transmission facilities" was irrelevant because "the statute contains no such limitation."  FCC 9th Cir. *Brand X* Br. 29-30.  And the Supreme Court agreed that "[t]he Act's definitions . . . parallel the [*Computer* orders'] definitions of enhanced and basic service" and "do not distinguish facilities-based and non-facilities-based" providers.  545 U.S. at 996-97.[8]

---

[7] The FCC's alternative argument (at 75 n.26) that DNS is an information service "separable from the transmission component of broadband" is meritless.  No provider offers broadband Internet access without DNS, and virtually all subscribers use their provider's DNS.  *See* AT&T Comments 48 (JA___).  That some subscribers have sufficient technical proficiency to replace their provider's DNS with a third-party alternative does not mean the provider no longer offers DNS as part of broadband service — just as the availability of aftermarket steering wheels does not mean that Ford separately offers consumers cars without steering wheels and steering wheels.  *See Brand X*, 545 U.S. at 990.

[8] The FCC's contention (at 62) that the *Stevens Report*'s analysis is limited to non-facilities-based providers is incorrect for these reasons.  *See Cable*

11

**b.**     The FCC barely addresses our argument (at 40-41), supported by numerous FCC decisions, that a function is "offered" to consumers regardless of whether a particular customer uses it.  The FCC highlights (at 64) the existence of third-party alternatives for functions such as email, but that is neither novel, *see* USTelecom Br. 49, nor legally relevant.  As the FCC told the Supreme Court in *Brand X*, whether a consumer uses a capability "does not eliminate that capability or change the underlying character of the service offering."  FCC *Brand X* Reply Br. 4; *see Cable Broadband Order* ¶ 38 (classification "turns on the nature of the functions that the end user is offered," "regardless of whether subscribers use all of the functions provided").  The FCC has no rebuttal to its prior analysis.

**3.**     Nothing in *Brand X* suggests that the FCC's attempt to sidestep the definition of "information service" is entitled to deference.  In particular, *Brand X* nowhere hints that, as the *Order* holds, *broadband Internet access itself* could reasonably be understood to be a telecommunications service and not an information service.  Rather, as the FCC does not dispute (at 53), *every* Justice understood that Internet access functions (*i.e.*, the computer-processing functions that allow customers to access data stored on computers, on the provider's network or elsewhere) create an information service.  *See* USTelecom Br. 41-42.

---

*Broadband Order* ¶ 38 (relying on *Stevens Report* in classifying facilities-based broadband).

The FCC is not helped by arguing (at 53-54) that the question in *Brand X* was whether, in addition to that information service, what the FCC calls the "telecommunications component" of Internet access was a severable telecommunications service offering to consumers. The "telecommunications component" at issue in *Brand X* was clearly, and only, the last-mile *link* used to reach the Internet access service. In *Brand X*, Internet service providers that did not have their own last-mile facilities wanted "open access" to cable providers' "monopoly" last-mile facilities so that they could provide their own competing information services (as they were able to do when customers used "dial-up" Internet access services). FCC *Brand X* Br. 9-10, 17, 31-36; *see* EarthLink *Brand X* Br. 21-26, 40-42. Consequently, they did "not challenge the FCC's finding" that Internet access is an information service. FCC 9th Cir. *Brand X* Br. 18.

Although the Supreme Court did not use the term "last mile" in rejecting these parties' attempts to gain access to those facilities, that is a matter of verbiage, not substance. *Brand X* was exclusively about *local* transmission. The FCC's contrary contention ignores the Supreme Court's adoption of the FCC's description of cable companies' "high-speed wire," which the FCC itself defined as the "local" link that terminated before the provider's Internet access facilities; disregards the dissent's reference to the potential telecommunications service being "downstream from the computer-processing facilities" and its analogy of that service to delivery

13

of an already-cooked pizza; and never addresses the FCC's own statement to the Supreme Court that the potentially separate telecommunications service was "between the user and the [Internet] service provider's computers."  USTelecom Br. 43-45 & n.20; *Cable Broadband Order* ¶ 17 n.70.

The issue here is thus not, as the FCC suggests (at 56-57), whether the Supreme Court debated Internet "architecture," or what type of equipment was used.  Rather, the ambiguity in *Brand X* involved whether, regardless of specific facilities, the link between end users and the provider's computer-processing facilities (the pizza delivery) was severable from the Internet access functionality (the pizza making) offered to consumers, or whether the two were offered as a single, integrated service.  The *Order*'s assertion that Internet access — from the end user through the provider's computer-processing facilities, to the edge provider — is *only* a telecommunications service is well outside that ambiguity.

The FCC cannot avoid that conclusion by claiming (at 57-58) that it is reclassifying only a transmission component while leaving other aspects of broadband provider offerings as information services.  Under the *Order*, *all* of the "broadband Internet access service" offered to consumers — defined as in 2010, when it was an information service, *see 2010 Order* ¶ 44 — is now a telecommunications service.  *Order* ¶ 308 (JA___).  The *Order* seeks to regulate the computer-processing functionality that allows customers to "browse" the

14

content of "third-party Web sites." *Brand X*, 545 U.S. at 1000. That very same service, in *Brand X*, was undisputedly an information service because it offered a "comprehensive capability for manipulating information." *Id.* at 987.

### B.    Reclassification Is Arbitrary and Capricious

**1.**    The FCC admits (at 64-68) that the *Order* rejects factual findings underlying its longstanding information-service classification of broadband. The FCC therefore was required to articulate a "more substantial justification" for contradicting those findings. *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015). Yet the FCC fails to show any factual change that is both *real* and *relevant* to its interpretation. As both its brief and the *Order* reflect, reclassification was not a reasoned response to pertinent new facts, but a results-driven effort to impose Title II "for the 21st Century" by any means necessary.

**a.**    The FCC first parrots (at 64-65) the *Order*'s assertion that two purported factual developments — customers' use of third-party services and marketing that emphasizes transmission speed — justify classifying broadband differently today. Neither is a change at all. *See* USTelecom Br. 48-50.

The FCC contends (at 64) that broadband is "useful to consumers today primarily as a conduit for reaching" content and services "provided by unaffiliated third parties." But that only confirms that "consumers use their cable modems . . . to obtain Internet access," *Brand X*, 545 U.S. at 979, as they have *always* done.

