**FINAL VERSION**

ORAL ARGUMENT SCHEDULED FOR DECEMBER 4, 2015
No. 15-1063 (and consolidated cases)

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

UNITED STATES TELECOM ASSOCIATION, *et al.*,

Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

Respondents.

_____

## ON PETITIONS FOR REVIEW OF AN ORDER OF THE
## FEDERAL COMMUNICATIONS COMMISSION

_____

## JOINT REPLY BRIEF FOR PETITIONERS ALAMO BROADBAND INC.
## AND DANIEL BERNINGER

_____

| | |
|---|---|
| RICHARD E. WILEY | ANDREW G. MCBRIDE |
| BENNETT L. ROSS | BRETT A. SHUMATE |
| BRETT A. SHUMATE | EVE KLINDERA REED |
| WILEY REIN LLP | WILEY REIN LLP |
| 1776 K Street, N.W. | 1776 K Street, N.W. |
| Washington, D.C. 20006 | Washington, D.C. 20006 |
| (202) 719-7000 | (202) 719-7000 |
| | |
| *Counsel for Daniel Berninger* | *Counsel for Alamo Broadband Inc.* |

Dated: October 13, 2015

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................................................ ii

GLOSSARY.......................................................................................................... v

SUMMARY OF ARGUMENT ............................................................................ 1

ARGUMENT ........................................................................................................ 1

I.    THE RULES VIOLATE THE FIRST AMENDMENT................................. 1

II.    THE FCC LACKS AUTHORITY TO BAN PRIORITIZATION.................. 8

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# **TABLE OF AUTHORITIES**

**PAGE(S)**

## **CASES**

*Arkansas Educ. Television Comm'n v. Forbes*,
　　523 U.S. 666 (1998)..................................................................................2

*Brown v. Entm't Merchs. Ass'n*,
　　131 S.Ct. 2729 (2011).................................................................................4

*Cablevision Sys. Corp. v. FCC*,
　　597 F.3d 1306 (D.C. Cir. 2010)..................................................................6

*CBS, Inc. v. FCC*,
　　453 U.S. 367 (1981)....................................................................................7

*Cellco P'ship v. FCC*,
　　700 F.3d 534 (D.C. Cir. 2012)....................................................................9

*Chamber of Commerce v. FEC*,
　　69 F.3d 600 (D.C. Cir. 1995)......................................................................8

*Chamber of Commerce v. SEC*,
　　412 F.3d 133 (D.C. Cir. 2005)....................................................................8

*Citizens United v. FEC*,
　　558 U.S. 310 (2010).................................................................................6, 8

*City of Lakewood v. Plain Dealer Pub. Co.*,
　　486 U.S. 750 (1988)....................................................................................2

*City of Los Angeles v. Preferred Commc'ns, Inc.*,
　　476 U.S. 488 (1986)....................................................................................2

*Edwards v. DC*,
　　755 F.3d 996 (D.C. Cir. 2014)....................................................................8

*Fox Television Stations, Inc. v. FCC*,
　　280 F.3d 1027 (D.C. Cir. 2002)..................................................................6

\*Authorities upon which we chiefly rely are marked with asterisks.

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) ................................................................................5

*Ex Parte Jackson*,
  96 U.S. 727 (1877) ................................................................................................5

*Leathers v. Medlock*,
  499 U.S. 439 (1991) ..............................................................................................3

*Malik v. Brown*,
  16 F.3d 330 (9th Cir. 1994) ..................................................................................3

*Miami Herald Pub. Co. v. Tornillo*,
  418 U.S. 241 (1974) ..........................................................................................5, 7

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  132 S.Ct. 2065 (2012) ...........................................................................................9

*Reno v. ACLU*,
  521 U.S. 844 (1997) ..........................................................................................6, 7

*Susan B. Anthony List v. Driehaus*,
  134 S.Ct. 2334 (2014) ...........................................................................................8

*\*Turner Broad. Sys. Inc. v. FCC*,
  512 U.S. 622 (1994) ...........................................................................2, 3, 4, 5, 6

*\*Verizon v. FCC*,
  740 F.3d 623 (D.C. Cir. 2014) .........................................................4, 6, 7, 8, 9

**STATUTES**

47 U.S.C. §230(c)(2)(A) .............................................................................................3

47 U.S.C. §536(a)(3) ...................................................................................................7

**ADMINISTRATIVE MATERIALS**

*Comcast Order*,
  23 F.C.C.R. 13028 (2008) ...................................................................................7

## MISCELLANEOUS

Christopher S. Yoo, *Free Speech and the Myth of the Internet as an Unintermediated Experience*, 78 GEO. WASH. L. REV. 697 (2010)......................3

