**RECORD NO. 15-1063(L)**
**CONS. W/15-1078, 15-1086, 15-1090, 15-1091, 15-1092, 15-1095,**
**15-1099, 15-1117, 15-1128, 15-1151, 15-1164**

IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Full Service Network; Truconnect Mobile;
Sage Telecommunications LLC; Telescape Communications Inc.,

*Petitioners,*

v.

Federal Communications Commission;
United States of America,

*Respondents.*

Ad Hoc Telecommunications Users Committee, *et al.*,

*Intervenors for Respondent,*

TechFreedom, *et al.*,

*Movant-Intervenor for Respondent.*

ON APPEAL FROM THE FEDERAL COMMMUNICATIONS COMMISSION

**REPLY BRIEF OF PETITIONERS**
**FULL SERVICE NETWORK, *et al.***

Earl W. Comstock
Robert J. Gastner
Michael A. Graziano
Eckert Seamans Cherin & Mellott, LLC
1717 Pennsylvania Avenue, NW, 12th Floor
Washington, DC 20006
(202) 659-6600
*Counsel for Petitioners*

October 13, 2015

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY OF ABBREVIATIONS ..................................................... v

SUMMARY OF ARGUMENT .............................................................. 1

STANDING ......................................................................................... 3

ARGUMENT ....................................................................................... 6

1. The FCC's Forbearance Was Unlawful .............................................. 6

    A. The FCC Must Follow Its Own Rules .......................................... 6

    B. The NPRM Did Not Meet the Requirements of the APA ............... 8

    C. The FCC's Forbearance was Arbitrary and Capricious ................. 8

2. The Act Compels Classification of Broadband Internet Access Service as Defined in the *Order* as a Telecommunications Service .................. 12

    A. The 1996 Act Adopted the *Computer II* Safeguards .................. 12

        i.  Section 230 Reinforces Common Carrier Regulation of Information Service Transmission ..................................... 12

        ii. The "Prohibition" on Common Carrier Regulation of Information Service Providers Does Not Exist ........................ 13

        iii. Common Carriage Required to Access Rights of Way ............ 15

        iv. The Myth of "Mutual Exclusivity" ................................... 16

        v.  Commercial Mobile Service Limitation .............................. 16

    B. *Brand X* is Not A Bar Because there is No Ambiguity to Interpret ....... 17

i

C. Broadband Internet Access Service as Defined in the *Order* Unambiguously Describes a Telecommunications Service ....................18

    i.   The Definition in the Order is Unambiguous......................................18

    ii.  The FCC and Other Parties Are Debating Definitions That No Longer Apply ....................................................................................19

3. The Order Unlawfully Fails to Apply Definitions in the Act............................20

4. Section 4(i) of the Act Does Not Allow the FCC to Issue Rules or Enforce Other Acts of Congress ........................................................................................21

5. Section 706 Does Not Grant Independent Regulatory or Enforcement Authority ................................................................................................................21

CONCLUSION ................................................................................................................22

CERTIFICATE OF COMPLIANCE................................................................................25

CERTIFICATE OF SERVICE ........................................................................................26

ADDENDUM ..................................................................................................................27

# TABLE OF AUTHORITIES

**\* *Authorities upon which we chiefly rely are marked with asterisks***

## CASES

*America Library Association v. FCC,*
    401 F.3d 489 (DC Cir. 2005)....................................................................4

*Consumer Federation of America v. FCC,*
    348 F.3d 1009 (D.C. Cir. 2003)...............................................................5

*Core Commc'ns, Inc. v. FCC,*
    545 F.3d 1 (D.C. Cir. 2008).....................................................................5

*EarthLink v. FCC,*
    462 F.3d 1 (D.C. Cir. 2006)................................................................9, 10

*International Brotherhood of Electric Workers v. I.C.C.,*
    862 F.2d 330 (D.C. Cir. 1988).................................................................5

\* *Mackey v. Lanier Collection Agency & Serv., Inc.,*
    486 U.S. 825 (1988)...............................................................................12

\* *National Cable & Telecomm. Association v.*
    *Brand X Internet Services,*
    545 U.S. 967 (2005)..............................................................14, 18, 20

\* *Service v. Dulles,*
    354 U.S. 363 (1957).................................................................................6

\* *Southwestern Bell Corp. v. FCC,*
    43 F.3d 1515 (1995) ...............................................................................1

*Telecomm. Research & Action Ctr. v. F.C.C.,*
    917 F.2d 585 (D.C. Cir. 1990).................................................................6

*Time Warner Telecom, Inc. v. FCC,*
    507 F.3d 205 (3d Cir. 2007) ..................................................................20

*United States v. Western Electric Co.*,
    907 F.2d 160 (D.C. Cir. 1990)........................................................................13

\* *Utility Air Regulatory Grp. v. E.P.A.*,
    134 S. Ct. 2427 (2014)..................................................................................9

\* *Verizon Communications Inc. v. FCC*,
    740 F.3d 623 (DC Cir. 2014)........................................................................21

## STATUTES

\* 47 U.S.C. § 151........................................................................3, 13, 20
  47 U.S.C. § 153(11)....................................................................15, 17
\* 47 U.S.C. § 153(24)....................................................................16, 19
\* 47 U.S.C. § 153(50)....................................................................19
\* 47 U.S.C. § 153(51)....................................................2, 12, 14, 17
\* 47 U.S.C. § 154(i)......................................................................3, 21
  47 U.S.C. § 160..........................................................................2, 9
  47 U.S.C. § 160(a)......................................................................9
  47 U.S.C. § 160(c)......................................................................7
  47 U.S.C. § 214..........................................................................16
  47 U.S.C. § 224..........................................................................16
  47 U.S.C. § 230..........................................................................2, 12
\* 47 U.S.C. § 230(b)(2).................................................................2, 12
\* 47 U.S.C. § 251..........................................................................4, 6
  47 U.S.C. § 251(b)......................................................................9
  47 U.S.C. § 251(c)......................................................................9
  47 U.S.C. § 271..........................................................................4, 23
  47 U.S.C. §§ 251 - 261................................................................23
  47 U.S.C. §§ 271 - 274................................................................23
  47 U.S.C. § 332(c)......................................................................2
  47 U.S.C. § 332(c)(1)(a).............................................................16, 17
  47 U.S.C. § 332(c)(2).................................................................17
  47 U.S.C. § 332(c)(7).................................................................16
  47 U.S.C. § 541(a)......................................................................16
  47 U.S.C. § 541(c)......................................................................15, 17
  47 U.S.C. § 571 - 573.................................................................23
  47 U.S.C. § 1302........................................................................6, 11

# REGULATIONS

\* 47 C.F.R. § 1.54 .................................................................................7
\* 47 C.F.R. § 64.702(a) ...........................................................13, 15, 16

# ADMINISTRATIVE MATERIALS

*Deployment of Wireline Services Offering Advanced Telecommunications,*
13 F.C.C. Rcd 24012 (1998) ..............................................................4, 10

*Federal-State Joint Board on Universal Service,* Report to Congress*,*
*13 FCC Rcd 11501 (1998) (2009)* .........................................................16

*Petition to Establish Procedural Requirements to Govern Proceedings*
*for Forbearance*, Report and Order, 24 FCC Rcd. 9543 (2009) ...........6, 7

*Protecting the Open Internet*, Notice of Proposed Rulemaking,
29 F.C.C. Rcd 5561 (2014) ....................................................................8

*Second Computer Inquiry, 77 F.C.C. 2d 384 (1980)* .............................15