Indeed, as discussed, the central premise of the FCC's classification of broadband as a single integrated information service was that Internet access — *i.e.*, the ability to "access the World Wide Web" — inherently consists of accessing third-party content. That consumers today use broadband to access third-party websites with enhanced functionalities has no bearing on the service broadband providers *offer*. *See supra* p. 12.

The FCC also repeats (at 65-66) the *Order*'s claims that consumers expect a "certain level of transmission capability" — *i.e.*, speed. Here, too, the FCC does not attempt to show how that reflects a change since the 2002 *Cable Broadband Order* (¶ 10 n.36) or since the subsequent orders from 2005-2007 classifying other broadband services as information services. *See* USTelecom Br. 15 n.11. Speed has always been broadband's primary characteristic and selling point, *see id.* at 49, as the *Brand X* dissenters underscored, *see* 545 U.S. at 1005 (Scalia, J., dissenting) ("cable-modem service is popular precisely because of the high-speed access it provides"); *id.* at 1007 n.1 (providers advertise speed).

More fundamentally, "speed claims" do not remotely show that broadband is a mere transmission service. Consumers purchase broadband because faster Internet access service enhances the subscriber's ability to obtain data stored on distant computers — the hallmark of an information service. *See supra* pp. 3-5. Indeed, faster speeds are necessary for widely popular video applications, like

16

Netflix and YouTube, underscoring that such speeds enhance customers' ability to interact with stored content.  In contrast, plain-old-telephone-service providers have never advertised speed in connection with those services.

      **b.**      Unable to show that either supposed change invoked by the *Order* is real, the FCC invokes (at 64-66) an array of other claimed changes.  But all those putative changes — broadband is more widely available, there are millions more third-party websites and a broader range of "apps" and "edge-provider services," and online video is increasingly prevalent — reflect only how subscribers *use* broadband.  They have no bearing on the capabilities providers *offer*, and thus are irrelevant to the statutory question.  *See supra* p. 12.  Broadband providers' supposedly "heightened technical ability" to "threaten Internet openness," FCC Br. 68, is even further afield.  There is no "rational connection between the facts found and the choice made"[9] if an agency announces:  "Yesterday it was raining, but today it is sunny; therefore we will reclassify."  That is what the FCC did here.

      The FCC also misleadingly suggests (at 67) that the dominant Internet-service providers in 2002 were "walled gardens," which it contrasts with the more "open" world providers enable today.  But, as the *Cable Broadband Order* explained, at that time broadband providers offered consumers " 'click-through'

---

      [9] *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

access to any and all content and services available on the Internet." *Cable Broadband Order* ¶ 11. Those providers offered consumers the ability to use "a web browser from Netscape" to access "content from Fox News" and "e-mail in the form of Microsoft's 'Hotmail.'" *Id.* ¶ 25. That is why the FCC argued in *Brand X* that "'click-through' access . . . entails . . . information-processing features" and renders Internet access an information service. FCC *Brand X* Reply Br. 5. Broadband has *always* given customers the ability to "mix and match" their broadband provider with the "content of their choice." FCC Br. 67.

   **c.**     In short, the reclassification ruling is not the result of objective analysis by the FCC of changed facts that undermined its longstanding position. It is a naked effort by the agency to achieve its desired result — subjecting broadband to "Modern Title II" — by relying on indefensible (or irrelevant) assertions of purportedly changed circumstances. Indeed, the FCC *admits* that reclassification is not a response to supposed factual changes by conceding that, even if "the facts regarding how [broadband] is offered had *not* changed," it would have reclassified anyway. *Id.* at 68-69 (emphasis added).

   That concession dooms the *Order* by confirming that its factual-developments rationale is an irrelevant sideshow. It takes chutzpah to claim that the correct classification of broadband hinges on the "factual particulars of how Internet technology works and how it is provided," *id.* at 16, 35, 52 — and to

18

demand deference on that basis — yet assert that, regardless of the facts, the

agency can and will do as it pleases.

Even on its own terms, the FCC's fallback assertion that, if the facts have

not changed, it will jettison its prior view of the *law* avails it nothing.  The FCC

still offers no alternative statutory interpretation that would yield a different

classification of broadband given unchanged facts.  The FCC's brief disavows its

prior interpretations "[t]o the extent necessary."  *Id.* at 71.  But the FCC never

specifies that "extent" or explains its new reading of the statute.

The FCC offers a tortured policy argument that, because the "information

service" classification caused the "edge-provider economy [to] explod[e]," it now

must *abandon* that massively successful regime to protect the "rapidly growing

edge-provider marketplace."  *Id.* at 70.  Killing the golden goose is not a good

strategy for increasing the output of golden eggs.  Regardless, that is not a legal

interpretation, but more evidence that the rulemaking was rigged to arrive at the

agency's preferred outcome.  *See* Pai Dissent 370 (JA___).

    **2.**    The FCC concedes that it had to " 'take[ ] into account' " reliance that

it deliberately induced.  FCC Br. 85 (quoting *Perez*, 135 S. Ct. at 1209).  But,

instead of doing so, the *Order* denies that such reliance *exists*.  *See* USTelecom Br.

51-52.  The FCC repeats that implausible claim (at 86-88), but never confronts its

own repeated pronouncements that its prior policy was designed to *encourage*

19

reliance and to "remove regulatory uncertainty that in itself may discourage investment." *Cable Broadband Order* ¶ 5; *see* USTelecom Br. 50-51.

Instead, the FCC echoes the *Order*'s claim that broadband's status was not "settled." FCC Br. 86. But the FCC's assertion that "the Commission for years subjected DSL to Title II," *id.*, is misleading. Internet access service has *never* been subjected to Title II, only the last-mile connection from the end user *to* its Internet access provider (and only wireline connections, not cable or wireless). *See* USTelecom Br. 9 n.8. For just a few months in 2010 was the possibility of reclassifying Internet access service even on the table.