# GLOSSARY

| | |
|---|---|
| **FCC** | Federal Communications Commission |
| **JA** | Joint Appendix |
| *Turner* | 1994 Supreme Court opinion holding that the must-carry provisions of the Cable Television Consumer Protection and Competition Act of 1992 are subject to intermediate scrutiny under the First Amendment |
| *Verizon* | 2014 D.C. Circuit opinion holding that the FCC's anti-blocking and anti-discrimination rules unlawfully imposed common-carrier regulation on broadband Internet access service providers |

## SUMMARY OF ARGUMENT

The FCC admits that broadband providers engage in and transmit speech, but contends the First Amendment does not protect these activities. That position is indefensible. The First Amendment protects broadband providers just as it does every other means of distributing mass communications, from cable systems to YouTube. The open Internet rules cannot survive any level of scrutiny because they foreclose the exercise of editorial discretion in the name of equalizing all speech. At a minimum, the rules present serious constitutional difficulties. The FCC also lacks authority to ban paid prioritization.

## ARGUMENT

### I.    THE RULES VIOLATE THE FIRST AMENDMENT.

**1.** The FCC acknowledges (at 5, 149) that broadband providers "engage in First Amendment activity" when creating their own Internet content (Verizon's huffingtonpost.com), but argues that "these activities...are unaffected by the open Internet rules." This is incorrect.

With prioritization, broadband providers convey a message by "favor[ing]" certain speech—that prioritized content is superior—because it is delivered faster. *Order* ¶125(JA3529). This is no different than a cable operator favoring popular channels by placing them on particular cable tiers. By foreclosing prioritization, the *Order* restricts broadband providers' editorial discretion to favor their own and unaffiliated Internet content. It also infringes the speech of edge providers like

1

Berninger who wish to distinguish their content and services by having them delivered faster.

**2.** The FCC is also mistaken (at 143-44) that broadband providers do not engage in First Amendment activity when acting "as conduits for" others' speech. Distributing communications to mass audiences is no less entitled to First Amendment protection than the communications distributed. *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 768 (1988).

Transmitting "communications of others" "plainly implicate[s] First Amendment interests," *City of Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488, 494 (1986), because it is a "communicative act[]," *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998). For example, cable operators engage in First Amendment activity by transmitting unaffiliated content, even though "cable system[s] function[]...as…conduit[s] for the speech of others." *Turner Broad. Sys. Inc. v. FCC*, 512 U.S. 622, 629 (1994). When "provid[ing]...its subscribers news, information, and entertainment" on the Internet, a broadband provider "is engaged in 'speech' under the First Amendment, and...part of the 'press.'" *Leathers v. Medlock*, 499 U.S. 439, 444 (1991); Yoo, *Free Speech and the Myth of the Internet as an Unintermediated Experience*, 78 GEO.WASH.L.REV. 697, 701-02, 717-57 (2010).

2

Disseminating content over the Internet is nothing like transmitting a telephone call over a copper wire. Broadband providers are not passive conduits; they "monitor and regulate the flow of traffic over their networks" to "optimize overall network performance and maintain a consistent quality experience for consumers." *Order* ¶¶85, 215(JA3510, 3576). Broadband providers communicate that they decide what may be transmitted over their networks. Time Warner Cable Internet Acceptable Use Policy, https://help.twcable.com/twc_misp_aup.html. They routinely exercise editorial discretion by deciding not to transmit content that is unlawful (child pornography) or harmful (spam). *Order* ¶¶113, 118 (JA3524-27). Congress recognized that the right of editorial discretion also includes the right to deny access to "objectionable" content. 47 U.S.C. §230(c)(2)(A); Yoo, at 756.

Broadband providers do not surrender their editorial discretion by electing to transmit all lawful content any more than an individual surrenders his free speech rights by not speaking. *Malik v. Brown*, 16 F.3d 330, 332 (9th Cir. 1994) ("A 'use it or lose it' approach…does not square with the Constitution."). Claiming that broadband providers are not speakers by prohibiting them from speaking is just as "flawed" as claiming that edge providers are not customers by forbidding customer relationships. *Verizon v. FCC*, 740 F.3d 623, 654 (D.C. Cir. 2014).

3

**3.** The FCC's view of the First Amendment is untenable in a time of Internet convergence. *Order* ¶¶3, 9(JA3479, 3481-82). The FCC's belief that companies engage in speech when they provide the ability to view content on television, but not an iPad, makes no sense. The way in which the user accesses content is irrelevant because First Amendment principles "'do not vary' when a new and different medium for communication appears." *Brown v. Entm't Merchs. Ass'n*, 131 S.Ct. 2729, 2733 (2011).