# GLOSSARY

| | |
|---|---|
| 1996 Act | Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56. |
| Act | Communications Act of 1934, June 19, 1934, 48 Stat. 1064, *codified generally at* 47 U.S.C. §§ 151 – 620. |
| *Advanced Services Order* | *Deployment of Wireline Services Offering Advanced Telecommunications,* 13 FCC Rcd. 24012 (1998) |
| APA | Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* |

| | |
|---|---|
| AT&T | Intervenors for Respondents in Case No. 15-1151. |
| *AT&T Brief* | *Joint Brief for Intervenors in Support of Respondents in Case No. 15-1151* (September 21, 2015). |
| *Brand X* | *Nat'l. Cable & Telecomm. Ass'n. v. Brand X Internet Serv's.*, 545 U.S. 967 (2005). |
| Broadband Internet Access Service | A "mass market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all Internet endpoints." *Order* ¶ 187 (J.A. 3558) |
| *Broadband NOI* | *Framework for Broadband Internet Service,* Notice of Inquiry, 25 FCC Rcd. 7866 (2010) |
| *Chevron* | *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). |
| Cogent | Intervenors in Support of Respondents in Case No. 15-1063. |
| *Cogent Brief* | *Joint Brief for Intervenors Cogent Communications, Inc., Comptel, Dish Network Corporation, Free Press, Netflix, Inc., Open Technology Institute, New America, Public Knowledge, et al, in Support of the FCC* (September 21, 2015) |

| | |
|---|---|
| *Computer II* | *Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry)*, 77 F.C.C.2d 384 (1980), *aff'd sub nom. Computer & Communications Indus. Ass'n*, 693 F.2d 198 (D.C. Cir. 1982). |
| FCC | Federal Communications Commission |
| FSN | Petitioners Full Service Network, Truconnect Mobile, Sage Telecommunications, and Telescape Communications. |
| *FSN Brief* | *Revised Opening Brief of Petitioners Full Service Network, et al.* |
| *Forbearance Order* | *In the Matter of Petition to Establish Procedural Requirements to Govern Proceedings for Forbearance*, Report and Order, 24 FCC Rcd. 9543 (2009). |
| *FSN Feb. 3 Ex Parte* | Correspondence filed by the Petitioners with the FCC in the underlying proceeding on February 3, 2015 (JA 3220 - 3248) |
| JA | Joint Appendix |
| *NPRM* | Notice of Proposed Rulemaking, *Protecting and Promoting the Open Internet,* 29 FCC Rcd. 5561 (2014) (JA 53 - 151). |

| | |
|---|---|
| *Order* | Report and Order on Remand, Declaratory Ruling, and Order, *Protecting and Promoting the Open Internet,* 30 FCC Rcd. 5601 (2015) (JA 3477 – 3876). |
| *Stevens Report* | *Federal-State Joint Board on Universal Service,* Report to Congress, 13 FCC Rcd 11501 (1998). |
| Title II | Title II of the Communications Act of 1934, 47 U.S.C. §§ 201 – 261. |
| USTelecom | United States Telecom Association, National Cable Telecommunications Association (NCTA), Cellular Telecommunications Industry Association (CTIA), American Cable Association (ACA), Wireless Internet Service Providers Association (WISPA), AT&T, and CenturyLink. |
| *USTelecom Brief* | *Joint Brief of Petitioners USTelecom, NCTA, CTIA, ACA, WISPA, AT&T, and CenturyLink* (July 30, 2015) |
| *Verizon* | *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014) |

## SUMMARY OF ARGUMENT

This Court held "the FCC cannot abandon the legislative scheme because it thinks it has a better idea."  *Sw. Bell Corp. v. FCC*, 43 F.3d 1515, 1516 (1995).  Congress adopted a detailed plan for local competition in the 1996 Act that the FCC has for more than a decade abandoned under its "light touch" policy.  *FCC Brief* at 133.  As the FCC admits, *Order* at ¶ 330 (JA 3619), their predictive judgment "cannot be reconciled with marketplace realities."  It is time to enforce the legislative scheme.

Full Service Network *et al* ("FSN")  first address the spurious standing challenge made by AT&T.[1]  FSN's believes its standing is evident from the record and its initial brief.

FSN then addresses the response of the parties to each argument in the order they appear in our initial brief.

On the forbearance rules the FCC argues for a dual standard and did not rebut FSN's judicial precedent that the rules apply to the FCC.

The FCC did not identify the basis for its forbearance under the APA; it relied on "considerable comment" that it did not identify or explain.

---

[1] This reply follows the FCC brief format for naming parties (e.g., "AT&T" and "*AT&T Brief*" for the Joint Brief of Intervenors in Support of Respondents in Case No. 15-1151).

The FCC's case on point regarding "geographic markets" demonstrates that its predictive judgment has failed. This Court should apply more recent Supreme Court precedent to the analysis of "geographic markets" in 47 U.S.C. § 160.

Parties' arguments about 47 U.S.C. § 230 reinforce FSN's point that the absence of a definition of "information service provider" is "significant." Further the word "preserve" in section 230(b)(2) supports FSN's point that well-settled law in 1996 required information service to be offered over common carrier facilities.

AT&T was the only party to respond to FSN's argument that 47 U.S.C. § 153(51) only prohibits common carrier regulation of information service provided by a telecommunications carrier. AT&T's argument demonstrates FSN is correct. FSN then rebuts AT&Ts allegation this would result in all communications services being subject to common carriage.

FSN then addresses the myth of "mutual exclusivity" asserted by AT&T and the FCC and rebuts AT&T's claim that 47 U.S.C. § 332(c) bars common carrier treatment of information service as well.

The FCC argues that *Brand X* is a bar to FSN's plain language argument. However, the parties' arguments demonstrate that FSN's plain

language argument is correct and *Brand X* is not a bar because the Supreme Court addressed an ambiguous definition that is not at issue in this case.

FSN argued that the definition of broadband Internet access service in the *Order* only described a telecommunications service. No party demonstrated that any part of the *Order* definition constitutes "information processing." As a result the *Order* definition describes a single "stand-alone" offering of telecommunications and *Brand X* is not a bar. The other parties are debating definitions in *Brand X* and later orders that do not apply.

FSN argued that 47 U.S.C. § 151 requires the FCC to apply definitions in the Act. No party rebutted this argument.

FSN argued the *Order* asserts authority under 47 U.S.C. § 154(i) that is contrary to statute and judicial precedent. No party rebutted this argument.

FSN respectfully maintains that *Verizon* can be distinguished. Should *stare decisis* apply then it seems the classification holding would also apply because the service definition is unambiguous and unchanged.

## STANDING

Full Service Network, Truconnect Mobile, Sage Telecommunications, and Telescape Communications (collectively "FSN") are competitive

carriers who provide telecommunications service to thousands of residential and small business customers in 12 states using the resale and unbundled network element provisions of 47 U.S.C. §§ 251 and 271 that Congress adopted expressly to promote competition in local telecommunications services. *See Deployment of Wireline Servs. Offering Advanced Telecommunications*, 13 FCC Rcd. 24012, 24046, ¶ 73 (1998) ("Sections 251(c) and 271 are cornerstones of the framework Congress established in the 1996 Act to open local markets to competition.").

AT&T's unsupported assertions notwithstanding, *AT&T Brief* at 6 and 12 – 13, FSN's standing is self-evident from the record below and its opening brief. *See FSN Feb. 3 Ex Parte* at 1 (JA 3220) and *FSN Brief* at 4, 8, 13, and 21.

Neither the FCC nor Cogent raised any question of standing for FSN. Despite the self-serving nature of the AT&T challenge, FSN "respond[s] with precision and clarity." *Am. Library Ass'n v. FCC*, 401 F. 3d 489, 495 (DC Cir. 2005)

Full Service Network is a reseller of telecommunications services in Pennsylvania. Truconnect Mobile, Sage Telecommunications, and Telscape Communications (collectively "Truconnect") is one of the Nation's largest

competitive local exchange carriers and provides local, long distance and Internet access service in 12 states. *FSN Feb. 3 Ex Parte* at 1 (JA 3220).

Both Full Service Network and Truconnect use 47 U.S.C. § 251 to obtain resale or unbundled network elements to compete with incumbent providers of broadband Internet access service.[2] *FSN Brief* at 4, 8, and 13.

The *Order* directly harms FSN in two ways. Broadband Internet access service, as defined in the *Order*, is a telecommunications service. This means that incumbent providers of broadband Internet access service would now be subject to 47 U.S.C. § 251 but for the forbearance in the *Order. See Consumer Fed'n of Am. v. FCC*, 348 F.3d 1009, 1011-12 (D.C. Cir. 2003); *see also Core Commc'ns, Inc. v. FCC*, 545 F.3d 1, 3 (D.C. Cir. 2008)(noting that the petitioners' standing would have been clear but for an unusual situation created by the Commission's failure to respond to a remand from this Court).

The *Order* also improperly expands the FCC's authority to FSN's detriment. *See Int'l Bhd. of Elec. Workers v. I.C.C.*, 862 F.2d 330, 334 (D.C. Cir. 1988). If upheld the *Order* would expand the FCC's discretion to

---

[2] The term "broadband" is not defined in the Act or the *Order.* As a result any Internet access service other than dial-up Internet access service qualifies as "broadband Internet access service." *See Order* at ¶ 187 (JA 3558)(excluding "dial-up Internet access").

reclassify broadband Internet access service yet again or forbear under 47 U.S.C. § 1302 with the result that FSN would be denied the use of 47 U.S.C. § 251. The cases cited by AT&T did not involve such an implication. *See e.g.*, *Telecomm. Research & Action Ctr. v. F.C.C.*, 917 F.2d 585, 588 (D.C. Cir. 1990)("If this case had involved a challenge…to a broad statement of agency policy, or an agency rule, then we would be faced with an entirely different situation.").