The FCC argues (at 87) that several clues signaled that the information-service classification blessed by the Supreme Court might later be abandoned. None of the breadcrumbs in its trail shows any such thing. Neither boilerplate statements in prior classification orders reserving "authority to achieve [the FCC's] policy goals, including" "openness," *id.*, nor pledges to take unspecified action if the "open Internet[ ] principles" were "violat[ed]," *id.* at 88, hinted that the FCC would impose numerous Title II provisions unrelated to openness. That the FCC — while *rejecting* proposals to reclassify broadband in the *2010 Order* — "left open" a separate docket in which reclassification had been floated, *id.* at 87, adds nothing. Scores of FCC dockets remain "open," without suggesting imminent upheaval in the law. Nor did *Verizon* — which provided a "blueprint" to pursue

20

the FCC's "openness" goals *under § 706*, *NPRM* ¶ 4 (JA___) — foreshadow Title II "for the 21st Century."

The FCC also fails to refute the harm that reclassification will cause to investment-backed reliance.  It argues (at 86) that reclassification will not leave providers' investment "worthless," but that conflates our APA arguments with a Takings claim.  Petitioners need prove only that the *Order* imposes significant new burdens that, had they been known, would have discouraged investment.  There is no question they do.  *See* NAM Amicus 10-16.

Nor does the FCC or its *amici* identify any benefit that could offset this harm.  They echo the *Order*'s pronouncement that openness will "fuel a virtuous cycle" yielding "positive effects on innovation and investment."  *E.g.*, FCC Br. 82.  But, as *Verizon* (740 F.3d at 655-59) and the FCC itself (*NPRM* ¶ 4 (JA___)) recognized, reclassification is unnecessary to achieve openness.  Moreover, the virtuous-cycle theory hinges on "expanded investments *in broadband infrastructure*."  *Order* ¶ 7 (JA___) (emphasis added).  Empirical analysis confirms that applying Title II will discourage investment.  *See* Georgetown Center Amicus 13-15.  Indeed, reports indicate investment has *already* decreased in 2015.[10]

---

[10] Hal Singer, *Does the Tumble in Broadband Investment Spell Doom for the FCC's Open Internet Order?*, Forbes.com (Aug. 25, 2015), http://goo.gl/Dx3bAj (capital expenditures among six largest ISPs 12 percent lower on average in the first half of 2015).

The FCC asserts (at 83) that the *Order*'s forbearance will mitigate these investment-chilling effects. *See also* Cogent et al. Br. 41-42. But it never addresses the immense costs imposed by the many Title II provisions from which the *Order* did *not* forbear. *See* USTelecom Br. 55.

The FCC cites (at 83-84) several services that purportedly were subject to Title II, yet flourished. These supposed "success stories" offer cold comfort. O'Rielly Dissent 389 (JA___). For instance, the FCC ignores that investment in mobile was "driven" by mobile-*broadband* services never subject to Title II. Verizon Feb. 19, 2015 Ex Parte 2 (JA___). As for DSL, the FCC again conflates the connection between an end user and an Internet access provider with Internet access service, and ignores that providers invested "to support *non-Title II* services." NCTA Reply Comments 9 (JA___) (emphasis added).[11]

The FCC cites (at 84) a few statements from executives and "market analysts" suggesting that reclassification would not diminish investment. Even

---

[11] Claims that investment flourished under Title II or when broadband's status was uncertain, and "dropped off precipitously" after the FCC classified broadband as an information service, are similarly misleading. CCIA-Mozilla Amicus 28-29; Cogent et al. Br. 38-41. Broadband Internet access services were never subject to Title II; moreover, pre-classification investment was primarily in *non*-Title II services. *See* NCTA Reply Comments 8-10 (JA___-__). Decreases over time in investment in dollar figures also largely reflect declining *input* costs; the cost of fiber-optic cable, for example, was up to 150 times higher in 1997 than in 2014. *See id.* at 11 (JA___).

taken at face value, those statements lend the FCC little support.  *See Order* ¶ 416

n.1223 (JA___) (reclassification may not affect short-term investment, but "will

affect 'long-term investment'") (citation omitted).  And they pale in comparison to

the *FCC's* repeated statements linking prior decisions *not* to impose Title II with a

desire to create certainty and spur investment, *see*, *e.g.*, *Cable Broadband Order*

¶ 5, as well as the empirical evidence, *see supra* pp. 21-22.

## II.  MOBILE BROADBAND IS TWICE IMMUNE FROM COMMON-CARRIAGE REGULATION

In addressing mobile broadband, the FCC again started with its desired

outcome — that mobile "be regulated in the same fashion as fixed broadband,"

FCC Br. 89 — and worked backward to that predetermined conclusion.  This

results-oriented decision-making is unlawful.  Mobile and fixed broadband

services are governed by different statutory provisions with different regulatory

histories.

As we demonstrated (at 32-33) and the FCC's brief fails to rebut, mobile

broadband cannot be treated as common carriage for two independent reasons.

*First*, mobile, like fixed, broadband offers consumers the ability to interact with

data stored on remote computers.  And mobile broadband contains both the same

inseparable data-processing features as fixed broadband and additional features

necessary to maintain the stable, secure wireless connection that customers expect.

The FCC makes no serious attempt to engage with these additional features, instead gesturing toward the "telecommunications management exception."  FCC Br. 79 n.30.  That response fails to account for the numerous features we identified (at 32-33) that "change . . . the form . . . of the information as sent" and so involve more than mere telecommunications, 47 U.S.C. § 153(50), and are done to benefit users, not to "manage[ ] . . . a telecommunications system," *id.* § 153(24).

*Second*, the FCC concedes that it reclassified mobile broadband as a "commercial mobile service" under 47 U.S.C. § 332(d) only by abandoning multiple, long-held regulatory definitions in favor of new ones that accomplish its predetermined goal.  These new definitions are utterly divorced from Congress's statutory purpose for § 332(c), as evinced by both statutory text and context:  to regulate the mobile *telephone* network.

## A.     The FCC Unlawfully Changed the Definition of "Commercial Mobile Service"

The FCC asserts (at 89, 92) that mobile broadband Internet access service is a "commercial mobile service," not a "private mobile service," because it is a mass-market service unlike a "taxi company's internal dispatch service" or "intra-enterprise" corporate network.  Contrary to the FCC's portrayal of "private mobile service[s]" in this narrow way, Congress defined that category broadly:  "*any* mobile service . . . that is not a commercial mobile service or [its] functional equivalent" is a "private mobile service," no matter how widely available.  47

24

U.S.C. § 332(d)(3) (emphasis added).  Congress adopted this structure because, as the FCC acknowledges, the purpose of § 332(c) and (d) was to regulate mobile voice services that were "essentially indistinguishable from cellular phone service, which was subject to common-carrier regulation," FCC Br. 32 n.15, while leaving *all other* mobile services free to flourish without the burden of common-carrier regulation, *see* USTelecom Br. 9-10.