No transmitter of mass communications would receive First Amendment protection under the FCC's approach. The FCC claims (at 144) that "[n]obody understands broadband providers to be sending a message or endorsing speech when transmitting the Internet content that a user has requested." But even though "there appears little risk that cable viewers would assume that the broadcast stations carried on a cable system convey ideas or messages endorsed by the cable operator," *Turner*, 512 U.S. at 655, cable operators still exercise editorial discretion protected by the First Amendment. Likewise, no one would assume that the *New York Times* endorses the advertisements therein, but the *Times* obviously has the right to select and print them. "When a user" watches *Innocence of Muslims* on YouTube, "she has no reason to think that the views expressed there are those of" YouTube, FCC Br. 144, but the First Amendment protects YouTube, *Garcia v. Google, Inc.*, 786 F.3d 733, 747 (9th Cir. 2015) (en banc). All means to

4

distribute mass communications must be protected by the First Amendment or none will.

The FCC's approach opens the door to content regulation. If the FCC can "designate what shall be carried," it can also "determine what shall be excluded," *Ex Parte Jackson*, 96 U.S. 727, 732 (1877), because an order to carry all Internet traffic "operates as a command in the same sense as a statute or regulation forbidding" a carrier "to publish specified matter," *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 256 (1974). If transmitting Internet content is not protected by the First Amendment, nothing would stop the government from requiring broadband providers to block content it deems objectionable.

**4.** Strict scrutiny should apply for the reasons already explained. Because all means of disseminating mass communications are converging on the Internet, the government could suppress the widespread dissemination of information by regulating Internet access.

The FCC offers no persuasive justification for discriminating among "different speakers within a single medium." *Turner*, 512 U.S. at 659. It concedes multiple competitive options exist to access the Internet and that other Internet companies exercise gatekeeper control over their users' ability to access content. "As gatekeepers," YouTube, Apple, Netflix, Facebook, and Twitter "can block access altogether; they can target competitors, including competitors to their own

5

video services; and they can extract unfair tolls." *Order* ¶20(JA3484). Those companies remain free to prefer their own content and block other content they deem offensive.

That the rules foreclose editorial discretion based on the agency's view of what is "harmful" and "legitimate" suggests that they are content based. *Id.* ¶69(JA3498). They are also directly related to the suppression of speech because they bar the exercise of editorial discretion. The FCC banned prioritization because it objects to the message it conveys.

**5.** The rules also fail intermediate scrutiny, which is "tough scrutiny." *Cablevision Sys. Corp. v. FCC*, 597 F.3d 1306, 1323 (D.C. Cir. 2010). Any threat to the open Internet falls short of the evidence in *Turner* that, without must-carry, cable's bottleneck monopoly power would destroy broadcasters. Although *Verizon* deferred to the "virtuous cycle" rationale, intermediate scrutiny is "more demanding," *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1041 (D.C. Cir. 2002), and the Court cannot "rely on…deference," *Cablevision*, 597 F.3d at 1311.

The only interest the prioritization rule remotely advances is "ensuring a level playing field" for speakers, *Order* ¶555(JA3748), but "equalizing" the ability to speak is not a legitimate interest, *Citizens United v. FEC*, 558 U.S. 310, 350 (2010), or an appropriate means to "foster[] the growth of the Internet," *Reno v. ACLU*, 521 U.S. 844, 885 (1997).

6

Because the FCC mistakenly viewed the rules as not burdening "*any* identifiable speech," FCC Br. 152, it made no attempt to tailor them. Instead of banning prioritization, for example, the FCC could have permitted "beneficial" arrangements, *Order* ¶19(JA3484), adopted a reasonableness exception, *e.g.*, 47 U.S.C. §536(a)(3), or reserved judgment, *Order* ¶¶246-47(JA3487-88). The FCC also fails to explain why disclosure rules, which "are among the least intrusive and most effective regulatory measures," could not preserve Internet openness. *Id.* ¶¶154, 169(JA3545, 3552-53) (requiring disclosure of "network practices"). Transparency "curb[s]…incentives" to impose "discriminatory restrictions on access and priority," *id.* ¶563(JA3750), because providers will only disclose "reasonable" practices, *Comcast Order*, 23 F.C.C.R. 13028, ¶53 (2008).