FSN's requested relief would allow FSN to use 47 U.S.C. § 251 to compete in the provision of all broadband Internet access services. The intervention of AT&T confirms that they too believe redress by this Court can be provided.

## ARGUMENT

### 1. The FCC's Forbearance Was Unlawful

#### A.    The FCC Must Follow Its Own Rules

The *FCC Brief* (at 133 – 142) did not cite any judicial authority to rebut the Supreme Court's holding that agencies are bound to follow their own rules. *Service v. Dulles,* 354 U.S. 363, 372 (1957). Nor did it offer any statutory support. Instead the *FCC Brief* offered a single passing reference in the *Forbearance Order. FCC Brief* at 141.

The FCC's position amounts to this: if a carrier submits a petition pursuant to the statute then the rules apply, but if a carrier gets the FCC to ask for petitions the rules do not apply.   That is precisely the case here, as AT&T's assertions of the linkage between reclassification and forbearance attest.  *See AT&T Brief* 21 – 23.  The *NPRM* asked commenters to "list and explain" which provisions should be forborne, "provide justification for the forbearance" and "define the relevant geographic and product markets" which "should receive forbearance." *Compare NPRM* at ¶154 (JA 108) with 47 C.F.R. § 1.54*.*  The carriers that benefit from forbearance then commented, *Order* at ¶ 495 (JA 3715), only without bearing the same burden of proof that would apply if they filed directly.  *See Forbearance Order,* 24 FCCR 9543 at 9951 ¶14 and 9956 ¶¶ 21 (discussing burden of proof).

The FCC's lone new argument is that the rules are needed for everyone else because of the one-year deadline in 47 U.S.C. § 160(c).  *FCC Brief* at 141, n. 50.  That might be a plausible argument but for one salient fact.  The FCC acted well within the one-year time frame.  It issued the *NPRM* on May 15, 2014 and adopted the *Order* on February 26, 2015.

Finally, the FCC asserts that it has "regularly" acted on its own motion without complying with the *Forbearance Order*.  *FCC Brief* at 141,

n. 51.  Two actions since 2009 stretches the meaning of "regularly" and neither was adjudicated.

### B.     The NPRM Did Not Meet the Requirements of the APA

The *FCC Brief* mischaracterized FSN's argument on the APA and did not address the issue FSN raised.  *FCC Brief* at 142 – 143.  FSN argued that the APA requires the agency to identify the *basis* on which it proposes to take an action.   *FSN Brief* at 13.  The FCC's response is that the FCC "had received considerable comment" in the 2010 *Broadband NOI* to which the *NPRM* directed parties.  *FCC Brief* at 143.  But no one could discern the import of those "considerable comments" because the three paragraphs in the *NPRM* contained no information on which comments the FCC found a compelling basis for action four years later. *See NPRM* at ¶¶ 153 – 155 (JA 107 - 108).

### C.     The FCC's Forbearance was Arbitrary and Capricious

The FCC asserts, wrongly, that FSN argued forbearance "can be granted *only* on the basis of competition."  *FCC Brief* at 135 (emphasis in original).  The FCC then proceeds, *FCC Brief* at 136 – 138, to knock down their straw man.

8

FSN argued that the statutory language requires that the FCC apply the three-part test in 47 U.S.C. § 160(a) "*in the definition and context of that provision in the Act*" and that with respect to 47 U.S.C. §§ 251(b) and 251(c) that context is local.  *FSN Brief* at 14 (emphasis in original).  The FCC responded with *EarthLink v. FCC*, 462 F.3d 1 (D.C. Cir. 2006).  *FCC Brief* at 138.

*EarthLink* did reject the argument that "geographic markets" precluded a decision to forbear on a nationwide basis.  However, that panel reached its conclusion by examining only 47 U.S.C. § 160, saying –

> "[o]n its face, the statute imposes no particular mode of market analysis or level of geographic rigor.  *See* 47 U.S.C. §160(a)(requiring forbearance in 'any or some of [a carrier's] geographic markets' if three conditions are met)… *Earthlink,* 462 F.3d at 8.

 The Court did not apply the broader statutory analysis that the Supreme Court has applied in more recent decisions, in particular *Util. Air Regulatory Grp. v. E.P.A.*, 134 S. Ct. 2427, 2441 (2014).   This Court should consider the statutory phrase "geographic markets" in 47 U.S.C. § 160(a) not in isolation, but in the context of 47 U.S.C. §§ 251(b) and (c).  In the context of section 251 the clear "public interest" expressed by Congress was to use resale, unbundled network elements and interconnection to bring lower rates

and better service to consumers by enabling *local* competition. *See Advanced Services Order*, 13 FCC Rcd. 24012, 24046 ¶ 73 (1998) (Section 251 a "cornerstone" of local competition).

The FCC argues that section 251 and the other provisions Congress expressly adopted to promote local competition "create 'disincentives for broadband deployment' so forbearance is in 'the interests of customers ... and the public interest more generally.'" *FCC Brief* at 139. This is the same rationale the FCC gave a decade ago in *Earthlink*, saying –

> "Ultimately, the FCC concluded that any short-term effects on competition are offset by the prospect of increased intermodal competition and the benefits that forbearance would provide: incentives for both ILECs and CLECs to invest in and deploy broadband facilities, which will increase competition going forward and thereby keep rates reasonable, benefit consumers, and serve the public interest." *EarthLink,* 462 F.3d at 208.

As the FCC admits its prior predictions of "vibrant intermodal competition" that justified its classification and forbearance decisions "cannot be reconciled with marketplace realities." *Order* at 330 (JA 3619). Further, the FCC can point to no evidence that its policies have resulted in broadband deployment beyond business as usual; Verizon recently

10

announced it has ceased deploying residential fiber entirely.  *FSN Feb. 3 Ex Parte* at 26, n. 107 (JA 3245).

47 U.S.C. § 1302(a) also says that State Commissions and the FCC "shall encourage the deployment" of advanced telecommunications capability through "measures that promote competition in the local telecommunications market."  There is nothing new or developing about the broadband Internet access service market twenty years after passage of the 1996 Act.  The FCC's insistence on ignoring the Congressional structure in favor of its own "light touch" policy, notwithstanding the failure of that policy to achieve its predicted results after more than a decade, is clearly arbitrary and capricious.  *FSN Brief* at 18 – 20.

Finally, because the statute compels the classification, AT&T's argument that reclassification and forbearance are not severable is irrelevant. *AT&T Brief* at 21 – 23.

**2.    The Act Compels Classification of Broadband Internet Access Service as Defined in the *Order* as a Telecommunications Service**

    **A.    The 1996 Act Adopted the *Computer II* Safeguards**

        **i.    Section 230 Reinforces Common Carrier Regulation of Information Service Transmission**

USTelecom and AT&T assert that the Congressional policy statement in 47 U.S.C. § 230(b)(2) and the statutory definition of "telecommunications service" at 47 U.S.C. § 153(51) prohibit common carrier treatment of "information service" and therefore information service providers. *See, e.g. USTelecom Brief* at 12, 24, 30, 33; *AT&T Brief* at 9, 10, 15.

As the FCC explains, 47 U.S.C. § 230 provides protection from liability for "interactive computer service" providers who block offensive material on the Internet.  *See FCC Brief* at 58 – 59.

In addition, section 230 reinforces two key arguments FSN made. First, 47 U.S.C. § 230 of the Act shows Congress knew how to define services and providers involved in the Internet and information processing. This means the Congressional omission of "information service providers" is "significant." *See FSN Brief* at 24 – 26 and 39 (citing *Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 837 (1988)).

Second, the word "preserve" in 47 U.S.C. § 230(b)(2) necessarily refers to maintaining the well-settled law at the time.  That law required

information services to be offered "over common carrier transmission

facilities."  47 C.F.R. § 64.702(a).  *See FSN Brief* at 24.  The FCC reinforced

this point, *FCC Brief* at 61, citing *United States v. Western Electric Co.*, 907

F.2d. 160 (D.C. Cir. 1990).  In that case this Court held that the

"telecommunications" component of "information service" under the

consent decree must be regulated separately as a "telecommunications

service."  *Id.* at 907 F.2d 163.

### ii.     The "Prohibition" on Common Carrier Regulation of Information Service Providers Does Not Exist

FSN argued 47 U.S.C. § 151 only exempts information service

offered by a telecommunications carrier from Title II.  *FSN Brief* at 24 – 26.