The FCC admits (at 94) that "the telephone network was . . . at the center of Congress's attention" when it enacted § 332.  And while the FCC asserts that Congress made only a passing reference to the telephone network in a voluminous legislative history, the Conference Report's reference to "the [p]ublic switched telephone network" occurred in its *only discussion* of § 332(d).  *See* USTelecom Br. 61.  The FCC likewise does not deny that *every* use of "public switched network" in the United States Code refers only to the telephone network and *not* the Internet.  *See id.* at 60-62.  As recently as 2012, Congress explicitly distinguished "the public switched network" from the "the public Internet."  47 U.S.C. § 1422(b)(1)(B)(ii).[12]

---

[12] The FCC notes (at 95) that Congress used "public switched telephone network" once.  18 U.S.C. § 1039(h)(4).  But that same criminal statute also distinguishes telecommunications carriers from providers offering Internet-based services.  *See id.* § 1039(h)(2).

Until now, the FCC always interpreted § 332 in the same manner:  a common-carriage "commercial mobile service" was an "interconnected service," meaning the service allowed users to connect to "all other users" on "the public switched network," which in turn meant (exclusively) the telephone network. 47 U.S.C. § 332(d)(1); 47 C.F.R. § 20.3 (1994).  The *Order* could fulfill the FCC's *idée fixe* of equal-reclassification for mobile broadband only by rewriting *both* definitions:  an "interconnected service" now need allow users access only to *some* "other users," and the "public switched network" now includes both the telephone network and the public Internet.  *Order* ¶¶ 391, 402 & n.1175 (JA ___, ___); 47 C.F.R. § 20.3 (2015).

The FCC fails to justify this dramatic change from its position in 2007, 2010, and 2011.  *See* USTelecom Br. 58.  The FCC says only (at 91, 100 & n.36) that, as compared to 1994, mobile broadband is no longer "nascent" and provides "ubiquitous access."  But it is precisely *because* mobile broadband has not been weighed down with heavy-handed common-carrier obligations that it is so competitive.  That fact independently precludes mandatory common-carrier treatment, as there could be no finding of market power for this service.  *See* USTelecom Br. 74.

Indeed, despite the FCC's continued efforts to justify the Order as restraining " 'gatekeeper' power" among broadband providers who are "acting as

'terminating monopol[ies],' " FCC Br. 2, 5, the FCC has no response to expert evidence establishing that "the fundamental assumptions of the 'terminating access monopoly' theory are not present," particularly in the mobile broadband market where "the percent of customers switching providers (or 'churning') in a given year rang[es] from 12 to 26 percent for individual providers," a "high rate of switching" that "indicates that subscriber switching costs are low." Lerner/ Ordover Decl. ¶¶ 4-5 (JA___-__). More than 82 percent of consumers have access to at least four mobile broadband providers, and these providers compete aggressively to attract and retain customers. *See* USTelecom Br. 56-57.

The FCC claims (at 90) that the *Order* merely "moderniz[es]" the statutory term "the public switched network." The Court should not be fooled. The FCC's redefinition of that term now includes both the telephone network and Internet-protocol-enabled networks that serve billions of devices that may have no connection *at all* to the telephone network. That is not an update, but a radical reimagining.

The FCC responds (at 93, 95) that the word "telephone" does not appear in the statutory definition. But, as demonstrated above, all the "traditional tools of statutory interpretation — text, structure, purpose, and legislative history," *Pharmaceutical Research & Mfrs. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001) — show that, to Congress, "the public switched network" means the same

27

thing as "the public switched telephone network." Nor does Congress's delegation to the FCC to define that term give it a free pass. Congress granted that authority so the FCC would have the flexibility to cover other mobile services that connect to the telephone network. Just as the FCC could not interpret the term "land vehicles" to include "boats," it may not fundamentally redefine "the public switched network" to extend to devices and services without *any* connection to the telephone network, "render[ing] the statute unrecognizable to the Congress that designed it." *Utility Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2444 (2014).

Even on the FCC's own terms, it was unreasonable to reclassify mobile broadband by redefining "the public switched network" — a single network — to include both the telephone network and the Internet. *See* FCC Br. 99. The FCC asserts (at 91) that "[the] quality of 'ubiquitous access' has been the touchstone of the FCC's definition of 'interconnected service' and 'public switched network'" for 20 years. But mobile broadband does not provide "ubiquitous access" to the public switched network — even as newly defined — because it provides no access *at all* to the hundreds of millions of end points on that network reached by telephone numbers.[13] That shortcoming goes far beyond an otherwise

---

[13] The FCC wisely abandons the claim that mobile broadband service actually *does* interconnect with the telephone network because consumers can use third-party Voice-over-Internet-Protocol applications. *See Order* ¶ 400 (JA___); USTelecom Br. 69-70.

interconnected network "restrict[ing] access" in "certain limited ways."  *Order* ¶ 402 (JA___).

Likewise, the FCC's redefinition produces the absurd consequence that mobile *voice* service no longer provides ubiquitous access to "the public switched network," because that service cannot reach any IP addresses.  *See* Pai Dissent 366 (JA___).  That the FCC's new interpretation of "commercial mobile service" would exclude "the one service that everyone agrees Congress intended to be a commercial mobile service" is clear evidence that the interpretation is unreasonable.  *Id.*

Finally, the FCC's redefinition of the public switched network to include the public Internet gives the FCC authority over billions of Internet-connected watches, thermostats, and other devices.  *See* USTelecom Br. 63-64.  The FCC's only response (at 99-100) is that these devices "themselves" technically do not "fall within the scope of the *Order.*"  But the *Order* certainly *does* cover the connections to and among these devices, which are critical to their functionality. *See Order* ¶ 391 (JA___).  The fact that the FCC's redefinition would allow it to control such a massive portion of the economy proves that the FCC's interpretation is untenable.  *See Utility Air*, 134 S. Ct. at 2444.