The blocking, throttling, and Internet conduct rules are overbroad because "the compelled carriage obligation applies in all circumstances and with respect to all edge providers." *Verizon*, 740 F.3d at 656. No court has ever "approved a general right of access to the media." *CBS, Inc. v. FCC*, 453 U.S. 367, 396 (1981). The FCC does not explain how compelled carriage of offensive content advances the "virtuous cycle." That a broadband provider is "not prevented…from saying anything it wishe[s]," *Tornillo*, 418 U.S. at 256, because it may speak "in some other place," *Reno*, 521 U.S. at 880, "begs the core question" whether broadband providers can be compelled to carry speech at all, *Tornillo*, 418 U.S. at 256; FCC

7

Br. 154. Because concern about degrading "competitors' content" animates each of the rules, *Order* ¶111, 123, 140(JA3523-24, 3528, 3538), the FCC could have limited the impact on speech—while still preserving Internet openness—by barring impairment of competitors' content, like the 2010 mobile blocking rule, *id.* ¶¶116-18(JA3526-27).

Finally, the Internet conduct rule is so vague that it chills speech. USTelecom Br. 79-81; ACLU Amicus Br. 28-29. The advisory opinion process, *Order* ¶¶229-39(JA3582-85), exacerbates the chill because the only way to avoid scrutiny is to "ask a governmental agency for prior permission to speak," *Citizens United*, 558 U.S. at 335-36.[1]

## II. THE FCC LACKS AUTHORITY TO BAN PRIORITIZATION.

**1.** The FCC relies (at 130) primarily upon Section 706 to ban prioritization, but Section 706 does not authorize *any* rules. *Verizon* suggested that "Section 706 would affirmatively authorize" some rules, *id.*, but that suggestion was unnecessary to the result.

---

[1] Intervenors' passing challenge to Petitioners' standing is meritless. Alamo's standing is self-evident; it is the object of the *Order*. None of the Petitioners must state that they "will in fact violate" the rules, *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2345 (2014), or "show injury to themselves" to bring a facial challenge, *Edwards v. DC*, 755 F.3d 996, 1001 (D.C. Cir. 2014). "The issue presented is a relatively pure legal one that subsequent enforcement proceedings will not elucidate." *Chamber of Commerce v. FEC*, 69 F.3d 600, 604 (D.C. Cir. 1995). Berninger has standing because the *Order* forecloses "the opportunity to purchase" prioritization. *Chamber of Commerce v. SEC*, 412 F.3d 133, 138 (D.C. Cir. 2005).

**2.** The Commission's reliance on Section 201(b) is unavailing because it concedes all prioritization cannot be banned under Section 202(a). FCC Br. 130-33. The specific ban on "unreasonable discrimination" in Section 202(a) controls over the general ban on "unreasonable practices" in Section 201(b) because prioritization is "discriminat[ion]." *Order* ¶¶103, 127(JA3521, 3531-32). If the FCC could prohibit all discrimination as unreasonable under Section 201(b), the specific ban in Section 202(a) would be superfluous. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S.Ct. 2065, 2070-71 (2012). The FCC also ignores that a ban on prioritization arrangements, even beneficial ones, reads the "reasonableness" modifier out of Section 201(b); offers no basis for interpreting "reasonable" differently in adjacent statutes; and fails to provide a reasoned explanation for disavowing previous decisions interpreting Sections 201-202 in parallel. While claiming (at 132) to disavow rate regulation, the FCC sets "a price of $0" for transmitting edge provider traffic, the other half of a two-sided market the FCC again ignores. *Verizon*, 740 F.3d at 653-54, 657-58.

**3.** Regarding Title III, the FCC concedes (at 133 n.47) that the prioritization rule "determine[s] the validity of contracts between licensees and others." *Cellco P'ship v. FCC*, 700 F.3d 534, 543 (D.C. Cir. 2012). The agency cannot escape this "limit on [its] regulatory authority," *id.*, by acting prospectively instead of retroactively.

9

Respectfully submitted,

/s/ *Brett A. Shumate*

| | |
|---|---|
| RICHARD E. WILEY | ANDREW G. MCBRIDE |
| BENNETT L. ROSS | BRETT A. SHUMATE |
| BRETT A. SHUMATE | EVE KLINDERA REED |
| WILEY REIN LLP | WILEY REIN LLP |
| 1776 K Street, N.W. | 1776 K Street, N.W. |
| Washington, D.C. 20006 | Washington, D.C. 20006 |
| (202) 719-7000 | (202) 719-7000 |
| | bshumate@wileyrein.com |
| *Counsel for Daniel Berninger* | *Counsel for Alamo Broadband Inc.* |

Dated: October 13, 2015

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C), as modified by the Court's June 29, 2015 briefing order, I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 32(a)(3)(B) because this brief contains 1,994 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure and Circuit Rule 32(a)(2).

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2010 version of Microsoft Word in 14 point Times New Roman.

　　　　　　　　　　　　　　　　　　/s/ *Brett A. Shumate*

# CERTIFICATE OF SERVICE

I hereby certify that, on October 13, 2015, I electronically filed the foregoing joint brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

　　　　　　　　　　　　　　　 /s/ *Brett A. Shumate*