AT&T was the only party to respond to FSN's argument.  In doing so they

baldy misrepresent FSN's arguments and the statutory text.

AT&T asserts that FSN contends "every information service includes

a common-carrier telecommunications service" and Congress defined "all

information services to be provided via a 'telecommunications service.'"

*AT&T Brief* at 9.  AT&T provided no cite to FSN's brief and FSN never

made either statement.  What FSN said is "under the Congressional

formulation, only an information service provided by a telecommunications

carrier is prohibited from being regulated as a common carrier service under the Act." *FSN Brief* at 24.

AT&T also asserts that "only telecommunications services can be subject to common-carrier regulation" and cites 47 U.S.C. § 153(51) in support. *AT&T Brief* at 9. The text of 47 U.S.C. § 153(51) demonstrates AT&T is wrong. The relevant portion of the definition states "A telecommunications carrier shall be treated as a common carrier under this Act only to the extent it is engaged in providing telecommunications service…." The defined term "telecommunications carrier" is the key. A "telecommunications carrier" is "any provider of telecommunications service." *Id.*

Under the plain language of the statute the limitation on common carrier treatment only applies to an entity that is providing "telecommunications service." That is precisely the service that *Brand X* held was not being provided. *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 989 (2005). If an information service provider is not offering telecommunications service, then that information service provider is not a "telecommunications carrier" and the "prohibition" AT&T asserts by its own terms does not apply. 47 U.S.C. § 153(51).

14

### iii.    Common Carriage Required to Access Rights of Way

This result does not mean, as AT&T alleges FSN claims (*AT&T Brief* at 10), that "all communications services are subject to common carriage." Broadcasting and cable service are "communications services" and Congress exempted both from common carrier treatment.  *FSN Brief* at 25 (citing 47 U.S.C. §§ 153(11) and 541(c)).

More importantly, 47 C.F.R. § 64.702(a) remains in effect, so any information service provider that purchases its "telecommunications" input at tariff from itself or anyone else has a regulatory exemption from Title II. Congress sanctioned the *Computer II* "forbearance" from all Title II regulation for *non-facilities based* information service providers by leaving 47 C.F.R. § 64.702(a) intact in 1996 while modifying or repealing other FCC regulations.[3]  *See* 1996 Act, 110 Stat. 56 (1996) at 110 (modifying broadcast regulations) and 124 (eliminating video dialtone regulations).

Only a public offering of "information service" for hire by a provider using its own facilities would qualify for common carrier treatment.  *See* 47 U.S.C. § 153(11) (defining "common carrier").  This is not an odd result when one considers, *FSN Brief* at 38, that an information service provider needs access to rights of way, poles, and tower sites to build a network that

---

[3] *Order* at ¶ 188 (JA 3558) does not undermine this statement.  *See Computer II*, 77 FCC 2d. 384, 417 ¶ 87 (1980).

serves the public.  Under the Act that access is limited to "common carriers," "telecommunications carriers," "commercial mobile service providers," and "cable operators."  *See* 47 U.S.C. §§ 214, 224, 332(c)(7), and 541(a).  No party offered a rebuttal to this important point.

### iv.    The Myth of "Mutual Exclusivity"

The FCC and AT&T both repeat the myth, started by the FCC, that "Congress intended the categories of 'information service' and 'telecommunications service' to be 'mutually exclusive.'"  *FCC Brief* at 13 and *AT&T Brief* at 10 (citing to the *Stevens Report* ¶ 13).  Like the *Stevens Report*, the FCC and AT&T cite to no statutory language to support that assertion because there is none. *Id.*  The Act's definition of "information service" and the FCC's definition of "enhanced service" in fact prove the opposite; both definitions are *dependent* on transmission services that under the statute and regulation retain their independent identity.  *See* 47 U.S.C. § 153(24) and 47 C.F.R. § 64.702(a).

### v.    Commercial Mobile Service Limitation

Finally, AT&T points out that FSN did not address the definition of commercial mobile service.  *AT&T Brief* at 11.  There was no need to.  That language says that a "person" providing commercial mobile service shall be treated as a common carrier to the extent of that service.  *See* 47 U.S.C. §

16

332(c)(1)(a).  AT&T implies the language prohibits common carrier treatment of any other service offered by a commercial mobile service provider, but it does not.  Congress would have used the formulation in 47 U.S.C. § 153(51), discussed *supra,* had it intended to do that.  When Congress wants to prohibit common carrier treatment of a service it says so directly.  *See* 47 U.S.C. §§ 153(11), 332(c)(2) and 541(c).

**B.** **$Brand X$ is Not A Bar Because There is No Ambiguity to Interpret**

FSN argued *Brand X* is not a bar because of later Supreme Court precedent on statutory construction.  *FSN Brief* at 27.  FSN also argued that the definition of broadband Internet access service in the *Order* describes only a telecommunications service so the statute controls.  *FSN Brief* at 28 – 30.  As discussed in the next section, the arguments of the FCC and the other parties demonstrate that FSN's plain language argument is correct.  The Supreme Court addressed a *different definition* of broadband Internet access service in *Brand X* and the ambiguity present in that definition is absent in this case.

## C.     Broadband Internet Access Service as Defined in the *Order* Unambiguously Describes a Telecommunications Service

### i.     The Definition in the Order is Unambiguous

The FCC asserts in a footnote (*FCC Brief* at 49, n. 18) that *Brand X* precludes FSN's plain language argument.  *FSN Brief* at 28 – 30.  The FCC is mistaken.  The extensive discussion of *Brand X* in the briefs demonstrates that a different definition of broadband Internet access service was at issue in that case.  *See FCC Brief* at 50 – 58, *USTelecom Brief* at 41 – 46, and *Cogent Brief* at 19 - 25.

The Supreme Court held that "telecommunications service" was ambiguous because the definition could be construed to require a "stand-alone" offering of telecommunications. *Brand X,* 545 US at 989.  That ambiguity is not present here.  The *Order* describes the offering of only one "stand-alone" service: data transmission to and from substantially all Internet endpoints.  *Order* at ¶ 187 (JA 3558).

The *Order* defines "broadband Internet access service" as "a mass-market retail service by wire or radio that provides the capability to transmit data to and from substantially all Internet end-points…" *Id.*

An "Internet endpoint" is simply a technology-limited subset of the statutory phrase "points specified by the user" in the definition of "telecommunications."  *See* 47 U.S.C § 153(50).  "Telecommunications" necessarily includes the information processing needed for the user to successfully specify the points and to enable delivery of the transmission "between or among" those points.  *Id.*

The FCC's definition does not even remotely suggest an offering that meets the statutory definition of "information service."  47 U.S.C. § 153(24). None of the other parties discuss "Internet endpoints" as offering information processing to users.

### ii.     The FCC and Other Parties Are Debating Definitions That No Longer Apply

The FCC's changing policy goals obscure what they defined in the *Order*.   The FCC refers to "the transmission component of broadband Internet access service" as if there are still "information processing" components in the definition.  *See FCC Brief* at 31, 35, and 58.  Since 2010 the definition has only included the transmission component, i.e. the "capability to transmit data," but the FCC carries on as if the definition describes more.  *See FCC Brief* at 30 (broadband Internet access service "includes an offering of telecommunications.").

19

The confusion stems from the vague definitions of "cable modem service" and "wireline broadband Internet access service" upheld as ambiguous. *Compare Brand X,* 545 U.S. at 987 ("[c]able modem service … provides consumers with the comprehensive capability for manipulating information using the Internet") and *Time Warner Telecom, Inc. v. FCC*, 507 F.3d 205, 217 (3d Cir. 2007) ("wireline broadband Internet access service combines computer processing, information provision, and computer interactivity with data transport") with the definition in the *Order, ¶* 187 (JA 3558). Those vague definitions are entirely different from, and not relevant to, the clearly defined service at issue in this case.

**3.      The Order Unlawfully Fails to Apply Definitions in the Act**

No party addressed, much less rebutted, FSN' argument that section 1 of the Act, 47 U.S.C. § 151, requires the FCC to apply the definitions and provisions of the Act. *FSN Brief* at 30 - 34. The FCC's failure to do so was arbitrary and capricious and the Court should remand the *Order* with appropriate instructions to the FCC.

4.    **Section 4(i) of the Act Does Not Allow the FCC to Issue Rules or Enforce Other Acts of Congress.**

FSN demonstrated that the FCC's repeated assertions in the *Order* of authority under 47 U.S.C. § 154(i) to implement and enforce other Acts of Congress conflict with the statute and judicial precedent. *FSN Brief* at 34 – 36. Surprisingly, no party, not even the FCC, offered any argument to rebut FSN. The Court should vacate the section 4(i) assertions in the *Order* to constrain the FCC's power to the bounds set by Congress.