**B.    The FCC Unlawfully Crafted a New Test for Functional Equivalence for this Proceeding Only**

The *Order* also concluded that, even if mobile broadband is not a commercial mobile service, it is nonetheless "functional[ly] equivalent." *Order* ¶¶ 404-405 (JA___-__).  The FCC concedes (at 102) that it reached that conclusion only after refusing to apply its long-settled functional-equivalence standard.  The FCC has always asked whether evidence shows that the service in question is "closely substitutable" — in an antitrust sense — such that "changes in price" would "prompt customers to change from one service to the other."  USTelecom Br. 66-67; *see Second Report and Order* ¶ 80.  Mobile broadband and mobile voice services indisputably are *not* close substitutes under that test.

The *Order* thus ignored the FCC's existing regulation, even though the FCC *did not amend* that rule and will continue to apply that definition "in other contexts" — presumably where it does not stand in the way of a desired result. *Order* ¶ 408 (JA___).  Applying a made-up standard for the first and only time to reach a conclusion that governing law will not permit, without actually changing the governing law or offering a reasoned basis for departing from it, is the essence of arbitrary action.  *See* USTelecom Br. 66-67.[14]

---

[14] The FCC notes (at 104) that the existing rule is in a section that governs "petitions filed by private parties" regarding individual mobile-service providers.

The FCC argues (at 102) that its functional-equivalence conclusion is permissible because mobile broadband "overlap[s]" in *some* respects with mobile voice telephony. That is nonsense. No one would describe a motorboat and a car as "functionally equivalent" simply because both can transport passengers between Los Angeles and San Diego. Similarly, some degree of overlapping utility does not render mobile broadband's data-processing capabilities functionally equivalent to mobile telephony's voice capabilities.

The FCC thus must climb to the highest levels of abstraction, arguing (at 102) that "[m]any forms of communication — from sharing news with family to ordering takeout — may be accomplished equally well through the telephone network or mobile internet service." This rings hollow. Consumers understand the difference between the voice service and data service on their mobile device: everyone knows that sending Mom an email on her birthday is not the functional equivalent of calling her.

The FCC further argues (at 103) that our view of functional equivalence — which requires at least *some* connection with the telephone network, *see* USTelecom Br. 67-68 — renders the statutory phrase meaningless because "[a] service that is functionally a commercial mobile service and that is connected to

---

But the FCC has never distinguished between such petitions and its own evaluation of offered services. *See Second Report and Order* ¶¶ 79-80.

31

the telephone network presumably would *be* a commercial mobile service." Not

so. That reading narrows the term's effect, yet, as the FCC has recognized, the

category of functional equivalents, by design, covers "very few mobile services."

*Second Report and Order* ¶ 79; *see* USTelecom Br. 68. It is implausible that

Congress hid the massive power to regulate mobile Internet service in the

"functional equivalent" prong of a definitional provision.

## III.  EVEN ASIDE FROM THE UNLAWFUL RECLASSIFICATIONS, THE *ORDER* MUST BE VACATED

The FCC concedes that the entire *Order* — except for the Internet Conduct

Standard — must be vacated if the Court holds that the FCC unlawfully

reclassified retail fixed and mobile broadband Internet access service. *See* FCC Br.

5, 119; USTelecom Br. 72-73 & n.27.

The FCC is wrong, however, in asserting (at 129) that the Internet Conduct

Standard can survive without Title II. The *Order* explicitly states that the Standard

"represents the [FCC's] interpretation *of sections 201 and 202*," *Order* ¶ 137

(JA___) (emphasis added), and that the FCC "will evaluate whether a practice is

unjust, unreasonable, or unreasonably discriminatory" under §§ 201 and 202 when

using the Standard, *id.* ¶ 295 (JA___). Unlike the test upheld in *Cellco*, the

Standard thus goes beyond "prohibiting commercially unreasonable practices," *id.*

¶ 150 (JA___), to impose quintessential, *per se* common-carrier obligations. *See*

*Verizon*, 740 F.3d at 650, 656-57; *Cellco P'ship v. FCC*, 700 F.3d 534, 548 (D.C. Cir. 2012).  It cannot survive without reclassification.

Even apart from reclassification, the *Order* is unlawful for independent reasons.

### A.    Broadband Providers Are Not Common Carriers

The FCC concedes (at 80) that the two-part *NARUC* test applies and, therefore, a broadband provider cannot be a common carrier unless it voluntarily "holds itself out as offering broadband service to the public indiscriminately."  The FCC claims (at 81 n.31) the *Order* "found that broadband was already being offered on a common carrier basis."

This "finding" — based on "marketing materials" of only a handful of providers — does not establish that *all* providers "hold themselves out indifferently."  *Order* ¶ 354 n.965 (JA___).  Nor does the FCC address the requirement that a provider must make a "conscious" decision to become a common carrier.  *Southwestern Bell Tel. Co. v. FCC*, 19 F.3d 1475, 1481 (D.C. Cir. 1994).  Before the *Order*, even providers that offered broadband indifferently were *not* making that conscious decision:  their services were statutorily immune from common-carriage duties (some doubly so).  Other broadband providers

explicitly reserved the right *not* to serve potential customers,[15] as the FCC

previously acknowledged.  *See 2010 Order* ¶ 79 (broadband providers can "decide

on a case-by-case basis whether to serve a particular end user").

The FCC's reliance (at 80) on its "definition" of the reclassified service as

one "marketed and sold on a standardized basis" does not satisfy the *NARUC* test.

A private carrier can "engage[ ] in solicitation . . . on a large scale"[16] and "serve a

significant clientele."[17]  The fundamental distinction between private and common

carriers is the ability to refuse to serve potential customers, not individualized

negotiations.  *See Orloff v. FCC*, 352 F.3d 415, 419-21 (D.C. Cir. 2003).

Therefore, to become a common carrier, a provider must voluntarily commit to

"serv[e] all similarly situated customers."  *Verizon California, Inc. v. FCC*, 555

F.3d 270, 275 (D.C. Cir. 2009).  Absent evidence that broadband providers are

voluntarily and consciously doing so, they cannot be subject to common-carrier

duties.  Notably, the FCC does not contend that it could compel unwilling

providers to act as common carriers on this record or that it found that any provider

has market power.  *See* USTelecom Br. 74.

---

[15] *See* AT&T Feb. 2, 2015(P) Ex Parte 6-7 (JA___-___).

[16] *Semon v. Royal Indem. Co.*, 279 F.2d 737, 739 (5th Cir. 1960).

[17] *NARUC v. FCC*, 525 F.2d 630, 642 (D.C. Cir. 1976).