5.    **Section 706 Does Not Grant Independent Regulatory or Enforcement Authority**

The FCC argues that this Court's decision in *Verizon* forecloses FSN's arguments. *FCC Brief* at 49, n. 17. As a result the FCC offers no rebuttal to petitioner's statutory analysis or judicial precedents. FSN respectfully maintains their position that the case is distinguishable on the facts. *FSN Brief* at 36 - 39.

Should this Court find that *stare decisis* does apply, it is not evident why it would not also apply to the Court's holding in *Verizon* that broadband Internet access service is an information service. *Verizon,* 740 F.3d 623, 632 - 633 (DC Cir. 2014). That holding determined the outcome in the case. *Id.*

at 650. The definition was exactly the same. *See Order* at ¶¶ 187 – 189 (JA 3558 - 3560)(stating the FCC is continuing to use its 2010 definitions of "broadband Internet access service" and "mass market."). There is no ambiguity in the definition that would allow changed "facts" to bear on the statutory classification.


## CONCLUSION

In a nutshell, the FCC is asking this Court to affirm that it has the authority to turn regulation on and off like a light switch. It can decide that the exact same service is either an information service or a telecommunications service under the Act, thus exempting that service entirely from Title II or applying Title II, depending on its "assessment" of how consumers "perceive" that service. In the alternative, it can simply decide under section 706 of the 1996 Act that "broadband" services are not being reasonably and timely deployed to all Americans, and presto, it has basically carte blanche to regulate or not regulate as it sees fit. Given these two sweeping alternative delegations of authority that the FCC claims Congress adopted *in the same statute*, it is difficult to fathom why Congress included forbearance authority in the statute as well, much less why Congress spent four years debating and drafting the detailed scheme it

adopted to ensure local competition in both telecommunications and cable

services.  *See* 47 U.S.C. §§ 251 – 261, 271 -274, and 571 – 573.  It was the

presence of substantial local competition that Congress intended would

enable market forces to allow removal of regulation.

Even though the *Order* would return the incumbents to limited

common carrier regulation "for now," the "light touch" regime sought by the

FCC would eliminate through forbearance all of the provisions Congress

expressly added in 1996 to enable FSN and other new entrants to compete

and provide consumers with the benefits of local competition.  To uphold the

FCC would be to elevate the FCC's policy above Congress.  That would

make a mockery of the statute and be an abuse of *Chevron* deference.  The

Court should grant FSN's requested relief (*FSN Brief* at 40).

Respectfully submitted,

_____\s\Earl Comstock_____

Earl W. Comstock
Robert J. Gastner
Michael A. Graziano
Eckert Seamans Cherin
& Mellott, LLC
1717 Pennsylvania Avenue, NW
12th Floor
Washington, DC 20006
(202) 659-6600
*Counsel for Petitioners Full Service*
*Network, Sage Telecommunications,*
*Telscape Communications, and*
*TruConnect Mobile*

Dated: October 13, 2015

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 32(a)(3)(B) because this brief contains 4,497 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure and Circuit Rule 32(a)(2).

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2010 version of Microsoft Word in 14 point Times New Roman.

 \s\   Earl Comstock

## CERTIFICATE OF SERVICE

I hereby certify that I have this 13th day of October, 2015,

electronically filed the Final Reply Brief of Petitioner Full Service Network,

*et al* in the Office of the  Clerk  of  the  United  States  Court  of  Appeals

for  the  District  of  Columbia  Circuit  using  the  Court's  CM/ECF system

which  will  send  notification  of  such filing to all counsel of record

October 13, 2015

/s/    Earl W. Comstock
Earl W. Comstock
Robert J. Gastner
Michael A. Graziano
Eckert Seamans Cherin
& Mellott, LLC
1717 Pennsylvania Avenue, NW
12th Floor
Washington, DC 20006
(202) 659-6600

# ADDENDUM

# STATUTORY AND REGULATORY ADDENDUM

47 U.S.C. § 151 ...................................................................ADD-3

47 U.S.C. § 153 ...................................................................ADD-3

47 U.S.C. § 154 ...................................................................ADD-5

47 U.S.C. § 160 ...................................................................ADD-5

47 U.S.C. § 201 ...................................................................ADD-7

47 U.S.C. § 214 ...................................................................ADD-8

47 U.S.C. § 224 ...................................................................ADD-9

47 U.S.C. § 230 .................................................................ADD-10

47 U.S.C. § 251 .................................................................ADD-10

47 U.S.C. § 252 .................................................................ADD-15

47 U.S.C. § 254 .................................................................ADD-16

47 U.S.C. § 257 .................................................................ADD-17

47 U.S.C. § 271 .................................................................ADD- 17

47 U.S.C. § 332 .................................................................ADD-20

47 U.S.C. § 541 .................................................................ADD-20

47 U.S.C. § 573 .................................................................ADD-21

47 U.S.C. § 1302 ...............................................................ADD-24

47 C.F.R. § 1.54 ................................................................ADD-25

47 C.F.R. § 8.2 ........................................................................................ADD-27

47 C.F.R. § 64.702 ..................................................................................ADD-28

## 47 U.S.C. § 151

For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

## 47 U.S.C. § 153

For the purposes of this chapter, unless the context otherwise requires—

***

(11) Common carrier

The term "common carrier" or "carrier" means any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter; but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier.

***

(24) Information service

The term "information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making

available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

\*\*\*

(32) Local exchange carrier

The term "local exchange carrier" means any person that is engaged in the provision of telephone exchange service or exchange access. Such term does not include a person insofar as such person is engaged in the provision of a commercial mobile service under section 332(c) of this title, except to the extent that the Commission finds that such service should be included in the definition of such term.

\*\*\*

(50) Telecommunications

The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

(51) Telecommunications carrier

The term "telecommunications carrier" means any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 226 of this title). A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services, except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage.

\*\*\*

(53) Telecommunications service

The term "telecommunications service" means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.

(54) Telephone exchange service

The term "telephone exchange service" means (A) service within a telephone exchange, or within a connected system of telephone exchanges within the same exchange area operated to furnish to subscribers intercommunicating service of the character ordinarily furnished by a single exchange, and which is covered by the exchange service charge, or (B) comparable service provided through a system of switches, transmission equipment, or other facilities (or combination thereof) by which a subscriber can originate and terminate a telecommunications service.

\*\*\*

## 47 U.S.C. § 154

\*\*\*

(i) Duties and powers

The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions.

\*\*\*

## 47 U.S.C. § 160

(a) Regulatory flexibility

Notwithstanding section 332(c)(1)(A)  of this title, the Commission shall forbear from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of its or their geographic markets, if the Commission determines that--

(1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that

telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

(2) enforcement of such regulation or provision is not necessary for the protection of consumers; and

(3) forbearance from applying such provision or regulation is consistent with the public interest.

(b) Competitive effect to be weighed

In making the determination under subsection (a)(3) of this section, the Commission shall consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services. If the Commission determines that such forbearance will promote competition among providers of telecommunications services, that determination may be the basis for a Commission finding that forbearance is in the public interest.

(c) Petition for forbearance

Any telecommunications carrier, or class of telecommunications carriers, may submit a petition to the Commission requesting that the Commission exercise the authority granted under this section with respect to that carrier or those carriers, or any service offered by that carrier or carriers. Any such petition shall be deemed granted if the Commission does not deny the petition for failure to meet the requirements for forbearance under subsection (a) of this section within one year after the Commission receives it, unless the one-year period is extended by the Commission. The Commission may extend the initial one-year period by an additional 90 days if the Commission finds that an extension is necessary to meet the requirements of subsection (a) of this section. The Commission may grant or deny a petition in whole or in part and shall explain its decision in writing.

(d) Limitation

Except as provided in section 251(f) of this title, the Commission may not forbear from applying the requirements of section 251(c) or 271 of this title under subsection (a) of this section until it determines that those requirements have been fully implemented.

(e) State enforcement after commission forbearance

A State commission may not continue to apply or enforce any provision of this chapter that the Commission has determined to forbear from applying under subsection (a) of this section.