### B.    The FCC's Regulation of Internet Interconnection Under Title II Violates *Verizon*

The FCC cannot defend its decision to apply Title II to Internet interconnection arrangements that were not themselves reclassified as common carriage. The FCC's brief (at 119-20) simply repeats the *Order*'s statements that the reclassified *retail* broadband service includes an implicit promise to establish common-carriage Internet interconnection arrangements. That is fiction. The FCC does not dispute that Internet interconnection agreements have always been private-carriage arrangements, *see* USTelecom Br. 77, or that those agreements "will continue to be commercially negotiated," *Order* ¶ 202 (JA___). It follows that broadband providers have not promised to enter into interconnection arrangements *on a common-carrier basis*. The FCC's attempt to impose Title II requirements on such services thus "run[s] afoul of section 153(51)" and "section 332." *Verizon*, 740 F.3d at 650.

In contesting that issue, the FCC misreads *Verizon* as turning on the fact that "the FCC had not classified broadband service *to end users* as a telecommunications service." FCC Br. 121-22 (emphasis added). In fact, *Verizon* found that the FCC "misunderst[oo]d the nature of the inquiry in which [it] must engage" by ignoring providers' separate relationship with edge providers. 740 F.3d at 653. As *Verizon* explained, broadband providers "undoubtedly" "furnish a service" to edge providers that is distinct from the service to end users, so the

35

"question is whether, given the rules imposed . . . , broadband providers are *now*

obligated to act as common carriers" with respect to that separate service. *Id.*

Because the answer under the *Order* is clearly "yes" — as evidenced by the fact

that edge providers may now assert claims against broadband providers under Title

II itself, *see* USTelecom Br. 78 — the FCC could not extend Title II to this

distinct, edge-facing service.

The FCC also insists that § 201(b) gives it authority to regulate distinct

"*services*" provided "in connection with" a telecommunications service, even when

those services are not themselves "subject to Section 201(b)." FCC Br. 121

(emphasis added). But § 201(b) does *not* regulate "services" offered "in

connection with" a telecommunications service (and *Verizon* found that

interconnection is a distinct service). *See* 47 U.S.C. § 201(b) (imposing the "just

and reasonable" requirement only on "charges, practices, classifications, and

regulations for and in connection with [a] communication service"). Moreover, the

Supreme Court has explained that, in construing the phrase "in connection with,"

courts must find "a limiting principle consistent with the structure of the statute

and its other provisions." *Maracich v. Spears*, 133 S. Ct. 2191, 2200 (2013).

Certainly, "in connection with" cannot be so broad as to support the imposition of

Title II to services that other statutory provisions expressly *exempt* from common

carriage. *See Verizon*, 740 F.3d at 649 (FCC cannot exercise authority "in a

36

manner that contravenes any specific prohibition contained in the Communications Act").[18]

### C.    The Internet Conduct Standard Is Unlawfully Vague

The FCC contends (at 125) that the Internet Conduct Standard provides "fair notice" because it prohibits only "unreasonabl[e]" conduct by broadband Internet access providers. But the word "unreasonable" is a "classic term of degree," which, in the brave new world of Title II Internet regulation, has no established meaning — as the FCC's Chairman himself admits. *See* USTelecom Br. 79-80.

The FCC asserts (at 125) that the *Order*'s factors provide the necessary guidance, but they are no better than those found insufficient in *Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993). The FCC refuses to say how it will weigh the factors, and it may include whatever additional "considerations" it likes. *Order* ¶ 138 (JA___). Indeed, after millions of filings, the FCC *itself* was unable to determine whether two industry practices debated in the record — "zero-rating" and "sponsored data" — were permitted under the Standard. *Id.* ¶¶ 151-153 (JA___-__). Thus, as even the FCC's *amici* recognize, the Standard is "vague" and will "discourage innovation." EFF-ACLU Amicus 28-29.

---

[18] Contrary to the FCC's contention (at 121 n.43), *Cable & Wireless v. FCC*, 166 F.3d 1224 (D.C. Cir. 1999), is inapposite: no such statutory prohibition was at issue.

Tellingly, the FCC does not dispute that it drafted the Standard to empower it to proscribe, "on a case-by-case basis," "current or future practices" that the agency might later find problematic, but cannot identify today. *Order* ¶ 135 (JA___). Maximizing enforcement discretion cannot justify a vague rule. The very purpose of the void-for-vagueness doctrine is to *prevent* unfettered enforcement discretion. *See Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).[19]

Finally, the FCC claims (at 125) the Standard survives unless it is "vague in all of its applications." The Supreme Court has recently confirmed that its decisions "squarely contradict" that theory. *Johnson v. United States*, 135 S. Ct. 2551, 2561 (2015). And a vague regulation is arbitrary apart from whether it violates due process. *See Timpinaro*, 2 F.3d at 460. That is especially true here, where the *Order* correctly concedes that "vague or unclear regulatory requirements could stymie . . . innovation." *Order* ¶ 138 (JA___).[20]

---

[19] The FCC's "mother-may-I" advisory opinion process does not answer these concerns. *See* FCC Br. 126. The advisory opinions cannot be obtained for existing conduct, conduct subject to a pending inquiry, or conduct that is a "mere possibilit[y]." *Order* ¶¶ 231-232 (JA___-__). The Enforcement Bureau has discretion whether and when to respond to a request for guidance; its guidance does not bind the FCC; and seeking guidance can trigger enforcement. *See id.* ¶¶ 231-235 (JA___-__).

[20] *Cement Kiln Recycling Coalition v. EPA*, 493 F.3d 207 (D.C. Cir. 2007), on which the FCC relies (at 126), is inapposite. There, the statute unambiguously

### D.    The FCC Violated the Regulatory Flexibility Act

The FCC's only substantive defense of its final Regulatory Flexibility Act

("RFA") analysis is the fleeting suggestion (at 156 & n.58) that burdens on small

providers emanate from Title II itself, not the *Order*.  But the FCC has claimed

discretion to impose Title II "for the 21st Century."  It therefore must consider the

costs of that decision on small businesses.  *See* USTelecom Br. 81-83.

The FCC's lead procedural argument (at 155) — that no party raised the

FCC's failure to address Title II's impact on small operators and the inadequacy of

its RFA analysis — is baseless.  *See* SBA Sept. 25, 2014 Ex Parte (JA___-__);

ACA Comments 32 & n.79 (JA___-__); WISPA Comments 16-22 (JA___-__).