## 47 U.S.C. § 201

(a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: Provided further, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: Provided further, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

## 47 U.S.C. § 214

### § 214. Extension of lines or discontinuance of service; certificate of public convenience and necessity

(a) Exceptions; temporary or emergency service or discontinuance of service; changes in plant, operation or equipment

No carrier shall undertake the construction of a new line or of an extension of any line, or shall acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line: *Provided*, That no such certificate shall be required under this section for the construction, acquisition, or operation of (1) a line within a single State unless such line constitutes part of an interstate line, (2) local, branch, or terminal lines not exceeding ten miles in length, or (3) any line acquired under section 221 of this title: *Provided further*, That the Commission may, upon appropriate request being made, authorize temporary or emergency service, or the supplementing of existing facilities, without regard to the provisions of this section. No carrier shall discontinue, reduce, or impair service to a community, or part of a community, unless and until there shall first have been obtained from the Commission a certificate that neither the present nor future public convenience and necessity will be adversely affected thereby; except that the Commission may, upon appropriate request being made, authorize temporary or emergency discontinuance, reduction, or impairment of service, or partial discontinuance, reduction, or impairment of service, without regard to the provisions of this section. As used in this section the term "line" means any channel of communication established by the use of appropriate equipment, other than a channel of communication established by the interconnection of two or more existing channels: *Provided, however*, That nothing in this section shall be construed to require a certificate or other authorization from the Commission for any installation, replacement, or other changes in plant, operation, or equipment, other than new construction, which will not impair the adequacy or quality of service provided.

***

(c) Approval or disapproval; injunction

The Commission shall have power to issue such certificate as applied for, or to refuse to issue it, or to issue it for a portion or portions of a line, or extension thereof, or discontinuance, reduction, or impairment of service, described in the

ADD-8

application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. After issuance of such certificate, and not before, the carrier may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, extension, acquisition, operation, or discontinuance, reduction, or impairment of service covered thereby. Any construction, extension, acquisition, operation, discontinuance, reduction, or impairment of service contrary to the provisions of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, the State commission, any State affected, or any party in interest.

\*\*\*

## 47 U.S.C. 224

### § 224. Pole attachments

(a) Definitions

As used in this section:

**(1)** The term "utility" means any person who is a local exchange carrier or an electric, gas, water, steam, or other public utility, and who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications. Such term does not include any railroad, any person who is cooperatively organized, or any person owned by the Federal Government or any State.

**(2)** The term "Federal Government" means the Government of the United States or any agency or instrumentality thereof.

**(3)** The term "State" means any State, territory, or possession of the United States, the District of Columbia, or any political subdivision, agency, or instrumentality thereof.

**(4)** The term "pole attachment" means any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility.

**(5)** For purposes of this section, the term "telecommunications carrier" (as defined in section 153 of this title) does not include any incumbent local exchange carrier as defined in section 251(h) of this title.

(b) Authority of Commission to regulate rates, terms, and conditions; enforcement powers; promulgation of regulations

**(1)** Subject to the provisions of subsection (c) of this section, the Commission shall regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable, and shall adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms, and conditions. For purposes of enforcing any determinations resulting from complaint procedures established pursuant to this subsection, the Commission shall take such action as it deems appropriate and necessary, including issuing cease and desist orders, as authorized by section 312(b) of this title.

**(2)** The Commission shall prescribe by rule regulations to carry out the provisions of this section.

****

## 47 U.S.C. § 230

***

(f) Definitions

As used in this section:

(1) Internet

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

***

## 47 U.S.C. § 251

(a) General duty of telecommunications carriers

Each telecommunications carrier has the duty--

(1) to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers; and

(2) not to install network features, functions, or capabilities that do not comply with the guidelines and standards established pursuant to section 255 or 256 of this title.

(b) Obligations of all local exchange carriers

Each local exchange carrier has the following duties:

(1) Resale

The duty not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of its telecommunications services.

(2) Number portability

The duty to provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission.

(3) Dialing parity

The duty to provide dialing parity to competing providers of telephone exchange service and telephone toll service, and the duty to permit all such providers to have nondiscriminatory access to telephone numbers, operator services, directory assistance, and directory listing, with no unreasonable dialing delays.

(4) Access to rights-of-way

The duty to afford access to the poles, ducts, conduits, and rights-of-way of such carrier to competing providers of telecommunications services on rates, terms, and conditions that are consistent with section 224 of this title.

(5) Reciprocal compensation

The duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications.

(c) Additional obligations of incumbent local exchange carriers

In addition to the duties contained in subsection (b) of this section, each incumbent local exchange carrier has the following duties:

(1) Duty to negotiate

The duty to negotiate in good faith in accordance with section 252 of this title the particular terms and conditions of agreements to fulfill the duties described in paragraphs (1) through (5) of subsection (b) of this section and this subsection. The requesting telecommunications carrier also has the duty to negotiate in good faith the terms and conditions of such agreements.

(2) Interconnection

The duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network--

(A) for the transmission and routing of telephone exchange service and exchange access;

(B) at any technically feasible point within the carrier's network;

(C) that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection; and

(D) on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title.

(3) Unbundled access

The duty to provide, to any requesting telecommunications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title. An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service.

(4) Resale

The duty--

(A) to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers; and

(B) not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of such telecommunications service, except that a State commission may, consistent with regulations prescribed by the Commission under this section, prohibit a reseller that obtains at wholesale rates a telecommunications service that is available at retail only to a category of subscribers from offering such service to a different category of subscribers.

(5) Notice of changes

The duty to provide reasonable public notice of changes in the information necessary for the transmission and routing of services using that local exchange carrier's facilities or networks, as well as of any other changes that would affect the interoperability of those facilities and networks.

(6) Collocation

The duty to provide, on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, for physical collocation of equipment necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier, except that the carrier may provide for virtual collocation if the local exchange carrier demonstrates to the State commission that physical collocation is not practical for technical reasons or because of space limitations.

(d) Implementation

(1) In general

Within 6 months after February 8, 1996, the Commission shall complete all actions necessary to establish regulations to implement the requirements of this section.

(2) Access standards

In determining what network elements should be made available for purposes of subsection (c)(3) of this section, the Commission shall consider, at a minimum, whether--

(A) access to such network elements as are proprietary in nature is necessary; and

(B) the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer.

(3) Preservation of State access regulations

In prescribing and enforcing regulations to implement the requirements of this section, the Commission shall not preclude the enforcement of any regulation, order, or policy of a State commission that--

(A) establishes access and interconnection obligations of local exchange carriers;

(B) is consistent with the requirements of this section; and

(C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.

***

(g) Continued enforcement of exchange access and interconnection requirements

On and after February 8, 1996, each local exchange carrier, to the extent that it provides wireline services, shall provide exchange access, information access, and exchange services for such access to interexchange carriers and information service providers in accordance with the same equal access and nondiscriminatory interconnection restrictions and obligations (including receipt of compensation) that apply to such carrier on the date immediately preceding February 8, 1996 under any court order, consent decree, or regulation, order, or policy of the Commission, until such restrictions and obligations are explicitly superseded by regulations prescribed by the Commission after February 8, 1996. During the period beginning on February 8, 1996 and until such restrictions and obligations are so superseded, such restrictions and obligations shall be enforceable in the same manner as regulations of the Commission.

(h) "Incumbent local exchange carrier" defined

(1) Definition

For purposes of this section, the term "incumbent local exchange carrier" means, with respect to an area, the local exchange carrier that--

(A) on February 8, 1996, provided telephone exchange service in such area; and

(B)(i) on February 8, 1996, was deemed to be a member of the exchange carrier association pursuant to section 69.601(b) of the Commission's regulations (47 C.F.R. 69.601(b)); or

(ii) is a person or entity that, on or after February 8, 1996, became a successor or assign of a member described in clause (i).

\*\*\*

(i) Savings provision

Nothing in this section shall be construed to limit or otherwise affect the Commission's authority under section 201 of this title.

## 47 U.S.C. § 252

(a) Agreements arrived at through negotiation

(1) Voluntary negotiations
Upon receiving a request for interconnection, services, or network elements pursuant to section 251 of this title, an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251 of this title. The agreement shall include a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement. The agreement, including any interconnection agreement negotiated before February 8, 1996, shall be submitted to the State commission under subsection (e) of this section.

(2) Mediation

Any party negotiating an agreement under this section may, at any point in the negotiation, ask a State commission to participate in the negotiation and to mediate any differences arising in the course of the negotiation.

(b) Agreements arrived at through compulsory arbitration

(1) Arbitration

During the period from the 135th to the 160th day (inclusive) after the date on which an incumbent local exchange carrier receives a request for negotiation under this section, the carrier or any other party to the negotiation may petition a State commission to arbitrate any open issues.