Nor can the FCC evade RFA requirements by arguing (at 156) that the

reclassification portion of the *Order* was a declaratory ruling, not a rulemaking.

The FCC rules are expressly predicated on Title II.  *See* FCC Br. 5.  It defies logic

for the FCC to suggest it can adopt *rules* while not conducting a rulemaking

subject to the RFA.

In any event, the Declaratory Ruling was not "issued in a specific factual

context" that "resolv[es] only the issues presented by [a specific] application" and

---

authorized case-by-case analysis, and the EPA's factors were detailed and did not
permit the agency to consider anything it wished.  *See* 493 F.3d at 218-19, 221,
223.  Moreover, the EPA there, unlike here, had not found that clear regulations
furthered the statutory purpose.  *See Order* ¶ 138 (JA___).

thus does not "belong[] to the genre of adjudicatory rulings." *Loveday v. FCC*, 707 F.2d 1443, 1447 (D.C. Cir. 1983). Indeed, the FCC already told this Court that the Declaratory Ruling was "a ruling of general applicability, not an adjudicatory decision 'with respect to specific parties.'" FCC Mot. Dismiss 5 (May 8, 2015).

## IV.   THE FCC FAILED TO PROVIDE NOTICE

The *Order* independently must be vacated because it is not a "'logical outgrowth'" of the *NPRM*. *Environmental Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005); *see* USTelecom Br. 83-94. The FCC's responses distort the legal standard and disregard bedrock APA notice requirements.

### A.   The FCC Failed To Provide Sufficient Notice of Reclassification

There is a night-and-day difference between the *NPRM*'s proposal to adopt specific rules to preserve "Internet openness," *NPRM* ¶ 4 (JA___), and the *Order*'s invention of a "Modern Title II" "tailored for the 21st Century," *Order* ¶ 38 (JA___), subjecting broadband to vast swaths of common-carrier regulation unrelated to openness. The FCC and its *amici* brush aside this "surprise switcheroo,"[21] insisting that it sufficed that the *NPRM* contemplated reclassification and asked open-ended questions about it. *See* FCC Br. 107-08; AdLaw Amicus 6-7. That is not the law.

---

[21] *Environmental Integrity Project*, 425 F.3d at 996.

The FCC had to "make its views known to the public in a concrete and focused form," *HBO, Inc. v. FCC*, 567 F.2d 9, 36 (D.C. Cir. 1977) (per curiam), "describe the range of alternatives being considered with reasonable specificity," *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983), and make clear the "objective of the rulemaking," *Council Tree Communications, Inc. v. FCC*, 619 F.3d 235, 253-54 (3d Cir. 2010). The *NPRM* did none of these.

The FCC cites nothing in the *NPRM* describing with *any* specificity the purported basis for reclassification. It notes the generic statement that the FCC would "seriously consider" reclassification, *NPRM* ¶ 4 (JA___), but that gave no notice of the entirely new regulatory edifice the *Order* constructed, let alone the *Order*'s *rationale* for reclassification: supposed changes in consumers' perceptions. Nor does the FCC identify anything in the *NPRM* addressing the scope of the *Order*'s reclassification, which covers *not* merely a last-mile transmission component, but the *entire* end-to-end service.

The FCC also points to nothing in the *NPRM* hinting that Open Internet rules would be transformed from the rulemaking's objective into an excuse for reclassification. It cites the *NPRM*'s acknowledgment that reclassification would render Title II provisions applicable, *see* FCC Br. 108, yet ignores the *NPRM*'s

41

"goal" of "protecting and promoting Internet openness" and pledge to forbear from "all but a handful of core statutory provisions," *NPRM* ¶¶ 4, 154 (JA___, ___).

The FCC's view would excuse agencies from providing any concrete notice of what they plan to do or why. The FCC does not deny, for example, that the *NPRM* never mentioned the telecommunications-management exception or reversing its position that DNS and caching fall outside that exception. Yet the FCC claims that, because its view of DNS and caching were two factors among many supporting its information-service classification of broadband, commenters should have "foresee[n]" that the *Order* might justify reclassification by abandoning that view. FCC Br. 111. That is antithetical to the APA. Commenters are not required "to divine the agency's unspoken thoughts." *Environmental Integrity Project*, 425 F.3d at 996.

That some commenters offered input on the telecommunications-management exception is irrelevant. *See* FCC Br. 111. Even if "a comment may evidence a recognition of a problem, it can tell [courts] nothing of how, or even whether, the *agency* will choose to address it." *Shell Oil Co. v. EPA*, 950 F.2d 741, 751 (D.C. Cir. 1991) (emphasis added).[22]

---

[22] The FCC does not argue that comments on the telecommunications-management exception rendered the inadequate notice harmless.

42

**B.     The FCC Provided No Notice That It Would Amend Multiple Regulations in Order To Reclassify Mobile Broadband**

The FCC concedes (at 112) that the *NPRM* asked only whether mobile broadband "fit[s] *within the definition* of 'commercial mobile service.'" *NPRM* ¶ 150 (JA___) (emphasis added).  As an appendage to that question, the *NPRM* cited the FCC's regulatory definitions of "interconnected service" — a service that allows users to communicate with "all other users" on the public switched network — and "public switched network" — the network that uses "the North American Numbering Plan."  47 C.F.R. § 20.3, *cited in NPRM* ¶ 150 n.307 (JA___).  Commenters reasonably responded by showing how the FCC's *existing* definitions applied to the facts of mobile broadband service.

No one contemplated — and the *NPRM* never suggested — that the FCC might fundamentally *change* these definitions by reinterpreting "interconnected service" to mean a service that allows users to reach only *some* other users and "public switched network" to mean both the telephone network *and* the Internet.  An agency's final rule may not redefine a statutory term when it has "neither stated nor suggested that [it] was contemplating amending the [definition]."  *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 102 (D.C. Cir. 2013).[23]

---

[23] The FCC notes (at 112-13) that the *NPRM* referenced the *2010 Notice*, but cites nothing in *either* docket that contemplated changing existing definitions.