\*\*\*

## 47 U.S.C. § 254

(a) Procedures to review universal service requirements

(1) Federal-State Joint Board on universal service

Within one month after February 8, 1996, the Commission shall institute and refer to a Federal-State Joint Board under section 410(c) of this title a proceeding to recommend changes to any of its regulations in order to implement sections 214(e) of this title and this section, including the definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for completion of such recommendations. In addition to the members of the Joint Board required under section 410(c) of this title, one member of such Joint Board shall be a State-appointed utility consumer advocate nominated by a national organization of State utility consumer advocates. The Joint Board shall, after notice and opportunity for public comment, make its recommendations to the Commission 9 months after February 8, 1996.

(2) Commission action

The Commission shall initiate a single proceeding to implement the recommendations from the Joint Board required by paragraph (1) and shall complete such proceeding within 15 months after February 8, 1996. The rules established by such proceeding shall include a definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for implementation. Thereafter, the Commission shall complete any proceeding to implement subsequent recommendations from any Joint Board on universal service within one year after receiving such recommendations.

\*\*\*

## 47 U.S.C. § 257

(a) Elimination of barriers

Within 15 months after February 8, 1996, the Commission shall complete a proceeding for the purpose of identifying and eliminating, by regulations pursuant to its authority under this chapter (other than this section), market entry barriers for entrepreneurs and other small businesses in the provision and ownership of telecommunications services and information services, or in the provision of parts or services to providers of telecommunications services and information services.

(b) National policy

In carrying out subsection (a) of this section, the Commission shall seek to promote the policies and purposes of this chapter favoring diversity of media voices, vigorous economic competition, technological advancement, and promotion of the public interest, convenience, and necessity.

(c) Periodic review

Every 3 years following the completion of the proceeding required by subsection (a) of this section, the Commission shall review and report to Congress on--

(1) any regulations prescribed to eliminate barriers within its jurisdiction that are identified under subsection (a) of this section and that can be prescribed consistent with the public interest, convenience, and necessity; and

(2) the statutory barriers identified under subsection (a) of this section that the Commission recommends be eliminated, consistent with the public interest, convenience, and necessity.

## 47 U.S.C. § 271

### §271. Bell operating company entry into interLATA services
### (a) General limitation
Neither a Bell operating company, nor any affiliate of a Bell operating company, may provide interLATA services except as provided in this section.

\*\*\*

**(c) Requirements for providing certain in-region interLATA services**
**(1) Agreement or statement**
A Bell operating company meets the requirements of this paragraph if it meets the requirements of subparagraph (A) or subparagraph (B) of this paragraph for each State for which the authorization is sought.
**(A) Presence of a facilities-based competitor**
A Bell operating company meets the requirements of this subparagraph if it has entered into one or more binding agreements that have been approved under section 252 of this title specifying the terms and conditions under which the Bell operating company is providing access and interconnection to its network facilities for the network facilities of one or more unaffiliated competing providers of telephone exchange service (as defined in section 153(47)(A) [1] of this title, but excluding exchange access) to residential and business subscribers. For the purpose of this subparagraph, such telephone exchange service may be offered by such competing providers either exclusively over their own telephone exchange service facilities or predominantly over their own telephone exchange service facilities in combination with the resale of the telecommunications services of another carrier. For the purpose of this subparagraph, services provided pursuant to subpart K of part 22 of the Commission's regulations (47 C.F.R. 22.901 et seq.) shall not be considered to be telephone exchange services.
**(B) Failure to request access**
A Bell operating company meets the requirements of this subparagraph if, after 10 months after February 8, 1996, no such provider has requested the access and interconnection described in subparagraph (A) before the date which is 3 months before the date the company makes its application under subsection (d)(1) of this section, and a statement of the terms and conditions that the company generally offers to provide such access and interconnection has been approved or permitted to take effect by the State commission under section 252(f) of this title. For purposes of this subparagraph, a Bell operating company shall be considered not to have received any request for access and interconnection if the State commission of such State certifies that the only provider or providers making such a request have (i) failed to negotiate in good faith as required by section 252 of this title, or (ii) violated the terms of an agreement approved under section 252 of this title by the provider's failure to comply, within a reasonable period of time, with the implementation schedule contained in such agreement.
**(2) Specific interconnection requirements**
**(A) Agreement required**
A Bell operating company meets the requirements of this paragraph if, within the

State for which the authorization is sought-

(i)(I) such company is providing access and interconnection pursuant to one or more agreements described in paragraph (1)(A), or

(II) such company is generally offering access and interconnection pursuant to a statement described in paragraph (1)(B), and

(ii) such access and interconnection meets the requirements of subparagraph (B) of this paragraph.

**(B) Competitive checklist**

Access or interconnection provided or generally offered by a Bell operating company to other telecommunications carriers meets the requirements of this subparagraph if such access and interconnection includes each of the following:

(i) Interconnection in accordance with the requirements of sections 251(c)(2) and 252(d)(1) of this title.

(ii) Nondiscriminatory access to network elements in accordance with the requirements of sections 251(c)(3) and 252(d)(1) of this title.

(iii) Nondiscriminatory access to the poles, ducts, conduits, and rights-of-way owned or controlled by the Bell operating company at just and reasonable rates in accordance with the requirements of section 224 of this title.

(iv) Local loop transmission from the central office to the customer's premises, unbundled from local switching or other services.

(v) Local transport from the trunk side of a wireline local exchange carrier switch unbundled from switching or other services.

(vi) Local switching unbundled from transport, local loop transmission, or other services.

(vii) Nondiscriminatory access to-

(I) 911 and E911 services;

(II) directory assistance services to allow the other carrier's customers to obtain telephone numbers; and

(III) operator call completion services.

(viii) White pages directory listings for customers of the other carrier's telephone exchange service.

(ix) Until the date by which telecommunications numbering administration guidelines, plan, or rules are established, nondiscriminatory access to telephone numbers for assignment to the other carrier's telephone exchange service customers. After that date, compliance with such guidelines, plan, or rules.

(x) Nondiscriminatory access to databases and associated signaling necessary for call routing and completion.

(xi) Until the date by which the Commission issues regulations pursuant to section 251 of this title to require number portability, interim telecommunications number

portability through remote call forwarding, direct inward dialing trunks, or other comparable arrangements, with as little impairment of functioning, quality, reliability, and convenience as possible. After that date, full compliance with such regulations.

(xii) Nondiscriminatory access to such services or information as are necessary to allow the requesting carrier to implement local dialing parity in accordance with the requirements of section 251(b)(3) of this title.

(xiii) Reciprocal compensation arrangements in accordance with the requirements of section 252(d)(2) of this title.

(xiv) Telecommunications services are available for resale in accordance with the requirements of sections 251(c)(4) and 252(d)(3) of this title.

*\*\*\*\*\*

## **47 U.S.C. § 332**

\*\*\*

(d) Definitions

For purposes of this section--

(1) the term "commercial mobile service" means any mobile service (as defined in section 153 of this title) that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public, as specified by regulation by the Commission;

\*\*\*

## **47 U.S.C. § 541**

\*\*\*

(c) Status of cable system as common carrier or utility

Any cable system shall not be subject to regulation as a common carrier or utility by reason of providing any cable service.

\*\*\*

**47 U.S.C. § 573**

(a)  Open video systems
 (1)  Certificates of compliance
A local exchange carrier may provide cable service to its cable service subscribers in its telephone service area through an open video system that complies with this section. To the extent permitted by such regulations as the Commission may prescribe consistent with the public interest, convenience, and necessity, an operator of a cable system or any other person may provide video programming through an open video system that complies with this section. An operator of an open video system shall qualify for reduced regulatory burdens under subsection (c) of this section if the operator of such system certifies to the Commission that such carrier complies with the Commission's regulations under subsection (b) of this section and the Commission approves such certification. The Commission shall publish notice of the receipt of any such certification and shall act to approve or disapprove any such certification within 10 days after receipt of such certification.

 (2)  Dispute resolution
The Commission shall have the authority to resolve disputes under this section and the regulations prescribed thereunder. Any such dispute shall be resolved within 180 days after notice of such dispute is submitted to the Commission. At that time or subsequently in a separate damages proceeding, the Commission may, in the case of any violation of this section, require carriage, award damages to any person denied carriage, or any combination of such sanctions. Any aggrieved party may seek any other remedy available under this chapter.