43

The FCC contends (at 114) that, because it had previously classified mobile broadband by applying its long-held definition of "public switched network," commenters *must have* known that "changing the categorization likely would entail revisiting that definition." The FCC cites no precedent supporting that contention. Certainly, commenters do not think like that. When an agency asks whether the snail darter should be classified as "endangered," and it has always interpreted "endangered" to mean "seriously at risk of extinction," commenters do not say to themselves, "The snail darter is not at serious risk of extinction, so I must address *every other definition* of 'endangered' that the agency might announce for the first time in order to reach its desired conclusion that the snail darter is endangered."

Nor can the FCC get off the hook by noting (at 115-16) that some commenters responded in *reply* comments to statutory redefinitions that were proposed by other commenters. As discussed above, and as the FCC recognizes (at 117), that some comments were submitted on an issue is not determinative "where an agency has failed to provide notice altogether." That is this case: the FCC failed to provide notice *altogether* that it might drastically change the definitions of "public switched network" and "interconnected service" that had been in place for 20 years.

44

### C.     The FCC Failed To Provide Notice About Important Aspects of the *Order*

*Internet Interconnection.*  The FCC claims that the *NPRM* provided notice of the *Order*'s extension of Title II to Internet interconnection, but has no answer to the *NPRM*'s proposal *not* to address the issue, *see NPRM* ¶ 59 (JA___), or the Chairman's statement that interconnection "is better addressed separately," Wheeler NPRM Statement 87 (JA___).  The FCC's citations (at 122) to open-ended *NPRM* questions cannot provide adequate notice.  *See supra* Part IV.A.

Regardless, these questions concerned only "expand[ing] the scope of *the open Internet rules*" to cover traffic exchange and preventing "eva[sion]" of those rules.  *NPRM* ¶ 59 (JA___) (emphasis added) — a proposal the FCC *rejected*, *see Order* ¶ 30 (JA___).  The FCC does not claim that those questions indicated that the *Order* would seek to evade *Verizon* by imposing Title II on Internet interconnection arrangements based on the novel theory that this edge-facing service "is subsumed within" retail broadband service.  *Order* ¶ 338 (JA___).

*Internet Conduct Standard*.  The FCC claims (at 128) that the Internet Conduct Standard — nowhere mentioned in the *NPRM* — is an outgrowth of comments addressing the different "commercially reasonable" standard the *NPRM* actually proposed.  But the agency "must *itself* provide notice of [its] proposal." *Association of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 462 (D.C. Cir. 2012).  The FCC cannot claim that the *Order*'s Conduct Standard is close

45

enough to the "commercially reasonable" standard to satisfy the APA. The never-mentioned Conduct Standard imposes *per se* common-carriage duties instead of a § 706 "commercially reasonable" standard.

## CONCLUSION

The Court should vacate the *Order*.

Dated: October 5, 2015

MIGUEL A. ESTRADA
THEODORE B. OLSON
JONATHAN C. BOND
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

MATTHEW A. BRILL
MATTHEW T. MURCHISON
JONATHAN Y. ELLIS
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 637-2200

RICK C. CHESSEN
NEAL M. GOLDBERG
MICHAEL S. SCHOOLER
NATIONAL CABLE & TELECOMMS.
  ASS'N
25 Massachusetts Avenue, N.W.
Suite 100
Washington, D.C. 20001
(202) 222-2445

*Counsel for NCTA*

Respectfully submitted,

 /s/ *Michael K. Kellogg*

MICHAEL K. KELLOGG
SCOTT H. ANGSTREICH
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Counsel for USTelecom, CTIA, and
AT&T*

STEPHEN E. CORAN
S. JENELL TRIGG
LERMAN SENTER PLLC
2000 K Street, N.W., Suite 600
Washington, D.C. 20006
(202) 429-8970

*Counsel for WISPA*

HELGI C. WALKER
MICHAEL R. HUSTON
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 887-3599

*Counsel for CTIA*

46

JEFFREY A. LAMKEN
MOLOLAMKEN LLP
The Watergate, Suite 660
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000

BARBARA S. ESBIN
CINNAMON MUELLER
1875 Eye Street, N.W., Suite 700
Washington, D.C. 20006

ROSS J. LIEBERMAN
AMERICAN CABLE ASSOCIATION
2415 39th Place, N.W.
Washington, D.C. 20007
(202) 494-5661

*Counsel for ACA*

DAVID H. SOLOMON
RUSSELL P. HANSER
WILKINSON BARKER KNAUER, LLP
2300 N Street, N.W., Suite 700
Washington, D.C. 20037
(202) 783-4141

TIMOTHY M. BOUCHER
CENTURYLINK
1099 New York Avenue, N.W.
Suite 250
Washington, D.C. 20001
(303) 992-5751

*Counsel for CenturyLink*

KATHLEEN M. SULLIVAN
QUINN, EMANUEL, URQUHART &
   SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

JONATHAN BANKS
UNITED STATES TELECOM ASS'N
607 14th Street, N.W., Suite 400
Washington, D.C. 20005
(202) 326-7272

*Counsel for USTelecom*

PETER D. KEISLER
JAMES P. YOUNG
C. FREDERICK BECKNER III
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

DAVID R. MCATEE II
DAVID L. LAWSON
GARY L. PHILLIPS
CHRISTOPHER M. HEIMANN
AT&T SERVICES, INC.
1120 20th Street, N.W., Suite 1000
Washington, D.C. 20036
(202) 457-3055

*Counsel for AT&T*

47

# CIRCUIT RULE 32(a)(2) ATTESTATION

In accordance with D.C. Circuit Rule 32(a)(2), I hereby attest that, as described in footnote 2, all other parties on whose behalf this joint reply brief is submitted concur in the brief's content.


 /s/ *Michael K. Kellogg*
Michael K. Kellogg

October 5, 2015

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and D.C. Circuit Rule 32(e), as modified by the Court's June 29, 2015 briefing order granting petitioners 10,000 words, the undersigned certifies that this brief complies with the applicable type-volume limitations.  This brief was prepared using a proportionally spaced type (Times New Roman, 14 point).  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(e)(1), this brief contains 9,981 words.  This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word 2013) used to prepare this brief.

 /s/ *Michael K. Kellogg*
Michael K. Kellogg

October 5, 2015

## CERTIFICATE OF SERVICE

I hereby certify that, on October 5, 2015, I electronically filed the foregoing joint reply brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Michael K. Kellogg*
Michael K. Kellogg