 (b)  Commission actions
 (1)  Regulations required
Within 6 months after February 8, 1996, the Commission shall complete all actions necessary (including any reconsideration) to prescribe regulations that—

 (A) except as required pursuant to section 531, 534, or 535 of this title, prohibit an operator of an open video system from discriminating among video programming providers with regard to carriage on its open video system, and ensure that the rates, terms, and conditions for such carriage are just and reasonable, and are not unjustly or unreasonably discriminatory;

(B) if demand exceeds the channel capacity of the open video system, prohibit an operator of an open video system and its affiliates from selecting the video programming services for carriage on more than one-third of the activated channel capacity on such system, but nothing in this subparagraph shall be construed to limit the number of channels that the carrier and its affiliates may offer to provide directly to subscribers;

(C) permit an operator of an open video system to carry on only one channel any video programming service that is offered by more than one video programming provider (including the local exchange carrier's video programming affiliate): Provided, That subscribers have ready and immediate access to any such video programming service;

(D) extend to the distribution of video programming over open video systems the Commission's regulations concerning sports exclusivity (47 C.F.R. 76.67), network nonduplication (47 C.F.R. 76.92 et seq.), and syndicated exclusivity (47 C.F.R. 76.151 et seq.); and

(E)
(i) prohibit an operator of an open video system from unreasonably discriminating in favor of the operator or its affiliates with regard to material or information (including advertising) provided by the operator to subscribers for the purposes of selecting programming on the open video system, or in the way such material or information is presented to subscribers;

(ii) require an operator of an open video system to ensure that video programming providers or copyright holders (or both) are able suitably and uniquely to identify their programming services to subscribers;

(iii) if such identification is transmitted as part of the programming signal, require the carrier to transmit such identification without change or alteration; and

(iv) prohibit an operator of an open video system from omitting television broadcast stations or other unaffiliated video programming services carried on such system from any navigational device, guide, or menu.

(2)  Consumer access
Subject to the requirements of paragraph (1) and the regulations thereunder, nothing in this section prohibits a common carrier or its affiliate from negotiating mutually agreeable terms and conditions with over-the-air broadcast stations and

other unaffiliated video programming providers to allow consumer access to their signals on any level or screen of any gateway, menu, or other program guide, whether provided by the carrier or its affiliate.

(c)  Reduced regulatory burdens for open video systems
(1)  In general
Any provision that applies to a cable operator under—

(A) sections 533 (other than subsection (a) thereof), 536, 543(f), 548, 551, and 554 of this title, shall apply,

(B) sections 531, 534, and 535 of this title, and section 325 of this title, shall apply in accordance with the regulations prescribed under paragraph (2), and

(C) sections 532 and 537 of this title, and parts III and IV of this subchapter (other than sections 543 (f), 548, 551, and 554 of this title), shall not apply,

to any operator of an open video system for which the Commission has approved a certification under this section.

(2)  Implementation
(A)  Commission action
In the rulemaking proceeding to prescribe the regulations required by subsection (b)(1) of this section, the Commission shall, to the extent possible, impose obligations that are no greater or lesser than the obligations contained in the provisions described in paragraph (1)(B) of this subsection. The Commission shall complete all action (including any reconsideration) to prescribe such regulations no later than 6 months after February 8, 1996.

(B)  Fees
An operator of an open video system under this part may be subject to the payment of fees on the gross revenues of the operator for the provision of cable service imposed by a local franchising authority or other governmental entity, in lieu of the franchise fees permitted under section 542 of this title. The rate at which such fees are imposed shall not exceed the rate at which franchise fees are imposed on any cable operator transmitting video programming in the franchise area, as determined in accordance with regulations prescribed by the Commission. An operator of an open video system may designate that portion of a subscriber's bill attributable to the fee under this subparagraph as a separate item on the bill.

(3)  Regulatory streamlining

With respect to the establishment and operation of an open video system, the requirements of this section shall apply in lieu of, and not in addition to, the requirements of subchapter II of this chapter.

(4)  Treatment as cable operator

Nothing in this chapter precludes a video programming provider making use of an open video system from being treated as an operator of a cable system for purposes of section 111 of title 17.

(d) "Telephone service area" defined

For purposes of this section, the term "telephone service area" when used in connection with a common carrier subject in whole or in part to subchapter II of this chapter means the area within which such carrier is offering telephone exchange service.

## 47 U.S.C. § 1302

(a) In general

The Commission and each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.

(b) Inquiry

The Commission shall, within 30 months after February 8, 1996, and annually thereafter, initiate a notice of inquiry concerning the availability of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) and shall complete the inquiry within 180 days after its initiation. In the inquiry, the Commission shall determine whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion. If the Commission's determination is negative, it shall take immediate action to accelerate deployment of such

capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market.

(c) Demographic information for unserved areas

As part of the inquiry required by subsection (b), the Commission shall compile a list of geographical areas that are not served by any provider of advanced telecommunications capability (as defined by subsection (d)(1)) and to the extent that data from the Census Bureau is available, determine, for each such unserved area--

(1) the population;

(2) the population density; and

(3) the average per capita income.

(d) Definitions

For purposes of this subsection:1

(1) Advanced telecommunications capability

The term "advanced telecommunications capability" is defined, without regard to any transmission media or technology, as high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology.

(2) Elementary and secondary schools

The term "elementary and secondary schools" means elementary and secondary schools, as defined in section 7801 of Title 20.


**47 C.F.R. § 1.54**

(a) Description of relief sought. Petitions for forbearance must identify the requested relief, including:

(1) Each statutory provision, rule, or requirement from which forbearance is sought.

(2) Each carrier, or group of carriers, for which forbearance is sought.

(3) Each service for which forbearance is sought.

(4) Each geographic location, zone, or area for which forbearance is sought.

(5) Any other factor, condition, or limitation relevant to determining the scope of the requested relief.

(b) Prima facie case. Petitions for forbearance must contain facts and arguments which, if true and persuasive, are sufficient to meet each of the statutory criteria for forbearance.

(1) A petition for forbearance must specify how each of the statutory criteria is met with regard to each statutory provision or rule, or requirement from which forbearance is sought.

(2) If the petitioner intends to rely on data or information in the possession of third parties, the petition must identify:

(i) The nature of the data or information.

(ii) The parties believed to have or control the data or information.

(iii) The relationship of the data or information to facts and arguments presented in the petition.

(3) The petitioner shall, at the time of filing, provide a copy of the petition to each third party identified as possessing data or information on which the petitioner intends to rely.

(c) Identification of related matters. A petition for forbearance must identify any proceeding pending before the Commission in which the petitioner has requested, or otherwise taken a position regarding, relief that is identical to, or comparable to, the relief sought in the forbearance petition. Alternatively, the petition must declare that the petitioner has not, in a pending proceeding, requested or otherwise taken a position on the relief sought.

(d) Filing requirements. Petitions for forbearance shall comply with the filing requirements in § 1.49.

(1) Petitions for forbearance shall be e-mailed to forbearance@fcc.gov at the time for filing.

(2) All filings related to a forbearance petition, including all data, shall be provided in a searchable format. To be searchable, a spreadsheet containing a significant amount of data must be capable of being manipulated to allow meaningful analysis.

(e) Contents. Petitions for forbearance shall include:

(1) A plain, concise, written summary statement of the relief sought.

(2) A full statement of the petitioner's prima facie case for relief.

(3) Appendices that list:

(i) The scope of relief sought as required in § 1.54(a);

(ii) All supporting data upon which the petition intends to rely, including a market analysis; and

(iii) Any supporting statements or affidavits.

(f) Supplemental information. The Commission will consider further facts and arguments entered into the record by a petitioner only:

(1) In response to facts and arguments introduced by commenters or opponents.

(2) By permission of the Commission.

## 47 C.F.R. § 8.2

(a) Broadband Internet access service. A mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all Internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up Internet access service. This term also encompasses any service that the Commission finds to be providing a functional equivalent of the service described

in the previous sentence, or that is used to evade the protections set forth in this part.

(b) Edge provider. Any individual or entity that provides any content, application, or service over the Internet, and any individual or entity that provides a device used for accessing any content, application, or service over the Internet.

(c) End user. Any individual or entity that uses a broadband Internet access service.

(d) Fixed broadband Internet access service. A broadband Internet access service that serves end users primarily at fixed endpoints using stationary equipment. Fixed broadband Internet access service includes fixed wireless services (including fixed unlicensed wireless services), and fixed satellite services.

(e) Mobile broadband Internet access service. A broadband Internet access service that serves end users primarily using mobile stations.

(f) Reasonable network management. A network management practice is a practice that has a primarily technical network management justification, but does not include other business practices. A network management practice is reasonable if it is primarily used for and tailored to achieving a legitimate network management purpose, taking into account the particular network architecture and technology of the broadband Internet access service.

## 47 C.F.R. § 64.702

(a) For the purpose of this subpart, the term enhanced service shall refer to services, offered over common carrier transmission facilities used in interstate communications, which employ computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information; provide the subscriber additional, different, or restructured information; or involve subscriber interaction with stored information. Enhanced services are not regulated under title II of the Act.

***